IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ROME DIVISION

|  |  |
|---|---|
| EARL PARRIS, JR.<br><br>Individually, and on behalf of a Class of persons similarly situated,<br><br>     Plaintiff,<br><br>        v.<br><br>3M COMPANY, et al.,<br><br>     Defendants. | CIVIL ACTION FILE<br>NO. 4:21-CV-40-TWT |

**OPINION AND ORDER**

This is a water pollution case. It is before the Court on Proposed Intervenor-Plaintiff City of Summerville's Amended Motion to Intervene [Doc. 84], Defendant Daikin America, Inc.'s Motion to Dismiss [Doc. 86], Defendant Mount Vernon Mills, Inc.'s Motion to Dismiss [Doc. 87], Defendant Ryan Dejuan Jarrett's Motion to Dismiss [Doc. 88], Defendant 3M Company's Motion to Dismiss [Doc. 89], Defendant Town of Trion's Motion to Dismiss [Doc. 90], Defendant Huntsman International, LLC's Motion to Dismiss [Doc. 91], Defendant Pulcra Chemicals, LLC's Motion to Dismiss [Doc. 92], the Plaintiff's Motion for Leave to File Sur-Reply [Doc. 114], and Defendant 3M Company

and Daikin America, Inc.'s Motion to Strike [Doc. 128]. For the reasons set forth below, the Court GRANTS Proposed Intervenor-Plaintiff City of Summerville's Amended Motion to Intervene [Doc. 84], DENIES Defendant Daikin America, Inc.'s Motion to Dismiss [Doc. 86], GRANTS in part and DENIES in part Defendant Mount Vernon Mills, Inc.'s Motion to Dismiss [Doc. 87], DENIES Defendant Ryan Dejuan Jarrett's Motion to Dismiss [Doc. 88], DENIES Defendant 3M Company's Motion to Dismiss [Doc. 89], DENIES Defendant Town of Trion's Motion to Dismiss [Doc. 90], DENIES Defendant Huntsman International, LLC's Motion to Dismiss [Doc. 91], DENIES Defendant Pulcra Chemicals, LLC's Motion to Dismiss [Doc. 92], DENIES as moot the Plaintiff's Motion for Leave to File Sur-Reply [Doc. 114], and DENIES Defendant 3M Company and Daikin America, Inc.'s Motion to Strike [Doc. 128].

## I.  Background

This case arises out of the contamination of surface waters and drinking water in Chattooga County, Georgia, with per- and polyfluoroalkyl substances, known as "PFAS." (Am. Compl. ¶ 1.) PFAS are a group of synthetic chemicals that have been used since the 1940s in a wide array of industrial and commercial applications. (*Id.* ¶¶ 38, 39, 55.) Their commercial usefulness is the product of strong carbon-fluorine bonds, which make PFAS highly stable, oil- and water-repellant, and resistant to heat and chemical reactions. (*Id.* ¶ 38.)

However, these same properties also make PFAS persistent in the environment, with no known natural processes to break them down. (*Id.* ¶¶ 38, 39.) PFAS are also highly mobile and water soluble and can leach from soil into groundwater, making groundwater and surface waters particularly vulnerable to contamination. (*Id.*) Once in the environment, these chemicals are absorbed into biota, ingested by humans via drinking water, and bioaccumulate with repeated exposure. (*Id.* at ¶¶ 39, 41.) As PFAS build up and distribute throughout the human body, they can cause long-term physiologic alterations and damage to the blood, liver, kidneys, immune system, and other organs. (*Id.* ¶ 41.) Some of the human diseases associated with PFAS exposure include immunotoxicity, cancer, thyroid disease, ulcerative colitis, and high cholesterol. (*Id.* ¶ 42.)

The Plaintiff Earl Parris, Jr., is a resident of Summerville, Georgia, who receives running, potable water to his home from the Summerville Public Works and Utilities Department. (*Id.* ¶ 21.) Summerville uses Raccoon Creek, a tributary of the Chattooga River, as the main source of its municipal water supply. (*Id.*) But the Plaintiff alleges that Raccoon Creek—and consequently his household water—has been contaminated with PFAS by the Defendants. (*Id.*) According to the First Amended Complaint ("Complaint"), the contamination started with four corporations referred to collectively as the "Manufacturing Defendants": 3M Company ("3M"), Daikin America, Inc.

3

("Daikin"), Huntsman International, LLC ("Huntsman"), and Pulcra Chemicals, LLC ("Pulcra"). Allegedly, the Manufacturing Defendants have for decades manufactured and supplied the PFAS that are being discharged into Raccoon Creek and pumped into the Summerville water system. (*Id.* ¶¶ 5, 29-33, 63, 68.) The Plaintiff asserts that the Manufacturing Defendant have long known about the risks associated with the use and disposal of PFAS. (*Id.* ¶¶ 55-72.)

The next stop in the flow of PFAS is Defendant Mount Vernon Mills, Inc. ("Mount Vernon"). Mount Vernon is a South Carolina corporation that has owned and operated a textile mill in Trion, Georgia, for at least 35 years. (*Id.* ¶¶ 24, 33.) During this time, Mount Vernon has purchased products containing PFAS, including Perfluorooctanesulfonic Acid ("PFOS") and Perfluorooctanoic Acid ("PFOA"), from the Manufacturing Defendants to make water- and stain-resistant fabrics. (*Id.* ¶¶ 33, 34, 63, 68.) The PFAS used at the mill is discharged via wastewater into the Trion Water Pollution Control Plant ("Trion WPCP"), which is owned and operated by Defendant Town of Trion ("Trion") pursuant to a National Pollutant Discharge Elimination System ("NPDES") permit. (*Id.* ¶¶ 33-35, 37.) However, the Trion WPCP is not capable of degrading the PFAS in Mount Vernon's wastewater, so these chemicals end up being discharged as effluent into the Chattooga River or applied as sludge to land in the Raccoon Creek watershed. (*Id.*) Since 1992, Trion has disposed

4

of nearly 8,000 tons of PFAS-contaminated sludge in the watershed, including on property owned by Defendant Ryan Dejuan Jarrett ("Jarrett"). (*Id.* ¶ 36.)

Between November 2019 and December 2020, the United States Environmental Protection Agency ("EPA") and the Environmental Protection Division of the Georgia Department of Natural Resources ("EPD") repeatedly discovered high levels of PFAS, including PFOA, PFOS, and short-chain PFAS, in Raccoon Creek. (*Id.* ¶¶ 74-78.) PFAS was also found in Summerville's treated water in January 2020; at 98 parts per trillion ("ppt"), the combined PFOA and PFOS levels in the water exceeded the EPA Drinking Water Health Advisory and other federal, state, and independent guidelines. (*Id.* ¶ 79.) Based on these sampling results, Summerville notified its water users to stop drinking or cooking with municipal water. (*Id.*) In October 2020, Summerville installed a temporary treatment system consisting of a pit in the ground filled with granulated activated carbon. (*Id.* ¶ 82.) Samples taken after installation, though, continued to show PFOA and PFOS of 24 ppt and 15 ppt, respectively, in treated water. (*Id.* ¶ 83.) According to the Complaint, Summerville's temporary treatment system is not effectively removing PFOA, PFOS, or short-chain PFAS from the water supply and thus has not eliminated the health and safety risk to the Plaintiff and other water users. (*Id.*)

The Plaintiff attributes the contamination of Raccoon Creek and his household water to Trion's land application of PFAS-contaminated sludge. (*Id.*

5

¶¶ 74, 87.) He further asserts that this threat is ongoing because Mount Vernon continues to discharge high levels of PFAS into the Trion WPCP, and because significant amounts of PFAS-contaminated sludge remain on properties in the Raccoon Creek watershed. (*Id.* ¶¶ 34, 87.) All the while, the Manufacturing Defendants have allegedly known that PFAS cannot be removed from industrial wastewater by conventional treatment processes, and that it is unsafe to dispose of PFAS through land application or effluent discharges. (*Id.* ¶¶ 60, 61.) The Plaintiff cites a number of internal studies conducted by the Manufacturing Defendants and their predecessors that found PFAS to be persistent, mobile, bioaccumulative, and toxic. (*Id.* ¶¶ 54-59, 63-69.) Allegedly, the Manufacturing Defendants communicated these findings within the industry, including to PFAS users like Mount Vernon, but concealed their knowledge from the public and government agencies. (*Id.* ¶¶ 70, 72.) In any event, the persistence and toxicity of PFAS have been widely published since at least 2000. (*Id.* ¶ 70.)

Though not identified in the Complaint, multiple Defendants direct the Court's attention to a Consent Decree executed between the EPD and Trion on April 13, 2020. (Trion's Br. in Supp. of Trion's Mot. to Dismiss, Ex. 2.) Generally, a district court must convert a motion to dismiss into a motion for summary judgment if it considers materials outside the complaint. *Day v. Taylor*, 300 F.3d 1272, 1275-76 (11th Cir. 2005). However, the Court finds that

the Consent Order is an exception to the rule because it is central to the Plaintiff's claims and its authenticity is undisputed. *Id.* at 1276. The Consent Order states that

> the land application of biosolids (i.e., sludge) by [Trion] from the Trion WPCP at multiple locations in the Raccoon Creek Watershed in Chattooga County is contributing to the levels of PFOA and PFOS in Raccoon Creek and consequently in the finished water from the City of Summerville's Raccoon Creek drinking water treatment plant[.]

(Trion's Br. in Supp. of Trion's Mot. to Dismiss, Ex. 2 at 6-7.) It further declares that sludge disposal has contributed to violations of section 391-3-6-.03(5)(e) of the Georgia Water Quality Rules, and requires, among other things, that Trion "immediately cease land applying biosolids in the Raccoon Creek Watershed[.]" (Id. at 7-8.)

As a result of the contamination of Raccoon Creek and Summerville's water supply, the Plaintiff alleges that he and a proposed class of Summerville water subscribers ("Proposed Class Members") have suffered numerous damages. (Am. Compl. ¶ 146.) Specifically, the Complaint seeks to recover for personal property damages—based on harm to household water—and real property damages—based on the diminution of property values, interference with the use and enjoyment of property, and upset, annoyance, and inconvenience. (*Id.* ¶¶ 88, 89.) The Plaintiff further alleges that he and the Proposed Class Members have paid surcharges and rate increases to recoup Summerville's PFAS removal efforts, and have incurred expenses to obtain

7

alternative water supplies. (*Id.* ¶ 90.) The Plaintiff raises four federal-law claims on his own behalf under the Clean Water Act ("CWA") and the Resource Conservation and Recovery Act ("RCRA") and six state-law claims on behalf of the Proposed Class Members for negligence, negligence per se, negligent failure to warn, wanton conduct and punitive damages, public nuisance, and abatement of public nuisance. He requests compensatory damages as well as an order to cease and remediate the sources of PFAS in Raccoon Creek and to provide an effective treatment system for Summerville's water supply. Now, the Defendants move separately to dismiss all of the claims against them, and the City of Summerville ("Summerville") seeks to intervene as a plaintiff in this case.

## II.   Legal Standard

A complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); Fed. R. Civ. P. 12(b)(6). A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. *Quality*

8

*Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983); *see also Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination"). Generally, notice pleading is all that is required for a valid complaint. *Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555).

### III.   Discussion

In their Motions to Dismiss, the Defendants raise numerous defenses to the Plaintiff's claims—some common to all or multiple claims and others specifically tailored to the elements of individual claims. This Order begins with a discussion of the broadly applicable defenses, turns next to the claim-specific defenses, and then closes by addressing Summerville's Motion to Intervene.

## A. Defenses Common to All or Multiple Claims

### 1. Sovereign Immunity

In a less than one-page section, Trion argues that all of the claims against it should be dismissed on sovereign immunity grounds. (Trion's Br. in Supp. of Trion's Mot. to Dismiss, at 5.) According to Trion, municipal

corporations are protected by sovereign immunity pursuant to Article IX, Section II, Paragraph IX of the Georgia Constitution, unless that immunity is waived by the General Assembly. (*Id.* at 5.) Trion also claims to be immune from liability for damages insofar as the Plaintiff seeks litigation expenses, remediation costs, or other monetary relief in his claims. (*Id.* at 6.) The Plaintiff counters that his CWA and RCRA claims remain viable because both statutes "expressly authorize citizen suits against municipalities like Trion," and because municipalities do not receive sovereign immunity under the Eleventh Amendment of the United States Constitution. (Pl.'s Br. in Opp'n to Trion's Mot. to Dismiss, at 4-6.) The Plaintiff further reasons that his abatement claim seeks only injunctive relief, not damages, and thus does not implicate Trion's purported immunity. (*Id.* at 6.)

Under the "citizen suit" provisions of the CWA and RCRA, a private individual "may commence a civil action on his own behalf—(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of [the Act]." 33 U.S.C. § 1365(a)(1); *see also* 42 U.S.C. § 6972(a)(1)(B). In relevant part, a "person" is defined as a "State, municipality, commission, or political subdivision of a State, or any interstate body," 33 U.S.C. § 1362(5); 42 U.S.C. § 6903(15), and a "municipality" is further defined as a "city, town, borough, county, parish,

district, association, or other public body created by or pursuant to State law and having jurisdiction over disposal of sewage, industrial wastes, or other wastes." 33 U.S.C. § 1362(4); 42 U.S.C. § 6903(13). Even though the CWA and RCRA specifically authorize citizen suits against states and municipalities, their citizen suit provisions operate only "to the extent permitted by the eleventh amendment to the Constitution." 33 U.S.C. § 1365(a)(1); 42 U.S.C. § 6972(a)(1)(B). Based on this language, several courts have held that the statutes "do not unequivocally express Congress's intent to abrogate sovereign immunity and subject states to suit." *Burnette v. Carothers*, 192 F.3d 52, 57 (2d Cir. 1999) (collecting cases). Therefore, the Eleventh Amendment precludes federal jurisdiction in citizen suits against unconsenting states.

Trion contends that, like a state, it too is entitled to Eleventh Amendment immunity because the Georgia Constitution confers sovereign immunity on municipalities. (Reply Br. in Supp. of Trion's Mot. to Dismiss, at 2-3.) What this argument fails to appreciate, however, is that "federal law, not state law . . . ultimately governs whether an entity is immune under the Eleventh Amendment." *Lightfoot v. Henry Cnty. Sch. Dist.*, 771 F.3d 764, 771 (11th Cir. 2014). Longstanding Supreme Court precedent makes clear that "the bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances, *but does not extend to counties and similar municipal corporations.*" *Mt. Healthy City Sch. Dist. Bd. of Educ.*

11

*v. Doyle*, 429 U.S. 274, 280 (1977) (emphasis added) (citation omitted); *see also*

*Lightfoot*, 771 F.3d at 768 (noting the Eleventh Amendment "does not . . .

extend to counties, municipal corporations, or similar political subdivisions of

the state"). Nor does the Eleventh Amendment prevent an award of damages

against a municipality. *Hutton v. Strickland*, 919 F.3d 1531, 1542 (11th Cir.

