IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

EARL PARRIS, JR., individually, and
on behalf of a Class of persons similarly
situated,

          *Plaintiff*,

CITY OF SUMMERVILLE,
GEORGIA,

          *Intervenor-Plaintiff*,

v.

3M COMPANY, DAIKIN AMERICA,
INC., E.I. DU PONT DE NEMOURS
AND COMPANY, HUNTSMAN
INTERNATIONAL, LLC, PULCRA
CHEMICALS, LLC, MOUNT
VERNON MILLS, INC., THE
CHEMOURS COMPANY, and the
TOWN OF TRION, GEORGIA,

          *Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 4:21-cv-40-TWT

TRIAL BY JURY REQUESTED

Complaint – Class Action

## SECOND AMENDED INDIVIDUAL AND CLASS ACTION COMPLAINT

Plaintiff Earl Parris, Jr., individually, and on behalf of a Class of other persons

similarly situated, files this Second Amended Individual and Class Action

Complaint as of right[1] against Defendants and the additional parties Defendant named herein alleges as follows:

## STATEMENT OF THE CASE

1.      This is an individual action on behalf of Plaintiff Earl Parris, Jr., pursuant to Section 505(a)(1) of the federal Clean Water Act ("CWA" or "Act"), 33 U.S.C. § 1365(a)(1), to address ongoing unlawful pollution of surface waters by illegal discharges of toxic per- and polyfluoroalkyl substances ("PFAS") into the Town of Trion Water Pollution Control Plant ("Trion WPCP") which have contaminated sludge and biosolids that are disposed of in the Raccoon Creek watershed. The discharges of PFAS from this sludge have contaminated Raccoon Creek, which is the main source of drinking water for the City of Summerville, Georgia ("Summerville"), with PFAS at toxic levels.

2.      This is also an individual action on behalf of Plaintiff Earl Parris, Jr., under the citizen suit provision of the federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), which authorizes private persons to sue those responsible for disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment, to require

---

[1] See Scheduling Order for addition of new parties [Doc. 187]. The Second Amended Complaint also removes Ryan Dejuan Jarrett as a defendant, as a result of the Consent Decree Plaintiff entered with him [Doc. 243].

Defendant Mount Vernon to cease PFAS discharges into the Trion WPCP, to require Defendant Trion to cease disposing of PFAS contaminated sludge on agricultural or other property from which PFAS may be released into groundwater or surface water, to require Defendants Mount Vernon and Trion to provide an effective permanent treatment system for the Summerville water supply capable of removing PFAS from the drinking water, and to require Defendants Mount Vernon and Trion to remove PFAS contaminated sludge from the Racoon Creek watershed.

3.    This is also a Class Action under Fed. R. Civ. P. 23 and Georgia law on behalf of individual Plaintiff and Class Representative Earl Parris, Jr., and a Class of people similarly situated, who have been damaged and continue to be damaged due to the wrongful acts and omissions by Defendants that have caused and continue to cause PFAS to be discharged into Raccoon Creek contaminating the Summerville drinking water supply with PFAS at toxic levels. By such wrongful acts and omissions, Defendants have created and maintained a continuing public nuisance causing special harm and injury to the Plaintiff and the Members of the Proposed Class.

4.    Plaintiff and Members of the Proposed Class are owners and occupants of property in the City of Summerville, Georgia, and Chattooga County, Georgia, who are provided domestic water service by Summerville, which is the only source

of running, potable water to their homes. Summerville uses a water intake on Raccoon Creek as its primary water source. As a direct and proximate result of the Defendants' wrongful acts and omissions, Plaintiff and Members of the Proposed Class have been damaged by the presence of toxic levels of PFAS in Raccoon Creek and in their water supply.

5.      Defendant Mount Vernon Mills, Inc., has operated a large textile mill in Trion, Georgia, and has used products from Defendants 3M Company ("3M"), Daikin America, Inc. ("Daikin"), Huntsman International, LLC ("Huntsman"), and Pulcra Chemicals, LLC ("Pulcra"), E.I. du Pont de Nemours and Company ("Dupont"), and The Chemours Company ("Chemours") (collectively, "PFAS Manufacturing Defendants"), containing various PFAS in its manufacturing process to provide stain resistance and water resistance to its fabrics. These chemicals used in the Mount Vernon manufacturing process have been and are being discharged in wastewater to the Trion WPCP. The sludge from the WPCP contains high levels of PFAS, which resist degradation during processing at the WPCP and are concentrated in the sludge disposed of by Trion. The sludge from the Trion WPCP is dewatered and disposed of by land application at a variety of locations throughout northern Georgia and northern Alabama, including farm property within the Raccoon Creek watershed.

6.     The PFAS Manufacturing Defendants have provided various formulations containing PFAS to Mount Vernon, and the PFAS Manufacturing Defendants and Defendant Mount Vernon knew or should have known that the PFAS would be discharged from Mount Vernon's manufacturing facility into a wastewater treatment facility that would not remove PFAS, and that PFAS would be released into the environment in sludge and effluent from the Trion WPCP receiving the PFAS discharged from Mount Vernon.

7.     As a result of the PFAS Manufacturing Defendants' and Mount Vernon's negligent acts and omissions and the nuisance thereby created, maintained, and continued, Plaintiff and Proposed Class Members have suffered damages different in kind and degree from the damage suffered by the public in general, including damages justifying an award of compensatory and consequential damages. Plaintiff and Proposed Class Members are also seeking equitable and injunctive relief to compel all Defendants to cease discharges of PFAS, to remove PFAS from the Summerville drinking water supply and to remove PFAS contaminated sludge from the Raccoon Creek watershed. In addition, based on the PFAS Manufacturing Defendants' and Mount Vernon's intentional, willful, wanton, reckless, malicious, and oppressive misconduct, Plaintiff and proposed Class Members are seeking recovery of punitive damages against these Defendants.

**JURISDICTION AND VENUE**

8.     This Court has subject matter jurisdiction over the CWA claims set forth in this Second Amended Complaint against Defendants Mount Vernon and Trion, pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331.

9.     This Court has subject matter jurisdiction over the RCRA claim set forth in this Second Amended Complaint pursuant to Sections 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), and 28 U.S.C. § 1331.

10.     Plaintiff has complied with the pre-suit notice provisions of the CWA. Pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiff, on November 20, 2020, mailed notices of intent to file suit under the CWA to Defendants Mount Vernon, Trion, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Georgia Department of Natural Resources' Environmental Protection Division ("EPD"), and the United States Attorney General ("CWA Notices"). [Attached to the First Amended Complaint and incorporated by reference herein] [Docs. 73, 73-1]. These Notices complied with 33 U.S.C. § 1365(b)(1)(A) and with 40 C.F.R. Part 135, Subpart A.  More than 60 days have passed since the CWA Notices were served on Defendants Mount Vernon and Trion, and these agencies.

11.   Neither EPA nor EPD has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or State to redress the violations of the CWA by Defendants Mount Vernon and Trion.  In addition, neither EPA nor EPD has commenced an administrative civil penalty action under Section 309(g)(6) of the Act, 33 U.S.C. § 1319(g)(6), or under a comparable Georgia law, to redress the violations of the CWA by these Defendants.  Any administrative action to address these violations taken by EPD would not preempt this CWA lawsuit because Georgia's water pollution enforcement scheme is not comparable to the enforcement provisions of the CWA.

12.   Plaintiffs have complied with the pre-suit notice provisions of the RCRA. Pursuant to Section 7002(b)(1)(A) of RCRA, 42 U.S.C. § 6972(b)(1)(A), on November 20, 2020, Plaintiffs mailed notices of intent to file suit under the RCRA to Defendants Mount Vernon and Trion, the Administrator of the EPA, the Regional Administrator of the EPA, the Georgia EPD, and the United States Attorney General. ("RCRA Notices") [attached to the First Amended Complaint and incorporated herein] [Docs. 73, 73-1]. These Notices complied with 42 U.S.C. § 6972(b)(1)(A) and with 40 C.F.R. § 254.3.  More than ninety (90) days have passed since the Notices were served on the Defendants Mount Vernon and Trion, and these agencies.

13.     The EPA has not commenced, nor is it prosecuting, a civil action in a court of the United States under 42 U.S.C. § 6973 or under 42 U.S.C. § 9606 to address the imminent and substantial endangerment to health or the environment. EPA has not engaged in a removal action nor incurred costs to initiate a Remedial Investigation and Feasibility Study under 42 U.S.C.A. § 9604. EPA has not obtained a court order (including a consent decree) or issued an administrative order under 42 U.S.C. § 9606 or 42 U.S.C. § 6973, pursuant to which the City is conducting a removal action, Remedial Investigation and Feasibility Study, or proceeding with a remedial action on the property where the sludge has been dumped.

14.     The Georgia EPD has not commenced, nor is it prosecuting, an action under 42 U.S.C. §6972(a)(1)(B) to address the imminent and substantial endangerment to health or the environment; nor is the Georgia EPD actually engaging in a removal action under 42 U.S.C. § 9604; nor has the Georgia EPD incurred costs to initiate a Remedial Investigation and Feasibility Study under 42 U.S.C. § 9604 on the property where the sludge has been dumped.

15.     Plaintiff will, immediately upon receipt of a file-stamped copy of this Second Amended Complaint, mail a copy to the Administrator of the EPA, the Regional Administrator of the EPA, and the Attorney General of the United States.

16.     Venue is appropriate in the Northern District of Georgia, pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations of the Act alleged herein are located within this judicial district.

17.     Venue is appropriate in the North District of Georgia, pursuant to 42 U.S.C. 6972(c), because the violations of RCRA alleged herein are located within this district.

18.     This Court has jurisdiction over the state law claims in this action, pursuant to 28 U.S.C. 1332(d)(2)(A), because it is a class action in which any member of a class of plaintiffs is a citizen of a State different from any Defendant, and the amount in controversy exceeds the sum of five million dollars ($5,000,000), exclusive of interest and costs.

19.     This Court has supplemental jurisdiction over the state law claims in this action in accordance with 28 U.S.C. § 1367(a), because they are so related to federal claims in the action within the Court's original jurisdiction that they form part of the same case or controversy.

20.     Venue is also properly in this Court pursuant to 28 U.S.C. § 1391(b), because Defendants have conducted substantial business in this District, and Defendants have caused harm to Plaintiff and to Class Members residing in this District. In addition, Plaintiff and Proposed Class Members reside in this District,

and a substantial part of the events or omissions giving rise to their claims occurred in the Northern District of Georgia.

## PARTIES

21.     Plaintiff Earl Parris, Jr., is a resident of Chattooga County, Georgia, and resides in the City of Summerville. Plaintiff is a customer of the City of Summerville Public Works and Utility Department, which provides water to Plaintiff's residence that Plaintiff uses for drinking, bathing, cooking and other domestic purposes. The City of Summerville uses water from Raccoon Creek as the main source of Plaintiff's domestic water supply, and given that Raccoon Creek has been and continues to be contaminated with PFAS as a result of Defendants' acts and omissions, Plaintiff has a particular interest in protecting the water quality of Raccoon Creek and its tributaries upstream of the intake for the Summerville water treatment plant. The sole source of running, potable water to Plaintiff's home is contaminated with PFAS, and Plaintiff has been, and will continue to be, directly and substantially injured in his use and enjoyment of his property as a direct result of Defendants' violations of the CWA and RCRA, and the contamination of Raccoon Creek, in particular. The relief sought in this case would provide redress for Plaintiff's injuries. Because these injuries are being caused by pollution of waters of the United States, the injuries fall within the zone of interests protected by the

CWA. Because these injuries are being caused by Defendants' disposal of solid waste containing PFAS, the injuries fall with the zone of interests protected by RCRA's imminent and substantial endangerment provision.

