# EXHIBIT 15

EARL PARRIS, JR., ET AL. vs 3M COMPANY, ET AL.
Gary Williams on 11/17/2022

30(b)(6)

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ROME DIVISION

 3
    EARL PARRIS, JR.,               § CASE NO.
 4  Individually, and on            § 4:21-cv-00040-TWT
    Behalf of a Class of            §
 5  Persons Similarly               §
    Situated,                       §
 6                                  §
                                    §
 7       Plaintiffs,                §
                                    §
 8                                  §
    CITY OF SUMMERVILLE,            §
 9  GEORGIA,                        §
                                    §
10                                  §
         Intervenor-Plaintiff,      §
11                                  §
                                    §
12       vs.                        §
                                    §
13                                  §
    3M COMPANY, DAIKIN              §
14  AMERICA, INC., HUNTSMAN         §
    INTERNATIONAL, LLC,             §
15  PULCRA CHEMICALS, LLC,          §
    MOUNT VERNON MILLS, INC.,       §
16  TOWN OF TRION, GEORGIA,         §
    and RYAN DEJUAN JARRETT,        §
17                                  §
                                    §
18       Defendants.                §
    ~~~~~~~~~~~~~~~~~~~~~~~~~
19
       30(b)(6) DEPOSITION OF MOUNT VERNON MILLS, INC.
20                     GARY WILLIAMS

21

22
                      10:06 a.m. EST
23       Thursday, the 17th day of November 2022

24

25
```

 1       witness?
 2          MR. DROZE:  That's a different
 3       witness.
 4          MR. FRIEDMAN:  Okay.
 5          MR. DROZE:  Just for the record, if it
 6       assists you in your examination of Gary,
 7       he's being designated for purposes of Topic
 8       A, the hierarchy and organization, and
 9       Topic D, as in David, which is the document
10       retention policy and record --
11       recordkeeping system.
12          MR. FRIEDMAN:  Okay.  Great.
13     Q.   (By Mr. Friedman)  That means you won't be
14  here all day.
15          Did you drive down from Trion or did you
16  come over last night?
17     A.   I drove down from Mauldin, actually from
18  Taylors --
19     Q.   Yeah.
20     A.   -- but I drove down last night.
21     Q.   Okay.  And you didn't bring any documents
22  with you.  I think we've -- okay.
23     A.   I did not.
24     Q.   All right.  I'm going to get to the
25  organizational structure, but I'm going to circle back

```
 1   to that once we get the flowchart for it.
 2           MR. FRIEDMAN:  Lacey, I want you to --
 3       if you would be so kind to pull up my Tab
 4       No. 54, and I'm going to make that
 5       Plaintiffs' Exhibit 3.
 6           (Plaintiffs' Exhibit 3 was marked for
 7       identification.)
 8           MR. FRIEDMAN:  Does everybody have a
 9       copy of that?
10       Q.   (By Mr. Friedman)  Could you identify
11   Exhibit -- we marked it 3; right?
12           Would you identify Exhibit 3 for the record,
13   please, sir.
14       A.   This is Mount Vernon's record retention
15   policy.
16       Q.   And it's dated May of 2009; is that right?
17       A.   Correct.
18       Q.   And at the bottom of the first page
19   of Exhibit 3, it says revised 5/13/2009.  So would
20   there have been a predecessor to this?
21       A.   I would be assuming.  I do not know that.
22       Q.   Okay.  I think we can agree on this, unless
23   I'm reading this wrong, this would be the record
24   retention policy, Mr. Williams, in effect at Mount
25   Vernon Mills, Incorporated, from May of 2009 through
```

```
 1   the present.
 2        A.   Yes.
 3        Q.   And, of course, in May of 2009, you were
 4   there at Mount Vernon Mills; right?
 5        A.   Yes.
 6        Q.   In what position were you in there?
 7        A.   Vice president of human resources.
 8        Q.   All right.  And did you have responsibility
 9   for the record retention policy?
10        A.   No.
11        Q.   Who would have been responsible for that
12   back in this time frame, if you know?
13        A.   Ned Cochrane.
14        Q.   Help me with that last name.
15        A.   C-O-C-H-R-A-N-E.
16        Q.   Is Mr. Cochrane still with the company?
17        A.   He is -- he is working out of retirement,
18   basically.
19        Q.   Okay.
20        A.   He retired formally at the end of last year
21   and we have retained him 20 hours a month --
22        Q.   Like --
23        A.   -- maximum.
24        Q.   Like a consultant basis?
25        A.   Correct.
```

