IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

EARL PARRIS, JR.
Individually, and on behalf of a Class of
persons similarly situated,

    Plaintiff,

        v.

                              CIVIL ACTION FILE
                              NO. 4:21-CV-40-TWT

3M COMPANY, et al.,

    Defendants.

## OPINION AND ORDER

This is an action under the Clean Water Act. It is before the Court on Plaintiff Earl Parris, Jr.'s Motion for Class Certification [Doc. 688]. For the reasons set forth below, the Court GRANTS in part and DENIES in part Plaintiff Parris's Motion for Class Certification [Doc. 688].

## I.  Background

This case arises out of the contamination of the Raccoon Creek watershed in Chattooga County, Georgia, with per- and polyfluoroalkyl substances known as "PFAS." (2d Am. Compl. ¶ 1 [Doc. 280].) PFAS are a group of synthetic chemicals that have been used since the 1940s in "a wide variety of industrial and commercial applications." (*Id.* ¶¶ 39, 56.) Their commercial usefulness is the product of strong carbon-fluorine bonds, which make PFAS highly stable, oil- and water-repellant, and resistant to heat and chemical reactions. (*See id.* ¶¶ 39–40.) However, these same properties also

make PFAS persistent in the environment, with no known natural processes to break them down. (*Id.* ¶¶ 40–41.) PFAS are "highly mobile and water soluble" and can "leach from soil to groundwater, making groundwater and surface water particularly vulnerable to contamination." (*Id.* ¶ 40.) Once in the environment, they are ingested by humans via drinking water, and bioaccumulate with repeated exposure. (*Id.* ¶¶ 40, 42.) As PFAS build up and distribute throughout the human body, they can cause long-term physiologic alterations and damage to the blood, liver, kidneys, immune system, and other organs. (*Id.* ¶ 42.) Some of the human diseases associated with PFAS exposure include "cancer, immunotoxicity, thyroid disease, ulcerative colitis, and high cholesterol." (*Id.* ¶ 43.)

Plaintiff Earl Parris, Jr., alleges that the Defendants have contaminated his household water with PFAS. Parris is a resident of Summerville, Georgia, who receives potable water to his home from the Summerville Public Works and Utilities Department. (*Id.* ¶ 21.) The City of Summerville—which has intervened in this case—uses Raccoon Creek, a tributary of the Chattooga River, as the main source of its municipal water supply. (*Id.*) Parris alleges that Raccoon Creek and—consequently, his household water—have been contaminated with PFAS by the Defendants. (*Id.*)

According to the Second Amended Complaint ("Complaint"), the contamination started with a group of corporations referred to collectively as

2

the "Manufacturing Defendants": 3M Company; E.I. du Pont de Nemours and Company; The Chemours Company; Daikin America, Inc.; Huntsman International, LLC ("Huntsman"); and Pulcra Chemicals, LLC ("Pulcra"). (*Id.* ¶ 5). For decades, the Manufacturing Defendants have allegedly manufactured and supplied the PFAS that are being discharged into Raccoon Creek and pumped into the Summerville water system. (*Id.* ¶¶ 6, 28–33, 64–65, 78, 80.) Specifically, these companies sold formulations and products to Defendant Mount Vernon Mills, Inc., a company that has owned and operated a textile mill in the neighboring town of Trion, Georgia, for at least thirty-five years. (*Id.* ¶ 24, 34.) During this time, the Manufacturing Defendants have sold products containing PFAS, including Perfluorooctanesulfonic Acid ("PFOS") and Perfluorooctanoic Acid ("PFOA"), to Mount Vernon to make water- and stain-resistant fabrics. (*See id.* ¶¶ 34–35, 65, 75–78.)

Parris alleges that the PFAS supplied to Mount Vernon ended up in Raccoon Creek through wastewater discharge. Mount Vernon allegedly discharged PFAS-infused wastewater into the Trion Water Pollution Control Plant ("Trion WPCP"). (*Id.* ¶¶ 34–36.) However, the Trion WPCP, which is owned by Defendant Town of Trion, is not capable of degrading the PFAS in Mount Vernon's wastewater, so these chemicals are allegedly discharged as effluent into the Chattooga River or applied as sludge to land in the Raccoon Creek watershed. (*Id.*) Since 1992, Trion has disposed of nearly 8,000 tons of

3

PFAS-contaminated sludge in the watershed. (*Id.* ¶ 37.)

