IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

EARL PARRIS, JR.
Individually, and on behalf of a Class of
persons similarly situated,

     Plaintiff,

        v.

3M COMPANY, et al.,

     Defendants.

CIVIL ACTION FILE
NO. 4:21-CV-40-TWT

## OPINION AND ORDER

This is an action under the Clean Water Act. It is before the Court on Plaintiff Earl Parris, Jr., and Intervenor-Plaintiff City of Summerville's (collectively, "the Plaintiffs") Motion to Exclude the Expert Testimony of Andy Davis [Doc. 868]. For the reasons set forth below, the Court DENIES the Plaintiffs' Motion to Exclude the Expert Testimony of Andy Davis [Doc. 868].

## I.   Background

This case arises out of the contamination of surface waters and drinking water in Chattooga County, Georgia, with per- and polyfluoroalkyl substances known as "PFAS." (2d Am. Compl. ¶ 1 [Doc. 280].) The facts of this case are well known to the parties by this point, so the Court will not belabor them here. In essence, Plaintiff Earl Parris, Jr., alleges that the Defendants have contaminated his city's water supply and thus his household water with PFAS. Parris is a resident of Summerville, Georgia, who receives running, potable

water to his home from the Summerville Public Works and Utilities Department. (*Id.* ¶ 21.) The City of Summerville, which has intervened in this case, uses Raccoon Creek as the main source of its municipal water supply. (*Id.*) The Defendants are the following companies, which allegedly manufactured and supplied the PFAS discharged into Raccoon Creek: 3M Company ("3M"), Daikin America, Inc., E.I. du Pont de Nemours and Company, and The Chemours Company. At present, the Plaintiffs jointly move to exclude the testimony of 3M's expert witness Andy Davis.

## II.    Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under that rule, "expert testimony is admissible if (1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014) (citation modified). Courts perform a "gatekeeping role" in excluding expert testimony that does not satisfy these qualification, reliability, and helpfulness requirements. *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "This gatekeeping role, however, is not intended to supplant the adversary system or the role of the jury" in determining the persuasiveness of an expert's

2

testimony. *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (citation modified). Rather, the goal is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "The proponent of the expert testimony always bears the burden" of establishing qualification, reliability, and helpfulness. *Id.* (citation modified).

### III.   Discussion

Andy Davis is a hydrogeologist who holds a Ph.D. in geology and "ha[s] been involved in investigating a wide range of environmentally contaminated sites . . . for over 40 years." (Pls.' Mot. to Exclude Davis, Ex. G ("Davis Report"),[1] at 52 [Doc. 868-7].) He concludes that no more than 0.2% of total PFAS load (or 2.9% of PFOS load, whereby PFOS is one type of PFAS) in the Raccoon Creek watershed originated from 3M's products. (*Id.* at 4, 7, 29.) This data is extrapolated from sampling data collected downstream of a farm where biosolids traceable to 3M were applied. (*Id.* at 28.) Using data on the amount of biosolids applied and farm acreage, he calculated that 3M products could contribute approximately 0.052 mg/ton/day of PFOS. (*Id.*) He then determined that biosolids traceable to 3M were deposited on two farms in the Raccoon

---

[1] The pagination of this exhibit reflects the PDF pagination.

Creek watershed, multiplied the total tons of biosolids applied to those farms by 0.052 mg/ton/day (with some adjustments), and concluded that 3M contributed "at most" 148 mg/day of 5,1000 mg/day (or 2.9%) of PFOS that made its way to Summerville's water treatment plant. (*Id.* at 28–29.) Factoring other types of PFAS, Davis finds that 3M contributed 0.2% of total PFAS load. (*Id.* at 29) To account for the remaining PFAS concentration, Davis points to other potential sources of PFAS using existing PFAS literature and additional sampling data. (*Id.* at 18–24). According to Davis, these potential sources include the application of biosolids to farmland post-2000, poultry farms, cotton farms, septic systems, a fish hatchery, lumbar operations, fire retardant from a mill fire, and the household use of certain commercial products. (*Id.*)

The Plaintiffs raise two challenges to the reliability of Davis's testimony. They first argue that "Davis's opinions regarding other 'potential sources' of PFAS in Raccoon Creek are speculative and unsupported by data." (Pls.' Mot. to Exclude Davis, at 8–19 [Doc. 902-1].) Specifically, they argue that Davis's methodology amounts to speculation because (a) he relied on studies identifying PFAS in certain products but failed to verify whether those products were actually used in the Raccoon Creek watershed and (b) his sampling data does not adequately support ruling out 3M products as PFAS sources. (*Id.*) The Plaintiffs additionally argue that Davis engaged in

---

[2] The pagination of this exhibit reflects the PDF pagination.

4

impermissible "results-based reasoning" when he "cherry-picked" certain facts to support his opinions and ignored others. (*Id.* at 20–25.)

In determining whether an expert witness's testimony is reliable under Rule 702, the Court must evaluate "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. *Daubert* sets forth a number of factors relevant to this inquiry, including (1) whether an expert's theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of a scientific technique; and (4) whether a known technique has achieved widespread acceptance in the scientific community. *Id.* at 593–94. These factors are not intended to be a "definitive checklist," *id.* at 593; rather, "the law grants the trial judge broad latitude to determine . . . whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case." *Kumho Tire Co., Ltd.*, 526 U.S. at 153.