1990). Accordingly, "the Court has consistently refused to construe the

Amendment to afford protection to political subdivisions such as counties and

municipalities, even though such entities exercise a slice of state power." *Hess*

*v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 43 (1994) (quotation marks

and citation omitted). In sum, Trion is not insulated from the Plaintiff's CWA

and RCRA claims by its state-law sovereign immunity.[1]

## 2. Article III Standing

Jarrett and Trion move to dismiss the CWA and RCRA claims against

them on the grounds that the Plaintiff has not adequately pleaded Article III

---

[1] Trion also cannot rely on its state-law immunity as a defense to liability under the CWA or RCRA. "Municipal defenses—including an assertion of sovereign immunity—to a federal right of action are, of course, controlled by federal law." *Abusaid v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 405 F.3d 1298, 1314-15 (11th Cir. 2005) (quoting *Howlett v. Rose*, 496 U.S. 356, 376 (1990)). "By including municipalities within the class of 'persons' subject to liability for violations of [the CWA and RCRA], Congress—the supreme sovereign on matters of federal law—abolished whatever vestige of the State's sovereign immunity the municipality possessed." *Id.* at 1315 (quoting *Howlett*, 496 U.S. at 376).

standing. (Jarrett's Br. in Supp. of Jarrett's Mot. to Dismiss, at 7-9, 11-12;
Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 14-15.)
Jarrett contends that, because the Plaintiff is one of many people who consume
Summerville's municipal water, there is no "particularized allegation of injury
different from the public at large sufficient to support standing." (Jarrett's Br.
in Supp. of Jarrett's Mot. to Dismiss, at 7.) Jarrett and Trion further claim that
the Consent Order between the EPD and Trion has eliminated any "continuing
and redressable CWA violation to provide . . . standing to the Plaintiff[.]" (*Id.*
at 9.) According to the Plaintiff, these arguments mischaracterize the
applicable requirements and burden to show standing at the pleading stage of
the litigation. (Pl.'s Br. in Opp'n to Jarrett's Mot. to Dismiss, at 4.) He argues
that PFAS contamination causes a concrete, particularized injury to his
property interest in safe domestic water. (*Id.* at 5.) He also asserts that recent
sampling results and the continued presence of PFAS-contaminated sludge in
the watershed make out "a good faith allegation of ongoing CWA violations in
order for jurisdiction to attach." (*Id.* at 9-10.)

> To satisfy Article III's standing requirements,
>
> a plaintiff must show (1) it has suffered an "injury in fact" that is
> (a) concrete and particularized and (b) actual or imminent, not
> conjectural or hypothetical; (2) the injury is fairly traceable to the
> challenged action of the defendant; and (3) it is likely, as opposed
> to merely speculative, that the injury will be redressed by a
> favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 180-81 (2000). "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-40 (2016) (emphasis omitted). Importantly, "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance. The victims' injuries from a mass tort, for example, are widely shared, to be sure, but each individual suffers a particularized harm." *Id.* at 339 n.7. At the motion-to-dismiss stage, "general factual allegations of injury resulting from the defendant's conduct may suffice" to demonstrate standing because those general allegations are presumed to embrace the specific facts needed to support them. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

As to the injury-in-fact element, the Plaintiff alleges that Summerville supplies water from Raccoon Creek to his home for drinking, bathing, cooking, and other domestic purposes; however, Raccoon Creek has been and continues to be contaminated with PFAS due to the Defendants' acts and omissions. (Am. Compl. ¶ 21.) Consequently, the sole source of running, potable water to the Plaintiff's home is contaminated with PFAS, posing a risk to his health and safety and interfering with the use and enjoyment of his property. (*Id.* ¶¶ 21, 83.) In another water pollution case, the Eleventh Circuit held that an injury-in-fact existed where individuals were similarly "exposed to threats to their

health by drinking water from and using affected areas." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1280 (11th Cir. 2015). On the issue of redressability, the Plaintiff alleges that significant amounts of PFAS-contaminated sludge remain in the Raccoon Creek watershed, and that this sludge continues to discharge toxic chemicals for decades after disposal. (Am. Compl. ¶¶ 40, 87.) He also claims that Summerville's current treatment system cannot effectively remove PFAS from the water supply. (*Id.* ¶ 83.) These allegations support that the Defendants' violations are ongoing and redressable by a favorable decision. Therefore, the Court denies Jarrett's and Mount Vernon's Motions to Dismiss on standing grounds.

### 3. Shotgun Pleading

Huntsman alone moves to dismiss the Complaint on the grounds that it is an impermissible shotgun pleading. (Huntsman's Br. in Supp. of Huntsman's Mot. to Dismiss, at 8-10.) Mainly, Huntsman faults the Plaintiff for pleading facts and claims against the Manufacturing Defendants as a group rather than making individual allegations against each of them. (*Id.* at 8.) According to Huntsman, this pleading method prevents it from "identifying which alleged wrongful acts were committed, or alleged states of mind were possessed, by each of those four defendants." (*Id.*) The Plaintiff counters that Federal Rule of Civil Procedure 8 allows a plaintiff to group together multiple

defendants, and that many of his allegations against the other Manufacturing Defendants can be imputed to Huntsman based on their communications. (Pl.'s Br. in Opp'n to Huntsman's Mot. to Dismiss, at 6-7.)

"[U]nder the liberal requirements of notice pleading, no technical forms of pleading are required." *Crowe v. Coleman*, 113 F.3d 1536, 1539 (11th Cir. 1997). "[A] plaintiff may plead claims against multiple defendants by referring to them collectively, for example by referring to a group of defendants as 'defendants.' These collective allegations are construed as applying to each defendant individually." *Sprint Solutions, Inc. v. Fils-Amie*, 44 F. Supp. 3d 1224, 1227 (S.D. Fla. 2014). Here, the Complaint clearly spells out the independent conduct and knowledge that allegedly gave rise to Huntsman's liability in this action. The Plaintiff alleges that Huntsman has been supplying PFAS products to Mount Vernon since at least 2007, when it acquired part of DuPont de Nemours, Inc.'s ("DuPont") PFAS business. (Am. Compl. ¶¶ 31, 63.) The Plaintiff further alleges that DuPont and the other Manufacturing Defendants shared five decades' worth of studies with Huntsman about the toxicity and persistence of PFAS prior to, during, or after the acquisition. (*Id.* ¶¶ 63-67, 70.) Indeed, contrary to its protestations, Huntsman's own arguments for dismissal reveal that it understands in detail the nature of and

basis for the claims against it.[2] Therefore, the Court denies Huntsman's Motion to Dismiss on shotgun pleading grounds.

### 4. Primary Jurisdiction

Mount Vernon contends that the Court should decline to adjudicate this action under the primary jurisdiction doctrine because it presents novel, complex issues concerning PFAS regulation. (Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 16-17.) According to Mount Vernon, the "initial regulation of PFAS in Georgia's waters is a question best suited for [the] EPD," whereas this Court is not equipped to fashion a remedy or appropriate cleanup standard without preexisting regulatory limits for PFAS.

---

[2] *See, e.g.*, *Amin v. Mercedes-Benz USA*, 349 F. Supp. 3d 1338, 1351 (N.D. Ga. 2018) ("Indeed, the balance of Daimler's own motion, which segues from a Rule 8(a)(2) attack into a traditional 12(b)(6) attack, belies any such notion. Rather, if the Complaint was so incomprehensible such that Daimler had no fair notice of the specific claims being interposed and the grounds upon which those claims rest, the Court finds it improbable that Daimler would be able to formulate coherent arguments as to why each of Plaintiffs' individual causes of action fail to state a claim upon which relief can be granted."); *Toback v. GNC Holdings, Inc.*, 2013 WL 5206103, at *2 (S.D. Fla. Sept. 13, 2013) ("Indeed, Defendants have demonstrated their understanding of the Complaint's allegations against them in a brief discussion in their Reply of the interrelated corporate Defendants' roles with regard to the distribution of TriFlex products."); *Abrams v. CIBA Specialty Chemicals Corp.*, 2008 WL 4183344, at *5 (S.D. Ala. Sept. 10, 2008) ("Indeed, defendants' own filings in support of their Rule 12(b) Motion reveal that they understand, at least in general terms, the nature of the claims against them. This is simply not a case in which a defendant is unable to respond to an unintelligible pleading; to the contrary, defendants clearly grasp the claims against them well enough to file an answer.").

(*Id.* at 16.) "Primary jurisdiction is a judicially created doctrine whereby a court of competent jurisdiction may dismiss or stay an action pending a resolution of some portion of the action by an administrative agency." *Wagner & Brown v. ANR Pipeline Co.*, 837 F.2d 199, 201 (5th Cir. 1988). The doctrine may be invoked "whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *Id.* (citation omitted). "Given that the court has a virtually unflagging obligation to exercise jurisdiction, abstention is extraordinarily disfavored." *Williams v. Alabama Dep't of Transp.*, 119 F. Supp. 2d 1249, 1255 (M.D. Ala. 2000) (quotation marks and citations omitted).

Courts in this circuit have consistently held that primary jurisdiction should not be applied to environmental citizen suits. *See, e.g.*, *Black Warrior Riverkeeper, Inc. v. Birmingham Airport Auth.*, 561 F. Supp. 2d 1250, 1255 (N.D. Ala. 2008); *College Park Holdings, LLC v. Racetrac Petroleum, Inc.*, 239 F. Supp. 2d 1322, 1328-29 (N.D. Ga. 2002); *Williams*, 119 F. Supp. 2d at 1256. "The weight of authority . . . indicates that federal courts should avoid deferring to state agencies for the enforcement of federal legislation" due to the risk of "uneven, suboptimal enforcement." *Williams*, 119 F. Supp. 2d at 1256. With respect to the CWA and RCRA, Congress expressly vested jurisdiction in

18

the federal district courts to hear enforcement actions brought by private citizens. 33 U.S.C. § 1365(a); 42 U.S.C. § 6972(a). "The statutory scheme thus contemplates citizen suits as a supplement to state government action, and the court could not, in good faith, unilaterally strip United States citizens of rights given them by their government." *College Park Holdings*, 239 F. Supp. 2d at 1329.

Moreover, this case does not raise a need to "coordinate the relationship between federal courts and administrative agencies." *Brogdon ex rel. Cline v. National Healthcare Corp.*, 103 F. Supp. 2d 1322, 1329 (N.D. Ga. 2000). To the Court's knowledge (and Mount Vernon does not claim otherwise), the EPD has not initiated a rulemaking or other administrative proceeding to regulate the discharge of PFAS from industrial sources in Georgia. Nor has the agency taken enforcement action against Mount Vernon or any other Defendant sufficient to preclude the Plaintiff's CWA and RCRA claims. *See infra* Section III.A.6 (holding the Consent Order does not constitute diligent prosecution under either statute). *Contra, e.g., Southern All. for Clean Energy v. Duke Energy Carolinas, LLC*, 2009 WL 1940048, at *3 (W.D.N.C. July 2, 2009) ("In sum, four of the five Plaintiffs here are also Petitioners in an action pending in the North Carolina's OAH before the Hon. J. Randall May, Administrative Law Judge. In addition to the similarity of issues, the relief sought is identical, *i.e.*, compliance by Duke Energy with Section 112(g) of the Clean Air Act. As a

result, two separate and independent courts are now being asked to decide the same issue.") (citations omitted). Therefore, the Court denies Mount Vernon's Motion to Dismiss based on the primary jurisdiction doctrine.

### 5. Pre-Suit Notice Requirements

Trion, Mount Vernon, and Jarrett move to dismiss some of the claims against them because the Plaintiff failed to comply with pre-suit notice requirements under state and federal law. In particular, Trion argues that the Plaintiff's November 20, 2020 Notice Letter ("November Notice" or "Notice") did not provide adequate detail about the dates and locations of its alleged violations, as mandated by Georgia's ante litem notice statute, the CWA, and RCRA. (Trion's Br. in Supp. of Trion's Mot. to Dismiss, at 14-15.) Mount Vernon and Jarrett make identical arguments about the specificity of the November Notice under the CWA and RCRA, while Jarrett further contends that the Notice was not addressed to his actual residence and thus provided him no notice at all. (Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 6-7, Jarrett's Br. in Supp. of Jarrett's Mot. to Dismiss, at 9, 10.) According to the Plaintiff, Trion was not entitled to ante litem notice on any of his federal- or state-law claims, and the contents of his November Notice fulfilled the "more flexible" requirements of the CWA and RCRA. (*E.g.*, Pl.'s Br. in Opp'n to Trion's Mot. to Dismiss, at 16-20 (citation omitted).)

### a. Georgia Ante Litem Notice

20

Under Georgia law, "ante litem notice is a prerequisite to the filing of suit against a municipality." *Davis v. City of Forsyth*, 275 Ga. App. 747, 747 (2005). The pertinent section, O.C.G.A. § 36-33-5(b), requires that a claimant, "[w]ithin six months of the happening of the event upon which a claim . . . is predicated," present the claim in writing to the governing authority of the municipality, "stating the time, place, and extent of the injury, as nearly as practicable, and the negligence which caused the injury." The Georgia Supreme Court recently clarified that this provision "applies only to damages caused by negligence[.]" *West v. City of Albany*, 300 Ga. 743, 747 (2017); *see also City of Statesboro v. Dabbs*, 289 Ga. 669, 670 (2011) ("As is clear from the plain text of this statute, it applies to tort claims regarding personal injury or property damage[.]") But the Plaintiff's CWA and RCRA claims are statutory in nature, with their own pre-suit notice requirements, and do not depend on or allege any negligence by Trion. Accordingly, the Plaintiff was not required to give Trion ante litem notice before filing his federal-law claims. The statute also does not apply to the Plaintiff's abatement claim since it seeks only injunctive relief and not monetary damages. *See Toma v. Columbia Cnty.*, 2007 WL 1221317, at *2 (S.D. Ga. Apr. 20, 2007) (finding O.C.G.A. § 36-33-5 "clearly does not apply to claims for equitable or injunctive relief").

### b.  Federal Notice of Intent to Sue

Before initiating a citizen suit under the CWA or RCRA, the plaintiff must give the alleged violator at least 60- or 90-days' notice, respectively, of the basis for his suit. 33 U.S.C. § 1365(b)(1); 42 U.S.C. § 6972(b)(2)(A). The notice must contain

> sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3; *see also* 40 C.F.R. § 254.3 (similar pre-suit notice requirements under RCRA). "The notice requirements are strictly construed to give the alleged violator the opportunity to correct the problem before a lawsuit is filed." *Kendall v. Thaxton Road LLC*, 443 F. App'x 388, 392 (11th Cir. 2011) (quoting *National Parks & Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 502 F.3d 1316, 1329 (11th Cir. 2007)). Even so, a citizen-plaintiff need not "list every specific aspect or detail of every alleged violation." *National Parks*, 502 F.3d at 1329 (citation omitted). Rather, the notice must provide "enough information to enable both the alleged violator and the appropriate agencies to identify the pertinent aspects of the alleged violations without undertaking an extensive investigation of their own." *Atwell v. KW Plastics Recycling Div.*, 173 F. Supp. 2d 1213, 1222 (M.D. Ala. 2001).

Trion, Mount Vernon, and Jarrett contend that the November Notice omits necessary information about the dates and locations of their alleged

violations. (Trion's Br. in Supp. of Trion's Mot. to Dismiss, at 16; Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 7; Jarrett's Br. in Supp. of Jarrett's Mot. to Dismiss, at 9.) However, the November Notice references at least two dates—November 2019 and January 2020—when sampling from Raccoon Creek and Summerville's drinking water showed elevated concentrations of PFAS. (Am. Compl., Ex. A at 4, 10, 11, 12, 18, 19.) Based on these samples, the Plaintiff informed the Defendants that their alleged violations "likely occurred prior to 2019 and are continuing" as of the notice date. (*Id.* at 11; *see also id.* at 4 (as to Jarrett, illegal discharges "continue and are ongoing, including sampling in 2019 and 2020"), 19 (as to Trion, 2019 and 2020 sampling results "confirm" that illegal discharges "are ongoing").) These date ranges gave sufficient notice as to when the alleged violations were occurring for purposes of the CWA and RCRA. *See Johnson v. 3M*, 2021 WL 4745421, at *12 (N.D. Ga. Sept. 20, 2021) (upholding a notice that "lists specific sampling locations and pinpoints actual dates as well as date ranges identifying when and where the alleged violations were occurring").