22.    Plaintiff is a "citizen" within the meaning of 33 U.S.C. §§ 1365(a) and 1365(g).

23.    Plaintiff is a "person" within the meaning of 42 U.S.C. 42 U.S.C. §§ 6903(15) and 6972(a).

24.    Defendant Mount Vernon Mills, Inc., is a foreign corporation with its headquarters in South Carolina which owns and operates a textile mill in Trion, Georgia, from which it discharges various PFAS used in its processes to the Town of Trion WPCP.

25.    Defendant the Town of Trion is a municipal corporation organized under the laws of the State of Georgia which owns and operates the Trion WPCP, consisting of various wastewater collection, treatment and sludge disposal facilities.

26.    Defendants Mount Vernon Mills and Trion are "person[s]" within the meaning of 33 U.S.C. §§ 1362(5) and 1365(a)(1).

27.    Defendants Mount Vernon Mills and Trion are also "person[s]" within the meaning of 42 U.S.C. §§ 6903(15) and 6972(a)(1)(B).

28.     Defendant 3M Company ("3M") is a foreign corporation authorized to do business in the State of Georgia, that, at all times relevant hereto, has conducted business in this District. Among other acts and omissions, Defendant 3M has for many years manufactured and supplied products containing PFAS to Mount Vernon Mills.

29.     Defendant Daikin America, Inc. ("Daikin") is a foreign corporation with its headquarters in New York, that, at all times relevant hereto, has conducted business within this District. Among other acts and omissions, Defendant Daikin has for many years manufactured and supplied products containing PFAS to Mount Vernon Mills.

30.     Defendant Huntsman International, LLC ("Huntsman"), is a foreign corporation with its headquarters in Texas, authorized to do business in the State of Georgia, and, at all times relevant hereto, has conducted business in this District. Among other acts and omissions, Defendant Huntsman and its predecessor, Ciba, Inc., have manufactured and supplied products containing PFAS to Mount Vernon Mills.

31.     Defendant Pulcra Chemicals, LLC ("Pulcra"), is a foreign corporation with its U.S. headquarters in South Carolina, that, at all times relevant hereto, was conducting business in this District. Among other acts and omissions, Defendant

Pulcra has manufactured and supplied products containing PFAS to Mount Vernon Mills.

32.     Defendant E.I. du Pont de Nemours and Company ("Dupont") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business in this District. Among other acts and omissions, Defendant DuPont has manufactured and supplied PFAS to Defendant Huntsman and its predecessor, Ciba Specialty Chemicals, which were sold to Mount Vernon Mills.

33.     Defendant The Chemours Company ("Chemours") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, was conducting business in this District. Among other acts and omissions, Defendant Chemours has manufactured and supplied PFAS to Defendant Huntsman, which were sold to Mount Vernon Mills.

## FACTUAL ALLEGATIONS

**Mount Vernon's Discharges of PFAS to Trion WPCP**

34.     For at least thirty-five (35) years Mount Vernon Mills, Inc., has operated a large textile mill in Trion, Georgia, producing broad-woven fabrics and dyeing and finishing broad-woven fabrics of cotton, and polyester/cotton or cotton/nylon blends. During this time, Mount Vernon has used products containing

various PFAS sold by the PFAS Manufacturing Defendants in its manufacturing process to provide stain resistance and water resistance to its fabrics. These chemicals used by Mount Vernon have been and are being discharged in wastewater to the Trion WPCP. Ninety-four percent (94%) of the wastewater received by the Trion WPCP is discharged by Mount Vernon Mills.

35.    Sampling of Mount Vernon Mills' discharges to the Trion WPCP in 2020 shows that Mount Vernon Mills continues to discharge high levels of PFAS to the Trion WPCP, including Perfluorooctanoic Acid ("PFOA") and Perfluorooctanesulfonic Acid ("PFOS"). An August 4, 2020 sample of Mount Vernon's discharge to the Trion WPCP showed elevated levels of numerous PFAS, including PFOA at 31.6 parts per trillion ("ppt") and PFOS at 135 ppt. Samples taken on February 5, 2020, June 22, 2020, and December 16, 2020, showed similar results. Based on Mount Vernon's ongoing discharges to the Trion WPCP and its failure to remove PFAS from these discharges, the discharges of PFAS are continuing as of the date of this Second Amended Complaint and will continue in the future.

36.    The treatment process used by the Trion WPCP is an activated sludge biological treatment process which is incapable of destroying or degrading PFAS in the wastewater from Mount Vernon Mills. As a result, PFAS pass through the Trion WPCP and are discharged in the effluent to the Chattooga River and disposed of in

the sludge generated by the WPCP. The sludge from the Trion WPCP is dewatered and disposed of by land application at a variety of locations throughout northern Georgia and northern Alabama, including farm property within the Raccoon Creek watershed. Raccoon Creek is a tributary of the Chattooga River and is waters of the United States and the State of Georgia.

37.    Since 1992, Defendant Trion has disposed of nearly 8,000 tons of PFAS contaminated sludge in the Raccoon Creek watershed by land application.

38.    The Town of Trion operates the Trion WPCP pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit GA0025607 issued by the EPD. The most recent NPDES Permit was effective on March 1, 2019, approved after a renewal application was submitted in March 2018. Trion also administers a pretreatment program for industrial dischargers, including Defendant Mount Vernon, that is required to implement federal and state industrial pretreatment standards and requirements.

**Persistence and Toxicity of PFAS**

39.    PFAS are a large group of man-made chemicals that do not occur naturally in the environment. Due to their strong carbon-fluorine bonds, PFAS are extremely stable and repel both oil and water and are resistant to heat and chemical reactions. As a result of these properties, PFAS have a wide variety of industrial and

commercial applications, and a large percentage of PFAS produced worldwide are used to treat textiles to confer stain, soil, water and/or oil resistance.

40. The stable carbon-fluorine bonds that make PFAS such pervasive industrial and consumer products also result in their persistence in the environment. PFAS do not biodegrade, and there is no known environmental breakdown mechanism for many of these chemicals, so they remain in the environment indefinitely. PFAS are readily absorbed into biota and tend to bioaccumulate with repeated exposure. PFAS are also highly mobile and water soluble, and leach from soil to groundwater, making groundwater and surface water particularly vulnerable to contamination. A major source of human exposure to PFAS is through ingestion of contaminated drinking water.

41. Perfluorooctanoic Acid ("PFOA") and Perfluorooctanesulfonic Acid ("PFOS") are the most studied PFAS, and, while they have been largely phased out by industry, they are persistent and remain in wastewater treatment processes for a long time, including at Mount Vernon Mills and the Trion WPCP. Past applications of sludge contaminated with PFOA and PFOS in the Raccoon Creek watershed continue to discharge these toxic chemicals to Raccoon Creek, having the same net polluting effect on these surface waters for decades, if not longer, after initial disposal of the sludge.

42.     When humans ingest PFAS, they bind to plasma proteins in the blood and are readily absorbed by and distributed throughout the body. The liver and kidneys are important binding and processing sites for PFAS, resulting in physiologic changes to these and other organs. Because of strong carbon-fluorine bonds, PFAS are stable to metabolic degradation, resistant to biotransformation, and have long half-lives in the body. These toxic chemicals accumulate in the body and cause long-term physiologic alterations and damage to the blood, liver, kidneys, immune system, and other organs. For instance, PFOS crosses the placenta in humans, accumulates in amniotic fluid, and has been detected in the umbilical cord blood of babies.

43.     The human diseases caused by exposure to PFAS include cancer, immunotoxicity, thyroid disease, ulcerative colitis, and high cholesterol. The association between exposure to these chemicals and certain cancers has been confirmed by the C8 Health Project, an independent Science Panel charged with reviewing the evidence linking certain PFAS to diseases based on its research on the Mid-Ohio Valley population exposed to certain PFAS as a result of releases from an E. I. du Pont de Nemours and Company chemical plant in Parkersburg, West Virginia.

44.    The C8 Science Panel identified kidney cancer and testicular cancer as having a "probable link" to PFOA exposure in the Mid-Ohio Valley population. Epidemiological studies of workers exposed to PFOA on the job support the association between PFOA exposure and both kidney and testicular cancer, and they further suggest associations with prostate and ovarian cancer and non-Hodgkin's lymphoma. Rodent studies also support the link with cancer. Most of an EPA Science Advisory Board expert committee recommended in 2006 that PFOA be considered "likely to be carcinogenic to humans." The C8 Science Panel has also found probable links between exposure to certain PFAS and pregnancy-induced hypertension, ulcerative colitis, and high cholesterol.

45.    The International Agency for Research on Cancer ("IARC") has classified PFOA as a possible human carcinogen, and the EPA has concluded that there is suggestive evidence of the carcinogenic potential of PFOA in humans.

46.    PFAS immunotoxicity has been demonstrated in a wide variety of species and models, including humans, in recent years. For instance, in 2016, the U.S. Department of Health and Human Service's National Toxicology Program ("NTP"), after conducting a systematic review of the evidence pertaining to PFAS exposure and immune-related health effects, concluded that PFOA and PFOS constitute a hazard to immune system function in humans.

47.     On May 19, 2016, EPA published lifetime Drinking Water Health Advisories for PFOA and PFOS ("May 2016 EPA Health Advisories" or "Health Advisories"). The Health Advisory for PFOA is 0.07 micrograms per liter ("µg/L"), or 70 parts per trillion ("ppt").  The Health Advisory for PFOS is also 0.07 µg/L, or 70 ppt. When both PFOA and PFOS are found in drinking water, the combined concentrations should be compared with the 70 ppt level.

48.     The May 2016 EPA Health Advisories are based on peer-reviewed studies of the effects of PFOA and PFOS on laboratory animals and epidemiological studies of human populations exposed to PFOA and PFOS. These studies indicate that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental defects to fetuses, cancer (testicular, kidney), liver effects, immune effects, thyroid effects, and other adverse effects.

49.     The May 2016 EPA Health Advisories state that PFOA and PFOS have "extremely high" persistence in the environment and the human body, and that the developing fetus and newborn are "particularly sensitive" to PFOA and PFOS induced toxicity. According to the Health Advisories, a single exposure to a developmental toxin at a critical time can produce a persistent adverse effect that increases with additional exposure.

50.     The federal Agency for Toxic Substances and Disease Registry ("ATSDR") issued an updated draft Toxicological Profile for Perfluoroalkyls in 2018, which found, *inter alia*, strong associations between PFAS exposure and several adverse health outcomes, including pregnancy-induced hypertension, liver damage, increased serum lipids, thyroid disease, and immunotoxicity.

51.     ATSDR's updated Toxicological Profile significantly lowered minimum risk levels ("MRLs") for both PFOA and PFOS, and using the methods EPA used to develop its May 2016 Drinking Water Health Advisories, these updated MRLs would translate to drinking water health levels of approximately 7 ppt for PFOA and 11 ppt for PFOS.