```
 1    Q.   What was his position?
 2    A.   He would have been vice president, secretary
 3  and legal counsel.
 4    Q.   And where does he reside?
 5    A.   Simpsonville, South Carolina.
 6    Q.   Is that right outside of Greenville as well?
 7    A.   Yes.
 8    Q.   Did you consult with Mr. Cochrane
 9  in preparing to give your deposition today?
10    A.   I did not.
11    Q.   Okay.
12    A.   I -- let me correct that.
13    Q.   Sure.
14    A.   In identifying where this document was, I
15  did ask him.  Beyond that, no.
16    Q.   Where did he tell you that this record
17  retention policy was located?
18    A.   It was electronically stored.
19    Q.   All right.  I would ask, in my layman's
20  jargon, where would you find this on the computer?  If
21  I need to be more technical, how would you find it
22  electronic -- or how did you find it electronically?
23    A.   It -- it actually ended up being on my
24  laptop.
25    Q.   He couldn't have hid it from you any better.
```

 1        Is this a document that representatives or
 2   employees of Mount Vernon Mills have access to?
 3        A.   There is nowhere that I know of on our
 4   employee access system or anything like that where
 5   they would have access.  If they had questions, they
 6   would be provided with a copy of the policy or
 7   questions would be answered to them.
 8        Q.   Are people in positions of responsibility
 9   trained on the company's record retention policy?
10        A.   Yes.
11        Q.   And are those people who've been trained,
12   are they expected to follow it?
13        A.   Yes.
14        Q.   In searching for the May of 2009 record
15   retention policy, did you find any predecessor
16   policies?
17        A.   No.
18        Q.   This was the only thing that you were able
19   to find on the computer?
20        A.   I would answer that by saying it was the
21   only thing that I looked for.
22        Q.   Okay.  Yeah.  The only thing that you looked
23   for.  But in look -- searching for this, did you see
24   any indication or anything that led you to believe
25   there was a policy that predated this?

```
 1     A.   No.
 2     Q.   I know when I asked you before, you said
 3  you'd have to hazard to guess or speculate.  I
 4  understand that.  But nothing in your recollection or
 5  nothing in your search indicated to you there was a
 6  president -- predecessor policy?
 7     A.   No.
 8     Q.   All right.  Would this record retention
 9  policy apply to documents that were then in existence
10  in 2009?
11     A.   Yes.
12     Q.   Stated another way, there wasn't some type
13  of purge of documents prior to May of 2009 before this
14  policy went into effect, was there?
15     A.   Not that I'm aware of.
16     Q.   So if there was a file of documents that
17  were intended to be maintained indefinitely, if they
18  existed in 2009 and the policy says maintain them
19  indefinitely, they would still be there today;
20  correct?
21     A.   Yes.
22     Q.   And so this policy could actually reach back
23  for many years or years predating May of 2009;
24  correct?
25          MR. DROZE:  Object to the form.
```

```
 1              THE WITNESS:  Yes.  I think that's
 2       fair to say.
 3       Q.   (By Mr. Friedman)  Sure.  Let's look at this
 4   for just a minute.  There's seven pages.  I'm going to
 5   go ahead and ask you to flip over to two, and look at
 6   Section F, which is entitled "Legally required
 7   suspension of document destruction."
 8            Do you see that?
 9       A.   Yes.
10       Q.   And are you familiar with that provision?
11       A.   Yes.
12       Q.   Are you familiar with a -- with a phrase
13   that is sometimes referenced as a litigation hold?
14       A.   Yes.
15       Q.   Has a litigation hold been issued with
16   respect to the lawsuit that we're here on today?
17       A.   Yes.
18       Q.   And where did that letter originate or
19   where did -- how did that originate?  Did that come
20   from your office?
21       A.   It probably originally came from Ned
22   Cochrane.
23       Q.   And was it circulated to -- how was it
24   circulated, I should say?
25       A.   I don't recall.
```