Significant amounts of PFAS-contaminated sludge remain in Raccoon Creek and on properties in the Raccoon Creek watershed. (See *id.* ¶¶ 86–90.) Between November 2019 and December 2020, the U.S. Environmental Protection Agency ("EPA") and the Georgia Environmental Protection Division ("EPD") repeatedly discovered high levels of PFAS—including PFOA, PFOS, and short-chain PFAS—in Raccoon Creek. (*Id.*) PFAS were also found in Summerville's treated water in January 2020. (*Id.* ¶ 91.) At 98 parts per trillion ("ppt"), the combined PFOA and PFOS levels in the water exceeded the EPA Drinking Water Health Advisory at the time (70 ppt) as well as other federal, state, and independent guidelines. (*Id.*)

All the while, the Manufacturing Defendants have allegedly known that PFAS cannot be removed from industrial wastewater by conventional treatment processes, and that it is unsafe to dispose of PFAS through land application or effluent discharges. (*Id.* ¶¶ 55, 57, 59–62.) Parris cites a number of internal studies conducted by the Manufacturing Defendants and their predecessors that found PFAS to be persistent, mobile, bioaccumulative, and toxic. (*Id.* ¶¶ 58–60, 62, 66–71, 80, 84.) The Manufacturing Defendants allegedly communicated these findings within the industry, including to PFAS users like Mount Vernon, but concealed their knowledge from the public and government agencies. (*Id.* ¶¶ 73, 80, 84.) In any event, the persistence and

4

toxicity of PFAS have been widely published since at least 2000. (*Id.* ¶ 82.)

According to the Complaint, Summerville has undertaken initial efforts to respond to this PFAS contamination, but the PFAS problem persists. For example, it notified its water users to stop drinking or cooking with municipal water. (*Id.* ¶ 92.) In October 2020, Summerville installed a temporary treatment system consisting of a pit in the ground filled with granulated activated carbon ("GAC"). (*Id.* ¶ 94.) Despite these efforts, Summerville's temporary treatment system does not effectively remove PFOA, PFOS, or short-chain PFAS from the water supply and thus has not eliminated the health and safety risk to Parris and other water users. (*Id.* ¶ 95.) Samples taken after installation continued to show PFOA and PFOS of 24 ppt and 15 ppt, respectively, in treated water. (*Id.*)

Nearly three years have passed since Parris filed his Second Amended Complaint. In that time, the Court has approved settlements between Parris and Defendants Pulcra [Doc. 849], Mount Vernon [Doc. 915], Trion [Doc. 915], and Huntsman [Doc. 916]. The remaining Defendants (3M, DuPont, Chemours, and Daikin) face state law claims for negligence, negligent failure to warn, public nuisance, and punitive damages. (2d Am. Compl. ¶¶ 173–81, 188–222.) Additionally, the EPA has updated its guidance on PFAS. In June 2022, it lowered its Drinking Water Health Advisory from 70 ppt to 0.004 ppt for PFOA and 0.02 ppt for PFOS. (Pl.'s Mot. for Class Certification, at 3

[Doc. 688] (citing 87 Fed. Reg. 36848 (June 21, 2022)). In April 2024, the EPA promulgated final Maximum Containment Levels ("MCLs") of 4 ppt for PFOA and PFOS in drinking water. (*Id.* (citing PFAS National Primary Drinking Water Regulation, 89 Fed. Reg. 32532 (Apr. 26, 2024)).) It also finalized a Maximum Containment Level Goal of 0 ppt for PFOS and PFOA. (*See generally* Pl.'s Mot. for Class Certification, Ex. J, [Doc. 688-10].) Lastly, with regard to the City of Summerville, its City Council engaged a company to test PFAS remediation options through a PFAS pilot study and, in September 2024, approved a plan to begin designing and constructing a permanent GAC system to treat water and wastewater in the long term. (Pls.' Resp. Br. in Opp'n to Defs.' Motion to Exclude Sipe & Senerman, Ex. 5 ("Sipe & Senerman Expert Report"), at 5, 7 [Doc. 951-5].)

Now, Parris seeks class certification pursuant to Rules 23(b)(2) and (b)(3). He alleges that the putative class is owed compensatory damages due to past and future water rate increases imposed by the City of Summerville to pay for PFAS removal efforts; payments incurred for obtaining alternative water supplies; diminution of real property values; loss of use and enjoyment of real property; upset, annoyance, and inconvenience; and injury to personal property interests in the supply of household water. (2d Am. Compl. ¶¶ 214, 100–02.) And he seeks an injunction ordering the Defendants to, among other things, remediate the sources of PFAS in the Raccoon Creek watershed and

install a "permanent treatment process to remove PFAS" from Summerville's water supply. (*Id.* ¶ 170.)

## II. Legal Standard

Federal Rule of Civil Procedure 23(c)(1)(A) provides that a court must "[a]t an early practicable time after a person sues or is sued as a class representative . . . determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). The first step in this process is to determine whether a named plaintiff has standing to sue. *Fox v. Ritz-Carlton Hotel Co.*, 977 F.3d 1039, 1046 (11th Cir. 2020) (quoting *Prado Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000)). As implicitly required by Rule 23(a), courts may then determine whether a proposed class is "adequately defined and clearly ascertainable." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021) (quoting *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)). If the ascertainability requirement is met, courts then assess whether the class representatives have satisfied the four express requirements of Rule 23(a):

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

7

Fed. R. Civ. P. 23(a).