Here, the Court holds that Davis's methodology is adequately reliable for admissibility purposes. First, Davis's report is not based on bare speculation regarding the potential non-3M PFAS sources. As an initial matter, the chief conclusion of Davis's report is that 0.2% of total PFAS load (or 2.9% of PFOS load) is attributable to 3M, which the Plaintiffs do not

5

challenge. Davis takes his analysis one step further in identifying potential other sources of PFAS, but he is careful throughout his report to refer to these other sources as "potential" sources based on the available PFAS literature and his sampling data. (*Id.* at 4.) He does not assert that these alternative sources definitively contribute to PFAS in the Raccoon Creek watershed; rather, he asserts that all of the PFAS sources in the watershed cannot be reliably traced but that there is reason to doubt the Plaintiffs' conclusions that most of the PFAS is attributable to 3M.

In their Motion to Exclude, the Plaintiffs advance a variety of explanations for why Davis failed to prove that some of the potential alternative sources were at work or why they could not account for PFAS concentrations in the Raccoon Creek watershed. But these arguments speak to the weight rather than admissibility of the evidence. *See Ala. Power Co.*, 730 F.3d at 1282 (noting Rule 702 "is not intended to supplant the adversary system or the role of the jury" through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"). For example, with regard to poultry farms, Davis found that several poultry farms in the Raccoon Creek watershed may contribute to PFAS levels because (1) there are several poultry farms in the area, (2) sampling data downstream of one of the farms revealed PFAS

concentrations that did not contain the electrochemical fluorination signature of 3M's products, and (3) studies have found PFAS in "[p]oultry farm bedding materials (litter)" made from recyclable materials and manure. (Davis Report, at 18–19.) The Plaintiffs do not challenge the sampling data results or the reputability of the studies. *See D.H. Pace Co. v. Aaron Overhead Door Atlanta LLC*, 526 F. Supp. 3d 1360, 1367 (N.D. Ga. 2021) (quoting *Daubert*, 509 U.S. at 595) (noting that the focus of the reliability inquiry is on the expert's "principles and methodology" rather than on his or her ultimate conclusions). Instead, they argue that the sampling data and studies are not conclusive, as the PFAS concentrations may be caused by 3M-polluted water purchased by the farms from Summerville and the farms may not even use PFAS-based litter or manure. (Pls.' Mot. to Exclude Davis, at 9–12.) The Plaintiffs can raise these and similar points on cross-examination to cast doubt on the credibility of Davis's testimony. The Court declines at this time to exclude Davis's potential alternative sources testimony as unreliable and inadmissible.

Second, the Court holds that Davis did not cherry-pick or conduct impermissible "results-based reasoning." The Plaintiffs take issue with Davis's decision to base his calculation of the 3M-attributable PFOS load on only two farms where biosolids were applied, citing 3M's and EPA's supposed statements to the contrary. (*See* Pls.' Mot. to Exclude Davis, at 20–21.) They also contend that Davis selectively cited facts from two secondary sources—a

report from the Agency for Toxic Substances and Disease Registry ("ATSDR") and "an interrogatory response from a carpet manufacturer in a different case." (*Id.* at 22.) For example, the Plaintiffs point out that Davis testified that PFOS presence could be the result of imports from Brazil, China, India, or Russia but relied on a report that did not mention India or Russia and found only a small amount of PFOS manufactured in (and not necessarily imported from) China. (*Id.* at 22–23.)

The Court declines to exclude Davis's testimony on either of these grounds. While the Plaintiffs may disagree with Davis's decision to limit his 3M PFAS calculations to only two farms and may believe it contradicts 3M's and the EPA's statements, Davis has provided a sufficient basis for his methodological choice. According to Davis, he limited his 3M PFAS calculations to two farms because he determined that those farms were the only two where biosolids were applied prior to 2001. (Davis Report, at 28.) His report notes that, in 2001, 3M stopped selling its products to a local textile mill, whose PFOS-laced wastewater generated biosolids that were applied to farms across the Raccoon Creek watershed. (*Id.* at 14.) The Plaintiffs' citation to broad statements by 3M or the EPA—such as a 3M representative's statement that "it's just a matter of mathematical probability" that "3M is the source" of any given PFOS molecule—are not sufficient to overcome the specific data and analysis that Davis has assembled in his report. (*See* Pls.' Mot. to Exclude

Davis, at 4).

Regarding cherry-picking certain reports, the Court agrees with the Defendants that Davis is free to rely on facts presented in published reports as well as his own experience and knowledge in forming his opinions where he does not agree with other facts presented in those reports. (*See* Defs.' Resp. Br. in Opp'n to Pls.' Mot. to Exclude, at 17–18.) Davis has testified that, based on his experience, PFOS have been imported from countries such as Brazil, China, India, and Russia and that existing reports to the contrary are incomplete. (*See* Davis Dep. at 176:7–179:25; 211:5–21 [Doc. 902-5].) An expert report is not automatically unreliable merely because it agrees with some aspects of an existing report and not others. Therefore, Davis has shown his methodology is sufficiently sound and that it is "properly grounded, well-reasoned, and not speculative." *Frazier*, 387 F.3d at 1262 (en banc) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment).

## IV.   Conclusion

For the reasons set forth above, the Court DENIES the Plaintiff Earl Parris, Jr., and Intervenor-Plaintiff City of Summerville's Motion to Exclude the Expert Testimony of Andy Davis [Doc. 868].

SO ORDERED, this ___16th___ day of March, 2026.

THOMAS W. THRASH, JR.
United States District Judge

9