The November Notice is even more precise as to the locations of the Defendants' alleged violations. To illustrate, the Notice states that "Mount Vernon has discharged PFAS into the Trion WPCP causing Pass Through in violation of the national pretreatment standards, Georgia law, Trion's NPDES permit, and the CWA." (Am. Compl., Ex. A at 11, 12.) The obvious implication

is that these discharges occurred at the pipe or other connection where Mount Vernon conveys its wastewater to the Trion WPCP.[3]  With respect to Trion, the November Notice lists the addresses and owners of four properties in the Raccoon Creek watershed that serve as land application sites for PFAS-contaminated sludge. (*Id.* at 19.) While Trion insists that still more detail is required under federal law (Trion's Br. in Supp. of Trion's Mot. to Dismiss, at 16), it would create an insurmountable hurdle to demand, for example, exact coordinates for every single sludge field on every single property in the watershed—especially since only Trion could reasonably be expected to have that information before discovery. Finally, the Notice explains that Jarrett's illegal discharges of PFAS have occurred on two of his properties in the

---

[3] The November Notice also explains how the PFAS in Mount Vernon's wastewater has been discharged from the Trion WPCP into Raccoon Creek:

> Sludge (biosolids) from the Trion WPCP containing PFAS from Mount Vernon Mills has been disposed on farmland in the Racoon Creek watershed upstream of the City of Summerville's drinking water intake for many years. . . . Mount Vernon contributed to the PFAS-contaminated sludge disposed of by Trion on property in the Racoon Creek watershed which has resulted in the contamination of the waters of Racoon Creek and the Summerville water supply with PFOA and PFOS levels exceeding the EPA Drinking Water Health Advisory and significantly exceeding levels considered unhealthy by the ATSDR and several states.

(Am. Compl., Ex. A at 10, 13.)

watershed: "5 Hairs Lake Rd. and 2012 Mahan Rd., Summerville, GA." (Am. Compl., Ex. A at 4.) The contents of the November Notice thus complied with the CWA and RCRA.

Jarrett separately argues that that November Notice is deficient because it was not addressed to his residence in Oklahoma. (Jarrett's Br. in Supp. of Jarrett's Mot. to Dismiss, at 9, 10.) To effectuate notice under the CWA and RCRA, the plaintiff must serve the alleged violator "by certified mail addressed to, or by personal service upon, the owner or managing agent of the building, plant, installation, vessel, facility, or activity alleged to be in violation." 40 C.F.R. § 135.2(a)(1); *see also* 40 C.F.R. § 254.2(a)(1). Notice "shall be deemed to have been served on the postmark date if mailed, or on the date of receipt if served personally." 40 C.F.R. § 135.2(c); *see also* 40 C.F.R. § 254.2(c) (if served by mail, "the date of receipt will be considered to be the date noted on the return receipt card."). Here, the Plaintiff served the November Notice via certified mail to the address listed for Jarrett by the Chattooga County tax collector, as the owner of property where PFAS-contaminated sludge has allegedly been discarded. (Pl.'s Br. in Opp'n to Jarrett's Mot. to Dismiss, at 11.) The Plaintiff received a return receipt confirming that the Notice was signed for by a person who shares Jarrett's last name. (*Id.*, Ex. A at 1.) Not only did this method of service comply with the pertinent regulations, but it was also reasonable to expect that Jarrett actually received the Notice under the

circumstances. Accordingly, the Court denies Trion's, Mount Vernon's, and Jarrett's Motions to Dismiss based on deficient pre-suit notice.

### 6. Diligent Prosecution

Trion contends for the first time on reply that the Consent Order "moots" the Plaintiff's CWA and RCRA claims under the diligent prosecution doctrine.[4] (Reply Br. in Supp. of Trion's Mot. to Dismiss, at 7-9.) In its opening brief, Trion summarily stated that the RCRA claim "should be dismissed . . . as it is barred by the Consent Order and is moot." (Trion's Br. in Supp. of Trion's Mot. to Dismiss, at 13.) However, this statement was accompanied by no legal authorities, was silent as to the Consent Order's effect on the CWA claims, and Trion thus did not give the Plaintiff a fair opportunity to respond to its newly raised argument. "As a general rule, federal courts do not consider arguments that are presented for the first time in a reply brief." *Rindfleisch v. Gentiva Health Servs., Inc.*, 22 F. Supp. 3d 1295, 1301 (N.D. Ga. 2014). Nonetheless, in

---

[4] Trion's invocation of the mootness doctrine is a misnomer. Mootness "encompasses the circumstances that destroy the justiciability of a suit *previously suitable* for determination." *Louisiana Env't Action Network v. City of Baton Rouge*, 677 F.3d 737, 745 (5th Cir. 2012) (emphasis in original) (citation omitted). In other words, the focus is on whether any developments *after* the commencement of a suit have eliminated the actual controversy and rendered the action moot. *Id.* at 744. But the Consent Order was executed on April 13, 2020—approximately ten months before the Plaintiff filed his original Complaint in this Court. To the Court's knowledge, there have been no developments in the Consent Order since the Plaintiff initiated this suit that could have rendered it moot.

the interests of efficiency, the Court deems it appropriate to address (and reject) Trion's diligent prosecution defense at this preliminary stage.

Congress intended citizen suits "to supplement rather than to supplant governmental action." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 60 (1987). To that end, the CWA "bars a citizen from suing if the EPA or the State has already commenced, and is 'diligently prosecuting,' an enforcement action." *Laidlaw,* 528 U.S. at 175 (quoting 33 U.S.C. § 1365(b)(1)(B)). Section 1319(g)(6)(A) of the CWA provides that

> any violation . . . (ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection, or (iii) for which . . . the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law, as the case may be, shall not be the subject of a civil penalty action . . . under section 1365 of this title.

33 U.S.C. § 1319(g)(6)(A). Section 1365(b) imposes a further limitation on citizen suits where the "State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order[.]" *Id.* § 1365(b)(1)(B). Trion does not specify which of these two provisions provides a basis to dismiss the Plaintiff's CWA claim. The answer, though, is "neither."

First, section 1319(g)(6)(A) requires that a state take enforcement action "under a State law comparable to [the CWA]" to preclude a citizen suit. *Id.* § 1319(g)(6)(A)(ii), (iii). Here, the Consent Order cites the Georgia Water Quality

Control Act ("GWQCA") as the source of the EPD's enforcement authority and declares that Trion has violated a state Water Quality Rule as a result of its sludge disposal operations. (Trion's Br. in Supp. of Trion's Mot. to Dismiss, Ex. 2 at 4, 7.) But in *Kendall v. Thaxton Road LLC*, 2013 WL 210892, at \*3-4 (N.D. Ga. Jan. 18, 2013), this Court determined that the GWQCA is not "roughly comparable" to the CWA based on its more limited public participation rights. Second, section 1365(b)(1)(B) applies only when a state "has commenced and is diligently prosecuting a civil or criminal action *in a court of the United States, or a State*[.]" 33 U.S.C. § 1365(b)(1)(B) (emphasis added). There is no indication in the Complaint or the briefs that the EPD ever filed a civil or criminal action in court related to the Plaintiff's CWA claim. *See Kendall*, 2013 WL 210892, at \*6. For these reasons, Trion has not shown that either section 1319(g)(6)(A) or section 1365(b)(1)(B) is an impediment to this citizen suit.

The Court turns now to RCRA's diligent prosecution provision. A citizen suit alleging an imminent and substantial endangerment is barred only where a state has undertaken one of three discrete, enumerated enforcement actions:

> if the State, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment—
>
> (i) has commenced and is diligently prosecuting an action under subsection (a)(1)(B);
>
> (ii) is actually engaging in a removal action under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980; or

> (iii) has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 and is diligently proceeding with a remedial action under that Act.

42 U.S.C. § 6972(b)(2)(C). It is evident that the Consent Order, which was executed pursuant to the GWCQA, does not fall within any of these categories of enforcement action. (*See* Am. Compl. ¶ 14 (alleging the EPD "has not commenced, nor is it prosecuting," any of the actions listed in section 6972(b)(2)(C)).) Accordingly, Trion does not have a viable diligent prosecution defense to the Plaintiff's RCRA claim.

### 7. Economic Loss Rule

The Manufacturing Defendants and Mount Vernon argue that the Plaintiff's tort claims are barred by the economic loss rule. (*E.g.*, 3M's Br. in Supp. of 3M's Mot. to Dismiss, at 7; Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 18.) The economic loss rule "generally provides that a contracting party who suffers purely economic losses must seek his remedy in contract and not in tort." *General Elec. Co. v. Lowe's Home Ctrs., Inc.*, 279 Ga. 77, 78 (2005). Nonetheless, "the rule has no application where the defendant breaches a duty imposed by law or arising from a special relationship." *Johnson*, 2021 WL 4745421, at *30; *see also In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1321 (N.D. Ga. 2019) ("Where, however, an independent duty exists under the law, the economic loss

rule does not bar a tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule.") (quotation marks and citation omitted); O.C.G.A. § 51-1-11(a) (exempting from the economic loss rule "cases where the party would have a right of action for the injury done independently of the contract"). This independent duty exception applies to the Plaintiff's tort claims because, as described below, the Manufacturing Defendants and Mount Vernon owed the Plaintiff and the Proposed Class Members legal duties under Georgia's common law, statutes, and regulations. *See infra* Sections III.B.4-.6. Therefore, the Court denies the Manufacturing Defendants' and Mount Vernon's Motions to Dismiss on the basis of the economic loss rule.

### 8. Filed-Rate Doctrine

Daikin alone moves to dismiss the Plaintiff's state-law claims under the filed-rate doctrine. (Daikin's Br. in Supp. of Daikin's Mot. to Dismiss, at 21-22.) "The filed-rate doctrine forbids a regulated entity from charging rates for its services other than those properly filed with the appropriate *regulatory authority*. As a result, where the legislature has conferred power upon an *administrative agency* to determine the reasonableness of a rate, the rate-payer can claim no rate as a legal right that is other than the filed rate." *Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314, 1321 (2018) (emphasis added) (quotation marks, citations, and punctuation omitted). Daikin's

argument can be easily dispensed with because municipal water rates "are not subject to the regulations of the Georgia Public Service Commission or any other regulatory body[.]" *Couch v. City of Villa Rice*, 203 F. Supp. 897, 905 (N.D. Ga. 1962); *see also Johnson*, 2021 WL 4745421, at *69 (holding the filed-rate doctrine does not apply to municipal water rates). Therefore, the filed-rate doctrine is irrelevant to this case and does not support dismissal of the Plaintiff's claims.

## B. Defenses Applicable to Individual Claims

### 1. Counts One and Two: Trion's and Jarrett's Violations of the CWA and the GWQCA

Counts One and Two of the Complaint state claims against Trion and Jarrett under the CWA: the first alleges that Trion and Jarrett have unlawfully discharged PFAS into Raccoon Creek without a NPDES permit, and the second alleges that Trion has violated its NPDES permit and the GWQCA by these same discharges. (Am. Compl. ¶¶ 97-99, 107-12.) Jarrett moves to dismiss Count One on the grounds that the Complaint does not identify a "point source" discharge on his property. (Jarrett's Br. in Supp. of Jarrett's Mot. to Dismiss, at 5-7.) Trion, meanwhile, argues that the CWA claims are barred by *County of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020), because PFAS discharges from sludge into Raccoon Creek are not the "functional equivalent of a direct discharge[.]" (Trion's Br. in Supp. of Trion's Mot. to Dismiss, at 11 (emphasis omitted).) Trion also raises a permit

31

shield defense, claiming that its sludge disposal was "in full compliance with its NPDES Permit." (Reply Br. in Supp. of Trion's Mot. to Dismiss, at 6.) The Court addresses these three grounds for dismissal in reverse order.

### a. Permit Shield

Trion argues that it is not liable under the CWA because it "was operating within all limits imposed by its [NPDES] permit and applicable regulations and statutes." (Trion's Br. in Supp. of Trion's Mot. to Dismiss, at 9.) The Plaintiff counters that there can be no permit shield defense since Trion's permit "does not cover discharges to Raccoon Creek and in no way regulates PFAS." (Pl.'s Br. in Opp'n to Trion's Mot. to Dismiss, at 10.) The CWA contains a permit shield provision for those who have obtained a NPDES permit to discharge pollutants into waters of the United States. It states that "[c]ompliance with a permit issued pursuant to this section shall be deemed compliance" with various effluent limitations and enforcement mechanisms under the law. 33 U.S.C. § 1342(k). "The permit shield is meant to prevent permit holders from being forced to change their procedures due to changes in regulations, or to face enforcement actions over 'whether their permits are sufficiently strict.'" *Southern Appalachian Mountain Stewards v. A & G Coal Corp.*, 758 F.3d 560, 564 (4th Cir. 2014) (quoting *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n.28 (1977)). "By rendering permits final, the

shield allows permit holders to conduct their operations without concern that an unexpected discharge might lead to substantial liability." *Id.*

In *Piney Run Preservation Ass'n v. County Commissioners of Carroll County, Maryland*, 268 F.3d 255, 268-69 (4th Cir. 2001), the Fourth Circuit explained the scope of the permit shield defense and its connection to the permitting process.

> The applicant discloses the nature of its effluent discharges to the permitting authority. The permitting authority analyzes the environmental risk posed by the discharge, and places limits on those pollutants that . . . it reasonably anticipates could damage the environmental integrity of the affected waterway. Thus, as long as a permit holder complies with the CWA's reporting and disclosure requirements, it may discharge pollutants not expressly mentioned in the permit. The only other limitation on the permit holder's ability to discharge such pollutants is that the discharges must be reasonably anticipated by, or within the reasonable contemplation of, the permitting authority. Because the permitting scheme is dependent on the permitting authority being able to judge whether the discharge of a particular pollutant constitutes a significant threat to the environment, discharges not within the reasonable contemplation of the permitting authority during the permit application process, whether spills or otherwise, do not come within the protection of the permit shield.

*Id.* at 268 (quotation marks and citations omitted). Based on this administrative framework, the Fourth Circuit proposed a two-part test to determine whether section 1342(k) insulates a permit holder from liability.

> We therefore view the NPDES permit as shielding its holder from liability under the Clean Water Act as long as (1) the permit holder complies with the express terms of the permit and with the Clean Water Act's disclosure requirements and (2) the permit holder does not make a discharge of pollutants that was not

33

within the reasonable contemplation of the permitting authority
at the time the permit was granted.

*Id.* at 259. A party must meet both parts of the test to receive protection from

the permit shield. *Southern Appalachian Mountain*, 758 F.3d at 565.

Trion operates the Trion WPCP pursuant to NPDES permit No.

GA0025607. (Am. Compl. ¶ 37.) It is undisputed that the permit does not

contain any conditions specifically pertaining to PFAS. (Trion's Br. in Supp. of

Trion's Mot. to Dismiss, Ex. 2 at 4.) The sole question for the Court, then, is

whether Trion sufficiently disclosed its PFAS discharges during the permitting

process such that they were within the reasonable contemplation of the EPD.