52.     Based on concerns that EPA's May 2016 EPA Health Advisories are not protective of human health, numerous states have taken action to pursue stricter guidelines for PFAS in drinking water, including: Vermont, which established a health advisory of 20 ppt for any combination of PFOA, PFOS, Perfluorohexanesulfonic acid ("PFHxS"), Perfluoroheptanoic acid ("PFHpA"), and Perfluorononanoic acid ("PFNA"); New Jersey, which established a MCL for PFNA of 13 ppt, and has proposed a MCL for PFOA of 14 ppt and PFOS of 13 ppt; New York, which has recommended adoption of MCLs of 10 ppt for PFOA and PFOS;

and Michigan, where a scientific panel has recommended adoption of health advisory for PFOA of 8 ppt and PFOS of 16 ppt.

53.    Several studies conclude that PFAS may pose a risk to human health at any level, and that the only safe level of PFAS in drinking water is zero.

54.    Section 7321 of the National Defense Authorization Act for Fiscal Year 2020 ("NDAA") added 172 PFAS to the list of toxic chemicals covered by the Toxics Release Inventory ("TRI") under Section 313 of the Emergency Planning and Community Right to Know Act ("EPCRA").

**Defendants' Knowledge of the Toxicity and Persistence of PFAS**

55.    The PFAS Manufacturing Defendants have long been aware of the persistence and toxicity of PFAS, including PFOA and PFOS. These Defendants nonetheless knowingly and intentionally sold these chemicals to Mount Vernon Mills without adequate warnings of their dangers when they knew or should have known they would be improperly disposed of and discharged into the Trion WPCP, where they inevitably concentrate in the sludge, which has been and is being disposed of in a manner that results in PFAS discharges to surface waters, including Raccoon Creek, which supplies drinking water to the City of Summerville and its water subscribers.

56.     3M invented PFAS chemicals, first producing them by electrochemical fluorination in the 1940s. 3M began producing PFAS as raw materials or ingredients that it used to produce other products, or that it sold to third parties for use in other products. 3M went on to market PFAS and products containing PFAS, and it shipped PFAS to manufacturers throughout the United States and worldwide, including to Defendant Mount Vernon. 3M exclusively manufactured PFOS until 2000.

57.     3M knew as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped to landfills would likely leach into groundwater and otherwise enter the environment. An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

58.     The PFAS Manufacturing Defendants have also known for years that PFAS persist in the environment and accumulate in the bodies of humans, fish, and animals. For instance, blood tests of 3M workers conducted in 1978 found elevated organic fluorine levels "proportional to the length of time that had been spent by employees in the production areas." The same study found that "laboratory workers, with former exposure, but none for 15-20 years, had elevated [organic fluorine levels] above literature normals." A 1979 3M study of fish caught by the Wheeler

Dam (26 miles downstream from the 3M manufacturing plant in Decatur, Alabama) showed that these chemicals bioaccumulate in fish.

59.    The PFAS Manufacturing Defendants have also known for years that PFOA, PFOS, and related chemicals are toxic. For instance, a 1978 3M study of the effects of fluorochemical compounds on Rhesus monkeys was terminated after 20 days because all the monkeys died as a result of exposure to the fluorochemicals. In 1983, a team of 3M toxicologists recommended broad testing regarding the effects of 3M's fluorochemicals on the environment and human beings.

60.    A 1997 MSDS for a product made by 3M listed its ingredients as water, PFOA, and other PFAS and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement.

61.    The PFAS Manufacturing Defendants have known for years that the disposal of PFAS through conventional land application, or discharge into waterways, such as Raccoon Creek, is unsafe. For instance, a Material Safety Data Sheet ("MSDS") produced by Defendant 3M in 1986 warned that PFOA should be disposed of only through incineration or at specially designed, properly lined landfills for hazardous chemicals, not dumped onto the ground or mixed with soil for farming.

62.     The PFAS Manufacturing Defendants have known for years that PFAS are not effectively treated by conventional wastewater treatment plant processes and are discharged to surface waters in the effluent and accumulate in the sludge from wastewater treatment processes. For example, in 1978, 3M found that the bacteria in wastewater treatment plants would not biodegrade PFOA. In 2001, 3M found high concentrations of these chemicals in samples from the Decatur Utilities wastewater treatment plant in Decatur, Alabama, effluent and sludge as a result of discharges from 3M. Both 3M and Defendant Daikin have been aware since the early 2000s that their Decatur, Alabama, manufacturing properties are contaminated with PFAS from the disposal of wastewater treatment plant sludge on the property years earlier by 3M. Daikin has also been aware since at least 2000 that its own wastewater sludge contains PFAS.

63.     In 2006, 3M agreed to pay a $1.5 million civil penalty for failure to disclose information to EPA about the health risks and environmental persistence of PFAS chemicals.

64.     Defendant Huntsman has been supplying products containing PFAS to the textile industry since at least 1999. Upon information and belief, DuPont provided available information to Huntsman concerning the toxicity and persistence of PFAS.

65.     Defendant DuPont began manufacturing PFAS-containing products for the textile industry at least fifty (50) years ago. It sold PFAS-containing products to other companies, such as Defendant Huntsman and its predecessor Ciba Specialty Chemicals, which were then sold to Mount Vernon Mills, since at least 1999. The PFAS-containing products sold by DuPont were either relabeled as Ciba or Huntsman products without modification, blended with other non-PFAS components before sale, or further reacted by Huntsman to produce final PFAS products before sale to Mount Vernon Mills.

66.     DuPont has a long history with PFAS, including using PFOA in its products since the 1950s, and has known of the dangers of PFAS for decades. In 1961 and 1962, DuPont toxicologists found adverse health effects associated with PFOA in animal studies. In the 1970s, DuPont documented high concentrations of PFOA in the blood of workers at its Washington Works facility in West Virginia, showing that PFOA bioaccumulates.

67.     In 1978, DuPont began to review and monitor the health conditions of its workers who were potentially being exposed to PFOA. DuPont subsequently found that PFOA is "toxic" and that "continued exposure is not tolerable," but did not disclose this to the public or to the EPA. Three years later, DuPont again failed to disclose data demonstrating the transplacental movement of PFOA to fetuses. It

also failed to disclose widespread PFOA contamination in public drinking water sources resulting from discharges at its Washington Works facility in Washington, West Virginia, where PFOA concentrations exceeded DuPont's own Community Exposure Guideline.

68.     By the early 1980s, DuPont and 3M were sharing their respective internal studies concerning the health and environmental effects associated with PFOA-exposure but did not make this information public. In 1987, H.A. Smith of DuPont's Manufacturing Division-Safety, Energy & Environmental Affairs office requested that DuPont's Haskell Laboratory establish acceptable levels of PFOA in the blood and in drinking water. On March 9, 1988, DuPont first recommended a drinking water limit for PFOA of 1 part per billion ("ppb"). DuPont adopted this guideline in June 1991.

69.     In 1991, DuPont researchers recommended following up a study from ten years earlier of employees who might have been exposed to PFOA. The prior study showed elevated liver enzymes in the blood of DuPont workers. On information and belief, for the purpose of avoiding or limiting liability, DuPont chose not to conduct the follow-up study, instead postponing it until after it was sued.

70.     A 1997 MSDS for a product made by 3M listed its only ingredients as water, PFOA, and other per-fluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement.

71.     In 1996, DuPont and 3M jointly commissioned private studies exposing Rhesus monkeys to PFOA and, by 1998, both companies became aware of severe health effects in the animals studied, with even the lowest-exposed group suffering adverse health effects. The researchers concluded there was no safe level of exposure to PFOA in primates at which adverse health effects would not occur.

72.     In or around December 2005, DuPont agreed to pay a $10.25 million fine to the federal government arising from its failures to disclose information to EPA about PFOA's health risks.

73.     Upon information and belief, in statements to the public and government regulators, DuPont has repeatedly and falsely claimed that human exposure to PFOA has no adverse health consequences. In a May/June 2008 publication, for example, DuPont stated that "the weight of the evidence indicates that PFOA exposure does not pose a health risk to the general public," and "there are no human health effects known to be caused by PFOA, although study of the chemical continues." DuPont made those statements against the advice of its own

Epidemiology Review Board, which urged it not to make public statements asserting that PFOA does not pose any health risks.

74.     For decades, 3M manufactured PFOA and supplied it to DuPont for its manufacture of Teflon and other products. Despite DuPont's knowledge of the risks to human health posed by PFOA, in response to the withdrawal of 3M from the market in May of 2000, DuPont opened its own plant to manufacture PFOA to be incorporated into DuPont's products.

75.     DuPont had knowledge of and control over the manner in which its PFAS products have been used by the textile industry, including Mount Vernon Mills. DuPont licensed the use of its trademark Teflon™ for PFAS use by the textile industry and supplied Huntsman and textile mills, including Mount Vernon Mills, with recommendations for PFAS product use, with technical assistance, and with performance specifications for license to use Teflon™ hang tags on textile products. Huntsman utilized DuPont product tradenames, such as Zonyl®, in the sale of DuPont products to textile mills, such as Mount Vernon Mills.

76.     DuPont sold its Zonyl business to Huntsman in 2007, at least for non-woven textile fabrics, and agreed to continue selling Huntsman Zonyl products containing PFAS. DuPont continued selling PFAS-containing products to Huntsman, which were then sold to Mount Vernon Mills, until 2015. Prior to 2015,

Huntsman sold hundreds of thousands of pounds of PFAS products produced by DuPont to Mount Vernon Mills.

77.    In 2015, Dupont spun off its performance chemicals business, which included the design, manufacture, marketing, and sale of PFAS, to a new company it created called Chemours. DuPont attempted to transfer all its PFAS liabilities to Chemours, but subsequent litigation has resulted in a sharing of those liabilities among Chemours, DuPont, and two holding companies.

78.    Chemours has continued to manufacture and distribute PFAS-containing products previously manufactured by DuPont and continued to sell them to Huntsman for use in Huntsman products sold to Mount Vernon Mills. Since 2015, Huntsman has sold hundreds of thousands of pounds of PFAS products produced by Chemours to Mount Vernon Mills.

79.    Similar to DuPont, Chemours has had knowledge of and control over the manner in which its PFAS products have been used by the textile industry, including Mount Vernon Mills. Chemours licensed the use of its trademark Teflon™ for PFAS use by the textile industry and supplied Huntsman and textile mills, including Mount Vernon Mills, with recommendations for PFAS product use, with technical assistance, and with performance specifications for license to use Teflon™ hang tags on textile products. Huntsman utilized Chemours product tradenames,

such as Zonyl®, in the sale of Chemours products to textile mills, such as Mount Vernon Mills.

80. Defendant Pulcra has been supplying products containing PFAS to Mount Vernon since at least 2010. Upon information and belief, Pulcra has known about the toxicity and persistence of PFAS since at least 2000 when this information was being shared among international manufacturers and trade associations and when the EPA began a public process to regulate the PFAS manufacturing and user industries.

81. In 2000, under EPA pressure, 3M agreed to phase out the production of PFOS, which was an ingredient in and precursor to products sold to the textile industry. 3M also stopped manufacturing PFOA in 2002. Other companies continued to make and use PFOA until EPA took regulatory action under the Toxic Substances Control Act ("TSCA") to limit the future manufacture of PFOA, PFOS, and related chemicals. In response, the PFAS Manufacturing Defendants undertook to develop and manufacture and supply to Mount Vernon certain "Short-Chain" PFAS; that is, PFAS with six or fewer carbon atoms. The PFAS Manufacturing Defendants and Mount Vernon are aware that these Short-Chain PFAS are, like PFOA and PFOS, persistent and not subject to biodegradation, and that they accumulate in human

blood. Likewise, Defendants are aware that Short-Chain PFAS are toxic and known to cause cancer in animal studies.