Lastly, the proposed class must also satisfy at least one of the alternative requirements in Rule 23(b). *See Herrera v. JFK Med. Ctr. Ltd. P'ship*, 648 F. App'x 930, 933 (11th Cir. 2016). The Plaintiff's Motion to Certify specifically contends that Rule 23(b)(3) and (b)(2) are satisfied. (Pl.'s Mot. for Class Certification, at 13–20.) A class can be certified under Rule 23(b)(3) if "[1] the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . [2] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A class can be certified under Rule 23(b)(2) if a defendant has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

The party seeking class certification bears the burden of proving that these requirements are satisfied. *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003); *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016) ("[The Plaintiff] must affirmatively demonstrate his compliance with Rule 23 by proving that the requirements are *in fact* satisfied." (quotation marks and citation omitted)). The decision to grant or deny class certification lies within the sound discretion of the district court.

*Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008); *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1386 (11th Cir. 1998) (en banc). When considering the propriety of class certification, the court should not conduct a detailed evaluation of the merits of the suit. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974). Nevertheless, the court must perform a "rigorous analysis" of the particular facts and arguments asserted in support of class certification. *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *Gilchrist v. Bolger*, 733 F.2d 1551, 1555 (11th Cir. 1984). Frequently, that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351–52 (2011).

## III. Discussion

Parris seeks to certify a "Damages Class" involving "[a]ll rate payers of water and sewer service with the City of Summerville from January 2020 through class certification." (Pl.'s Mot. for Class Certification, at 12.) And he seeks to certify an "Injunction Class" involving "'[a]ll account holders of water service with the City of Summerville at the time of class certification." (*Id.*) Ultimately, the Court grants certification in part and denies it in part. The Court grants certification as to Parris's proposed Damages Class pursuant to Rule 23(b)(3), but only as to the past damages sought. The Court denies

certification of the Damages Class as to any future damages sought. Additionally, the Court denies certification of the Injunction Class pursuant to Rule 23(b)(2).

As an initial matter, the Court holds that Parris satisfies the requirements of Rule 23(a). Neither 3M, DuPont, Chemours, nor Daikin contest the Rule 23(a) requirements, and the Court's independent review reveals no apparent issue. Parris has standing, as he has alleged that he has incurred increases to his water rate as a result of the Defendants' PFAS and is at imminent risk of future rate increases as a result of the Defendants' contamination. The proposed classes are clearly defined and mostly ascertainable: the class definitions rely on objective criteria regarding who is a ratepayer, and Summerville's finance director has filed a declaration affirming that the City maintains records of each of its ratepayers, (*see* Rutledge Decl. ¶ 9, [Doc. 843-3]). The proposed classes are also sufficiently numerous (with approximately 4,500 potential class members) such that joinder of all members would be impracticable. (Pl.'s Mot. for Class Certification, at 13; Rutledge Decl. ¶ 3.) And they involve multiple common questions central to Parris's claims (e.g., the Defendants' knowledge of PFAS' harmful effects, whether the Defendants had a duty to warn their downstream PFAS users). Parris's claim is typical of the proposed classes as well since he alleges claims common to the class that are based on the same alleged injury

as all other proposed class members. *J.M. v. Crittenden*, 337 F.R.D. 434, 449 (N.D. Ga. 2019) (quoting *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)). Lastly, the Court is not aware of any reason why class counsel would inadequately represent the proposed classes, based on the qualifications and materials provided. The Court next turns to Rules 23(b)(3) and (b)(2).

### 1. Rule 23(b)(3) Damages Class

Parris seeks to certify a Damages Class based on two different models of damages: (1) one model of damages based on past rate increases; and (2) one model of damages based on future anticipated rate increases. William Zieburtz describes these damages models in his expert report. For past PFAS-related rate increases, Zieburtz's report shows that he used estimates by Carter & Sloope (Sipe and Senerman's firm) of the amount of past rate increases attributable to PFAS, divided those estimates by Summerville's total rate increases to get the percentage of those increases attributable to PFAS, and then used those percentages to apply a "common formula" to determine the amount that each customer's water bill increased due to Summerville's PFAS response. (Zieburtz Am. Expert Report for Parris, [Doc. 759-1], at 2, 5.) He states that a common formula is possible because, "[w]hile each customer's bill would vary based upon usage levels, the same percentage of PFAS-related increases have been applied to all rate classes" (e.g., residential class,

commercial class). (*Id.* at 1.) The formula applies the percentage of each year's rate increase attributable to PFAS to customers' base and volumetric charges. (*See id.* at 11, 15–16.) Lastly, Zieburtz applies the formula to a sample customer bill (based on an average water and sewer bill) to arrive at the dollar amount attributable to PFAS. (*See id.* at 17–18.)