*Piney Run*, 268 F.3d at 268. Neither the Plaintiff nor Trion references any

permit application materials or other administrative records to substantiate

what Trion did or did not disclose to the EPD. Nor would it be appropriate for

the Court to consider such materials at the dismissal stage. *See St. Georgia v.*

*Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002). It is also impossible for

the Court to infer from the terms of Trion's permit alone whether it adequately

informed the EPD about the nature and locations of its discharges. Until there

has been more factual development of Trion's permit shield defense, the Court

must accept the relevant allegations in the Complaint as true: those are, Trion

has made illegal and unpermitted discharges of PFAS from its sludge disposal

areas to Raccoon Creek, and/or Trion has committed various violations of its

NPDES permit as a result of these discharges. (Am. Compl. ¶¶ 97-101, 106-

34

12.) *See, e.g., Flint Riverkeeper, Inc. v. Southern Mills, Inc.*, 276 F. Supp. 3d 1359, 1368-69 (M.D. Ga. 2017) (declining to dismiss a CWA claim where the defendant allegedly discharged wastewater in a manner not authorized by its NPDES permit).

Trion, however, claims that it was not aware of the PFAS in its sludge and thus could not have informed the EPD about these discharges. (Reply Br. in Supp. of Trion's Mot. to Dismiss, at 6.) Trion further argues that it was only required to disclose the type of discharge (i.e., sludge) but not the contents of the discharge (i.e., PFAS) to receive a NPDES permit. (*Id.*) The Fourth Circuit rejected almost identical arguments in *Southern Appalachian Mountain.* 758 F.3d at 565-68. There, a coal mine had failed to disclose discharges of selenium from two artificial ponds in its NPDES permit application. Still, the mine argued that the permit shield was intact because it did not have reason to know selenium was at the site, and because the permitting agency reasonably contemplated such discharges. *Id.* at 562. Disagreeing, the court noted that the CWA places the burden on the permit applicant to gather and provide information to the permitting agency. *Id.* at 566. By contrast, the mine's (and Trion's) interpretation "encourages willful blindness by those discharging pollutants and prevents the state and federal agencies tasked by the CWA with protecting our waters from receiving the information necessary to effectively safeguard the environment." *Id.* at 567. Moreover, the court held that a permit

35

holder is not shielded from liability where its permit application identified general "wastestreams, operations, and processes" as opposed to constituent pollutants. *Id.* at 568. In sum, Trion cannot claim ignorance about the contents of its own discharges and expect to receive the protection of the permit shield.[5]

### b. "Functional Equivalent" Test

The Plaintiff alleges that Trion was required to obtain a NPDES permit for PFAS discharges that migrate from land-applied sludge to Raccoon Creek through hydrologically connected groundwater. (Am. Compl. ¶ 98.) These are not traditional, end-of-pipe discharges that convey pollutants directly from the source to receiving waters, and Trion argues that the connection between its sludge disposal sites and Raccoon Creek is too tenuous to come within the scope of the CWA. (Trion's Br. in Supp. of Trion's Mot. to Dismiss, at 11.) In *County of Maui*, the Supreme Court clarified that the CWA requires a permit "when

---

[5] Trion relatedly argues that the Plaintiff's CWA claims should be dismissed because it has not committed "an intentional violation of the permit or any statutory requirements[.]" (Trion's Br. in Supp. of Trion's Mot. to Dismiss, at 6.) "The regulatory provisions of the [CWA] were written without regard to intentionality, however, making the person responsible for the discharge of any pollutant strictly liable." *United States v. Earth Scis., Inc.*, 599 F.2d 368, 374 (10th Cir. 1979); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC)*, 890 F. Supp. 470, 496 (D.S.C. 1995) ("[U]nder the [CWA] a violation of an NPDES permit is a strict liability offense. Thus, the reasonableness or *bona fides* of an alleged violator's efforts to comply with its permit is not relevant in determining whether a violator is liable under the Act.") (citations omitted) (emphasis in original).

36

there is a direct discharge from a point source into navigable waters or when there is the *functional equivalent of a direct discharge*." 140 S. Ct. at 1476 (emphasis in original). The Court endorsed several non-exhaustive factors to determine "[w]hether pollutants that arrive at navigable waters after traveling through groundwater are 'from' a point source":

> (1) transit time, (2) distance traveled, (3) the nature of the material through which the pollutant travels, (4) the extent to which the pollutant is diluted or chemically changed as it travels, (5) the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source, (6) the manner by or area in which the pollutant enters the navigable waters, (7) the degree to which the pollution (at that point) has maintained its specific identity.

*Id.* at 1476-77. "Time and distance will be the most important factors in most cases, but not necessarily every case." *Id.* at 1477.

Other than citing these factors and an EPA guidance document, Trion hardly explains why its sludge-based PFAS discharges do not meet the "functional equivalent" test. (Trion's Br. in Supp. of Trion's Mot. to Dismiss, at 7-11.) Trion argues that these discharges "*may* not be the functional equivalent of a direct discharge due to the time involved (distribution over a 28-year period) and the fact that it is not known what other factors could have impacted this groundwater contamination." (*Id.* at 11 (emphasis added).) Trion also claims that it "is unaware of when the PFAS substances began to be discharged into the [Trion WPCP] and is therefore unsure as to how long these substances may have been in the biosolids used for agricultural purposes." (*Id.*) If

37

anything, these statements raise factual issues that cannot be resolved without the benefit of discovery and a factual record. The Plaintiff, meanwhile, alleges that Trion's "discharges of PFAS to Raccoon Creek from the sludge disposed of in the Raccoon Creek watershed through hydrologically connected groundwater constitute the 'functional equivalent' of a direct discharge to these surface waters[.]"[6] (Am. Compl. ¶ 98.) For now, nothing more is required to avoid dismissal.

### c. Point Source

Jarrett contends that the Plaintiff has failed to allege, "with any plausible particularity," facts to support the existence of a "point source" on his property. (Jarrett's Br. in Supp. of Jarrett's Mot. to Dismiss, at 5-6.) A point source discharge is a central element of a claim under section 1311(a) of the CWA. *See Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1008 (11th Cir. 2004). The statute defines a "point source" as "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel,

---

[6] This allegation finds support elsewhere in the Complaint and the EPD Consent Order. For example, the Complaint describes samples of Raccoon Creek and Summerville's finished water supply, which showed elevated levels of PFAS downstream of Trion's sludge disposal sites in the watershed. (Am. Compl. ¶¶ 74-79.) Based on these sampling results, the Consent Order states that "the land application of biosolids by [Trion] . . . is contributing to the levels of PFOA and PFOS in Raccoon Creek and consequently in the finished water from the City of Summerville's Raccoon Creek drinking water treatment plant." (Trion's Br. in Supp. of Trion's Mot. to Dismiss, Ex. 2 at 7.)

tunnel, conduit, well, discrete fissure, [or] container . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). In the Eleventh Circuit, courts interpret the term broadly to embrace "any identifiable conveyance from which pollutants might enter waters of the United States." *Parker*, 386 F.3d at 1009 (citation omitted); *see also Earth Scis.*, 599 F.2d at 373 ("We believe it contravenes the intent of [the CWA] and the structure of the statute to exempt from regulation any activity that emits pollution from an identifiable point."). "[A] point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters[.]'" *South Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 105 (2004).

According to Jarrett, the Plaintiff's CWA claim should be dismissed because the point source element was not pleaded with "particularized factual allegations[.]" (Reply Br. in Supp. of Jarrett's Mot. to Dismiss, at 2.) But a complaint need not contain "detailed factual allegations" to survive dismissal; the allegations must merely "be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555. Here, the Plaintiff asserts that sludge from the Trion WPCP "is dewatered and disposed of by land application" on Jarrett's farm property in the Raccoon Creek watershed. (Am. Compl. ¶ 35.) The PFAS in the sludge then allegedly migrates through hydrologically connected groundwater into Raccoon Creek as the functional equivalent of a direct discharge. (*Id.* ¶ 98.) Courts routinely find that land application systems,

spray head sprinklers, and trucks constitute point sources when used to spread treated wastewater and manure on land.[7] The Plaintiff's allegations, though imprecise, are broad enough to encompass these and potentially other categories of point sources. The Court believes that discovery is needed to allow the Plaintiff to further refine his theory of a point source discharge.

For these reasons, the Court denies Trion's Motion to Dismiss on the grounds that the statutory permit shield and the functional equivalent test bar the Plaintiff's CWA claims, and denies Jarrett's Motion to Dismiss on the grounds that the Plaintiff has not sufficiently alleged a point source on his property.

## 2. Count Three: Mount Vernon's Violations of Federal Pretreatment Standards, Local Ordinances, and the GWCQA

In Count Three of the Complaint, the Plaintiff alleges that Mount Vernon has violated federal pretreatment standards, local ordinances, and the

---

[7] *See, e.g.*, *Concerned Area Residents for Env't v. Southview Farm*, 34 F.3d 114, 119 (2d Cir. 1994) (holding manure-spreading vehicles are point sources based on "[t]he collection of liquid manure into tankers and their discharge on fields"); *Flint Riverkeeper*, 276 F. Supp. 3d at 1368 ("[D]istrict courts in other jurisdictions have found such [land application] systems are point sources. Plaintiffs also allege Defendant sprays wastewater into its . . . fields through a series of spray heads. A spray apparatus can be a discernable, confined, and discrete conveyance, and thus other district courts have found spray apparatuses are point sources."); *Community Ass'n for Restoration of Env't (CARE) v. Sid Koopman Dairy*, 54 F. Supp. 3d 976, 981 (E.D. Wash. 1999) ("The instruments or machinery used to apply those animal wastes [to agricultural fields] will be considered 'point sources' under the CWA.").

GWQCA by its PFAS discharges into the Trion WPCP. (Am. Compl. ¶¶ 116-34.) Mount Vernon contends that the Complaint offers no viable theory of recovery under any of these local, state, or federal laws, as described below.

### a. "Pass Through" Under the CWA

The Plaintiff first claims that Mount Vernon's PFAS discharges have caused "Pass Through" at the Trion WPCP in violation of the CWA and its implementing regulations. (Am. Compl. ¶¶ 117-23.) Section 1317 of the CWA establishes the federal pretreatment program to regulate discharges from industrial facilities into publicly owned treatment works ("POTW"). 33 U.S.C. §§ 1317(b)-(e). Most POTWs "were designed and built to treat domestic sewage and other similar biological waste. However, industrial users of POTWs may discharge wastes in concentrations or volumes that cannot be adequately treated by the receiving POTW." *Arkansas Poultry Fed'n v. EPA*, 852 F.3d 324, 326 (8th Cir. 1988). Accordingly, the EPA has enacted rules that prohibit "introduc[ing] into a POTW any pollutant(s) which cause Pass Through or Interference." 40 C.F.R. § 403.5(a)(1). "Pass Through" is defined as

> a Discharge which exits the POTW into waters of the United States in quantities or concentrations which, alone or in conjunction with a discharge or discharges from other sources, is a cause of a violation of any requirement of the POTW's NPDES permit (including an increase in the magnitude or duration of a violation).

*Id.* § 403.3(p). According to the Plaintiff, Mount Vernon's PFAS discharges constitute Pass Through because they cannot be effectively treated at the Trion

41

WPCP and then enter Raccoon Creek via PFAS-contaminated sludge, causing a violation of a condition in Trion's NPDES permit. (Am. Compl. ¶ 122.)

In response to these allegations, Mount Vernon argues that the land application of sludge is not subject to the Pass Through rule, which focuses instead on "discharge[s] of treated effluent directly from the [POTW]" into jurisdictional waters. (Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 10.) Mount Vernon points out that the disposal and use of sludge is governed by different statutory and regulatory programs than pretreatment effluent. (Reply Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 7 (citing 33 U.S.C. § 1345; 40 C.F.R. § 503.1).) This construction of the CWA is consistent with *Chemical Manufacturers Ass'n v. EPA*, 870 F.2d 177 (5th Cir. 1989). There, the EPA enacted regulations finding that chromium, copper, and nickel do not cause Pass Through when they are discharged into POTWs and transferred to sludge. The EPA based this conclusion on its "plans to regulate sludge separately from wastewater[.]" *Id.* at 187. The Fifth Circuit upheld the regulations because "Congress' intent was that the presence of pollutants in sludge would be regulated under § 405(d). As further evidence of Congress' intent, in 1977 Congress rejected a proposed amendment which would have required the EPA to regulate pollutants which contaminate the sludge of POTWs." *Id.* at 248. Accordingly, the Court grants Mount Vernon's Motion to Dismiss as to the Plaintiff's Pass Through claim. The Court further concludes

42

that the Plaintiff's claim under Trion's Industrial User Ordinance should be dismissed as it is predicated on a Pass Through violation. (Am. Compl. ¶ 126.)

### b. Local Sewer Use Ordinance

Next, Mount Vernon argues that the Plaintiff has failed to plead a claim under Trion's Sewer Use Ordinance. (Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 12-13.) According to Mount Vernon, the CWA authorizes citizen suits only for municipal standards that are developed in accordance with public notice-and-comment procedures, but the Complaint does not allege whether Trion followed these procedures in crafting its ordinances. (*Id.* at 12 (citing 40 C.F.R. § 403.5(d)).) On the Court's review of the pertinent regulations, Mount Vernon overstates the degree of public participation required to make local ordinances actionable as federal standards. 40 C.F.R. § 403.5(c)(3) states only that a POTW shall provide "*individual notice*"—not general notice—to "persons or groups *who have requested such notice and an opportunity to respond.*" *Id.* (emphasis added). The Plaintiff sufficiently alleges that Trion complied with this requirement in enacting the Sewer Use Ordinance. (Am. Compl. ¶ 124 (the ordinance was enacted "so that Trion can comply with all State and Federal laws, including the Clean Water Act").)

The next question for the Court is whether the Plaintiff also sufficiently alleges a violation of the Sewer Use Ordinance to maintain this citizen suit.

43

Section 62-231 of the Trion Code provides that "[t]he [CWA] governs industrial discharge, and specific rules for industrial pretreatment are contained in Pretreatment Regulation (40 CFR 403), as issued by the [EPA]. Industrial users will be required to cooperate with the Town in complying with the federal regulations." (*Id.* ¶ 125.) This provision does not impose any specific limitations apart from the CWA but merely requires industrial users to comply with federal regulation. Because the Court has dismissed the Plaintiff's federal Pass Through claim, he no longer has a viable claim under section 62-231. Section 62-213(8), meanwhile, prohibits discharges to the sewer system of "[a]ny waters or wastes containing chemical residues, textile fibers, toxic materials or other industrial byproduct in sufficient quantity to injure or interfere with any sewage treatment process, constitute a hazard to humans or animals, or create any hazard in the receiving waters of the sewage treatment plant." (*Id.* ¶ 124.) The Complaint contains ample allegations that Mount Vernon's PFAS discharges pose a hazard to human health when they resist degradation in the Trion WPCP and then leach from sludge into Raccoon Creek and Summerville's water supply. (*Id.* ¶¶ 33-53.)[8] Accordingly, there is an adequate basis for the Plaintiff's claim under section 62-213(8).

---

[8] Mount Vernon argues that it cannot be liable under section 62-213(8) because it holds an industrial user permit to discharge wastewater into the Trion WPCP. (Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 13.) The Plaintiff counters that the permit "in no way" authorizes Mount

### c. GWQCA Provisions

Finally, Mount Vernon argues that the Plaintiff has no private right of action to enforce provisions of the GWCQA, specifically O.C.G.A. §§ 12-5-29(a) and 12-5-30.4(a). (Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 13-14.) However, Mount Vernon concedes that state standards can be enforced in a citizen suit when they are incorporated as conditions into a permit (*id.* at 14), and Mount Vernon's industrial user permit expressly requires compliance with "any applicable State and Federal pretreatment laws, regulations, standards, and requirements," (*Id.*, Ex. 1 at 3.) *Altamaha Riverkeeper, Inc. v. Rayonier, Inc.*, 2015 WL 1505971 (S.D. Ga. Mar. 31, 2015), is not to the contrary. *Id.* at *4-5 (holding the EPD did not intend to incorporate Georgia's water quality standards as conditions to a NPDES permit that was issued "in compliance with" the GWQCA. Mount Vernon further insists that neither O.C.G.A. § 12-5-29(a) nor O.C.G.A. § 12-5-30.4(a) applies to its wastewater discharges into the Trion WPCP. (Reply Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 10.) As discussed in Section III.B.5, the Court agrees with Mount Vernon as to the latter, but not the former, provision and thus dismisses the Plaintiff's claim under O.C.G.A. § 12-5-30.4(a).