82.    Upon information and belief, the PFAS Manufacturing Defendants and Mount Vernon have long been aware of the persistence and toxicity of PFAS, at least as a result of communications among the PFAS Manufacturing Defendants, between the PFAS Manufacturing Defendants and Mount Vernon, and with other users of these chemicals and trade associations, as well as the EPA and EPD. At least since 2000, the persistence and toxicity of PFAS have been widely published.

83.    Upon information and belief, the PFAS Manufacturing Defendants and Mount Vernon knew or should have known that, in their intended and/or common use, products containing PFAS would very likely cause harm and injury, and/or threaten public health and the environment.

84.    Upon information and belief, the PFAS Manufacturing Defendants and Mount Vernon knew or should have known that PFAS are mobile and persistent, bioaccumulative, biomagnifying and toxic. These Defendants nonetheless concealed their knowledge from the public and government agencies resulting in the contamination of the Summerville water supply with PFAS.

85.    Upon information and belief, the instructions and warnings supplied with the PFAS products sold by the PFAS Manufacturing Defendants did not

adequately disclose the nature and extent of the dangers associated with the use and disposal of PFAS.

**Contamination of Raccoon Creek and City of Summerville Water Supply with PFAS**

86.    In November 2019 the United States Environmental Protection Agency ("EPA") sampled the Chattooga River and its tributaries for PFAS and identified areas in the watersheds of those tributaries sampled where sludge from the Trion WPCP has been and is being disposed of.  The sample results showed Raccoon Creek is contaminated with 95 ppt of PFOA and PFOS resulting from Trion WPCP sludge disposed of in the Raccoon Creek watershed. These levels exceed the current EPA Drinking Water Health Advisory and greatly exceed levels that are considered toxic to humans by other states, by other federal agencies, and by independent toxicologists and epidemiologists.

87.    On January 23, 2020, EPA and EPD took additional samples of Raccoon Creek at the Summerville water intake, which showed that Raccoon Creek is contaminated with combined PFOA and PFOS levels of 95 ppt and 88 ppt (two samples), both of which exceed EPA's current Drinking Water Health Advisory and greatly exceed levels that are considered toxic to humans by other states, by other federal agencies, and by independent toxicologists and epidemiologists.

88.     Sampling of Raccoon Creek downstream of properties on which PFAS contaminated sludge was disposed of and upstream or near Summerville's water intake in June and August 2020 showed high levels of PFAS, including PFOA and PFOS, as well as numerous Short-Chain PFAS.

89.     Sampling of Raccoon Creek downstream of properties on which PFAS contaminated sludge was disposed of and upstream or near Summerville's water intake on November 10, 2020, showed high levels of PFAS, including individual and combined levels of PFOA and PFOS exceeding the EPA Health Advisory and greatly exceeding levels that are considered toxic to humans by other states, by other federal agencies, and by independent toxicologists and epidemiologists. A sample of Raccoon Creek at Hair Lake Road showed PFOA of 430 ppt, PFOS of 850 ppt, and total of all PFAS of 4,535 ppt. A sample at Raccoon Creek at Highway 48 showed PFOA of 150, PFOS of 210 ppt, and total of all PFAS of 4,039.6 ppt. A sample of Raccoon Creek close to the Summerville Water Treatment Plant showed PFOA of 47 ppt, PFOS 47 ppt, and a total of all PFAS of 1,186.6 ppt.

90.     Sampling of Raccoon Creek downstream of Defendants' PFAS contaminated sludge in December of 2020 showed high levels of PFAS, including combined levels of PFOA and PFOS in excess of EPA's Health Advisory.  A sample of Raccoon Creek taken on December 16, 2020 close to the Summerville Water

Treatment Plant showed PFOA of 39.7 ppt, PFOS of 40.1 ppt, and numerous other PFAS. This ongoing PFAS contamination of Raccoon Creek is the result of Defendant Trion's disposal of sludge contaminated with Mount Vernon's PFAS on properties in the Raccoon Creek watershed.

91.     The City of Summerville primarily takes its drinking water from Raccoon Creek, which flows through rural farmland into the City, then into the Chattooga River. Sludge (biosolids) from the Trion WPCP containing PFAS from Mount Vernon Mills have been disposed on farmland in the Raccoon Creek watershed upstream of the City of Summerville's drinking water intake for many years. In January 2020 samples of finished (treated) water from the City's Raccoon Creek Treatment Plant were analyzed for PFAS and were determined to contain 98 ppt combined PFOA and PFOS, above the EPA Drinking Water Health Advisory of 70 ppt for these combined compounds and greatly exceeding levels that are considered toxic to humans by other states, by other federal agencies, and by independent toxicologists and epidemiologists. It is unknown how long the drinking water has been contaminated and how long water users, such as Plaintiff Parris and other Proposed Class Members, have been drinking and using PFAS contaminated water.

92.    As a result of the PFAS contamination, the City of Summerville notified its water users that they should not drink or cook with the water and should use bottled water instead. The City provided a water truck for water users to fill their own water jugs and has investigated treatment systems to remove PFAS and alternative sources of uncontaminated drinking water, including wells.

93.    Based upon information and belief, many Members of the proposed Class, continued to drink, cook with and use PFAS contaminated water for domestic purposes after the do not drink notification.

94.    In October 2020 the City installed a temporary treatment system consisting of a pit in the ground filled with granulated activated carbon. Granulated activated carbon treatment systems, if designed and operated properly, can remove PFOA and PFOS, but high levels require frequent replacement of expensive carbon, and granulated activated carbon does not remove Short-Chain PFAS. Plaintiff and Members of the Proposed Class must obtain alternate sources of potable water for household use by, for example, purchasing their own filters or bottled water for drinking and domestic uses.

95.    Sampling of the City's treated water on December 9, 2020 showed that the finished water still contained toxic levels of PFAS, including PFOA at 24 ppt, PFOS at 15 ppt, and elevated levels of numerous Short-Chain PFAS. Sampling of

the raw water from Raccoon Creek on this date showed a combined level of PFOA and PFOS of 59 ppt. Thus, Summerville's temporary treatment system is not effectively removing PFOA or PFOS, or Short-Chain PFAS, from the City's water supply, and these chemicals remain in Plaintiff's domestic water and that of Class Members, posing a risk to their health and safety and interfering with the use and enjoyment of their property. Based on the inadequacy of this temporary treatment system and the failure of Defendants to remove the PFAS contamination from the Raccoon Creek watershed, this risk continues as of the filing of this Second Amended Complaint and will continue in the future.

96.    Due to the high levels of PFOA and PFOS continuing to be found in the Summerville water supply from Raccoon Creek, and due to the presence of Short-Chain PFAS, Summerville requires a new and permanent filtration system, which is necessary to provide a safe, long-term supply of water, which will effectively remove PFOA and PFOS, as well as Short-Chain PFAS, and provide safe water for the Plaintiff and Members of the Class on a permanent basis.

97.    The temporary emergency efforts have cost, and will continue to cost, Summerville hundreds of thousands of dollars to implement, and in June 2020 the City increased water bills significantly in order to help pay for the temporary fixes for the contamination. Additionally, implementation of a new, permanent filtration

system will increase the future costs the City must incur to provide a safe, long-term supply of water which will eliminate PFAS contamination and provide safe water for the public. Such increased costs will be passed on to all customer rate payers to recoup them through additional rate increases.

98.     Under Georgia law, the City of Summerville has the authority to set municipal water rates, and these rates are not subject to regulation by the Georgia Public Service Commission (PSC). Through this action, Plaintiff is not challenging Summerville's authority to set water rates, or the reasonableness or propriety of those rates.

99.     Significant amounts of PFAS-contaminated sludge remain on property in the Raccoon Creek watershed where it was disposed of insidiously contaminating Raccoon Creek with PFAS. The continued presence of this toxic sludge also threatens to further contaminate the Summerville water supply with PFAS, creating a risk of harm to human health or the environment, including to Plaintiff and others who consume or have consumed water from the City of Summerville.

100.   As a direct and proximate result of Defendants' contamination of Raccoon Creek and the Summerville water supply with PFAS, Plaintiff and the Proposed Class Members have suffered personal property damages, as the PFAS contamination has injured Plaintiff's property interest in his household water supply.

101.   As a direct and proximate result of Defendants' contamination of Raccoon Creek and the Summerville water supply with PFAS, Plaintiff and the Proposed Class Members have suffered real property damages, including, but not limited to: (1) the diminution in value of their property as a result of the provision of PFAS-contaminated water to their homes; (2) interference with and loss of use and enjoyment of their property; and (3) upset, annoyance and inconvenience.

102.   As a direct and proximate result of Defendants' contamination of Raccoon Creek and the Summerville water supply with PFAS, Plaintiff and the Proposed Class Members have also suffered losses for the payment of surcharges and rate increases due to both the temporary measures taken by Summerville to attempt to remove PFAS from the water supply and the future measures to be taken by Summerville to permanently filter the PFAS pollution in order to provide a safe, long-term water supply. Plaintiff and the Proposed Class Members have further incurred costs in obtaining alternate supply(s) of potable water, such as costs for bottled water and water filtration, as well as other damages to be proved at trial.

## COUNT ONE:
## DEFENDANT TRION'S DISCHARGE OF POLLUTANTS TO SURFACE WATERS WITHOUT AN NPDES PERMIT IN VIOLATION OF THE CLEAN WATER ACT

103.   Plaintiff repeats, re-alleges and incorporates by reference the common allegations of this Second Amended Complaint as though fully set forth herein.

104.   Section 301(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into waters of the United States unless the discharge is in compliance with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of the terms of, an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.  Each discharge not authorized by a permit, and each violation of a permit, is a violation of the CWA.

105.   The State of Georgia has been delegated authority to implement the permitting programs of the CWA by the EPA, including the NPDES permit program, pursuant to 33 U.S.C. § 1342(b).  The EPD is the state water pollution control agency for purposes of the CWA and administers statutory and regulatory implementing the CWA's permitting programs within the State of Georgia.  *See, e.g.,* O.C.G.A. § 12-5-30.

106.   A citizen suit, pursuant to 33 U.S.C. § 1365(a)(1), may be brought for the discharge of pollutants into waters of the United States without a permit in violation of Section 301 of the CWA.  33 U.S.C. § 1365(f). There is also CWA jurisdiction where pollutants are discharged from a point source to navigable surface waters through hydrologically connected ground water, where the discharge is the

"functional equivalent" of a direct discharge to navigable waters. *County of Maui v. Hawaii Wildlife, Fund,* 140 S. Ct. 1462, 1476 (2020).

107.   Raccoon Creek and its tributaries are waters of the State of Georgia and waters of the United States as that term is used in the CWA and as it has been interpreted by the federal courts.

108.   Per- and polyfluoroalkyl substances ("PFAS") are "pollutants" within the meaning of the CWA.  33 U.S.C. § 1362(6).

109.   Defendants Trion's discharges of PFAS from the sludge disposed of in the Raccoon Creek watershed constitute the discharge of a pollutant from a point source requiring an NPDES Permit authorizing such discharge.