For future PFAS-related rate increases, Zieburtz's report relies on GAC cost estimates provided by Insite (Pate's firm) in present day dollars. (*Id.* at 2–3.) He escalated those costs according to several variables (e.g., borrowing terms, construction cost changes over time) and determined the net present value of GAC construction and operation (about $110.2 million) based on a 3.5% discount rate. (*Id.* at 2–3, 9–10 (describing initial cost estimates and escalation); Br. in Supp. of Defs.' Mot. to Exclude Zieburtz, Ex. C, at 4–5 [Doc. 882-4] (totaling initial capital expenses and escalated operating costs).) As with his past damages calculations, Zieburtz states that he can apply a "common formula" to determine the amount of rate increases that would be attributable to PFAS for all customers. (*Id.* at 3.) By way of example, Zieburtz plugs in Summerville's estimated GAC spend and total rate revenue,[1] for the next ten years, (*see id.* at 12, 14), to arrive at customers' PFAS-related rate increases, (*id.* at 11).

---

[1] For future rate increases, Zieburtz states that he assumed "an increase in expenses of 5% per year" based on items such as inflation, deferred maintenance, and retention. (Zieburtz Am. Expert Report for Parris, at 14.)

To certify a class under Rule 23(b)(3), a plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Defendants dispute predominance and superiority as to both types of damages models, arguing that (1) the damages models are "disconnected" from his "PFAS-centered theory of liability" and require cumbersome individual analyses that predominate over analyses common to the class, and (3) the City's lawsuit is a superior "method[ ] of resolving the parties' dispute." (Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for Class Certification, at 1–5 [Doc. 785-1].)

### a. Predominance

"The predominance requirement in Rule 23(b)(3) is far more demanding than the commonality requirement found in Rule 23(a)(2), and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016) (citation modified). Questions common to the class predominate if "they have a direct impact on every class member's effort to establish liability that is more substantial than the impact of individualized issues in resolving the claim or claims of each class member." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1270 (11th Cir. 2009) (citation modified). Questions common to the class

will not predominate "[w]here, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims." *Klay*, 382 F.3d at 1255. The predominance inquiry considers whether both liability and damages are capable of classwide resolution, but courts treat liability differently from damages. Generally, "[t]he presence of individualized damages issues does not prevent a finding that the common issues in the case predominate" as long as "liability can be determined on a class-wide basis." *Herrera v. JFK Med. Ctr. Ltd.*, 648 F. App'x 930, 936 (11th Cir. 2016) (quoting *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003)); *see also Carriuolo*, 823 F.3d at 988 ("[I]ndividual damages calculations do not preclude class certification." (citations omitted)). This general rule, however, is subject to an exception for "extreme cases in which computation of each individual's damages will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable." *Klay*, 382 F.3d at 1260.

Here, there is no doubt that questions of liability are common to the class as a whole. Parris alleges that the Defendants manufactured and supplied the PFAS that contaminated the Raccoon Creek watershed, which affects the drinking water of the entire class of ratepayers. (2d Am. Compl. ¶ 3.) Thus, common questions of liability include questions as to the

14

Defendants' knowledge and concealment of the harmful effects of PFAS, their knowledge that conventional wastewater treatment plants could not treat PFAS-laced industrial waste, their duty to warn downstream users about PFAS, the resulting contamination of the Raccoon Creek watershed and the putative class's drinking water supply, the health and environmental consequences of that contamination, and more. (*See* Pl.'s Mot. for Class Certification, at 20–21.) Answers to these questions "have a direct impact on every class member's effort to establish liability." *See Vega*, 564 F.3d at 1270.

Only Defendants DuPont and Chemours contest whether liability can be determined as to the whole putative class, but they do so to no avail. In their response brief, DuPont and Chemours argue that questions regarding their liability are "deeply individualized" and "unsuitable for class treatment."[2] (*See* Defs.' DuPont & Chemours's Resp. Br. in Opp'n to Pl.'s Mot. for Class Certification, at 7 [Doc. 782].) They cite "individualized" questions about "*[w]hat* [DuPont] and Chemours knew about the alleged effects of PFAS and *when* they knew it," arguing that those questions predominate over common

---

[2] DuPont and Chemours also argue in their response brief that their role in the alleged PFAS contamination is too "remote" to establish any liability. (*See* Defs.' DuPont & Chemours's Resp. Br. in Opp'n to Pl.'s Mot. for Class Certification, at 2 [Doc. 782].) They explain that they sold products to one set of companies that in turn sold products to Defendant Mount Vernon (as distinguished from Defendants 3M and Daikin, which sold products directly to Mount Vernon). (*Id.* at 2.) But questions of DuPont and Chemours's ultimate liability are not properly before the Court on a motion for class certification.

questions. (*See id.*) But this argument misunderstands the predominance inquiry. It does not matter that multiple fact-intensive questions exist as to each Defendants' liability. Rather, what matters is whether the *answers* to those liability questions are common to the class as a whole. *See Wal-Mart*, 564 U.S. at 350. And they are here.