---

Vernon to discharge PFAS, setting up a factual dispute which the Court is not prepared to decide on a Rule 12(b)(6) motion. (Pl.'s Br. in Opp'n to Mount Vernon's Mot. to Dismiss, at 14-15.)

### 3. Count Four: RCRA Imminent and Substantial Endangerment

Count Four of the Complaint alleges that Mount Vernon, Trion, and Jarrett have violated RCRA by disposing of PFAS in a manner that "may present an imminent and substantial endangerment to health or the environment." (Am. Compl. ¶ 142.) The Defendants contend that there is no basis for an endangerment claim because the alleged disposal operations took place wholly in the past and the harmful effects of PFAS have since been remediated. (*E.g.*, Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 8-9.) In addition, Jarrett argues that the Complaint fails to plead "non-conclusory plausible factual allegations" regarding his role in creating the endangerment. (Jarrett's Br. in Supp. of Jarrett's Mot. to Dismiss, at 9-10.)

"RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). "RCRA's primary purpose . . . is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" *Id.* (quoting 42 U.S.C. § 6902(b)). While the EPA is primarily responsible for implementing and enforcing RCRA, the statute contains a citizen suit provision allowing private citizens to enforce its mandates in some circumstances. 42 U.S.C. § 6972(a)(1)(B). In relevant part, section

6972(a)(1)(B) empowers any person to "commence a civil action . . . against any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." *Id.*

The operative word in the statute is 'may,' which signals only "a *potential* for an imminent threat of a serious harm to the environment or [human] health." *Parker*, 386 F.3d at 1015 (emphasis added) (citation omitted). For an endangerment to be considered "imminent," "there must be a threat which is present *now*, although the impact of the threat may not be felt until later." *Meghrig*, 516 U.S. at 486 (emphasis in original) (citation omitted). Section 6972(a)(1)(B) "applies retroactively to past violations, so long as those violations are a present threat to health or the environment." *Parker*, 386 F.3d at 1014; *see also Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.*, 989 F.2d 1305, 1316 (2d Cir. 1993) ("[U]nder an imminent hazard citizen suit, the endangerment must be ongoing, but the conduct that created the endangerment need not be."). In other words, "the disposal of wastes as wholly past acts can constitute a continuing violation as long as no proper disposal procedures are put into effect or as long as the waste has not been cleaned up and the environmental effects remain remediable." *Cox v. City of Dallas*, 256 F.3d 281, 298 (5th Cir. 2001) (citation omitted).

47

The Defendants argue that PFAS pollution does not pose a threat to the Plaintiff because: (1) Mount Vernon stopped using PFOA and PFOS at its Trion mill in 2017; (2) Trion has ceased land application of sludge in the Raccoon Creek watershed under the Consent Order; and (3) Summerville's treatment system has reduced PFOA and PFOS levels in drinking water below the health advisory threshold. (Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 8-9; Trion's Br. in Supp. of Trion's Mot. to Dismiss, at 12; Jarrett's Br. in Supp. of Jarrett's Mot. to Dismiss, at 10-11.) None of these factual contentions, however, can overcome the Plaintiff's extensive allegations of an imminent and substantial endangerment. First, while Mount Vernon claims to no longer use PFOA and PFOS at its mill, the Complaint alleges that it "continues to discharge high levels of PFAS to the Trion WPCP," including PFOA and PFOS, based on samples taken in 2020. (Am. Compl. ¶ 34.) The Court must accept this allegation of ongoing discharges as true rather than wade into a premature "contest between the parties about the facts or the substantive merits of the case." *Howell v. QS of Ga., LLC*, 2007 WL 9702215, at *4 (N.D. Ga. Mar. 12, 2007) (citation omitted).

Similarly, whether Trion has ended the land application of sludge in the Raccoon Creek watershed, is a factual matter "to be explored in discovery and ultimately considered on summary judgment." *May v. Sony Music Ent.*, 399 F. Supp. 3d 169, 182 (S.D.N.Y. 2019). Furthermore, the Court finds that the

Plaintiff has plausibly alleged that even wholly *past* disposals of PFAS-contaminated sludge are a *present* threat to downstream water users. For example, the Plaintiff claims that (1) Trion has disposed of nearly 8,000 tons of PFAS-contaminated sludge in the watershed since 1992; (2) due to their persistence and mobility, PFAS are discharged from sludge to Raccoon Creek for decades, or longer, after initial disposal; (3) significant amounts of PFAS-contaminated sludge remain on properties in the watershed, threatening Raccoon Creek and Summerville's water supply with further contamination; and (4) all sludge must be removed from the watershed to abate the risk of harm to the Plaintiff and others who consume Summerville's municipal water. (Am. Compl. ¶¶ 36, 39-40, 87, 143.)

Finally, the fact that the EPD has lifted the water advisory for Summerville customers, does not necessarily spell the end of the endangerment. Though instructive, "state standards do not define a party's federal liability under RCRA." *Interfaith Community Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 261 n.6 (3d Cir. 2005). The Plaintiff also alleges that Mount Vernon currently uses and discharges short-chain PFAS to the Trion WPCP, which are persistent, toxic, and bioaccumulate in human blood like PFOA and PFOS. (Am .Compl. ¶ 69.) According to the Plaintiff, Summerville's temporary treatment system does not effectively remove PFOA, PFOS, or short-chain PFAS from the municipal water supply, and therefore, these chemicals

49

continue to pose a health and safety risk to the Plaintiff and other Summerville water customers. (*Id.* ¶ 82-83.) Indeed, sampling conducted in December 2020 allegedly shows that Summerville's finished water contains "toxic" levels of PFAS, including PFOA at 24 ppt, PFOS at 15 ppt, and "elevated levels" of multiple short-chain PFAS. (*Id.* ¶ 83.) The Plaintiff insists that a new permanent treatment system is needed to effectively remove PFOA, PFOS, and short-chain PFAS from the water supply to guarantee a safe, permanent source of water for residents. (*Id.* ¶ 83-84.)

The Court turns now to Jarrett's argument that the factual allegations in the Complaint are too "conclusory" to make out a plausible RCRA claim against him. (Jarrett's Br. in Supp. of Jarrett's Mot. to Dismiss, at 10.) According to Jarrett, the sole non-conclusory allegation is "that he allowed Trion at some time in the past to spread biosolids from its waste[]water treatment plant onto his property." (*Id.* at 10.) Though not explicit, this argument appears to be directed at the "contribution" element of an endangerment claim. RCRA does not define what acts of contribution come within the scope of section 6972(a)(1)(B); however, other courts have explained that "a defendant [must] be actively involved in or have some degree of control over the waste disposal process to be liable under RCRA." *Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 851-52 (9th Cir. 2011) (collecting cases). The Plaintiff alleges that Jarrett has permitted Trion to "dump" PFAS-contaminated sludge

on his property in the Raccoon Creek watershed. (Am. Compl. ¶¶ 26, 35.) Jarrett's affirmative permission to dispose of sludge on his land shows that he has actively participated in and maintained some degree of control over Trion's disposal operations. *See Cox*, 256 F.3d at 297 (holding the City's "'lax oversight' of its contractors and their disposal of City waste is evidence of the City's 'contributing to' liability"). Accordingly, the Court denies his and the other Defendants' Motions to Dismiss as to the Plaintiff's RCRA claim.

### 4. Count Five: Negligence

In Count Five of the Complaint, the Plaintiff asserts a negligence claim against the Manufacturing Defendants and Mount Vernon. He alleges that they have breached a duty of reasonable care owed to the Plaintiff and the Proposed Class Members to prevent the contamination of Raccoon Creek with PFAS. (Am. Compl. ¶¶ 162-67.) The Manufacturing Defendants and Mount Vernon urge the Court to dismiss this claim because Georgia law imposes no legal duty on them for the Plaintiff's protection, and because their actions did not proximately cause the Plaintiff's alleged injuries. (E.g., 3M's Br. in Supp. of 3M's Mot. to Dismiss, at 11-13.; Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 18-19.) The Court addresses each argument in turn, distinguishing between the Manufacturing Defendants and Mount Vernon as the law dictates.

### a. Legal Duty

The elements of negligence are (1) "the existence of a duty on the part of the defendant," (2) "a breach of that duty," (3) "causation of the alleged injury," and (4) "damages resulting from the alleged breach of the duty." *Rasnick v. Krishna Hosp., Inc.*, 289 Ga. 565, 566 (2011). "Before negligence can be predicated upon a given act, some duty to the individual complaining must be sought and found, the observance of which duty would have averted or avoided the injury or damage." *CSX Transp. Inc. v. Williams*, 278 Ga. 888, 889 (2005) (citation omitted); *see also Department of Lab. v. McConnell*, 305 Ga. 812, 815 (2019) ("Negligence is premised on, among other things, a duty owed by the defendant to the plaintiff."). "The legal duty is the obligation to confirm to a standard of conduct under the law for the protection of others against unreasonable risks of harm." *Rasnick*, 289 Ga. at 566. Such a duty can arise from either a legislative enactment or a common law principle recognized in the case law. *Id.* at 566-67. Whether either of these sources imposed a legal duty on the Manufacturing Defendants or Mount Vernon under the circumstances, is a question of law reserved to the Court. *Id.* at 567.

According to the Manufacturing Defendants and Mount Vernon, the Complaint alleges only an impermissible "generalized duty to prevent harm to the public." (3M's Br. in Supp. of 3M's Mot. to Dismiss, at 12-13.) This argument relies on *McConnell*, a case in which a Georgia Department of Labor ("DOL") employee widely circulated a spreadsheet with the names, social

security numbers, and other personal information of 4,757 individuals. 305 Ga. at 812-13. One of those individuals filed a negligence suit against the DOL based on "a purported common law duty 'to all the world not to subject others to an unreasonable risk of harm[.]'" *Id.* at 815 (punctuation omitted) (quoting *Bradley Ctr. v. Wessner*, 250 Ga. 199, 201 (1982)). The Georgia Supreme Court affirmed the dismissal of the complaint, disapproving its earlier *Bradley Center* opinion to the extent that it could be read to create such a broad legal duty. *Id.* at 816. The court, however, explicitly did not consider "whether a duty might arise on these or other facts from any other statutory or common law source[.]" *Id.* at 816 n.5. Georgia and federal courts have since relied on *McConnell* to find that "plaintiffs who failed to show a specific, recognized legal duty under Georgia law as opposed to some generalized duty could not maintain a claim for negligence." *Johnson*, 2021 WL 4745421, at *45. The Court weighs now whether the Plaintiff has shown a specific, recognized legal duty with respect to the Manufacturing Defendants and Mount Vernon.

### i.   Manufacturing Defendants

The Plaintiff argues that the Manufacturing Defendants owed a duty of reasonable care under section 389 of the Second Restatement of Torts as the supplier of a knowingly hazardous product. (Pl.'s Br. in Opp'n to 3M's Mot. to Dismiss, at 3.) Section 389 provides:

> One who supplies directly or through a third person a chattel for
> another's use, knowing or having reason to know that the chattel

53

> is unlikely to be made reasonably safe before being put to a use which the supplier should expect it to be put, is subject to liability for physical harm caused by such use to those whom the supplier should expect to use the chattel or to be endangered by its probable use, and who are ignorant of the dangerous character of the chattel or whose knowledge thereof does not make them contributorily negligent, although the supplier has informed the other for whose use the chattel is supplied of its dangerous character.

Restatement (Second) of Torts § 389 (Am. L. Inst. 1965). The term "physical harm" in this context refers to impairment of the human body as well as land and chattels. *Johnson v. Ford Motor Co.*, 281 Ga. App. 166, 173 (2006) ("[T]he Restatement (Second) of Torts clearly provides that physical harm can be damage to property."), *overruled on other grounds by Campbell v. Altec Indus., Inc.*, 288 Ga. 535 (2011). The Georgia Court of Appeals originally adopted section 389, then part of the First Restatement of Torts, in *Moody v. Martin Motor Co.*, 76 Ga. App. 456, 461 (1948).

Applying section 389 of the Second Restatement, Georgia courts have found that product suppliers have a duty to protect third parties from reasonably foreseeable harm that occurs during the normal use of their products. For example, in *Ogletree v. Navistar International Transportation Corp.*, 194 Ga. App. 41 (1989), *overruled on other grounds by Weatherby v. Honda Motor Co., Ltd.*, 195 Ga. App. 169 (1990), the plaintiff's late husband, Ogletree, was killed when the driver of a truck manufactured by the defendant, Navistar, mistakenly backed up and struck him. *Id.* at 42. The trial court

54

granted summary judgment to Navistar on whether it owed a duty to install an audible back-up alarm on its trucks for the safety of bystanders. *Id.* at 44. The Georgia Courts of Appeals then reversed, holding that "it was reasonably foreseeable to [Navistar] that in normal operation, the completed product would be backed up and there would be people behind it who were unaware of its rearward movement towards them." *Id.* at 47. While Navistar argued that the lack of a back-up alarm was "open and obvious," this fact did not foreclose liability to "third parties who may only learn of the absence after not being warned." *Id.* at 47-48. Finally, the court clarified that "[f]oreseeability itself does not allow the imposition of a duty" absent evidence that an ordinarily prudent manufacturer would install the alarm. *Id.* at 48.

The Georgia Court of Appeals again addressed the scope of section 389 in *Dupree v. Keller Industries, Inc.*, 199 Ga. App. 138 (1991). There, the plaintiffs sustained severe hand injuries while operating a hydraulic punch press and brought a negligence claim against the company, Keller, that had sold the press to their employer, Dixie. *Id.* at 139.

> The primary theory of negligence was that Keller was under a duty to conform to industry standards and to regulations of the United States Occupational Safety & Health Administration (OSHA) with respect to the press, that Keller breached the duty by failing to incorporate into the press certain safeguards, namely "control reliability" and "brake monitoring circuitry," and that the failure to add the safeguards was the proximate cause of their injuries.

*Id.* The court held that Keller owed no legal duty to the plaintiffs under section 389 of the Second Restatement. First, the court noted that there had been no injuries during Keller's ownership and use of the press; moreover, even if the industry and federal regulations evidenced an inherent danger in the press, "there was a complete absence of evidence that Keller had reason to believe that Dixie or its employees would not realize the lack of the safeguard devices." *Id.* at 143. The court also reasoned that the plaintiffs knew or should have known about the missing safety devices because similar accidents had occurred with the press before their own injuries, and because there had been multiple inspections and repairs to the press after delivery to Dixie. *Id.* at 140-41, 143.