110.   Defendant Trion's discharges of PFAS to Raccoon Creek from the sludge disposed of in the Raccoon Creek watershed through hydrologically connected groundwater constitute the "functional equivalent" of a direct discharge to these surface waters requiring an NPDES Permit authorizing such discharges.

111.   Defendant Trion is, and has been, in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), due to illegal unpermitted discharges of PFAS, including, but not limited to, PFOA and PFOS, from sludge or biosolids disposed of on the Jarrett property in the Raccoon Creek watershed, including, but not limited to, property located at 5 Hairs Lake Rd. and 2012 Mahan Rd., Summerville, GA.

112.   These are illegal unpermitted discharges. The requirement for an NPDES permit authorizing discharges of PFAS from Mr. Jarrett's property arose at the time that pollutants were first being discharged into surface waters, and each day since that time is a violation of the CWA.

113.   Analytical results from sampling of Raccoon Creek and the City of Summerville drinking water confirm that Defendant Trion's illegal and unpermitted discharges of PFAS from its sludge disposal areas continue and are ongoing, including sampling in 2019 and 2020. As demonstrated by the levels of PFAS in Raccoon Creek adjacent to sludge disposal areas, Trion has been in continuous violation of the CWA, 33 U.S.C. § 1311, by discharging PFAS into Raccoon Creek without an NPDES Permit authorizing such discharges.

114.   Defendant Trion should be subject to an enforcement order or injunction order to cease their discharges of PFAS from sludge disposal areas in the Raccoon Creek watershed without an NPDES Permit authorizing such discharges.

115.   Defendant Trion should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

116.   For the purpose of assessing the maximum civil penalty for which Defendant Trion is liable, each day that Defendant has discharged pollutants without

a permit authorizing such discharges constitutes a separate violation of Section 301(a) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this Second Amended Complaint.

## COUNT TWO: DEFENDANT TRION'S VIOLATIONS OF ITS NPDES PERMIT, THE GEORGIA WATER QUALITY CONTROL ACT, AND THE CLEAN WATER ACT

117.   Plaintiff repeats, re-alleges and incorporates by reference the common allegations of this Second Amended Complaint as though fully set forth herein.

118.   As referenced above, the Trion WPCP is governed by NPDES Permit No. GA0025607, which became effective on February 11, 2019.  Trion is violating this permit, each violation of which constitutes a separate violation of the CWA.  33 U.S.C. § 1319(d).

119.   Condition II.A.11 of the NPDES Permit provides, in pertinent part:

Whenever … any toxic … substance, or any other substance which would endanger downstream users of the waters of the State or would damage property, is discharged into such waters, or is so placed that it might flow, be washed, or fall into them, it shall be the duty of the person in charge of such substances at the time to forthwith notify EPD in person or by telephone of the location and nature of the danger,  and it shall be such person's further duty to immediately take all reasonable and necessary steps to prevent injury to property and downstream users of said water.

Trion has violated this provision by failing to take all reasonable and necessary steps to prevent injury to property and downstream users of the waters of Raccoon Creek resulting from the PFAS contaminated sludge disposed of in the Raccoon Creek watershed.

120.   Part III.A. of Trion's NPDES Permit provides that the "the permittee's approved pretreatment program shall be enforceable through this permit," and requires Trion to, among other things, administer its approved pretreatment program by:

> Enforcing and obtaining appropriate remedies for noncompliance by any industrial user with any applicable pretreatment standard or requirement defined by Section 307(b) and (c) of the [CWA], 40 CFR Part 403.5 and 403.6 or any State or local requirement, which is more stringent.

NPDES Permit, Part III.A.2.b.

121.   Trion is also required to revise the adopted local limits based on technical analyses to ensure the local limits continue to prevent:

> Interference with the operation of the POTW;
> Pass-through of pollutants in violation of this permit;
> Municipal sludge contamination; and
> Toxicity to life in the receiving stream.

NPDES Permit Part III.A.2.c; See also GA. COMP. R. & REGS. § 391-3-6-0(9)(a) ("The POTW shall have authority ... to immediately and effectively halt or prevent any discharge of pollutants to the POTW which reasonably appears to present an

43

imminent endangerment to the health or welfare of persons"); see also 40 C.F.R. § 403.5 (Prohibited Discharges) ("A User may not introduce into a POTW any pollutant(s) which cause Pass Through or Interference").

122.   Trion has violated, and continues to violate, Part II.A.2.b and 2.c, in addition to the above-referenced Georgia and EPA regulations, with regard to Mount Vernon Mills by failing to require compliance with these users' pretreatment permits and national pretreatment standards.   This includes the failure to prevent and/or enforce prohibited discharges, to revise local limits to prevent Pass-Through of PFAS through the Trion collection and disposal system, as well as the contamination of municipal sludge with PFAS, and to halt or prevent discharges of PFAS  into the POTW which present an imminent and substantial endangerment to the health and welfare of persons.

123.   Pursuant to the Georgia Water Quality Control Act, O.C.G.A. § 12-5-30, et seq. ("GWQCA"), it is the declared policy of the State of Georgia that:

> that the water resources of the state shall be utilized prudently for the maximum benefit of the people, in order to restore and maintain a reasonable degree of purity in the waters of the state and an adequate supply of such waters, and to require where necessary reasonable usage of the waters of the state and reasonable treatment of sewage, industrial wastes, and other wastes prior to their discharge into such waters.

O.C.G.A. §12-5-21(a).  To effectuate this policy, the GWQCA provides, inter alia, that it "shall be unlawful to use any waters of the state for disposal of sewage, industrial wastes, or other wastes …."  O.C.G.A. § 12-5-29(a).

124.   Trion's conventional treatment technology cannot remove PFAS from its wastewater or sludge.   Thus, in addition to the violations of the CWA for discharging without a permit discussed in Section I of this Notice, Trion has violated and continues to violate the GWQCA, O.C.G.A. § 12-5-29(a), and the CWA, by using waters of the State for disposal of sewage, industrial wastes, or other wastes.

125.  Defendant Trion should be subject to an enforcement order or injunction order to cease its violations of its NPDES Permit, the GWQCA, and the CWA, and to fully enforce local limits by preventing prohibited discharges, revising local limits to prevent Pass-Through of PFAS through the Trion collection and disposal system, as well as the contamination of municipal sludge with PFAS, and to halt or prevent discharges of PFAS  into the POTW.

126.   Defendant Trion should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

127.   For the purpose of assessing the maximum civil penalty for which Defendants Trion is liable, each day that Defendant has violated its NPDES Permit,

the GWQCA, and the CWA, constitutes a separate violation of Section 301(a) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this Second Amended Complaint.

## COUNT THREE:
## DEFENDANT MOUNT VERNON MILLS' VIOLATIONS OF FEDERAL PROHIBITIONS, SEWER USE RULES AND REGULATIONS, AND THE CLEAN WATER ACT

128.   Plaintiff repeats, re-alleges and incorporates by reference the common allegations of this Second Amended Complaint as though fully set forth herein.

129.   Section 307(b) through (e) of the CWA, 33 U.S.C. §§ 1317(a)-(e), establish the federal pretreatment program for regulation of discharges from industrial facilities into publicly owned treatment works.  Section 307(d) of the Act, 33 U.S.C. § 1317(d), prohibits the operation of any source of discharge of pollutants into a publicly owned treatment works in violation of, amongst other things, prohibitions on discharges.

130.   EPA has adopted pretreatment standards for industrial dischargers to publicly owned treatment works at 40 C.F.R. Parts 403 through 471, including both general regulations and categorical regulations for specific industrial categories.

131.   The State of Georgia has been delegated authority to implement the permitting programs of the Act by EPA, including the pretreatment program for industrial discharges into wastewater facilities, pursuant to 33 U.S.C. § 1342(b).

EPD is the state water pollution control agency for purposes of the CWA and administers statutory and regulatory implementing the CWA's permitting programs within the State of Georgia. *See, e.g.,* GA. COMP. R. & REGS. §§ 391-3-6-0(8), 391-3-6-0(9).

132.   Both the EPA and EPD rules applicable to Defendant Mount Vernon Mills prohibit the discharge into a POTW of "any pollutant(s) which cause Pass Through or Interference."  40 C.F.R. § 403.5(a); GA. COMP. R. & REGS. §§ 391-3-6-0(8)(3)(a)(2).

133.   Mount Vernon has violated, and continues to violate, the national pretreatment standards promulgated under Section 307 of the CWA, 33 U.S.C. § 1317, by discharging PFAS from its Trion facility into the Trion WPCP.  40 C.F.R. § 403.5(a)(1) provides, in pertinent part, that a "User shall not introduce into a POTW any pollutant(s) which cause Pass Through or Interference."  "Pass Through" is defined as a discharge which:

> exits the POTW into waters of the United States in quantities or concentrations which, alone or in conjunction with a discharge or discharges from other sources, is a cause of a violation of any requirement of the POTW's NPDES permit (including an increase in the magnitude or duration of a violation).

40 C.F.R. § 403.3(p); see also GA. COMP. R. & REGS. § 391-3-6-08(2)(n).

134.   As discussed *supra*, the treatment technology utilized by the Trion WPCP cannot remove PFAS from the wastewater or prevent it from accumulating in the sludge. Thus, Mount Vernon's discharges of industrial/process wastewater containing PFAS into the Trion WPCP have, and continue to be, the source of contamination of the sludge disposed of by the Trion WPCP. The Pass Through of PFAS from Mount Vernon's discharges causes violations of Trion's NPDES Permit, including Condition II.A.11 of the NPDES Permit, which provides, in pertinent part:

> Whenever … any toxic … substance, or any other substance which would endanger downstream users of the waters of the State or would damage property, is discharged into such waters, or is so placed that it might flow, be washed, or fall into them, it shall be the duty of the person in charge of such substances at the time to forthwith notify EPD in person or by telephone of the location and nature of the danger,  and it shall be such person's further duty to immediately take all reasonable and necessary steps to prevent injury to property and downstream users of said water.

135.   As evidenced by the results of sampling of Mount Vernon's industrial discharges into the Trion WPCP in 2020, and from discharges of Trion's sludge in the Raccoon Creek watershed in November 2019, Mount Vernon has discharged PFAS into the Trion WPCP causing Pass Through in violation of the national pretreatment standards, Georgia law, Trion's NPDES permit, and the CWA. These violations likely occurred prior to 2019 and are continuing as shown by the November and December 2020 samples.

48

136.   Trion has enacted a sewer use ordinance and an Industrial User Ordinance incorporating federal and state pretreatment standards for discharges of industrial wastes into the Trion WPCP, so that Trion can comply with all State and Federal laws, including the Clean Water Act. Section 62-213(8) of the Code of the Town of Trion, Georgia, prohibits the discharge to the sewer system of:

> Any waters or wastes containing chemical residues, textile fibers, toxic materials or other industrial byproduct in sufficient quantity to injure or interfere with any sewage treatment process, constitute a hazard to humans or animals, or create any hazard in the receiving waters of the sewage treatment plant.

137.   Section 62-231 of the Code states:

> The Clean Water Act of 1977 (Public Law 95-217) governs industrial discharge, and specific rules for industrial pretreatment are contained in Pretreatment Regulation (40 CFR 403), as issued by the U.S. Environmental Protection Agency. Industrial users will be required to cooperate with the Town in complying with the federal regulations.