Regarding the question of past damages, Parris has sufficiently shown that they are capable of classwide resolution by way of his damages model. Specifically, Parris has shown that his damages model is reliable under Rule 702, and he has shown that his model is consistent with his theory of liability as to the class. *See Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 893 (11th Cir. 2023) (noting that a plaintiff must prove that "a reliable damages methodology exist[s]" at class certification); *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (holding that a plaintiff's damages model "must be consistent with its liability case"). That is the damages model standard on a motion for class certification.

The Defendants appear to argue that a plaintiff must *prove* a reasonable damages model in order to obtain class certification. Relying on *Comcast Corp.*, the Defendants specifically claim that "a plaintiff must present a 'model purporting to serve as evidence of damages' that 'measures only those damages attributable to' his theory of liability" in order to "obtain certification of a damages class under Rule 23(b)(3). (Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for

Class Certification, at 15 (quoting *Comcast*, 569 U.S. at 35).) They then argue that Parris's damages model does not meet this standard because it "does not adequately measure rate increases exclusively attributable to PFAS contamination." (*Id.* at 16.) They point to various explanations such as Zieburtz's failure to account for grants and loans (with principal forgiveness) that the City received to offset past PFAS treatment efforts. (*See id.* at 17–19.)

But the Defendants misstate *Comcast* as it relates to the requirements of certification. In *Comcast*, the Supreme Court reversed a circuit court's order certifying a class of Comcast subscribers because the plaintiffs' damages model "failed to measure damages resulting from the particular antitrust injury on which [plaintiffs'] liability in th[e] action [was] premised." *Id.* at 36. The plaintiffs there had set forth four theories of liability explaining why Comcast's conduct increased their cable subscription rates, but the district court had only accepted one of those theories as "capable of classwide proof." *Id.* at 31; *see also id.* at 36 (describing the four theories as "decreased penetration by satellite providers, overbuilder deterrence, lack of benchmark competition, and increased bargaining power"). However, the damages model of the plaintiffs' expert provided one measure of damages that accounted for all four theories of liability, without attempting to isolate the impact of the sole theory accepted by the district court. *Id.* at 36–37; *see also id.* at 35 (requiring, where a classwide damages model is required to satisfy predominance, an expert's

17

damages methodology to reflect "a just and reasonable inference" and not mere "speculati[on]"). The Supreme Court reasoned that, because the expert's model "does not even attempt" to "measure only those damages attributable to [the accepted] theory," *see id.* at 35, certification was inappropriate, *id.* at 38. The Supreme Court ultimately held that "[c]alculations need not be exact, but at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be *consistent with* its liability case." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (emphasis added) (citation omitted).[3]

The Supreme Court in *Comcast* "did not hold" that "a plaintiff seeking class certification must present an expert damages model," let alone *prove* a reasonable one. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016); *see also Carriuolo*, 823 F.3d at 988 (noting that plaintiffs need not "prove predominance separately as to both liability and damages"). Rather, the language that the Defendants cite is based on the Supreme Court's "assum[ption]" that an expert damages model was necessary to establish predominance "because the parties had conceded" its necessity. *Brown*, 817 F.3d at 1239. Furthermore, *Comcast* did not alter the long-established rule

---

[3] *See also Schultz v. Emory Univ.*, 2024 WL 4534428, at *5 (11th Cir. Oct. 21, 2024) (noting that *Comcast* "held that an expert's damages model that did not align with the plaintiff's theory of liability could not" satisfy a plaintiff's burden to "show damages are capable of measurement on a classwide basis." (citation omitted)); *Carriuolo*, 823 F.3d at 988 ("*Comcast* simply requires that 'any model supporting a plaintiff's damages case must be consistent with its liability case.'").

that "[i]t is primarily when there are significant individualized questions going to liability that the need for individualized assessments of damages is enough to preclude 23(b)(3) certification." *See id.*; *Klay*, 382 F.3d at 1260.