Although no Georgia court has ever applied section 389 in an environmental pollution case, decisions from other jurisdictions are persuasive as to how a Georgia court might evaluate this action. For example, in *Henry v. St. Croix Alumina, LLC*, 2007 WL 6030275 (D.V.I. Aug. 10, 2007), individuals who lived and worked downwind of an aluminum refinery sued the company, Glencore, that supplied bauxite to the refinery. Red bauxite mud is produced as a by-product of the refining process, and the plaintiffs complained that this mud blew into their neighborhoods during a hurricane due to improper storage. *Id.* at *1. The court declined to grant summary judgment to Glencore on whether it owed a legal duty under section 389 as a bauxite supplier. *Id.* at *14-15. The court found "sufficient evidence for a jury to conclude that Glencore

56

knew or had reason to know that the bauxite was unlikely to be made unreasonably [sic] safe before being put to its expected use." *Id.* at \*15. Glencore's designated representative had visited the refinery multiple times each year and seen the open-air storage of red mud firsthand. Further, Glencore knew that the refinery was in a hurricane zone, and that there was a possibility for mud to be blown into nearby neighborhoods. On these facts, the court determined that Glencore could be held liable under section 389 for continuing to sell bauxite to the refinery. *Id.*

Based on the foregoing authority, the Court concludes that the Plaintiff has identified a specific, established legal duty under Georgia law applicable to the Manufacturing Defendants. That is, a duty arose where the Manufacturing Defendants continuously supplied PFAS to Mount Vernon with knowledge that the chemicals were unlikely to be made reasonably safe in their regular use and could foreseeably contaminate surface waters and downstream water supplies. The following allegations in the Complaint support the imposition of a legal duty here: the Manufacturing Defendants (1) have known for decades that PFAS are toxic and persistent in humans and other animals (Am. Compl. ¶¶ 54-59, 64-67, 70), (2) have long been aware that conventional wastewater treatment processes are ineffective, resulting in PFAS discharges to surface waters and accumulation in sewage sludge (*id.* ¶ 60-61), and (3) notwithstanding these known risks of harm, have supplied PFAS to Mount

Vernon without taking necessary precautions to prevent PFAS from contaminating surface waters such as Raccoon Creek and municipal water supplies. (*Id.* ¶ 163.) In the Court's view, these allegations are not equivalent to a general duty to prevent harm to all the world, but make out a well-established duty under Georgia law with a limited geographic scope.

The Manufacturing Defendants, however, contend that section 389 cannot be used to create a legal duty to control the conduct of third persons like Mount Vernon. (*E.g.*, Reply Br. in Supp. of 3M's Mot. to Dismiss, at 5.) They cite *Maynard v. Snapchat, Inc.*, 357 Ga. App. 496 (2020), for support, but that case is easily distinguishable from the one at bar. In *Snapchat*, the court considered whether Snapchat breached a duty by designing a speed filter into its smartphone application that allowed users to record and overlay their speeds onto a photo or video. The plaintiffs argued that the filter was negligently designed because it encouraged users to endanger themselves and others on the road. *Id.* at 496-98. The court disagreed, holding that Snapchat did not owe a duty to prevent "*the intentional (not accidental) misuse of the product* in a tortious way by a third party." *Id.* at 500 (emphasis added) (quotation marks and citations omitted). By contrast, the Plaintiff here does not allege that Raccoon Creek was contaminated due to Mount Vernon's or any other Defendant's *intentional misuse* of PFAS but as a predictable consequence

58

of the chemicals' normal use.[9] For these reasons, the Court denies the Manufacturing Defendants' Motions to Dismiss on the issue of legal duty.[10]

### ii.   Mount Vernon

The Plaintiff argues that Mount Vernon owed a legal duty because "it was reasonably foreseeable that its discharges of PFAS to the Trion WPCP would result in the release of PFAS into the surrounding environment." (Pl.'s Br. in Opp'n to Mount Vernon's Mot. to Dismiss, at 22.) In *Johnson*, the court considered a nearly identical question: that is, whether carpet manufacturers were subject to a duty based on allegations that they (1) generated industrial wastewater with high levels of PFAS, (2) were aware that PFAS are toxic to human health and persistent in the environment, (3) discharged their industrial wastewater to a local treatment facility, and (4) knew that PFAS

---

[9] Nor would the Manufacturing Defendants be required to control the conduct of third parties to discharge their legal duties. (*Contra* Reply Br. in Supp. of Daikin's Mot. to Dismiss, at 5.) Instead, they could refuse to sell PFAS to customers like Mount Vernon whose disposal methods are inadequate to prevent environmental contamination. Or they could develop alternative chemical compounds that offer the commercially beneficial properties of PFAS but without the harmful effects.

[10] In so holding, the Court recognizes that it has reached a different conclusion than did the *Johnson* court in this district, which held that PFAS suppliers do not owe a duty to protect third parties who are harmed by others' negligent use or disposal of PFAS. 2021 WL 4745421, at *49. However, *Johnson* did not have the occasion to address section 389 of the Second Restatement or the Georgia case law adopting a duty thereunder. *See generally id.* at *44-49.

resist degradation during treatment and inevitably flow via sludge into surface waters. 2021 WL 4745421, at *48. The court chronicled a number of specific, established duties under Georgia law that are applicable to such conduct.

> The Georgia courts recognize a duty not to engage in conduct that will result in pollution of state waters (including non-navigable streams) rendering them unfit for their ordinary purposes by downstream users. . . . Similarly, the Eleventh Circuit recognized that the Georgia legislature has expressed a strong interest in deterring environmental pollution and in protecting the rights of property owners to have water flow upon their land in its natural state free from adulteration. . . . Additionally, the Georgia Supreme Court has held that while as a general rule one is not liable in damages for the natural results from a lawful, proper, and non-negligent use of his property[,] yet where, as here, such uses put in motion conditions that go upon the lands of another and there damage his health or property, such injured person is entitled to relief in equity to abate or terminate such injuries which are alleged to be irreparable and continuous. . . . Georgia law further recognizes that a defendant who conducts an abnormally dangerous activity which proximately causes a plaintiff's injuries should be held liable for those injuries.

*Id.* at *46-47 (quotation marks, citations, and punctuation omitted).

From the Court's perspective, these legal duties extend equally to the present case. The Plaintiff alleges that Mount Vernon (1) has used PFAS in its manufacturing process for at least 35 years (Am. Compl. ¶ 33), (2) has discharged and continues to discharge these chemicals via wastewater into the Trion WPCP (*id.*), (3) has long been aware of the persistence and toxicity of PFAS due to scientific publications and communications with the Manufacturing Defendants (*id.* ¶¶ 70, 167), and (4) knew or should have known that its use, disposal, and/or discharge of PFAS would result in contamination

60

to surface waters and downstream water supplies, endangering human health and the environment. (*Id.* ¶ 167.) Under the Georgia authorities cited in *Johnson*, these allegations are sufficient to establish a legal duty on the part of Mount Vernon. In particular, Mount Vernon has a duty to exercise reasonable care in its use and disposal of unreasonably dangerous chemicals such as PFAS to avoid pollution of state waterways and injury to downstream water users. *See Johnson*, 2021 WL 4745421, at *48. Accordingly, the Court denies Mount Vernon's Motion to Dismiss for lack of a cognizable duty.

### b.  Proximate Causation

The Manufacturing Defendants and Mount Vernon also seek to dismiss the Plaintiff's negligence claim on the grounds that he has not alleged a causal connection between their conduct and his injuries. (*E.g.*, 3M's Br. in Supp. of 3M's Mot. to Dismiss, at 17.) Causation is an essential element of negligence, nuisance, and trespass claims. *Alexander v. Hulsey Env't Servs.*, 306 Ga. App. 459, 462 (2010) (citation omitted). "[P]roximate cause is defined as that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." *Yearty v. Scott Holder Enters., Inc.*, 349 Ga. App. 718, 722 (2019) (quotation marks and citation omitted). Importantly, a "proximate cause is not necessarily the last act or cause, or the nearest act to the injury[.]" *Sprayberry Crossing P'ship v. Phenix Supply Co.*, 274 Ga. App. 364, 365 (2005). Rather, it encompasses "all

61

of the natural and probable consequences of the tortfeasor's negligence, unless there is a sufficient and independent intervening cause." *Cowart v. Widener*, 287 Ga. 622, 627-28 (2010). "[F]or an intervening act of a third party to become the sole proximate cause of a plaintiff's injuries, the intervening act must not have been foreseeable by defendant, must not have been triggered by defendant's act, and must have been sufficient by itself to cause the injury." *Ontario Sewing Mach. Co., Ltd. v. Smith*, 275 Ga. 683, 686 (2002).

According to the Manufacturing Defendants and Mount Vernon, they cannot be the proximate cause of the Plaintiff's alleged injuries without having directed or controlled Trion's sludge disposal operations. (*E.g.*, 3M's Br. in Supp. of 3M's Mot. to Dismiss, at 17-18; Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 20.) They rely on the Georgia Court of Appeals' decision in *Alexander*, in which a customer of a waste disposal facility, HES, was sued for creating a nuisance to nearby properties. 306 Ga. App. at 461-62. The plaintiffs complained that the disposal facility sprayed water from processing human and commercial waste into the air, generating offensive odors, attracting pests, and interfering with the use and enjoyment of their properties. *Id.* at 460-62. The court, however, upheld summary judgment in favor of HES because, "[a]s a customer, it does not direct or control any conduct of the waste disposal operation." *Id.* at 461. Importantly, this holding was

premised on a lack of evidence that HES had *actual knowledge* that its waste was being processed and discarded in an offensive manner. *Id.* at 461-62.

By contrast, the Plaintiff here alleges that the Manufacturing Defendants and Mount Vernon had actual knowledge that their PFAS were contaminating Raccoon Creek and downstream water supplies due to inadequate treatment and disposal methods. (Am. Compl. ¶¶ 61, 164, 167.) *See Johnson*, 2021 WL 4745421, at *50 (distinguishing *Alexander* where carpet manufacturers allegedly discharged PFAS into a local treatment facility with knowledge that the PFAS were contaminating surface waters). This case is more analogous to *Citizens & Southern Trust Co. v. Phillips Petroleum Co., Inc.*, 192 Ga. App. 499 (1989). In *Phillips Petroleum*, the plaintiffs sued two service stations and their supplier, Phillips, after gasoline leaked from underground storage tanks and migrated onto their property. Phillips' only connection with the underground tanks was in its capacity as the supplier of gasoline stored within them. *Id.* at 499-500. Nonetheless, the Georgia Court of Appeals found that Phillips could be liable for the property damage because "a genuine issue of material fact remain[ed] as to . . . Phillips' *actual knowledge* of a defective condition in the storage tanks." *Id.* at 500 (emphasis added).

Next, the Manufacturing Defendants argue that Mount Vernon's, Trion's, and Jarrett's handling and disposal of PFAS were independent, intervening acts that severed the chain of causation. (*E.g.*, 3M's Br. in Supp. of

3M's Mot. to Dismiss, at 18.) The Manufacturing Defendants cite *Edwards v. Campbell*, 338 Ga. App. 876 (2016), for support. In *Edwards,* the plaintiff was injured in a car accident following the improper installation of two new tires on his vehicle. He filed suit against Campbell, the *former* owner of the store where the tires were replaced, alleging that Campbell had negligently trained the *new* owner, Lanham, two years earlier. *Id.* at 876. The Georgia Court of Appeals affirmed that Campbell was not the proximate cause of the plaintiff's injuries. The court emphasized that Lanham had "legal obligations, as a business owner, to ensure the safe installation of . . . tires," and that Campbell was not bound to anticipate "Lanham would blindly follow his instructions on tire installation for *two years* without independently confirming" industry standards. *Id.* at 885 (emphasis in original). The court further reasoned that it "would be unusual and only remotely and *slightly probable*" for a new business owner to rely exclusively on years-old training *Id.* (quotation marks and citation omitted) (emphasis in original).

Unlike in *Edwards*, the Plaintiff's allegations here support that the Manufacturing Defendants should have anticipated the other Defendants' intervening acts and their harmful consequences. The Plaintiff claims that the Manufacturing Defendants sold PFAS to Mount Vernon for decades with knowledge that the chemicals are toxic and persistent and would not be properly treated at the Trion WPCP. (Am. Compl. ¶¶ 54, 60, 164.) Indeed, 3M

64

discovered that PFOA would not biodegrade in water treatment plants in 1978, and 3M and Daikin have been aware of PFAS contamination in their own wastewater effluent and sludge since at least 2000. (*Id.* ¶ 61.) Under these circumstances, the Court cannot say that it was necessarily unforeseeable for third parties to use and dispose of PFAS in a manner that would contaminate surface waters like Raccoon Creek. *See Sims v. American Cas. Co.*, 131 Ga. App. 461, (1974) (foresight does not require a defendant to "anticipate the particular consequences which ensued," but that "consequences of a generally injurious nature might result") (citation omitted); *Warner v. Arnold*, 133 Ga. App. 174, 177 (1974) (an intervening illegal act does not sever proximate causation if the original wrongdoer "had reasonable ground for apprehending that such criminal act would be committed"). For these reasons, the Court denies the Manufacturing Defendants' and Mount Vernon's Motions on causation grounds.[11]

### 5. Count Six: Negligence Per Se

The Plaintiff raises a claim for negligence per se against Mount Vernon in Count Six of the Complaint. "In Georgia, negligence per se arises when a defendant violates a statute or ordinance, satisfying, as a matter of law, the

---

[11] The Defendants and Mount Vernon make identical arguments with respect to the Plaintiff's negligent failure-to-warn and nuisance claims, which fail for the same reasons articulated above.

first two elements of a negligence claim." *Amick v. BM & KM, Inc.*, 275 F. Supp. 2d 1378, 1381 (N.D. Ga. 2003); *see also* O.C.G.A. § 51-1-6. According to the Plaintiff, Mount Vernon owed him and the Proposed Class Members legal duties under the GWQCA and its implementing regulations to:

- not use any waters of the State for the disposal of sewage, industrial wastes, or other wastes, O.C.G.A. § 12-5-29(a);

- immediately notify [the] EPD of the location and nature of PFAS discharges into waters of the State and immediately take all reasonable steps to prevent injury to the health or property of downstream users of waters of the State, O.C.G.A. § 12-5-30.4;

- keep waters of the State free from "industrial wastes or other discharges in amounts sufficient to . . . interfere with the designated use of the water body," Ga. Comp. R. & Regs. § 391-3-6-.03(5)(b);

- keep waters of the State free from "industrial or other discharges which . . . interfere with the designated use of the water body," *id.* § 391-3-6-.03(5)(c); and

- keep waters of the State free from "toxic . . . substances discharged from . . . industries or other sources . . . in amounts, concentrations or combinations which are harmful to humans, animals or aquatic life[.]" *Id.* § 391-3-6-.03(5)(e).

(Am. Compl. ¶ 172.) Mount Vernon, however, contends that these provisions do not apply to its wastewater discharges into the Trion WPCP as opposed to direct effluent discharges into state waters. (Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 21.) Mount Vernon further argues that the Complaint does not allege the kinds of harm and interference to Raccoon Creek prohibited by the GWQCA regulations. (*Id.* at 21-22.)

First, Mount Vernon denies that it has "use[d] any waters of the state for the disposal of . . . industrial wastes" within the meaning of O.C.G.A. § 12-5-29(a). (*Id.* at 21.) Without citation, Mount Vernon insists that it did not have the requisite control over Trion's sludge disposal operations to trigger a duty under the statute. (*Id.* at 21.) But the Court does not read O.C.G.A. § 12-5-29(a)—especially the inclusion of the term "use"—so narrowly to cover only *direct* discharges into state waters. *See Use*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/use (last visited Feb. 24, 2022) ("use" means "to carry out a purpose or action by means of" or "make instrumental to an end or process"). Nor is the Court persuaded that Mount Vernon necessarily did not "control" the disposal of PFAS-contaminated sludge in state waters (to the extent control is an element of O.C.G.A. § 12-5-29(a)). As explained below, the Plaintiff alleges that Mount Vernon had knowledge of and the right to abate the causes of PFAS pollution in Raccoon Creek. *See infra* Section III.B.8.b. These allegations are enough to demonstrate control over a dangerous situation under Georgia law.[12]

---

[12] Mount Vernon also argues that O.C.G.A. § 12-5-29(a) is inapposite because its wastewater discharges were made into the Trion WPCP pursuant to an industrial user permit. However, there remains a factual question as to whether the permit authorized Mount Vernon to discharge wastewater containing PFAS, an unlisted pollutant.