138.   Among other requirements, the Town of Trion Industrial User Ordinance contains prohibitions on Pass Through of toxic chemicals, such as PFAS.

139.   Pursuant to 33 U.S.C. § 1365(f), the violation of an effluent standard or limitation for which a citizen suit may be brought includes violations of pretreatment standards under Section 307 of the CWA, 33 U.S.C. § 1317, including violations of local pretreatment ordinances and regulations. *See* 40 C.F.R. §§ 403.5(c) and (d).

140.   As evidenced by the results of sampling of discharges from Trion's sludge in the Raccoon Creek watershed in November 2019, Mount Vernon has discharged PFAS into the Trion WPCP causing violations of Section 62-213(8) of the Code of the Town of Trion, violations of the EPA Pretreatment Regulations as incorporated into the Code (Section 62-231) and violations of the Trion Industrial User Ordinance prohibiting Pass Through. These violations likely occurred prior to 2019 and are continuing as shown by the November and December 2020 samples.

141.   Pursuant to the Georgia Water Quality Control Act, O.C.G.A. § 12-5-30, et seq. ("GWQCA"), it is the declared policy of the State of Georgia that:

> that the water resources of the state shall be utilized prudently for the maximum benefit of the people, in order to restore and maintain a reasonable degree of purity in the waters of the state and an adequate supply of such waters, and to require where necessary reasonable usage of the waters of the state and reasonable treatment of sewage, industrial wastes, and other wastes prior to their discharge into such waters.

O.C.G.A. §12-5-21(a).

142.   To effectuate this policy, the GWQCA provides, inter alia:

> Whenever any substance which would endanger the health or property of downstream users of the waters of this state is discharged into such waters, it shall be the duty of any person in charge of such substance to immediately notify the division of the location and nature of the discharge and to immediately take all reasonable steps to prevent injury to the health or property of such downstream users.

O.C.G.A. § 12-5-30.4(a); *see also* O.C.G.A. § 12-5-29(a) ("It shall be unlawful to use any waters of the state for disposal of sewage, industrial wastes, or other wastes ….").

143.   As discussed above, the Trion WPCP cannot remove PFAS during its treatment process, and the PFAS discharged by Mount Vernon Mills into the Trion WPCP is concentrated in the sludge disposed of by Trion, from which it is discharged into Raccoon Creek, the source of drinking water for Summerville.  As a result, Mount Vernon has violated and continues to violate the GWQCA, O.C.G.A. § 12-5-30.4(a) and § 12-5-29(a), and the CWA, by using waters of the State for disposal of industrial wastes and failing to notify the division of these PFAS discharges or to immediately take all reasonable steps to prevent injury to the health or property of downstream users.

144.   Defendant Mount Vernon should be subject to an enforcement order or injunction ordering Defendant to cease its violations of pretreatment requirements and standards.

145.   Defendant Mount Vernon should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

146.   For the purpose of assessing the maximum civil penalty for which Defendant Mount Vernon is liable, each instance of Defendant's violation of pretreatment requirements and standards constitutes a separate violation of Section 307(d) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this Second Amended Complaint.

### COUNT FOUR:
### RCRA IMMINENT AND SUBSTANTIAL ENDANGERMENT CREATED BY DEFENDANTS MOUNT VERNON AND TRION

147.   Plaintiff repeats, re-alleges and incorporates by reference the common allegations of this Second Amended Complaint as though fully set forth herein.

148.   RCRA at 42 U.S.C. § 6903(27) defines the term "solid waste" as:

any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities…

149.   RCRA at 42 U.S.C. § 6903(26A) defines the term "sludge" as:

any solid, semisolid or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant, water supply treatment plant, or air pollution control facility or any other such waste having similar characteristics and effects.

150.   RCRA at 42 U.S.C. § 6903(3) defines "disposal" as:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

151.   RCRA in 42 U.S.C. § 6972(a)(1)(A) provides:

(a) In general

Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—

(1)(B) against any person, … including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage or disposal facility, who has contributed or who is contributing, to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

152.   Defendants Mount Vernon Mills and Trion are "persons . . . who have contributed or who are contributing, to the past and present transportation and disposal of solid waste which may present an imminent and substantial endangerment to health or the environment," pursuant to 42 U.S.C. § 6972(a)(1)(B).

153.   The PFAS discharged into the Trion WPCP and the PFAS contaminated sludge generated by Trion and disposed on the Jarrett property are "solid waste" as that term is defined in RCRA, 42 U.S.C. § 6903(27).

154.   As set out in the Factual Allegations, above, Defendants' disposal of PFAS contaminated sludge may present an imminent and substantial endangerment

to health or the environment, including to the Plaintiff and Members of the Proposed Class who consume or have consumed water from the City of Summerville water utility.

155. An enforcement order or injunction is necessary to redress the damages suffered by Plaintiff requiring Defendant Mount Vernon to cease PFAS discharges into the Trion WPCP, requiring Trion to cease disposing of PFAS contaminated sludge on agricultural or other property from which PFAS may be released into groundwater or surface water, and requiring Mount Vernon and Trion to remove PFAS contaminated sludge from the Racoon Creek watershed and provide an effective permanent treatment system for the Summerville water supply capable of removing PFAS, including Short-Chain PFAS, from the drinking water.

## CLASS ALLEGATIONS FOR STATE LAW CLAIMS

156. Plaintiff repeats, re-alleges and incorporates by reference the common allegations of this Second Amended Complaint as though fully set forth herein.

157. Plaintiff brings his state law claims in this action pursuant to the provisions of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure as a Class Action on his own behalf and on behalf of all other persons similarly situated. This action satisfies the numerosity, commonality, typicality, predominance, and superiority requirements of Fed. R. Civ. P. 23(a) and 23(b)(3).

158.   Plaintiff and the Proposed Class Members are water subscribers and ratepayers with the City of Summerville who have been in the past, and will be in the future, harmed, injured, and damaged through the contamination of Raccoon Creek and their drinking water with PFAS causing real and personal property damages and the payment of surcharges to recoup the costs of removing this contamination.

159.   Plaintiff brings this Class action on behalf of a proposed Class as set forth below:

**All water subscribers (ratepayers) with the City of Summerville, Georgia Public Works and Utilities Department.**

160.   Excluded from the proposed Class are:

a.      Defendants, their employees, and any entities in which Defendants have a controlling interest;

b.      Any of the legal representatives, heirs, successors, or assigns of Defendants;

c.      The Judge to whom this case is assigned and any Member of the Judge's immediate family and any other judicial officer assigned to this case;

d.      Any attorneys, or their immediate family, representing the Plaintiff or Members of the proposed Class; and

e.      All persons or entities that properly execute and timely file a request for exclusion from the Proposed Class.

161.   Plaintiff reserves the right to modify or amend the definition of the Proposed Class if, prior to the Court's determination on whether certification is appropriate, discovery and further information reveals that the Class definition should be modified or amended in any way.

### Numerosity

162.    The Proposed Class Members are so numerous that separate joinder of each Member is impractical. Although the exact number of proposed Class Members will be established after Class notification, upon information and belief, the number of proposed Class Members probably exceeds 11,000 people (over 4,000 service connections). The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and the Court.

163.   Putative Class Members are readily identifiable through records of the City of Summerville and through publicly available property records and may be given any required notices by regular mail, supplemented, if necessary and required by the Court, by published notice.

## **Typicality**

164.   Plaintiff Earl Parris, Jr.'s claims are typical of the claims to be advanced by Members of the Class, because he is a water subscriber (ratepayer) with the City of Summerville, Georgia Public Works and Utilities Department. He is also a property owner. His claims encompass those of the other Class Members, in that the facts and circumstances giving rise to liability are the same, the claims are based on the same legal theories, and the damages suffered by Plaintiff are the same kinds of damages suffered by Members of the Class.

## **Adequate Representation**

165.   Plaintiff Earl Parris, Jr. will fairly and adequately protect and represent the interests of each Proposed Class Member, as his interests do not conflict with Proposed Class Members. In fact, Plaintiff's interests are co-extensive with Proposed Class Members' common rights of recovery based on the same essential facts and legal theories, Plaintiff is a member of the same community as Proposed Class Members, Plaintiff is similarly damaged and is seeking the same remedies as Proposed Class Members. Finally, Plaintiff intends to prosecute this action vigorously.

166.   Plaintiff has retained counsel competent and experienced in complex Class action and toxic tort litigation, including actions like this one involving PFAS

contamination.  Plaintiff's counsel also intend to prosecute this action vigorously and have the resources and experience to do so.

## **Predominance of Common Questions of Law and Fact**

167.  Common questions of fact and law among the Representative Plaintiffs and Proposed Class Members predominate over questions affecting only individual Class Members. There are numerous questions of law and fact common to the Class, including:

(a)   The factual history of the manufacturing, sale and use of products containing PFAS by the PFAS Manufacturing Defendants and Defendant Mount Vernon Mills;

(b)   When the Defendants knew or should have known of the harmful effects of PFAS and related chemicals;

(c)   Whether the PFAS Manufacturing Defendants and Defendant Mount Vernon Mills failed to disclose the harmful effects of PFAS being released into the Trion WPCP;

(d)   The manufacturing processes at Mount Vernon Mills and the extent of discharges of PFAS from these processes to the Trion WPCP;

(e)   The extent of PFAS contamination of sludge disposed of from the Trion WPCP, the amount of sludge disposal, and the location of the disposal sites;

(f)     The manner in which PFAS from the contaminated sludge migrated to Raccoon Creek;

(g)     Whether the water supplied to Plaintiff and the Proposed Class Members has been and continues to be contaminated with PFAS and related chemicals;

(h)     Whether Plaintiff and the Proposed Class Members have paid and will pay more for their water as a result of the PFAS contamination;

(i)     Whether Plaintiff and the Proposed Class Members have suffered real and personal property damages as a result of the PFAS contamination;

(j)     Whether the PFAS Manufacturing Defendants' conduct was intentional, willful, wanton, reckless, and negligent, and constitutes a nuisance;

(k)     Whether Defendant Mount Vernon Mills' conduct was intentional, willful, wanton, reckless, and negligent, and constitutes a nuisance;

(l)     Whether punitive damages should be imposed on the PFAS Manufacturing Defendants and Mount Vernon Mills in an amount sufficient to punish, penalize, or deter their intentional, willful, wanton, and reckless, malicious, and oppressive acts and omissions that have created and maintained a public nuisance.

(m)   Whether and to what extent injunctive relief is appropriate to require Defendants to abate the claimed nuisance and prevent Defendants' chemicals from invading the Plaintiff's and the Proposed Class Members' water supplies and properties.

168.   The questions of law and fact common to Proposed Class Members predominate over any questions affecting only individual Members, and thus a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The prosecution of separate actions by individual Proposed Class Members would create a risk of (a) inconsistent or varying adjudications with respect to individual Proposed Class Members, which would establish incompatible standards of conduct for the Defendants and/or (b) adjudications with respect to individual Proposed Class Members which would as a practical matter be dispositive of the Members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

169.   Common questions of fact and law among the Representative Plaintiff and Proposed Class Members predominate over questions affecting only individual Class Members.