Here, Parris's damages model satisfies *Comcast*'s consistency standard: the model is consistent with Parris's theory of liability. Zieburtz's model relies on the application of a "common formula" that can purportedly determine the amount of each ratepayer's actual incurred rate increase that is attributable to PFAS remediation. The Defendants' primary problem with this formula is that Zieburtz's calculations are based on the estimates that the City relied on to approve new rate increases, rather than the City's actual PFAS spending, which was offset by certain grants and loans (with principal forgiveness). (*See* Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for Class Certification, at 15–18.) But the decision to exclude certain grants is consistent with Parris's sole theory of liability—actual water rate increases paid by ratepayers to cover the remediation of the Defendants' PFAS. The out-of-circuit case law that the Defendants cite does not rebuff this point. *See, e.g.*, *Kingsbury v. U.S. Greenfiber, LLC*, 2013 WL 12114077, at *1, 3 (C.D. Cal. Nov. 5, 2013) (focusing on the "reliability" of the damage model, and finding the model "completely arbitrary"); *In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36, 78 (D.N.H. 2015) (describing the expert's methodology as "bare bones" in identifying certain market comparators); *Werdebaugh v. Blue Diamond*

19

*Growers*, 2014 WL 7148923, at *9–11 (N.D. Cal. Dec. 15, 2014) (finding the damages model insufficient because it did not attempt to control for the plaintiff's theory of liability). For these reasons, the Court thus agrees the damages model is sufficient to show that past damages are capable of classwide resolution.[4] Therefore, because Parris has shown that both liability and damages are capable of classwide resolution, the Court concludes that common questions predominate over any potential remaining individualized questions.

### b. Superiority

Under Rule 23(b)(3), the class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) lists four nonexhaustive factors courts may consider as part of this inquiry: (a) "class members' interests in individually controlling the prosecution or defense of separate actions"; (b) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (c) "the desirability or undesirability of concentrating the

---

[4] Even if Parris had not provided any damages model, the Court would still find the predominance inquiry satisfied in this case. That is because "individualized damages calculations are insufficient to foreclose the possibility of class certification, especially when . . . the central liability question is so clearly common to each class member." *Carriuolo*, 823 F.3d at 988. The "central liability question[s]" here are "clearly common to each class member" and would therefore predominate over any individualized damages questions that may arise. And there is no suggestion that this case is one of the "extreme cases" in which individual damage determinations would be "simply intolerable" for the Court.

litigation of the claims in the particular forum"; and (d) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D); *see also Vega*, 564 F.3d at 1278 n.19 ("[A] complete failure to address these factors . . . when conducting a Rule 23(b)(3) inquiry is an abuse of discretion.").

The factors outlined in Rule 23(b)(3)(A)–(D) weigh in favor of certification of a past rate increase class. There would appear to be little interest in litigating each issue through individual suits, as this case involves few factual distinctions between the putative class members but many complicated liability issues pertaining to the Defendants' knowledge and conduct. No members of the proposed class have filed suit, and all of them were allegedly injured in the Northern District of Georgia. Given the numerosity of the class (about 4,500 people), managing separate lawsuits would likely be more difficult than managing this class action.

Notwithstanding these express factors, the Defendants contend that "the superior way to determine who, if anyone should pay for water-supply remediation is for the City to directly sue the parties it believes to be responsible for PFAS contamination," as the City has done here. (Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for Class Certification, at 30.) They argue that a successful suit by the City would obviate the need to raise rates on ratepayers in the future and cut out a source of uncertainty in Parris's damages model— the potential disconnect between the estimated (or actual) cost of PFAS

21

remediation and what the City will charge its ratepayers. (*Id.* at 30–31.) Notably, Parris concedes that the putative class's future damages claims would be "resolve[d]" should the City prevail on its claims to recover its future GAC costs. (Reply Br. in Supp. of Mot. for Class Certification, at 13–14 [Doc. 843].)

The Defendants' argument has some merit, but the Court considers two complications. First, this argument does not apply to past damages sought by the putative class. Even if Summerville prevailed in its entirety, the City would be under no obligation to refund past rate hikes to the putative class. A successful suit by the City therefore would not remedy the putative class's alleged injuries from past rate increases. As a result, the Court finds the Damages Class as to past rate increases superior to all other methods of adjudicating the present controversy for the Rule 23(b)(3)(A)–(D) reasons described above.

Second, as to the future damages claim, the Court must consider the underlying question of whether a class action can be inferior to a *third party's* intervening suit. As an initial matter, much of the superiority case law naturally focuses on whether a class action is superior to other remedies that *class members* can pursue or have pursued directly—namely, individual suits. *See, e.g., Donovan v. Phillip Morris USA, Inc.*, 268 F.R.D. 1, 29 (D. Mass. 2010) ("Superiority exists where 'there is a real question whether the putative class members could sensibly litigate on their own . . . .'" (citation omitted));

22

*Crossroads Grp., LLC v. City of Cleveland Heights*, 346 F.R.D. 75, 90 (N.D. Ohio 2024) ("Superiority requires courts to analyze whether a class action 'is a better way than individual litigation to adjudicate a claim.'"). That makes sense since the Advisory Committee developed the "predominance" and "superiority" requirements to "cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (citation modified). Moreover, Rule 23(b)(3)(B) itself instructs courts to consider "the extent and nature of any litigation concerning the controversy *already begun by or against class members.*" Fed. R. Civ. P. 23(b)(3)(B) (emphasis added). And the Eleventh Circuit has stated that "[t]he focus of [the superiority] analysis is on 'the relative advantages of a class action suit over whatever other forms of litigation might be realistically *available to the plaintiffs.*'" *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1183–84 (11th Cir. 2010) (emphasis added) (quoting *Klay*, 382 F.3d at 1269).