Next, Mount Vernon claims that it was not "in charge of" any PFAS discharges into Raccoon Creek and thus did not violate the notice and response requirements of O.C.G.A. § 12-5-30.4(a). While the statute does not define what it means to be "in charge of" a substance, the phrase indicates a greater degree of control that the knowledge-plus-right-to-abate standard above—something more akin to possession or custody at the time that a substance is discharged into state waters. *See Charge*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/in%20charge (last visited February 24, 2022) ("in charge" means "having the control or custody of something"). This interpretation follows from the specific context in which the phrase is used: O.C.G.A. § 12-5-30.4(a) requires a person "to immediately notify the [EPD] of the location and nature of the discharge and to immediately take all reasonable steps to prevent injury to the health or property of . . . downstream users." To comply with these directives, a person must know with some precision where and when a substance was discharged into state waters, but the Plaintiff does not allege that Mount Vernon had such direct involvement in Trion's sludge disposal. Accordingly, the Court finds that Mount Vernon was not subject to a legal duty under O.C.G.A. § 12-5-30.4(a).

Finally, Mount Vernon argues that the three GWQCA regulations cited in the Complaint also have no bearing on its PFAS discharges. Mount Vernon is correct with respect to Ga. Comp. R. & Regs. §§ 391-3-6-.03(5)(b) and (c). The

68

former states that "[a]ll waters shall be free from oil, scum and floating debris associated with . . . industrial waste," but there are no allegations that PFAS have generated oil, scum, or floating debris in Raccoon Creek. Ga. Comp. R. & Regs. § 391-3-6-.03(5)(b). The latter states that "all waters shall be free from material related to . . . industrial . . . discharges which produce turbidity, color, odor or other objectionable conditions," but there are no allegations that PFAS have produced turbidity, color, odor, or other aesthetic changes in Raccoon Creek.[13] *Id.* § 391-3-6-.03(5)(c). The Plaintiff fares better on his claim under Ga. Comp. R. & Regs. § 391-3-6-.03(5)(e). This regulation prohibits "toxic" industrial discharges "in amounts, concentrations or combinations which are harmful to humans, animals or aquatic life." *Id.* § 391-3-6-.03(5)(e). The Complaint recounts in detail how Mount Vernon's PFAS discharges have caused the contamination of Raccoon Creek and Summerville's municipal water supply, exposing the Plaintiff and the Proposed Class Members to

---

[13] Because "other objectionable conditions" is listed alongside "turbidity, color, [and] odor," the Court interprets the phrase to encompass aesthetic, rather than merely chemical, changes in the waterbody. *See People for Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 879 F.3d 1142, 1147 (11th Cir. 2018) ("The interpretive maxim *noscitur a sociis* counsels that a word is known by the company it keeps. It is frequently employed where, as here, a string of statutory terms raises the implication that the words grouped in a list should be given related meaning.") (quotation marks and citations omitted); *Altamaha Riverkeeper, Inc. v. Rayonier Performance Fibers, LLC*, 346 Ga. App. 269, 270 (2018) (noting Ga. Comp. R. & Regs. § 391-3-6-.03(5)(c) is a non-numerical narrative standard designed to address "aesthetic concerns").

hazardous levels of PFAS. (Am. Compl. ¶¶ 33-36, 38-53, 74-87.) These allegations create sufficient grounds for a legal duty under Ga. Comp. R. & Regs. § 391-3-6-.03(5)(e).

### 6. Count Seven: Negligent Failure to Warn

In Count Seven of the Complaint, the Plaintiff alleges that the Manufacturing Defendants and Mount Vernon negligently failed to warn the purchasers of PFAS products, as well as those who may be foreseeably harmed by PFAS, about the associated risks to human health and the environment. The Manufacturing Defendants argue that this claim should be dismissed because a duty to warn the Plaintiff and other Summerville water customers would be unmanageably broad. (*E.g.*, Daikin's Br. in Supp. of Daikin's Mot. to Dismiss, at 12.) They further contend that it was unnecessary to warn Mount Vernon about the risks of PFAS because those risks were widely known in the industry. (*E.g.*, 3M's Br. in Supp. of 3M's Mot. to Dismiss, at 16.) The Plaintiff responds that it would have been neither impractical nor ineffective for the Manufacturing Defendants to include a warning with the sale of their PFAS products. (Pl.'s Br. in Opp'n to 3M's Mot. to Dismiss, at 8.) He also argues that dismissal would be premature in light of outstanding factual questions, including when Mount Vernon became aware of the dangers of PFAS, and whether any of the Manufacturing Defendants provided adequate warnings to Mount Vernon. (*Id.* at 9.)

To state a cause of action for negligent failure to warn, "a plaintiff must allege facts sufficient to show that (1) the manufacturer knew or reasonably should have known of a danger arising from use of the product and therefore had a duty to warn; (2) the manufacturer breached the duty; and (3) the breach was the proximate cause of the plaintiff's injury." *Johnson v. Shaner SPA Assocs.*, 2011 WL 13323678, at *2 (N.D. Ga. May 19, 2011); *see also Davis v. John Crane, Inc.*, 353 Ga. App. 253, 251 (2019). "The duty to warn may be owed to consumers, reasonably foreseeable users, and[] purchasers of the product. This duty has been extended, in some cases, to reasonably foreseeable third parties." *Certainteed Corp. v. Fletcher*, 300 Ga. 327, 330 (2016) (citations omitted). "In determining whether such a duty exists, the court should consider the foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger. Such matters generally are not susceptible of summary adjudication and should be resolved by a trial in the ordinary manner." *Williams v. Taser Int'l, Inc.*, 2006 WL 8433374, at *6 (N.D. Ga. Oct. 10, 2006) (quotation marks and citations omitted).

Under Georgia law, "the warning need not necessarily be given to the person actually injured in order for the manufacturer to escape liability"; rather, it may be given to "a person in a position such that he may reasonably be expected to act so as to prevent the danger from manifesting itself." *Stovall & Co. v. Tate*, 124 Ga. App. 605, 613 (1971) (citation omitted). In *Shaner SPE,*

71

for example, a hotel guest sustained a head injury when he violently slammed into an electromagnetic door lock protruding into the entryway. 2011 WL 13323678, at *1. He sued the manufacturers of the door lock, alleging that they had a duty to warn the hotel, *not him*, of the "danger inherent in purchasing and installing an electromagnetic door lock that reduced the door height below minimum building and safety codes[.]" *Id.* at *2. On the manufacturers' motion to dismiss, the court held that the complaint sufficiently pleaded a negligent failure-to-warn claim. Because the manufacturers had allegedly managed the installation of the door lock, they were "likely to have superior knowledge of the dangers posed by improper selection or installation of such a lock and influence over its positioning." *Id.* at *3. This knowledge, the court held, established that the manufacturers had a duty to warn the hotel, and that breach of the duty may plausibly be linked to the plaintiff's alleged injuries *Id.*

The Plaintiff makes similar allegations in support of his negligent failure-to-warn claim, including that: (1) the Manufacturing Defendants had superior knowledge of the human health and environmental hazards associated with PFAS (Am. Compl. ¶¶ 54-60, 64-67, 70, 177); (2) they were aware that PFAS could not be effectively treated at conventional wastewater treatment plants like the Trion WPCP (*id.* ¶¶ 61, 180); (3) they failed to warn Mount Vernon about these risks even though it was foreseeable that improper use and disposal of PFAS would result in contamination to surface waters and

downstream water supplies (*id.* ¶¶ 179-80); and (4) their negligent failure to warn proximately caused the contamination of the Plaintiff's domestic water. (*Id.* ¶ 186). Accordingly, there is a sufficient factual basis to find that the Manufacturing Defendants owed a duty to warn Mount Vernon about the risks of PFAS for the protection of reasonably foreseeable third parties like the Plaintiff. *See, e.g.*, *Williams*, 2006 WL 8433374, at *7 (holding the plaintiff, whose husband was killed following multiple taser discharges to his chest, sufficiently alleged that the taser manufacturer had a duty to warn police officers about the potential lethal risks of taser use).

The Manufacturing Defendants, however, contend that *Certainteed Corp. v. Fletcher*, 300 Ga. 327 (2016), and *Reichwaldt v. General Motors LLC*, 304 F. Supp. 3d 1312 (N.D Ga. 2018), carve out an exception to the duty to warn in this case. (*E.g.*, Pulcra's Br. in Supp. of Pulcra's Mot. to Dismiss, at 10-12.) In *Certainteed*, the plaintiff, who was diagnosed with mesothelioma, sued an asbestos manufacturer for failing to warn about the health effects of asbestos. 300 Ga. at 327. The plaintiff's father had worked with asbestos-laden water pipes manufactured by the defendant, and she attributed her disease to years of washing her father's asbestos-covered clothing. The Georgia Court of Appeals agreed with the plaintiff, holding that a warning label could have allowed her father to mitigate the danger from his clothing. *Id.* at 330. The

Georgia Supreme Court, though, reversed based on the "broader application" of the lower court's proposed duty.

> [U]nder the theory developed below, the warning aimed at protecting third parties would not have been systematically distributed or available to the individuals to which it was targeted; instead, the onus would have been on the *worker* to keep those third parties safe. It is not difficult to envision that, while some workers might have taken steps to protect or warn family members or other individuals with whom they came in contact, other workers might not have taken such steps.

*Id.* (emphasis in original). The court deemed it unreasonable to impose a duty to warn all individuals in the plaintiff's position "as the mechanism and scope of such warnings would be endless." *Id.* at 331.

In *Reichwaldt*, the plaintiff suffered serious burns when her car was struck by a GM "CK" pickup truck and then exploded due to a puncture in the truck's gas tank. 304 F. Supp. 3d at 1313. According to the plaintiff, before GM ever manufactured and marketed the CK truck, it knew that the gas tank was vulnerable to side impacts and could cause post-collision fires even in relatively minor accidents. The plaintiff thus alleged that GM had a duty to warn reasonably foreseeable third-party victims about the dangerous fuel tank design. *Id.* at 1314, 1317. Disagreeing, this Court reasoned that such a duty would have "almost no fixed scope."

> With hundreds of thousands of CK pickup trucks on the road, there are countless individuals who could foreseeably come into contact with CK pickup trucks. It would be impractical, if not impossible, to fulfill this purported duty to warn. It is difficult to imagine the manner in which . . . GM would have been able to

74

> make such a warning, and it would be unreasonable to impose
> such a duty.

*Id.* at 1317. The Court also held that GM did not owe a duty to warn the driver

of the CK truck based on "the same logical chain" in *Certainteed*. *Id.* at 1318.

From the Court's perspective, the rationale behind *Certainteed* and

*Reichwaldt* does not foreclose a duty to warn on the facts of this case. Unlike

in *Certainteed* and *Reichwaldt*, it would be neither impractical nor ineffective

for the Manufacturing Defendants to warn Mount Vernon (and other

customers) about the known hazards of PFAS and the proper methods of

disposal. Presumably, this duty would have a more limited scope than the

untold number of workers in *Certainteed* or the hundreds of thousands of truck

owners in *Reichwaldt*. Moreover, the Manufacturing Defendants have

allegedly maintained a continuous commercial relationship with Mount

Vernon over multiple decades, making it more probable that Mount Vernon

would receive and act in accordance with product warnings. (Am. Compl. ¶¶

33, 63, 68.) The effectiveness of these warnings would not depend on the

fortuitous acts of individual workers or truck owners. *Contra Reichwaldt*, 304

F. Supp. 3d at 1318. Rather, sophisticated companies like Mount Vernon

should be expected to take action, when adequately warned, to reduce the

potential harms from their operations to humans and the environment.

Finally, the Manufacturing Defendants oppose a duty to warn on the

grounds that Mount Vernon had long been aware of the risks of PFAS, as

alleged in the Complaint.[14] (3M's Br. in Supp. of 3M's Mot. to Dismiss, at 16 (citing Am. Compl. ¶¶ 60, 70).) Under the "learned intermediary" doctrine, "[w]here the product is vended to a particular group or profession, the manufacturer is not required to warn against risks generally known to such group or profession." *Carter v. E.I. DuPont de Nemours & Co., Inc.*, 217 Ga. App. 139, 139 (1995) (citation omitted). But whether a risk is known to a profession is a question of fact that should not be decided on a motion to dismiss. This question is not resolved by the Plaintiff's allegation that the persistence and toxicity of PFAS have been widely published since at least 2000—especially since he also alleges that some of the Manufacturing Defendants have been selling PFAS to Mount Vernon for far longer. (Am. Compl. ¶¶ 33, 70.) And even though 3M allegedly produced a warning about PFAS disposal in 1986, whether this (and any other) warning was adequate under the circumstances also presents a question of fact. (*Id.* ¶¶ 60, 73.) *See Thornton v. E.I. Du Pont De Nemours & Co., Inc.*, 22 F.3d 284, 289 (11th Cir.

---

[14] The Manufacturing Defendants make a similar argument on the issue of proximate causation: that their failure to warn Mount Vernon did not cause the Plaintiff's injuries because Mount Vernon allegedly knew its use and disposal of PFAS would contaminate downstream water supplies. (*E.g.*, 3M's Br. in Supp. of 3M's Mot. to Dismiss, at 19-20 (citing Am. Compl. ¶¶ 70, 167, 182-83.).)

1994). For these reasons, the Court denies the Manufacturing Defendants'
Motions to Dismiss as to the Plaintiff's claim for negligent failure to warn.

### 7.  Count Eight: Wanton Conduct and Punitive Damages

In Count Eight of the Complaint, the Plaintiff alleges that he is entitled
to punitive damages based on the Manufacturing Defendants' and Mount
Vernon's "knowing[], willful[] or wanton[]" conduct "with conscious disregard
and indifference to the rights and safety others[.]" (Am. Compl. ¶¶ 190-93.) The
Plaintiff also alleges that these Defendants are liable for his attorney's fees
and litigation expenses because they have exhibited bad faith and stubborn
litigiousness, which has put the Plaintiff through unnecessary trouble and
expense. (*Id.* ¶ 194.) Mount Vernon contends that, because the Plaintiff's
underlying claims are meritless, so too are these derivative claims for punitive
damages and attorney's fees. (Mount Vernon's Br. in Supp. of Mount Vernon's
Mot. to Dismiss, at 24.) Moreover, even if any of the underlying claims survive
dismissal, Mount Vernon insists that it lawfully disposed of PFAS in
compliance with a validly issued permit, and that its conduct does not meet the
standards for punitive damages or attorney's fees. (*Id.*)

As an initial matter, Mount Vernon is correct that the Plaintiff cannot
recover punitive damages or attorney's fees unless he recovers damages or
other relief on an underlying, substantive claim. *ABH Corp. v. Montgomery*,
365 Ga. App. 703, 706 (2020) ("The derivative claims of attorney fees and

punitive damages will not lie in the absence of a finding of compensatory damages on an underlying claim.") (citation omitted). However, because the Court has declined to dismiss the Plaintiff's tort claims as to Mount Vernon, his claims for punitive damages and attorney's fees also survive dismissal. Moreover, Mount Vernon's industrial user permit does not shield it from liability for punitive damages since, as explained above, its compliance with that permit is a disputed factual question. Nor can the Court say at this preliminary stage whether Mount Vernon's conduct falls outside the scope of O.C.G.A. § 13-6-11, which awards litigation expenses "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." In general, the jury should be allowed to decide whether a party has displayed such conduct in the course of the litigation. *Steel Magnolias Realty, LLC v. Bleakley*, 276 Ga. App. 155, 156 (2005). Accordingly, the Court denies Mount Vernon's Motion to Dismiss as to the Plaintiff's punitive damages and attorney's fees.[15]

### 8.  Counts Nine and Ten: Public Nuisance and Abatement

---

[15] For the same reasons, the Court also denies Mount Vernon's Motion to Dismiss as to the Plaintiff's class claims, which is based on the now-rejected argument that the Plaintiff has no viable claims against Mount Vernon. (Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 24-25.) From the Court's perspective, Mount Vernon's other contention that the "Plaintiff's class claims are plagued with individual questions," is premature at this juncture. (*Id.* at 25.)