**Fed. R. Civ. P. 23(a) and 23(b)(2) Injunctive or Declaratory Relief**

170.   In addition to the above, Plaintiff brings this Class action under Fed. R. Civ. P. 23(a) and 23(b)(2), because Defendants have acted or refused to act on grounds generally applicable to all Members of the proposed Class, making final declaratory and injunctive relief appropriate with respect to the Class as a whole. Such injunctive relief includes, but is not limited to, an injunction to require remediation of the PFAS contaminated sludge in the Raccoon Creek watershed and installation of a permanent treatment process to remove PFAS, including Short-Chain PFAS, from the water supply of Plaintiff and Members of the proposed Class.

**Superiority**

171.   Additionally, Class action treatment is a superior method to other available methods for the fair and efficient adjudication of the controversy. Certification would be proper in that, among other things: there is no interest by Proposed Class Members in individually controlling the prosecution of separate actions; the expense of prosecuting individual claims for the matters for which Class certification is sought would be prohibitive in light of the typical claimant's injuries; neither Plaintiff nor Members of the proposed Class have filed or are parties to any litigation in which the legal and factual issues raised herein are to be adjudicated; and it is desirable to concentrate the litigation of claims in a single proceeding so as

61

to avoid unnecessary and expensive duplication of actions and to provide for judicial economy. Whatever difficulties may exist in the management of a Class action will be greatly outweighed by its benefits.

172.   Class action treatment is preferable to other available methods in providing a fair and efficient method for the adjudication of the controversy described herein, which has affected a large number of persons. The Class action provides an effective method whereby the enforcement of the rights of the Plaintiffs can be fairly managed without unnecessary expense or duplication.

**COUNT FIVE:**
**NEGLIGENCE**
**(PFAS MANUFACTURING DEFENDANTS AND MOUNT VERNON)**

173.   Plaintiff repeats, re-alleges and incorporates by reference the common allegations of this Second Amended Complaint as though fully set forth herein.

174.   As manufacturers, distributors, and/or suppliers of PFAS, the PFAS Manufacturing Defendants, who have superior knowledge of these chemicals, owed a duty to Plaintiff and Proposed Class Members, as persons who would be foreseeably harmed by their chemicals, to exercise due and reasonable care to prevent the disposal and discharge of toxic PFAS chemicals into surface waters and downstream water supplies.

175.   The PFAS Manufacturing Defendants knowingly breached their duty of reasonable care owed to Plaintiff and Proposed Class Members by supplying PFAS to users, including Mount Vernon, without exercising reasonable care to ensure that their chemicals would not contaminate surface waters and downstream water supplies.

176.   The PFAS Manufacturing Defendants knew or should have known that their manufacture, distribution, and/or supply of PFAS to users, including Mount Vernon, would result in environmental pollution such as contaminated surface waters and downstream water supplies, thereby endangering human health and the environment. This PFAS contamination was reasonably foreseeable in light of the Defendants' knowledge of the dangers of PFAS, including its persistence and toxicity.

177.   As a user, disposer and/or discharger of PFAS, Defendant Mount Vernon owed a duty to Plaintiff and Proposed Class Members, as persons who would be foreseeably harmed by these chemicals, to exercise due and reasonable care to prevent the disposal and discharge of toxic PFAS into surface waters and downstream water supplies.

178.   Defendant Mount Vernon knowingly breached its duty of reasonable care owed to Plaintiff and Proposed Class Members by using, disposing and/or

discharging PFAS without exercising due care to ensure that these chemicals would not contaminate surface waters and downstream water supplies.

179.   Defendant Mount Vernon knew or should have known that its use, disposal and/or discharge of PFAS chemicals would result in environmental pollution such as contaminated surface waters and downstream water supplies, thereby endangering human health and the environment. This PFAS contamination was reasonably foreseeable in light of Mount Vernon's knowledge of the dangers of PFAS, including its persistence and toxicity.

180.   Plaintiff and Proposed Class Members have a reasonable expectation that the PFAS Manufacturing Defendants and Mount Vernon will not contaminate surface waters or their downstream domestic water supplies with PFAS.

181.   As a direct, proximate, and foreseeable result of the PFAS Manufacturing Defendants' and Mount Vernon's conduct, practices, actions, omissions, and inactions, Plaintiff and Proposed Class Members have suffered, and will continue to suffer, damages arising from the PFAS contamination of their domestic water supply, including, but not limited to, personal property damages, real property damages, losses for payment of past and future surcharges and rate increases due to measures taken by Summerville to attempt to remove PFAS from

the water supply, costs in obtaining alternate supply(s) of potable water, and other damages to be proved at trial.

## COUNT SIX:
## NEGLIGENCE PER SE
## (MOUNT VERNON MILLS)

182.   Plaintiff repeats, re-alleges and incorporates by reference the common allegations of this Second Amended Complaint as though fully set forth herein.

183.   Defendant Mount Vernon owed a duty to Plaintiff and Proposed Class Members under Sections 301(a) and 307(d) of the CWA, 33 U.S.C. §§ 1311(a) and 1317(d), to operate its facility in such a manner as to ensure its industrial discharges into the Trion WPCP did not cause Pass Through or Interference.

184.   Defendant Mount Vernon owed a duty to Plaintiff and Proposed Class Members under the Georgia Water Quality Control Act ("GWQCA"), O.C.G.A. §§ 12-5-20, *et seq.*, and its implementing regulations to, among other things: not use any waters of the State for the disposal of sewage, industrial wastes, or other wastes, O.C.G.A. § 12-5-29(a); to immediately notify EPD of the location and nature of PFAS discharges into waters of the State and immediately take all reasonable steps to prevent injury to the health or property of downstream users of waters of the State, O.C.G.A. § 12-5-30.4; keep waters of the State free from "industrial wastes or other discharges in amounts sufficient to … interfere with the designated use of the water

body," Ga. Comp. R. & Regs. § 391-3-6-.03(5)(b); keep waters of the State free from "industrial or other discharges which … interfere with the designated use of the water body," *id.* at § 391-3-6-.03(5)(c); and to keep waters of the State free from "toxic … substances discharged from … industries or other sources … in amounts, concentrations or combinations which are harmful to humans, animals or aquatic life[.]" *Id.* at § 391-3-6-.03(5)(e).

185.   Plaintiff and Proposed Class Members are within the class of persons that the CWA and the GWQCA and its implementing regulations were designed to protect, and the harm sustained is the type of harm that these statutes and regulations are designed to prevent.

186.   Defendant breached these duties owed to Plaintiff and Proposed Class Members, and pursuant to O.C.G.A. § 51-1-6, under the circumstances, Defendant's breaches constitute negligence per se.

187.   As a direct, proximate, and foreseeable result of Defendant's conduct, practices, actions, omissions, and inactions, Plaintiff and Proposed Class Members have suffered, and will continue to suffer, damages arising from the PFAS contamination of their domestic water supply, including, but not limited to, personal property damages, real property damages, losses for payment of past and future surcharges and rate increases due to measures taken by Summerville to attempt to

remove PFAS from the water supply, costs in obtaining alternate supply(s) of potable water, and other damages to be proved at trial.

**COUNT SEVEN:**
**NEGLIGENT FAILURE TO WARN**
**(PFAS MANUFACTURING DEFENDANTS AND MOUNT VERNON)**

188.   Plaintiff repeats, re-alleges and incorporates by reference the common allegations of this Second Amended Complaint as though fully set forth herein.

189.   As manufacturers, distributors, and/or suppliers of PFAS with superior knowledge of its hazards, the PFAS Manufacturing Defendants had a duty to warn the purchasers and users of their PFAS products, including Mount Vernon, of the dangers associated with PFAS, including the existence and extent of the risks PFAS pose to human health and the environment and the inability of conventional wastewater treatment to remove these chemicals. This duty extended to those who may be foreseeably and unreasonably harmed by PFAS, including Defendant Trion and Plaintiff and Proposed Class Members, who are reasonably foreseeable third parties.

190.   The PFAS Manufacturing Defendants have a duty to warn of the dangers associated with PFAS that is commensurate with the inherently dangerous, harmful, toxic, injurious, environmentally persistent, water soluble and highly mobile and bio-accumulative nature of these chemicals.

191.   The PFAS Manufacturing Defendants knew, foresaw, anticipated, and/or should have known, foreseen, and/or anticipated that their manufacture, distribution, and/or supply of PFAS to users like Mount Vernon without adequate warnings of its hazards and disposal requirements, and/or other acts and omissions as described in this Second Amended Complaint, would likely result in the improper disposal of and the environmental contamination of surrounding areas, including surface waters and downstream water supplies.

192.   Despite knowing, anticipating, and/or foreseeing of the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS, and its inability to be effectively treated by wastewater treatment plants like the Trion WPCP, the PFAS Manufacturing Defendants breached the foregoing duty owed to Plaintiff and the Proposed Class Members by failing to warn Mount Vernon of the existence and extent of the dangers associated with PFAS and its use and disposal.

193.   As a user, disposer and/or discharger of PFAS, Defendant Mount Vernon had a duty to warn Trion, as the owner of the WPCP receiving its PFAS-laden wastewater discharges, of the dangers associated with PFAS, including the existence and extent of the risks it knew or should have known that PFAS poses to human health and the environment and the inability of conventional wastewater

treatment to remove these chemicals. This duty extended to those who may be foreseeably and unreasonably harmed by Mount Vernon's PFAS discharges, including Plaintiff and Proposed Class Members, who are reasonably foreseeable third parties.

194. Defendant Mount Vernon knew, foresaw, anticipated, and/or should have known, foreseen, and/or anticipated that its disposal and discharge of PFAS to Trion without adequate warnings of its hazards, and/or other acts and omissions as described in this Second Amended Complaint, would likely result in the environmental contamination of surrounding areas, including surface waters and downstream water supplies. Therefore, Defendant Mount Vernon had a duty to warn Trion of these dangers.

195. Despite knowing, anticipating, and/or foreseeing of the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature characteristics of PFAS, and its inability to be effectively treated by wastewater treatment plants like Trion, Defendant Mount Vernon breached the foregoing duty owed to Plaintiff and the Proposed Class Members by failing to warn Trion of the existence and extent of the dangers associated with PFAS.

196.   It was reasonably foreseeable to Defendants that Plaintiff and Proposed Class Members would suffer the injuries and harm described in this Second Amended Complaint by virtue of Defendants' breach of their duty to warn.

197.   But for Defendants' negligent failure to warn, Plaintiff and Proposed Class Members would not have been injured or harmed. Furthermore, as described throughout this Second Amended Complaint, Defendants' acts and/or omissions were also done maliciously or with knowledge of a high degree of probability of harm and reckless indifference to the consequences to persons such as Plaintiff and Proposed Class Members who foreseeably might be harmed by Defendants' acts and/or omissions.

198.   As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, omissions, and inactions, Plaintiff and Proposed Class Members have suffered, and will continue to suffer, damages arising from the PFAS contamination of their domestic water supply, including, but not limited to, personal property damages, real property damages, losses for payment of past and future surcharges and rate increases due to measures taken by Summerville to attempt to remove PFAS from the water supply, costs in obtaining alternate supply(s) of potable water, and other damages to be proved at trial.

**COUNT EIGHT:**
**WANTON CONDUCT AND PUNITIVE DAMAGES**
**(PFAS MANUFACTURING DEFENDANTS AND MOUNT VERNON)**

199.   Plaintiff repeats, re-alleges and incorporates by reference the common allegations of this Second Amended Complaint as though fully set forth herein.