Additionally, the Defendants point to no court that has denied class certification because it found a *third-party's* intervening suit superior. The most helpful case that the Defendants cite is *In re Conagra Peanut Butter*

*Products Liability Litigation*, 251 F.R.D. 689 (N.D. Ga. 2008).[5] In that case, this Court held that the defendant's voluntary policy of "issuing full refunds to purchasers of [ ] potentially contaminated peanut butter" was a superior mechanism to class certification. *Id.* at 699.[6] The Court found it sufficient that the refund program was ongoing, was not "minimal" or "illusive," and had "received at least 1,365,352 calls." *Id.* at 701. But unlike in *Conagra*, there is no comparable certainty here that Summerville will continue pursuing its claims, reach a comprehensive settlement, or otherwise prevail. (*See* Reply Br. in Supp. of Pl.'s Mot. for Class Certification, at 23–24 ("[T]he Class's interests

---

[5] The other cases that the Defendants cite are not helpful. In *Gregory v. Finova Capital Corp.*, 442 F.3d 188 (2006), the Fourth Circuit reversed and remanded an order granting class certification, finding that the district court "did not consider 'the extent and nature of any litigation concerning the controversy already commenced by or against members of the class.'" *Id.* at 191. There, in addition to their class action, *members of the proposed class* had already instituted an adversary proceeding against the defendant in a separate bankruptcy dispute. Id. at 191–92. In *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996), the Ninth Circuit vacated an order granting certification of a class of persons who used a particular drug because it did not consider whether ongoing multidistrict litigation—consolidating all federal cases concerning that same drug—was superior to class treatment. *Id.* at 1235. Unlike the putative class members in these two cases, the members here are not actively involved in separate litigation with the Defendants. In *Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241 (C.D. Cal. 2006), a district court held that putative class members could realistically pursue individual suits or administrative hearings. *Id.* at 253–54. Of course, there is no applicable administrative proceeding here.

[6] *But see Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 610 (E.D. La. 2006) ("The [superiority] analysis is whether the class action format is superior to other methods of *adjudication*, not whether a class action is superior to an out-of-court, private settlement program.").

24

diverge from the City's interests . . . The Court should [ ] certify the Damages Class so that the independent interests of the Class may be preserved and protected during adjudication of the City's claims.").)

On the other hand, the language of Rule 23(b)(3) is broad and does not specifically provide that other methods of adjudication must directly involve the class members. It simply requires that the class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). That one of the Rule 23(b)(3) factors considers litigation by or against class members does not preclude the Court from considering other types of litigation. *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 337 (S.D. Fla. 1996) ("[T]he Court has discretion to consider other factors when making this superiority determination." (citation omitted)). The Court may consider other factors, with the overall goal being to ensure the class action mechanism "is the most efficient, effective and economic means of settling the controversy." *Id.* (citation omitted).

Here, the Court holds that adjudication of the City's intervening suit is superior to adjudication by a class action as to the putative class's future damages claims. The plain language of Rule 23(b)(3)'s superiority requirement is sufficiently broad as to encompass all available methods of fairly and efficiently adjudicating the dispute, *see* Fed. R. Civ. P. 23(b)(3), which could reasonably include litigation between the Defendants and a third party. The

Court is persuaded that the City's suit is the "most efficient, effective and economic means of settling the controversy" without sacrificing fairness to the putative class. *See Walco Invs.,* 168 F.R.D. at 337. The same liability questions pertain to the City's suit as to the putative class's suit. And the same damages considerations pertain to both as well. In fact, the putative class's suit for future damages would have relied on initial findings regarding the cost of a permanent treatment system. The Court does not foresee a circumstance in which a trier of fact would award partial damages to the City but full damages to the putative class, as both the City's damages and the putative class's damages would presumably be determined by the reasonable cost of permanently treating the water supply. (*But see* Reply Br. in Supp. of Pl.'s Mot. for Class Certification, at 23–24 ("In the event the City does not receive full compensation for the costs of a permanent GAC system sufficient to offset its rate increases to Class members, the Damages Class should be entitled to seek an award for the full extent of these future rate increases.").)