In Counts Nine and Ten of the Complaint, the Plaintiff alleges that the Defendants have caused or contributed to a public nuisance, seeking damages against the Manufacturing Defendants and Mount Vernon and an injunction to abate the nuisance against all of the Defendants. Under Georgia law, a nuisance is anything that "causes hurt, inconvenience, or damage to . . . . an ordinary, reasonable man." O.C.G.A. § 41-1-1. A public nuisance is "one which damages all persons who come with the sphere of its operation, though it may vary in its effects on individuals." *Id.* § 41-1-2. The Motions to Dismiss put forth two main arguments in opposition to the Plaintiff's nuisance claims: (1) the Plaintiff does not allege special damages as required to maintain a private right of action for public nuisance, and (2) the Manufacturing Defendants and Mount Vernon did not exercise control over the cause of the alleged harm.[16] The Court addresses each of these arguments in turn.

### a. Special Damages

---

[16] Mount Vernon also claims that it cannot be liable in nuisance because its wastewater discharges complied with an industrial user permit. (Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 23.) However, this arguments fails under the statutory definition of "nuisance," which specifically includes otherwise lawful acts. O.C.G.A. § 41-1-1 ("[T]he fact that the act done may otherwise be lawful shall not keep it from being a nuisance."); *see also May v. Brueshaber*, 265 Ga. 889, 889 (1995) ("If one do an act, of itself lawful, which, being done in a particular place, necessarily tends to the damage of another's property, it is a nuisance[.]" (citation omitted)).

The Defendants contend that the Plaintiff cannot show any special damages where, as here, his alleged injuries are shared by other members of the public. (*E.g.*, 3M's Br. in Supp. of 3M's Mot. to Dismiss, at 24; Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 22-23; Trion's Br. in Supp. of Trion's Mot. to Dismiss, at 13-14; Jarrett's Br. in Supp. of Jarrett's Mot. to Dismiss, at 12-13.) "A public nuisance generally gives no right of action to any individual. However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action." O.C.G.A. § 41-1-3. According to the Plaintiff, the alleged injuries to his real property interests are recognized as special damages under Georgia law, no matter how many other Summerville water users sustained similar injuries. (Pl.'s Br. in Opp'n to 3M's Mot. to Dismiss, at 22-23.)

The Plaintiff's argument is consistent with *Savannah, Florida & Western Railway Co. v. Parish*, 117 Ga. 893 (1903). There, the Georgia Supreme Court distinguished personal injury and property damage from general public injury on the basis that the former, "[i]n the very nature of things . . . can only be predicated of the individual." *Id.* at 280.

> [T]he public cannot be said to enjoy health or suffer sickness. . . . Whatever affects his health affects him specially, and him alone. Such damage is special damage within the meaning of the Code, and the fact that other citizens suffer similar special damages does not convert his injury into the nature of public damages. So, too, anything which damages a particular plaintiff's property, or renders it unfit for use, is not lost in the general and public nuisance. . . . [W]here the cause and the effect are close and

80

immediate; when the inhabitants of a particular house are rendered sick; when the rental value of the residence is immediately and proximately due to a special and particular cause close at hand, and when that cause is produced by a violation of law or the maintenance of something contrary to law, or which in its nature works hurt to those near by—a cause of action arises in favor of the injured party against the maintainer of the nuisance.

*Id.* at 280-81. An injured person does not "lose this right because others in the vicinity have similar causes of action. To hold otherwise would be to render the defendant liable for one injury, and hold him harmless where many were damaged." *Id.* at 281 ("No matter how numerous the persons may be who have sustained this peculiar damage, each is entitled to compensation for his injury.") (citation omitted).

Relying on *Savannah, Florida & Western Railway Co.*, the *Johnson* court held that the plaintiff sufficiently pleaded special harm arising out of PFAS contamination to his and the putative class members' drinking water. 2021 WL 4745421, at *62-63. The court specifically differentiated between the allegations of harm to the general public and the allegations of harm to the putative class members.

[T]he general public harm involves the contamination of the Conasauga, Oostanaula, and Coosa Rivers and the interference with the use and enjoyment of those waters, including the provision of safe drinking water. But the putative class members have experienced special harm in the particular harm of having to pay the added costs of attempting to remove the PFAS contamination by way of increased rates and surcharges they incur as ratepayers.

81

*Id.* at \*62 (quotation marks and citation omitted). The court also found support in federal case law in Georgia and Alabama recognizing that "environmental cleanup costs qualify as special pecuniary damages conferring standing to maintain a public nuisance claim arising out of environmental contamination." *Id.* at \*63 (quoting *Briggs & Stratton Corp. v. Concrete Sales & Servs.*, 29 F. Supp. 2d 1372, 1376 (M.D. Ga. 1998)) (citing *West Morgan-East Lawrence Water & Sewer Auth. v. 3M Co.*, 208 F. Supp. 3d 1227 (N.D. Ala. 2016)).

As in *Johnson*, the Plaintiff here alleges that the PFAS contamination caused by the Defendants "has unreasonably interfered with, and continues to interfere with, a right common to the general public—the use and enjoyment of Raccoon Creek and downstream waters, including the Chattooga River and Weiss Lake[.]" (Am. Compl. ¶ 199; *see also id.* ¶¶ 200, 207-08.) Further, the Plaintiff and the Proposed Class Members have allegedly suffered special damages in the form of: "(1) the diminished value of their properties; (2) interference with their use and enjoyment of their properties; (3) upset, annoyance and inconvenience; (4) increased rates and surcharges as Summerville ratepayers; and (5) costs incurred to obtain alternate potable water supplies." (*Id.* ¶ 202.) These real and personal property damages give rise to a private cause of action for public nuisance—regardless of the Plaintiff's request to have this case certified as a class action. *Johnson*, 2021 WL 4745421, at \*63 (finding "plaintiffs can show special damages even where

they represent a class of thousands"). Therefore, the Court denies the Manufacturing Defendants', Mount Vernon's, Trion's, and Jarrett's Motions to Dismiss Counts Nine and Ten for lack of special damages.

### b. Control over the Cause of the Harm

Next, the Manufacturing Defendants contend that they are not liable for the alleged nuisance because they lack control over Mount Vernon's wastewater discharges and Trion's disposal operations. (*E.g.*, 3M's Br. in Supp. of 3M's Mot. to Dismiss, at 23.) Mount Vernon similarly argues that it has no control over PFAS disposal after it discharges wastewater into the Trion WPCP. (Mount Vernon's Br. in Supp. of Mount Vernon's Mot. to Dismiss, at 23.) Under Georgia law, "[t]he essential element of nuisance is control over the cause of the harm. The tortfeasor must be either the cause or a concurrent cause of the creation, continuance, or maintenance of the nuisance." *Grinold v. Farist*, 284 Ga. App. 120, 122 (2007) (citation omitted). According to the Plaintiff, the Manufacturing Defendants and Mount Vernon exercised sufficient control by continuously distributing, using, and discarding PFAS with knowledge that the PFAS was creating a public nuisance. (Pl.'s Br. in Opp'n to 3M's Mot. to Dismiss, at 20.)

A defendant need not *own* the cause of a nuisance to have *control* over it. *Sanders v. Henry Cnty., Ga.*, 484 F. App'x 395, 400 (11th Cir. 2012) ("While ownership of property generally may give rise to a nuisance when property is

used to cause harm to others, such ownership is not an essential element of the cause of action for nuisance."); *Bailey v. Annistown Rd. Baptist Church, Inc.*, 301 Ga. App. 677, 688 (2009) ("[I]t is control, not ownership, of the relevant property that is at issue[.]"). Nor must a defendant *create* a nuisance to be liable for *continuing* or *maintaining* it. *Bailey*, 301 Ga. App. at 688 ("[L]iability for a nuisance arises out of responsibility for the continuance or maintenance of a nuisance in addition to the creation of one[.]"). Still, "some Georgia courts have emphasized that, in the case of a continuing nuisance, to be liable, the defendant must at least have a 'legal right' to terminate the cause of the injury." *Johnson*, 2021 WL 4745421, at *59. In sum, where a defendant has knowledge of and a right to abate a dangerous situation, but he fails to do so within a reasonable time, his actions or omissions may constitute a nuisance. *Id.*; *Horton v. City of Macon*, 144 Ga. App. 380, 382 (1977) ("Knowledge of a dangerous situation created by a defect and failure to repair the defect within a reasonable time would amount to a nuisance.")

For example, in *Fielder v. Rice Construction Co., Inc.*, 239 Ga. App. 362 (1999), homeowners sued a county health department for creating, continuing, and maintaining a nuisance when raw sewage constantly seeped from a county-approved septic tank on their property. *Id.* at 365. The health department argued that its conduct did not constitute a nuisance since it did not own or control the plaintiff's property, but the Georgia Court of Appeals

disagreed, finding that the health department had control over whether to approve the lot for septic tank use and to compel the developer to install abatement measures. *Id.* at 366-67. First, the court emphasized that the health department not only approved the septic tank but also waived soil inspection requirements designed to prevent the problem. *Id.* at 364. Therefore, it "knew of the probable potential problem but yielded to pressure to allow substandard septic tanks conditions to be approved nonetheless." *Id.* Second, when put on actual notice of the septic tank problem, the health department "refused to require [the developer] to take the appropriate steps necessary to abate the nuisance." *Id.* at 365.

Notwithstanding *Fielder*, the Manufacturing Defendants argue that "[t]here can be no claim for nuisance against manufacturers whose products allegedly cause harm after they left the manufacturers' control." (3M's Br. in Supp. of 3M's Mot. to Dismiss, at 21.) However, their cited authorities do not support such an expansive liability shield for manufacturers and, in any event, are distinguishable from the facts of this case. In *Corporation of Mercer University v. National Gypsum Co.*, 1986 WL 12447, at \*1 (M.D. Ga. Mar. 9, 1986), Mercer University filed a nuisance action against the manufacturers of asbestos-containing products that had to be removed from university buildings due to health concerns. The court dismissed the nuisance claim on the grounds that the manufacturers had no legal right to abate the asbestos problem by

forcing repairs or replacements on the plaintiff's property. *Id.* at *6. In *Jordan v. Southern Wood Piedmont Co.*, 805 F. Supp. 1575, 1577 (S.D. Ga. 1992), landowners whose properties were contaminated with a pesticide called penta sued a nearby wood treatment plant and its penta supplier Dow Chemical. The court granted summary judgment to Dow on the plaintiffs' nuisance claim, concluding that it was not associated with the plant's handling and disposal activities. *Id.* at 1582. Discovery revealed that Dow had sold only one penta shipment to the wood treatment plant, *id.* at 1579 n.7, and had never given the plant advice, solicited or otherwise, concerning PFAS disposal. *Id.* at 1580.

As in *Fielder*, and in contrast to *Mercer University* and *Jordan*, the Plaintiff here alleges that the Manufacturing Defendants and Mount Vernon have exercised control over the cause or a concurrent cause of the nuisance. According to the Complaint, the Manufacturing Defendants have for decades sold PFAS to Mount Vernon "without adequate warnings of their dangers when they knew or should have known [the PFAS] would be improperly disposed of and discharged into the Trion WPCP." (Am. Compl. ¶ 54; *see also id.* ¶¶ 60-61, 197.) Similarly, the Plaintiff alleges that Mount Vernon has discharged wastewater containing PFAS into the Trion WPCP in a manner that it knew or should have known would result in environmental contamination. (*Id.* ¶¶ 35, 70-71, 198.) The Manufacturing Defendants and Mount Vernon could thus be liable, at a minimum, for continuing or maintaining the nuisance given that

they have a legal right to abate the PFAS pollution but have failed to take appropriate remedial steps in the Plaintiff's view. For example, as the *Johnson* court proposed, the Manufacturing Defendants could refuse to sell PFAS except to customers that have established and complied with proper disposal methods, while Mount Vernon could find alternative means to dispose of its wastewater or eliminate the use of PFAS in its mill altogether. 2021 WL 4745421, at *61, *65. For these reasons, the Court denies the Manufacturing Defendants' and Mount Vernon's Motions to Dismiss on the grounds that they have no control over the cause of harm.

## C. Summerville's Motion to Intervene

Summerville moves to intervene as a plaintiff in this action pursuant to Federal Rule of Civil Procedure 24(a)(2), which provides:

> On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

(Summerville's Br. in Supp. of Summerville's Mot. to Intervene, at 3.) None of the existing Parties oppose Summerville's intervention request on substantive grounds. Mount Vernon filed a response to the Motion to Intervene arguing that intervention "appears premature until this Court first determines whether any aspect of [the] Plaintiff's lawsuit will survive." (Mount Vernon's Br. in Opp'n to Summerville's Mot. to Dismiss, at 2-3.) Mount Vernon further

proposed that the Court either deny the Motion to Intervene without prejudice or defer a ruling pending the resolution of the Defendants' Motions to Dismiss. (*Id.* at 5.) Accordingly, because all of the Plaintiff's claims have survived dismissal at least in part, the Court grants Summerville's Motion to Intervene.[17]

## IV.  Conclusion

For the foregoing reasons, the Court GRANTS Proposed Intervenor-Plaintiff City of Summerville's Amended Motion to Intervene [Doc. 84], DENIES Defendant Daikin America, Inc.'s Motion to Dismiss [Doc. 86], GRANTS in part and DENIES in part Defendant Mount Vernon Mills, Inc.'s Motion to Dismiss [Doc. 87], DENIES Defendant Ryan Dejuan Jarrett's Motion to Dismiss [Doc. 88], DENIES Defendant 3M Company's Motion to Dismiss [Doc. 89], DENIES Defendant Town of Trion's Motion to Dismiss [Doc. 90], DENIES Defendant Huntsman International, LLC's Motion to Dismiss [Doc.

---

[17] 3M and Daikin submitted a Motion to Strike Summerville's "procedurally and substantively improper" reply brief in support of its Motion to Strike. (3M & Daikin's Br. in Supp. of 3M & Daikin's Mot. to Strike, at 1.) However, "a motion to strike is not the proper vehicle for challenging matters not contained in pleadings, which [Federal Rule of Civil Procedure] 7(a) defines to include complaints, answers, and court-ordered replies to answers, but not briefs or supporting exhibits." *Chavez v. Credit Nation Auto Sales, Inc.*, 966 F. Supp. 2d 1335, 1344 (N.D. Ga. 2013). The Court thus denies the Motion to Strike. To the extent Summerville's brief violates the Local Rules or makes improper arguments, the Court may exercise its discretion to decline to consider it. LR 7.1(F), NDGa.

91], DENIES Defendant Pulcra Chemicals, LLC's Motion to Dismiss [Doc. 92],

DENIES as moot the Plaintiff's Motion for Leave to File Sur-Reply [Doc. 114],

and DENIES Defendant 3M Company and Daikin America, Inc.'s Motion to

Strike [Doc. 128].

SO ORDERED, this ___30th___ day of March, 2022.


THOMAS W. THRASH, JR.

United States District Judge