200.   As manufacturers, distributors, suppliers, users, disposers and/or dischargers of PFAS, the PFAS Manufacturing Defendants and Mount Vernon owed a duty to Plaintiff and Proposed Class Members to exercise due and reasonable care to prevent the disposal and discharge of toxic PFAS chemicals into surface waters and downstream water supplies, thereby contaminating the City of Summerville water supply.

201.   Plaintiff and Proposed Class Members have a reasonable expectation that Defendants will not contaminate surface waters or their domestic water supply with PFAS.

202.   In breaching these duties and performing the other tortious acts and omissions described above, Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire absence of care which would raise the presumption of conscious indifference to the consequences.

203.   Defendants knew or should have known that their distribution, sale, use, disposal and/or discharge of toxic PFAS chemicals would result in contaminated

surface waters and downstream water supplies, thereby endangering human health and the environment.  Such harm was foreseeable.

204.  Defendants acted, or failed to act, knowingly, willfully or wantonly with conscious disregard and indifference to the rights and safety of others with knowledge that their actions and inactions would cause injury and harm to Plaintiff and Proposed Class Members.

205.  Punitive damages should be imposed on Defendants in an amount sufficient to punish, penalize and deter them from repeating such willful and wanton conduct.

206.  Because the Defendants have acted in bad faith in the underlying transactions or occurrences, have been stubbornly litigious, and have put the Plaintiff and Proposed Class Members to unnecessary trouble and expense, they are subject to liability for reasonable attorney's fees and expenses of litigation as a part of damages recoverable by Plaintiff and Proposed Class Members.

**COUNT NINE:**
**PUBLIC NUISANCE/DAMAGES**
**(ALL DEFENDANTS EXCEPT TRION)**

207.  Plaintiff repeats, re-alleges and incorporates by reference the common allegations of this Second Amended Complaint as though fully set forth herein.

208.   Plaintiff and Proposed Class Members own and occupy residential properties supplied with drinking water by the City of Summerville, which continues to be contaminated with PFAS, and are forced to pay surcharges so that the City can attempt to filter some of the PFAS from the water supply.

209.   The PFAS Manufacturing Defendants have created, caused or contributed to a continuing public nuisance by improperly directing and/or instructing the purchasers and users of their PFAS products, including Defendant Mount Vernon Mills, as to disposal requirements that these Defendants knew or should have known would result in the contamination of soil, groundwater and surface waters, and ultimately downstream water supplies.

210.   Defendant Mount Vernon has concurrently caused, created, and/or contributed to a continuing public nuisance by disposing of PFAS in a manner that it knew or should have known would result in the contamination of soil, groundwater and surface waters, and ultimately downstream water supplies.

211.   The PFAS contamination caused by the PFAS Manufacturing Defendants and Mount Vernon has unreasonably interfered with, and continues to interfere with, a right common to the general public—the use and enjoyment of Raccoon Creek and downstream waters, including the Chattooga River and Weiss Lake—unimpaired by Defendants' PFAS pollution.

212.   The public nuisance—the PFAS-contaminated waters of Raccoon Creek—damages, hurts or inconvenience all who come within the sphere of its operation. The harm caused by Defendants' conduct is not fanciful, or such as would affect only one of fastidious taste; rather, Defendants' conduct is such that it affects all ordinary, reasonable persons who use and enjoy Racoon Creek. *See* O.C.G.A. § 41-1-1.

213.   Plaintiff and Proposed Class Members have suffered, and will continue to suffer, special damages from Defendants' PFAS pollution of Raccoon Creek because it closely and immediately affects them and their property. Plaintiff and Proposed Class Members consume and have consumed PFAS-contaminated drinking water provided by the City of Summerville from Raccoon Creek, which poses a risk to their health and well-being. The PFAS contamination has invaded their homes, rendering their domestic water supply non-potable.

214.   As a result Plaintiff and Proposed Class Members have sustained special damages in the form of: (1) the diminished value of their properties; (2) interference with their use and enjoyment of their properties; (3) upset, annoyance and inconvenience; (4) increased rates and surcharges as Summerville ratepayers; and (5) costs incurred to obtain alternate potable water supplies.

215.   The nuisance created by the PFAS Manufacturing Defendants' and Mount Vernon's conduct is continuing, because the discharge of PFAS into Raccoon Creek is ongoing.

216.   As a direct result of the public nuisance caused by Defendants, Plaintiff and Proposed Class Members have suffered, and will continue to suffer, damages arising from the PFAS contamination of their domestic water supply, including, but not limited to: personal property damages, real property damages, losses for payment of past and future surcharges and rate increases due to measures taken by Summerville to attempt to remove PFAS from the water supply; and  costs in obtaining an alternate supply(s) of potable water.

**COUNT TEN:**
**ABATEMENT OF PUBLIC NUISANCE**
**(ALL DEFENDANTS)**

217.   Plaintiff repeats, re-alleges and incorporates by reference the common allegations of this Second Amended Complaint as though fully set forth herein.

218.   Pursuant to O.C.G.A. §§ 41-2-1 and 41-2-2, Plaintiff and Proposed Class Members have the right to bring an action to abate the nuisance caused by Defendants' manufacture, supply, disposal and/or discharge of PFOA, PFOS, and related PFAS, which has caused and continues to cause the contamination of Raccoon Creek and the Summerville water supply.

219.   In addition to their claims for damages, Plaintiff and Proposed Class Members are entitled to an injunction to abate the nuisance created and maintained by Defendants, who have concurrently caused, created, and/or contributed to the public nuisance. The public nuisance caused, created, and/or contributed to by the PFAS Manufacturing Defendants and Mount Vernon is set out in the previous section and in the common allegations of this Second Amended Complaint. Defendant Trion has caused, created, and/or contributed to the public nuisance by disposing of PFAS contaminated sludge in the Raccoon Creek watershed where it resulted in the contamination of soil, groundwater and surface waters, and ultimately downstream water supplies.

220.   Plaintiff and Proposed Class Members request this Court to issue an order and decree requiring Defendants to remove their PFAS chemicals and toxins from the water supplies of Plaintiff and Proposed Class Members and/or fund the measures necessary to prevent these chemicals and toxins from continuing to contaminate Plaintiff's and Proposed Class Members' water supply, based on the continuing irreparable injury to them posed by the continuing nuisance, for which there is no adequate remedy at law.

221.   Plaintiff and Proposed Class Members further request that this Court enter an order and decree permanently enjoining Defendants from continuing the

conduct described herein and requiring Defendants to take all steps necessary to remove their chemicals from Plaintiff's and Proposed Class Members' water supplies and properties.

222.   There is continuing irreparable injury to Plaintiff and Proposed Class Members if an injunction does not issue, as Defendants' PFAS in the water supply pose a continuing threat to Plaintiff's and the Proposed Class' health and property, and there is no adequate remedy at law.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiff and Proposed Class Members demand trial by jury and respectfully request that the Court grant the following relief:

(a)   Enter a declaratory judgment that Defendant Mount Vernon has violated and is in violation of the CWA, 33 U.S.C. §§ 1311 and 1317;

(b)   Enter an enforcement order or an injunction under the CWA ordering Defendant Mount Vernon to cease discharge of wastewater containing PFAS into the Trion WPCP in violation of industrial pretreatment requirements and standards, including federal prohibitions and Trion's ordinances and rules;

(c)   Enter a declaratory judgment that Defendant Trion has violated and is in violation of the CWA, 33 U.S.C. § 1311;

(d)     Enter an enforcement order or an injunction under the CWA ordering Defendant Trion to cease and abate the discharge of PFAS into waters of the United States without an NPDES permit, including the full remediation and elimination of the PFAS contaminated sludge disposed of in the Raccoon Creek watershed;

(e)     Order Defendants Mount Vernon and Trion to pay civil penalties of up to fifty-five thousand eight hundred dollars  ($55,800) per day for each day of each violation of the CWA set out in this Second Amended Complaint, pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a);

(f)     Enter a declaratory judgment that the disposal of PFAS contaminated sludge by Defendants Mount Vernon and Trion may present an imminent and substantial endangerment to health or the environment, pursuant to RCRA, 42 U.S.C. § 6972(a)(1)(B);

(g)     Enter an enforcement order or an injunction under RCRA ordering Defendant Mount Vernon to cease PFAS discharges into the Trion WPCP, requiring Trion to cease disposing of PFAS contaminated sludge on agricultural property, and requiring Mount Vernon and Trion to remove PFAS contaminated sludge from the Racoon Creek watershed and provide an effective treatment system for the Summerville water supply capable of removing PFAS from the drinking water.

(h)     Award Plaintiff his costs, including reasonable attorney and expert witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(d);

(i)     Award Plaintiff his costs, including reasonable attorney and expert witness fees, as authorized by Section 7002(e) of RCRA, 42 U.S.C. § 6972(e);

(j)     That this case be certified as a Class Action as proposed, pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(k)     Enter a judgment and decree against all Defendants under Georgia law enjoining them from maintaining the nuisance they have cased, created, and maintained;

(l)     Enter a judgment and decree against all Defendants under Georgia law, jointly and severally, requiring them to abate the nuisance they have caused, created, and maintained;

(m)     Enter a judgment and decree against all Defendants under Georgia law, jointly and severally, requiring them to cease the discharge or release of any kind of PFAS into rivers, streams, and/or tributaries where they contaminate the City of Summerville water system and the water supplies of Plaintiff and the Proposed Class Members;

(n)     Enter a judgment and decree against all Defendants under Georgia law, jointly and severally, requiring them to remove their PFAS chemicals from the City

of Summerville water system and the water supplies of Plaintiff and the Proposed Class Members;

(o)    Enter a judgment and decree against all Defendants under Georgia law, jointly and severally, requiring them to prevent any kind of PFAS chemicals from being released into rivers, streams, and tributaries where they contaminate the City of Summerville water system and the water supplies of Plaintiff and the Proposed Class Members;

(p)    Enter a judgment against the PFAS Manufacturing Defendants and Mount Vernon Mills, jointly and severally, for past, present, and future compensatory damages in an amount greater than Five Million Dollars ($5,000,000) as the evidence will show them to be justly entitled to recover, including interest and reasonable attorneys' fees and litigation expenses, and punitive damages, if applicable, in an amount sufficient to punish and penalize them, and deter them from repeating their wrongful conduct, and all costs; and

(q)    Award such other relief and further relief as this Court deems just, proper, and equitable.

Respectfully submitted,

**DAVIS ATTORNEYS, P.C.**

By: */s/ Gary A. Davis*
Gary A. Davis
N.C. Bar No. 25976 (*phv*)

80

21 Battery Park Avenue, Suite 206
Asheville, NC 28801
Phone: 828-622-0044
Fax: 828-398-0435
gadavis@enviroattorney.com

**MORRIS & DEAN, LLC**
Jeffrey J. Dean
Ga. Bar #006890
Thomas Causby
Ga. Bar # 968006
101 E. Crawford St.
Dalton, GA 30720
jeff@morrisanddean.com
tom@morrisanddean.com
Phone: 706-226-0300
Fax: 706-229-4363

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

Pursuant to Northern District of Georgia Civil Local Rule 7.1.D., the undersigned counsel certifies that the foregoing filing is prepared in Times New Roman 14-point font, as mandated in Local Rule 5.1.C.

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing **SECOND AMENDED INDIVIDUAL AND CLASS ACTION COMPLIANT** has been filed electronically with the Clerk of Court by using the CM/ECF system which will automatically email all counsel of record.

This the 21st day of November, 2022.

*/s Gary A. Davis*