The request to certify a class for future damages faces insurmountable obstacles. First the claim for future damages based upon projected rate increases is entirely speculative and dependent upon whether Summerville builds a permanent GAC filtration system and how it finances the project. Second, the Plaintiff's claim for future damages also presents further predominance and superiority problems, as it cannot be resolved without

26

answering a long list of individualized questions. He wants current residents to collect damages for PFAS-related rate increases that may happen a decade into the future. It would be difficult enough for a factfinder to assess whether one resident of Summerville will still be alive, living there, and paying water bills years from now. It would be impossible to do so for thousands of people all at once. If these individualized inquiries are overlooked, the inevitable result would be over- and under-compensation. Some people would be paid now for years of rate increases but then pass away, move away, or other otherwise stop paying water bills, pocketing upfront an expense they will never incur. Those who move to the City after class certification and start paying for the water would be under-compensated because they would not receive the benefit of any settlement or judgment. Any damages class must exclude claims of future damages given these significant individualized issues. In response to this argument by the Defendants, the Plaintiff in his Reply essentially abandoned his initial class definition. He proposes that members of the class be determined on an annual basis limited to those who are current rate payers. Of course, this means that the proposed class is unascertainable.

The Court is not persuaded by Parris's argument that this class action is at least "on the same plane" as and "not inferior" to the City's suit. (*See id.* at 12.) Rule 23(b)(3) specifically requires superiority. Allowing both the class action (as to future damages) and the City's suit to move forward would not

27

serve the interest of judicial economy. This is notwithstanding Parris's rebuttal that the Court has an "array of tools to ensure the litigation is handled fairly and efficiently, including post-verdict offsets of damages, or potential bifurcation of the action." (*Id.* at 14.) The Court also notes that it is immaterial that the City could voluntarily dismiss its suit at any time. That risk exists any time the Court must determine whether a class action is superior to other suits, including class members' individual suits or multidistrict litigation.

### 2. Rule 23(b)(2) Injunction Class

Although the Court has held that certification under Rule 23(b)(3) is appropriate, Parris may seek certification under Rule 23(b)(2) as well. *Wal-Mart*, 564 U.S. 360. Rule 23(b)(2) certification is available if the Defendants "ha[ve] acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "A declaratory or injunctive relief class pursuant to Rule 23(b)(2) is appropriate only if 'the predominant relief sought is injunctive or declaratory'" rather than monetary. *DWFII Corp. v. State Farm Mut. Auto Ins. Co.*, 469 F. App'x 762, 765 (11th Cir. 2012) (quoting *Murray*, 244 F.3d at 812 (citation omitted)). "Where 'the apparent principal aim of the lawsuit is to recover damages,' the injunctive relief 'takes a back seat' to the damages request, and Rule 23(b)(2) certification is improper." (Defs.' Resp. Br. in Opp'n to Pl.'s Mot. for Class

Certification, at 34 (quoting *Karhu v. Vital Pharms., Inc.*, 2014 WL 815253, at *11 (S.D. Fla. Mar. 3, 2024)).)

On behalf of the proposed Injunction Class, Parris seeks an injunction ordering all Defendants to "abate the nuisance they have caused, created, and maintained," among other things.[7] (2d Am. Compl. at 79.) He states that such abatement would involve "providing temporary clean drinking water to the Injunction Class members" in the short term and "install[ing] [] a permanent GAC treatment system for the City's water treatment plant" in the long term. (Pl.'s Mot. for Class Certification, at 25; 2d Am. Compl. ¶ 170.)

The trouble with the Plaintiff's proposed Injunction Class is that he does not want this Court to order Defendants to do (or stop doing) anything now, besides paying money to remedy the purported harm to the putative class. Specifically, he demands that Defendants pay for, among other things, an expensive GAC filtration system. But that request is just a dressed-up version of his request for monetary damages—Parris has not shown and cannot show that this so called "injunction" request differs in any way from his request for

---

[7] As stated in the Complaint, Parris also seeks an injunction ordering all Defendants to "remove their PFAS chemicals from the City of Summerville water system and the water supplies of Plaintiff and the Proposed Class Members"; "cease the discharge or release of any kind of PFAS into rivers, streams, and/or tributaries where they contaminate" the same; and "prevent any kind of PFAS chemicals from being released into rivers, streams, and tributaries where they contaminate" the same. (2d Am. Compl. at 79–80.)

damages to cover the cost of the filtration system. And his request for temporary relief presents the same problem: the demand that Defendants buy bottled water for putative class members is no different from a demand that Defendants pay money to them so that they can buy bottled water. A plaintiff cannot transform a damages class into an injunctive-relief class by creating a registry of things he wants someone to buy for the class.

### IV. Conclusion

For the reasons set forth above, the Court GRANTS in part and DENIES in part Plaintiff Parris's Motion for Class Certification [Doc. 688]. The Motion for Class Certification is GRANTED as to the past damages sought through the Damages Class, but the Motion is DENIED as to the future damages sought through the Damages Class and the Injunction Class.

SO ORDERED, this ____29th____ day of September, 2025.


THOMAS W. THRASH, JR.
United States District Judge