IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

EARL PARRIS, JR.
Individually, and on behalf of a Class of
persons similarly situated,

     Plaintiff,

         v.

3M COMPANY, et al.,

     Defendants.

CIVIL ACTION FILE
NO. 4:21-CV-40-TWT

## OPINION AND ORDER

This is an action under the Clean Water Act. It is before the Court on

Defendants 3M Company ("3M"), E.I. DuPont de Nemours ("DuPont"), The

Chemours Company ("Chemours"), and Daikin America, Inc.'s ("Daikin")

Motion to Exclude the Expert Testimony of William Zieburtz [Doc. 882],

Motion to Exclude the Expert Testimony of Chad Sipe & Spencer Senerman

[Doc. 883], and Motion to Exclude the Expert Testimony of Bryan Pate

[Doc. 885]. For the reasons set forth below, the Court GRANTS in part and

DENIES in part Defendants 3M, DuPont, Chemours, and Daikin's Motion to

Exclude the Expert Testimony of William Zieburtz [Doc. 882], DENIES their

Motion to Exclude the Expert Testimony of Chad Sipe & Spencer Senerman

[Doc. 883], and GRANTS in part and DENIES in part their Motion to Exclude

the Expert Testimony of Bryan Pate [Doc. 885].

## I.    Background

This case arises out of the contamination of surface waters and drinking water in Chattooga County, Georgia, with per- and polyfluoroalkyl substances known as "PFAS." (2d Am. Compl. ¶ 1 [Doc. 280].) The facts of this case are well known to the parties by this point, so the Court will not belabor them here. In essence, Plaintiff Earl Parris, Jr., alleges that the Defendants have contaminated his city's water supply and thus his household water with PFAS. Parris is a resident of Summerville, Georgia, who receives running, potable water to his home from the Summerville Public Works and Utilities Department. (*Id.* ¶ 21.) The City of Summerville, which has intervened in this case, uses Raccoon Creek as the main source of its municipal water supply. (*Id.*) The Court will collectively refer to Plaintiff Parris and Intervenor-Plaintiff Summerville as the Plaintiffs. The Defendants are the following companies, which allegedly manufactured and supplied the PFAS discharged into Raccoon Creek: 3M Company, Daikin America, Inc., E.I. du Pont de Nemours and Company, and The Chemours Company.

At present, the Defendants jointly move to exclude the expert witness testimony of William Zieburtz, Chad Sipe and Spencer Senerman, and Bryan Pate. The testimony of these experts focus on Summerville's efforts to respond to the existing PFAS contamination, including by installing water treatment and raising water rates on residents.

## II.    Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under that rule, "expert testimony is admissible if (1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014) (citation modified). Courts perform a "gatekeeping role" in excluding expert testimony that does not satisfy these qualification, reliability, and helpfulness requirements. *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "This gatekeeping role, however, is not intended to supplant the adversary system or the role of the jury" in determining the persuasiveness of an expert's testimony. *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (citation modified). Rather, the goal is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

"The proponent of the expert testimony always bears the burden" of establishing qualification, reliability, and helpfulness. *Id.* (citation modified).

3

An expert's qualification may be based on "knowledge, skill, experience, training, or education." *Id.* at 1261 (emphasis omitted) (quoting Fed. R. Evid. 702). Regarding reliability, a variety of factors may be relevant, but "in *all* cases," the Court must find the testimony "properly grounded, well-reasoned, and not speculative before it can be admitted." *Id.* at 1262 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). The focus of the reliability inquiry is on the expert's "principles and methodology," rather than his or her ultimate conclusions. *D.H. Pace Co. v. Aaron Overhead Door Atlanta LLC*, 526 F. Supp. 3d 1360, 1367 (N.D. Ga. 2021) (quoting *Daubert*, 509 U.S. at 595). Lastly, the helpfulness of an expert's opinions to a trier of fact speaks "primarily to relevance," which is a "liberal" standard. *Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11th Cir. 2016) (citations omitted). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (citation omitted).

In addition to relying on the Federal Rules of Evidence to exclude expert witness testimony, the Defendants also seek to exclude expert testimony under the Federal Rules of Civil Procedure—specifically Rule 37(c)(1). Under Rule 37(c)(1), a court may exclude the expert testimony of (or impose other appropriate sanctions on) a party that fails to comply with Rules 26(a) or (e). Fed. R. Civ. P. 37(c)(1). As relevant in this case, Rule 26(a)(2)(B) requires

4

parties to ensure the reports of their expert witnesses disclose "the facts or data" that they "considered . . . in forming" their opinions. Fed. R. Civ. P. 26(a)(2)(B). Rule 26(e) further requires parties to supplement their expert disclosures if they "learn[ ] that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

### III.   Discussion

#### A. Motion to Exclude Chad Sipe & Spencer Senerman

Chad Sipe and Spencer Senerman are civil engineers with the engineering consulting company Carter & Sloope. (Sipe & Senerman Expert Report, [Doc. 921-8], at 2–3.) Sipe has more than twenty-three years of experience in "project design and project management for a wide variety of civil and environmental projects with concentrations in water distribution, utility relocation, deep well water supply, hydraulic modeling, elevated tank sizing and design, sewer collection, lift stations, and groundwater treatment systems." (*Id.* at 2.) Senerman has more than ten years of experience "as a civil and environmental engineering consultant on municipal projects in Georgia" with concentrations in "water and wastewater [ ] treatment, water distribution systems and water system modeling." (*Id.* at 3.) Both Sipe and Senerman have also "worked on numerous general consulting projects" that have "include[ed]

5

rate studies." (*Id.* at 4.)

The duo has provided services to Summerville in a professional capacity as well as to the Plaintiffs as a retained expert witness. Since 2020, Summerville has engaged Sipe and Senerman (through Carter & Sloope) to "assist[ ]" with "all of [its] PFAS related projects." (*Id.*) This work has included (1) evaluating possible solutions for meeting the EPA's health advisory at the time (70 parts per trillion of combined PFOA and PFOS); (2) constructing a "deep well" near Gamble Springs to "bring groundwater with non-detectable levels of PFAS back to the Raccoon Creek [Water Treatment Plant] to blend with Raccoon Creek Water";[1] (3) constructing a second deep well "to serve as a redundant or back up source of water supply";[2] (4) developing a PFAS pilot study to test various technologies to address the PFAS contamination; and (5) conducting water rate studies in 2020 and 2023 regarding the rate increases that would be necessary to pay for Summerville's PFAS response in the short term. (*Id.* at 4–6 (regarding the first four projects listed); Pls.' Resp. Br. in Opp'n to Defs.' Mot. to Exclude Sipe & Senerman, Ex. 1 ("Sipe Dep. July

---

[1] As of the date of Sipe and Senerman's report, "[t]his project is under construction and the well is not yet producing water." (Sipe & Senerman Expert Report, at 5.) Sipe and Senerman are also assisting with constructing a water transmission line to transport water from the deep well and have assisted the City with obtaining associated permits. (*Id.* at 5.)

[2] As of the date of Sipe and Senerman's report, "[n]o design or permitting services have been performed for this project," and "[f]unding options are still under consideration." (Sipe & Senerman Expert Report, at 6.)

23, 2024"), at 514:6–20 [Doc. 951-4] (regarding the fifth project listed).) Within this litigation, Sipe and Senerman opine in their joint expert report on the necessity of constructing a permanent granulated active carbon ("GAC") system to treat Summerville's water and on the percentage of the City's recent rate increases that are "attributable to PFAS expenses," among other things. (Sipe & Senerman Expert Report, at 7, 9.)

The Defendants seek to exclude Sipe and Senerman's opinions regarding both treatment with a permanent GAC and the percentage of past rate increases attributable to PFAS. The Defendants contend that (1) both opinions are unreliable since they are not supported by adequate explanation or analysis, (Br. in Supp. of Defs.' Mot. to Exclude Sipe & Senerman, at 9–21), and (2) the opinion regarding the necessity of the permanent GAC system "would not help the trier of fact" since the costs associated with the GAC "are an improper measure of damages," (*id.* at 2, 21–24). As explained below, the Court denies the Defendants' motion to exclude Sipe and Senerman's testimony.

### 1. Reliability

The methodologies undergirding Sipe and Senerman's recommendation to treat Summerville's water with a permanent GAC system and their calculation of PFAS-related rate increases are reliable. The Court begins below with the GAC recommendation, followed by the rate increase data.

### a. GAC Treatment Recommendation

Sipe and Senerman have shown that their methodology for recommending treatment through a permanent GAC system is reliable. The Defendants contend that Sipe and Senerman failed to meaningfully analyze nontreatment alternatives, (Br. in Supp. of Defs.' Mot. to Exclude Sipe & Senerman, at 2), but the Court disagrees with this characterization. The alternative options that the Defendants identify include drawing additional water from Lowe Springs, relying on groundwater from the deep well under construction near Gamble Springs, constructing additional deep wells, and purchasing water from neighboring water systems. (*Id.* at 6.) According to the Defendants, these nontreatment options may meet all or at least part of Summerville's water supply needs and are more cost-effective than constructing a permanent GAC system. (*Id.* at 17–21; *see also* Reply Br. in Supp. of Defs.' Mot. to Exclude Sipe & Senerman, at 6 [Doc. 1005] ("It is inherently unreliable for Sipe and Senerman to ignore less costly means of delivering clean water to the City's residents.").)

As an initial matter, even if the Court assumes that the Defendants' proposed solutions are lower-cost alternatives (which involves a factual dispute inappropriate for a *Daubert* analysis), the mere existence of a lower-cost alternative would not by itself discredit Sipe and Senerman's methodology. Their methodology considers non-cost factors such as certainty of meeting the

8

EPA's MCLs, timing, and ease of administration. (*See* Sipe & Senerman Expert Report, at 9; Senerman Dep. at 175:21–25 [Doc. 951-2] (explaining that they did not "cost out" the piloted technologies, as estimating costs was the domain of civil engineer Bryan Pate).)

Without wading into the merits of whether a permanent GAC system is indeed the best solution for Summerville, the Court finds that Sipe and Senerman's methodology passes muster under *Daubert*. Sipe and Senerman cite specific facts as to why they considered Defendants' proposed alternatives inferior to a permanent treatment system. Regarding Lowe Springs, Sipe and Senerman explain that Summerville is permitted to withdraw only 0.75 million gallons per day ("MGD") of water from Lowe Spring, that they "cannot guarantee that some water uses only receive Lowe Spring [w]ater," and that Summerville ratepayers will therefore continue to receive water from Raccoon Creek water that exceeds the EPA's 2024 Maximum Containment Levels. (Sipe & Senerman Expert Report, at 8.)

Regarding Gamble Springs, the report explains that the Gamble Springs deep well could potentially deliver up to 1.3 MGD of water but that blending this water with the Raccoon Creek water will not be sufficient to "compl[y] with the EPA's April 2024 MCLs for PFOA and PFOS." (*Id.* at 7.) It also explains that the deep well construction faces a "variety of complications, including unprecedented construction cost inflation requiring additional project funding,

9

well withdrawal impacts on a nearby fish hatchery spring, property access and easement issues." (*Id.* at 9.)

Regarding constructing additional wells, Sipe notes that he initially looked at groundwater wells as a potential PFAS-free source at the City's request and that additional well sources are still under consideration. (*See* Pls.' Resp. Br. in Opp'n to Defs.' Mot. to Exclude Sipe & Senerman, Ex. 1 ("Sipe Dep. July 22, 2024"), at 147:5–25 [Doc. 951-1].) But he cited several potential issues with this solution as reasons why they "realiz[ed] . . . that it's going to be very difficult for the City to do wells and wells only" and that "the surface water is going to have to be part of [the City's] water delivery." (*Id.* at 239:19–23.) These issues include short- and long-term uncertainty as to whether the wells would provide sufficient supply (e.g., potential sinkhole formation could limit how much can be pumped, which the City would not know "until [it] pump[s] for a while"), the possibility that EPD would consider certain well waters "under the influence of surface water" and therefore still require treatment, and potential hatchery impacts. (*See id.*, 239:10–242:20.)

Regarding purchasing water from neighboring water systems and any other combination of nontreatment options, Sipe testified that these options would not provide sufficient supply "without Frankensteining the system." (Pls.' Resp. Br. in Opp'n to Defs.' Mot. to Exclude Sipe & Senerman, Ex. 3 ("Sipe Dep. Dec. 4, 2024"), at 171:16–19 [Doc. 951-3].) Sipe and Senerman further

stated in their report that they "have not recommended and would never recommend that the City abandon" Raccoon Creek, which is the City's "existing, permitted surface water source" (i.e., the City has the right to use the water and generate revenue from selling it). (Sipe & Senerman Expert Report, at 7.)

For these reasons, the Court finds Sipe and Senerman's analysis on treating PFAS with a GAC system sufficiently thorough for purposes of determining its reliability. The cases cited by the Defendants, in which courts excluded expert testimony on the necessity of remediation measures, are inapposite. In *Moore v. State Farm Fire & Casualty Co.*, 2015 WL 5729266 (E.D. Pa. Sept. 30, 2015), a district court excluded expert testimony estimating the cost of mold remediation, finding that the testimony merely provided a "list[ ] [of] work tasks and costs" and did not describe "any method" for determining whether the work was necessary. *Id.* at *4. In *Leese v. Lockheed Martin Corp.*, 6 F. Supp. 3d 546 (D.N.J. 2014), another district court found testimony about the necessity of certain remedial measures unreliable because it contained no explanation for why the measures were necessary. *Id.* at 553. Unlike the clearly insufficient testimony in these two cases, Sipe and Senerman's testimony is detailed and thus reliable.

### b. Rate Increases to PFAS

Sipe has shown that his methodology is reliable as it pertains to his calculations of the portion of the City's past rate increases imposed as a result of PFAS. Summerville raised its water rates in 2020, 2021, and 2023, as described above. (*See* Sipe & Senerman Expert Report, at 9.) In his section of the expert report, Sipe opines on the percentage of those increases attributable to PFAS as follows:

> For the 2020 and 2021 rate increases, approximately 47–55% is attributable to PFAS expenses for fiscal years ending 2021, 2022, and 2023. For the 2023 rate increase, approximately 0% is attributable for PFAS expenses for fiscal year 2024 and approximately 13% is attributable to PFAS expenses for fiscal year 2025. In addition, for the 2023 rate increase, approximately 18–20% is projected to be attributable to PFAS expenses for fiscal years 2026 and 2027.

(*Id.*) The Defendants seize on this lone paragraph to argue that Sipe's percentages lack proper explanation.

However, Sipe's deposition and the associated documents produced explain Sipe's methodology and show that it is reliable for purposes of this motion to exclude. Sipe testified that his percentages were calculated from rate studies he performed for Summerville to assist the City in setting water rates that account for the new PFAS expenses. (Sipe Dep. Dec. 4, 2024, at 126:13–130:20.) The rate studies contain Carter & Sloope's estimates of the PFAS-related expenses that Summerville would incur by fiscal year. (*Id.* at 128:9–130:20.) Carter & Sloope presented the rate study results to the

Summerville City Council—which were also produced to defense counsel—and the City directly incorporated the PFAS expense estimates into its rate increases for 2020, 2021, and 2023. (*See* Sipe & Senerman Expert Report, at 7, 9.) Sipe testified that he calculated the portion of each rate increase attributable to PFAS by dividing Carter & Sloope's PFAS expense estimates by the total rate increase levied for the relevant years. (Sipe Dep. Dec. 4, 2024, at 192:13–193:3.) Although not particularly complex, Sipe's approach is logical.

The Defendants argue that Sipe's opinion is nonetheless unreliable because it fails to (1) analyze whether Summerville actually used the revenue it received from its rate increases for PFAS expenses and (2) quantify or otherwise control for other factors that contributed to the City's rate increases. (Br. in Supp. of Defs.' Mot. to Exclude Sipe & Senerman, at 9–13.) Both arguments are unavailing.

First, Summerville's actual PFAS expenditures are irrelevant with respect to the reliability of Sipe's rate-setting opinion, which focuses only on how much the City increased rates (from the ratepayer's perspective) to respond to the Defendants' PFAS. (*See* Sipe Dep. Dec. 4, 2024, [Doc. 951-3], at 131:1–17.) He clarified in his deposition: "My opinion is that these water rate increases were passed on to the customers based off anticipated PFAS expenses. So what they actually spent, in my opinion, is a nothing burger. This is the related expense to PFAS that . . . was passed on to the customer." (*Id.* at

13

131:7–13.)

Second, while Summerville increased its water rates for a variety of reasons, (*id.* at 126:21–127:8), it undisputedly imposed part of those increases to specifically respond to PFAS, as it set the increase according to the PFAS expenses estimates by Carter & Sloope, (*see id.* at 136:8–24 ("Q. There's no doubt that the rate increases were passed on to the customers. . . . I understand they were based on your projections of PFAS expenses."). Based on Sipe's deposition testimony, it does not appear that Summerville revised Carter & Sloope's PFAS expense estimates upward or downward when determining how much to increase the rates to account for the PFAS response. (*See* Sipe Dep. Dec. 4, 2024, at 131:1–17.) In other words, Carter & Sloope's PFAS expense estimates were directly "passed on" to the water ratepayers through the 2020, 2021, and 2023 rate increases.[3] (*See id.*) Thus, there is no need to "identify[ ] and quantify[ ]" *all* of the factors that the City considered in raising its rates, as the Defendants appear to contend, (*see* Br. in Supp. of Defs.' Mot. to Exclude Sipe & Senerman, at 10); those non-PFAS factors are irrelevant due to the way the City set its rates.

---

[3] The Court notes that Carla Rutledge, Summerville's finance director and a fact witness in this case, has also independently affirmed the same. (*See* Rutledge Decl. ¶ 9 [Doc. 843-3] (affirming that the Summerville City Council approved PFAS-related rate increases in the amounts determined by the 2020 and 2023 rate studies).)

## 2. Helpfulness

The Defendants argue that Sipe and Senerman's recommendation to treat Summerville's water with a permanent GAC system "would not help the trier of fact because the costs of building and operating such a system are an improper measure of damages in this case." (Br. in Supp. of Defs.' Mot. to Exclude Sipe & Senerman, at 2; *see also id.* at 21 (contending that the opinions are "poorly tailored to determining what damages Parris or the City should recover").) "Because awarding the full costs of a GAC system" would be an inappropriate damages award, the Defendants continue, "Sipe's and Senerman's opinions that the City must install one wouldn't help a jury accurately award damages." (*Id.* at 3.)

The Court disagrees and finds that Sipe and Senerman's recommendation to build a GAC system would assist the trier of fact. Because the City is moving forward with building a GAC and is claiming the GAC costs as damages in this case, Sipe and Senerman's recommendation would be critical to a jury in determining whether to award the GAC costs as damages. The Defendants are free to argue that the City's GAC costs are unnecessary or not awardable as damages, but Sipe and Senerman's GAC recommendation is certainly relevant.

15

### B. Motion to Exclude Bryan Pate

Bryan Pate is a civil engineer who "ha[s] been involved in the design and construction of municipal water, wastewater, natural gas and civil engineering projects since 1993." (Br. in Supp. of Defs.' Mot. to Exclude Pate, Ex. A ("Pate Expert Report"),[4] at 3 [Doc. 885-3].) His report states that he has "extensive experience related to PFAS mitigation and remediation in drinking water." (*Id.* at 2.) It cites his experience designing and constructing filtration systems that remove PFAS in Decatur, Alabama; Gadsden, Alabama; and Rome, Georgia. (*See id.* at 2–3; *see also* Pls.' Resp. Br. in Opp'n to Defs.' Mot. to Exclude Pate, Ex. B ("Pate Dep. Dec. 4, 2024"), at 38:14–40:13, 44:12–45:17, 46:12–19 [Doc. 966-2].) And Pate testified that he has served as a consultant on PFAS-related issues for the EPA, Georgia EPD, Mississippi [Department of Environmental Quality, and the Alabama [Department of Environmental Management]." (Pate Dep. Dec. 4, 2024, at 379:3–9.)

Like Sipe and Senerman, Pate has provided professional services to the City of Summerville, in addition to serving as an expert witness in this litigation. Summerville and Carter & Sloope, Inc. engaged Pate's company, InSite Engineering ("InSite"), to "supplement Summerville's Pilot Study and to make recommendations for removal of PFOA and PFOS from the City's drinking water and wastewater." (Pate Expert Report at 5.) Specifically, InSite

---

[4] The pagination for this exhibit reflects the PDF pagination.

"assisted with pilot testing setup," "reviewed pilot testing samples and methodologies," "met with Carter & Sloope and Summerville operations staff when necessary to provide requested guidance and input," recommended the construction of a "full-scale GAC [Granular Activated Carbon] system" for water and wastewater treatment, and "prepar[ed] [ ] capital cost estimates as well as operation and maintenance cost estimates for both the Raccoon Creek [Water Treatment Facility] and the Summerville [Wastewater Treatment Plant]." (*Id.* at 6 (regarding pilot study assistance and GAC cost estimates); *id.* at 9, 11, 14 (regarding InSite's recommendation to treat Summerville's water and wastewater with a GAC filtration system).) For this litigation, the Plaintiffs have retained Pate to provide expert witness testimony, and Pate has submitted an expert report on the necessity of treating Summerville's water and wastewater (with a GAC system) and the estimated costs of doing so. (*See id.* at 6–15.)

The Defendants seek to exclude the testimony of Bryan Pate for four primary reasons, arguing that (1) Pate has not produced the facts and data supporting his GAC cost estimates, as required by Rule 26(a)(2)(B); (2) his methodology is unreliable because he did not sufficiently analyze nontreatment alternatives; (3) his GAC cost estimates will not assist the trier of fact in determining damages; and (4) he is not qualified to calculate the net present value of the GAC's cost. (*See* Br. in Supp. of Defs.' Mot. to Exclude

17

Pate, at 1–3 [Doc. 900-11].)

As explained below, the Court denies the Defendants' motion to exclude regarding the first three arguments but grants the motion as to the fourth argument. Pate produced his underlying data in compliance with Federal Rule of Civil Procedure 26(a)(2)(B). Pursuant to Federal Rule of Evidence 702, Pate also reliably analyzed alternative options and provided opinions that assist a trier of fact. However, the Court finds that Pate is not qualified to provide net present value calculations for his GAC cost estimates, though the rest of his opinions stand undisturbed.

### 1. Rule 26

Rule 26(a)(2)(B) requires the Plaintiffs to ensure Pate's expert report discloses "the facts or data" that he "considered . . . in forming" his opinions. Fed. R. Civ. P. 26(a)(2)(B). Under Rule 26(e), the Plaintiffs were also under an obligation to supplement his expert disclosures if he "learn[ed] that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

Pate's expert report recommends that Summerville construct a GAC system to treat its water and wastewater and provides the corresponding cost estimates. According to the report, capital construction costs for the GAC

system will total \$21.8 million for water treatment and \$15.2 million for wastewater treatment. (Pate Expert Report, at 14.) Pate further estimates that annual operational costs will total \$1.9 million for water treatment and \$0.9 million for wastewater treatment. (*Id.*) The breakdown of these costs are contained in Exhibits B–G of his report.

The Defendants argue that Pate's testimony should be excluded because he has not provided the underlying data to support his cost estimate opinions, as required by Rule 26(a)(2)(B). They claim that Pate's "list of cost drivers" is "too vague to help Defendants or the Court understand his cost estimate" and suggest that Pate must provide papers showing how he calculated each cost driver. (Br. in Supp. of Defs.' Mot. to Exclude Pate, at 11; *see also id.* at 12 ("[N]either the Court nor Defendants can possibly know what items are included in Pate's estimation of costs for 'GAC equipment' or 'Instrumentation & Controls.'" (citation omitted)).)

The Court finds that the Plaintiffs have satisfied Rule 26's disclosure requirements with regard to Pate's testimony, as Pate sufficiently details the basis for the GAC's estimated capital costs and operational costs. For the capital construction costs, Pate's exhibits contain detailed calculations. (*See* Pate Expert Report, at 20, 23.) The cost inputs are organized by category (e.g., sitework, GAC waste treatment, electrical), and each category is further broken down into subcategories. The subcategories include items such as

asphalt paving, landscaping, yard piping, GAC plumbing, GAC process piping, GAC equipment, electrical subcontracting, a waste stream thickener, a screw press and conveyer, a mini-disk filter, and more. (*See id.*) The report details the relevant units, quantities, and unit costs that support the cost of each subcategory. (*See id.*) Moreover, Pate provided additional documents and testimony during his deposition regarding how he calculated the unit cost of each subcategory. He produced a spreadsheet containing the line-by-line cost drivers identified by the contractor of a similar GAC project in Rome, Georgia, and he explained that he "scaled" the Rome figures according to Summerville's specified parameters (e.g., millions of gallons per day, square footage). (Pate Dep. Dec. 4, 2024, [Doc. 966-2], at 168:10–17, 167:6–10.) Pate also produced a spreadsheet containing data direct from the GAC equipment manufacturer that shows how he determined how much equipment was necessary and at what cost. (*Id.* at 171:3–172:11 (explaining that the spreadsheet shows the number of "models" and containment "vessels" that would be required, along with their costs).

The exhibits pertaining to estimated operational costs are similarly descriptive—containing units, quantities, and unit costs. (*See id.* at 21, 24.) And Pate explained in his deposition that the unit costs were scaled from the "actual operational costs of running the West Morgan-East Lawrence plant going back to 2019," which were contained in a document also produced to

defense counsel. (Pate Dep. Dec. 4, 2024, at 170:2–171:2 ("[W]e converted everything to a cost per thousand gallons for electrical cost, labor cost, and those kind[s] of things.").)

Although the Defendants' request more specificity and documents, the Court finds that Pate has adequately produced the "facts and data" he "considered" for the purposes of Rule 26(a)(2)(B). Pate's estimates are wholly different than those excluded in the Defendants' cited cases, where the experts were "unable to articulate with any degree of specificity the basis for [their] cost calculations." *See KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1289, 1293–94 (M.D. Ala. 2001) (excluding an expert's report in part because his construction cost estimates were based entirely on his claimed "experience and knowledge of construction" and he did not "produce any documents corroborating his conclusion"); *see also Jones Creek Invs., LLC v. Columbia County*, 2013 WL 12141348, at *21–22 (S.D. Ga. Dec. 23, 2013) (excluding an expert's cost estimate for a remediation project because he apparently provided nothing more than an all-in estimate and his word that he consulted other experts).

As the Plaintiffs point out, many of the Defendants' quibbles are more akin to disagreements with Pate's opinions rather than Pate's failure to disclose his underlying data. For example, the Defendants argue that Pate improperly set the unit cost for one line item at $2.75, supposedly adding $0.25

in unexplained "ancillary costs" to the GAC manufacturer's unit cost estimate of $2.50. (Br. in Supp. of Defs.' Mot. to Exclude Pate, at 14.) The Defendants also argue that Pate does not explain why he set the GAC's capacity at 3.0 MGD, when the City's permit sets a monthly average limit of 2.5 MGD. (*See id.* at 13.) Any lack of clarity around these particular calculations is not grounds to exclude Pate's report, but the Court nonetheless notes that Pate has adequately testified to the basis of both calculations. (*See* Pls.' Resp. Br. in Opp'n to Defs.' Mot. to Exclude Pate, Ex. C ("Pate Dep. Apr. 15, 2025"), at 58:13–59:25 [Doc. 966-3] (noting the ancillary labor costs); Pate Expert Report, at 13 (noting that the City's permit allows a maximum daily amount of 3.0 million gallons); *see also* Pls.' Resp. Br. in Opp'n to Defs.' Mot. to Exclude Pate, Ex. D ("Frankel Dep."), at 67:23–68:17 [Doc. 966-5] (distinguishing between the permit's maximum *daily amount* and its maximum *monthly average*, and agreeing that the analysis must account for the maximum *daily* amount).)

## 2. Rule 702

### a. Reliability

According to the Defendants, Pate's "approach reveals an absence of the 'intellectual rigor' that characterizes 'the practice' of a civil engineer." (Reply Br. in Supp. of Defs.' Mot. to Exclude Pate, at 4 (quoting *Kumho*, 526 U.S. at 152 (1999)).) The Defendants levy many of the same contentions against Pate as they did against Sipe and Senerman. Chiefly, they point to a variety of

22

nontreatment solutions that they consider "more cost-effective" and argue that Pate "doesn't do the work to show that a treatment solution is necessary." (Br. in Supp. of Defs.' Mot. to Exclude Pate, at 14, 17.)

The Court disagrees and concludes that Pate's testimony is reliable under Rule 702 and *Daubert*. Pate has sufficiently detailed the facts and circumstances that support his recommendation to pursue treatment. To support his opinion that there is "no other viable alternative source of water with adequate capacity to allow the City to abandon Raccoon Creek," (Pate Expert Report, at 11), he cites several considerations. For example, Pate's report lists several problems with the Gamble Springs production well: it has the capacity to produce approximately 1 MGD, which is only enough to "supplement" and not "replace" Raccoon Creek Water Treatment Facility's 3 MGD; it is "not in service"; it lacks any "timeline . . . to be placed into service"; and it "will not reduce the PFOA/PFOS levels to below the [National Primary Drinking Water Standard] even if put into service. (*Id.* at 12; *see also* Pate Dep. Dec. 4, 2024, at 174:19–179:15 (noting that Summerville would run the risk of PFAS contamination in new wells).)

As to other water sources, Pate testified that flipping" Summerville's system from an "internal drinking water source" (Raccoon Creek) to an "external" one would not be "cost effective" due to the location of Summerville's current treatment plant, the lack of appropriately sized transmission mains,

23

and debt that would "become immediately due" if the City "abandon[ed] the drinking water plant." (*See* Pate Dep. Dec. 4, 2024, at 395:6–395:21.) He also testified that "blending" external water sources with Raccoon Creek water would not reduce the need to construct a new treatment facility or otherwise "require less treatment" since Summerville would "still have to treat the same amount of water as it goes through the plant." (*See id.* at 135:11–136:13, 179:22–180:9, 364:17–366:4.) Lastly, Pate testified that InSite "do[esn't] typically recommend to [its] customers they give up a natural resource that is a permitted natural resource as a water intake." (*Id.* at 180:22–181:3.) In his words, he would "absolutely recommend" that Summerville "keep" Raccoon Creek "as a natural resource" to "have it available for growth and for control of their own destiny so they're not relying on a business to provide them with drinking water or some municipality where they give up control of rates for their citizens." (*Id.* at 181:15–23.)

Based on this testimony, the Court cannot say that Pate did not "do[ ] any work" to determine whether treatment was "necessary." (*Contra* Br. in Supp. of Defs.' Mot. to Exclude Pate, at 17.) Pate clearly considered nontreatment options and explained the analysis that led him to reject those options. That the Defendants may disagree with his conclusions is not grounds to exclude Pate's testimony. Therefore, the Court denies the Defendants' motion to exclude Pate's testimony on these grounds.

24

### b. Helpfulness

The Defendants argue that Pate's GAC estimates will not assist a trier of fact because (1) "[i]t is speculative whether the City will need to pay for a GAC system and pass along those costs to ratepayers" in part or full, (Br. in Supp. of Defs.' Mot. to Exclude Pate, at 22), and (2) "[a]warding the [full] costs of a GAC system would place Plaintiffs in a better position because a GAC system would remove contaminants other than PFAS," (*id.* at 23).

The Court finds Pate's testimony helpful and relevant. The helpfulness standard is a "liberal one," and Pate's testimony easily satisfies it. *Seamon*, 813 F.3d at 988. Given the Plaintiffs' damages models—which rely on the City's construction of a permanent GAC system—Pate's estimates of the costs of such a system will clearly be one piece of that damages puzzle. Pate need not establish that the City *will* construct a GAC system or pass along those costs for his testimony to be helpful in this regard, and he need not establish that his estimates perfectly compensate the Plaintiffs. Those questions are more appropriate for a jury evaluating the weight of the evidence.[5]

---

[5] That being said, the Court addresses similar arguments targeted at William Zieburtz's expert testimony below, as the Defendants argue there that Zieburtz's failure to incorporate these two factors renders his damages methodology unreliable—rather than merely unhelpful.

### c. Qualification

Pate's report contains a net present value calculation for his estimated GAC costs, which uses an eighty-year forecast horizon and a 2% discount rate. Arguing that Pate is qualified to testify as a civil engineer and not an economist, the Defendants seek to exclude Pate's net present value calculations. (Br. in Supp. of Defs.' Mot. to Exclude Pate, at 24–25.) They contend that Pate's eighty-year forecast horizon is "entirely speculative" and that selecting a discount rate is "outside his expertise." (*Id.* at 25.) They further point to Pate's deposition, where he testified that he was not an expert on selecting discount rates, did not "account for escalation of the construction costs or inflation," did not talk to any individuals about the rate, and did not remember if he relied on any sources for his rate selection. (Pate Dep. Apr. 15, 2025, [Doc. 966-3], at 115:1–117:5; *see also id.* at 116:6 (responding that he is "not an economist" when asked about the discount rate).)

The Court agrees with the Defendants on this subject. While the Plaintiffs explain in briefing that Pate reasonably relied on other experts and guidance in selecting his eighty-year forecast horizon, they do not explain why Pate might be qualified to select a discount rate for a net present value calculation. Pate did testify that his firm "regularly calculate[s] net present values of water and wastewater treatment plant projects for [its] customers," (*id.* at 114:19–115:4.) but neither his report nor his deposition testimony

26

contain any explanation for why he chose a 2% discount rate. Pate's statement that his firm "tr[ies] to do the best [it] can" in selecting a discount rate is not sufficient for purposes of this litigation. Therefore, the Court grants the Defendants' motion to exclude Pate's expert testimony with respect to his net present value calculations.

### C. Motion to Exclude William Zieburtz

William Zieburtz is "an economist and management consultant experienced in economic, business process, and financial planning issues facing local governments in utilities." (Not. of Filing Replacement of Ex. K to Pl.'s Mot. for Class Certification, Ex. 1 ("Zieburtz Am. Expert Report for Parris"),[6] at 3 [Doc. 759-1].) Zieburtz "has worked with a focus on water utilities since 1985," and his experience includes "rate, cost of service, rate design, . . . valuation, [and] financing and feasibility studies for water, wastewater, stormwater, solid waste, and other local government and regional projects," (*id.* at 4.)

Both Summerville and Parris have retained Zieburtz as an expert witness. Summerville seeks to use Zieburtz's net present value calculations of building and operating the permanent GAC system to determine its damages. (Intervenor-Pl.'s Resp. Br. in Opp'n to Defs.' Mot. to Exclude Zieburtz, Ex. C

---

[6] The pagination for this exhibit reflects the PDF pagination.

27

("Zieburtz Expert Report for Summerville"),[7] at 2 [Doc. 921-4].) Meanwhile, Parris retained Zieburtz to opine that he can devise "a common methodology/formula" to calculate Summerville's "PFAS-related rate increase[s]" and thus past and future damages (Zieburtz Am. Expert Report for Parris, at 2–3.) For his reports, Zieburtz relies on Sipe and Senerman's calculations of past water rate increases attributable to Summerville's temporary PFAS remediation efforts and Pate's calculations of future costs attributable to construction and operation of a permanent GAC treatment system. (*See, e.g.*, Zieburtz Am. Expert Report for Parris, at 2–3; Zieburtz Expert Report for Summerville, at 9–10.)

The Defendants seek to exclude Zieburtz's testimony based on five deficiencies: (1) he did not independently verify Sipe and Senerman's estimates regarding the amount of past rate increases attributable to PFAS and thus overstated the figures; (2) his damages calculations impermissibly speculate that the City will move forward with a GAC system and charge its water ratepayers for the full cost; (3) he does not account for the fact that the GAC filters out contaminants other than PFAS; (4) he failed to fully correct a calculation in response to Pate's correcting his own testimony; and (5) his chosen forecast horizon and discount rate for the GAC net present value is unreliable. (Br. in Supp. of Defs.' Mot. to Exclude Zieburtz, at 1–3 [Doc. 882-1].)

---

[7] The pagination for this exhibit reflects the PDF pagination.

In the time since the parties filed their briefs, the Court has since certified Parris's damages class for past damages but not future damages. (Sept. 29, 2025, Op. & Order, at 11–30 [Doc. 1059].) Parris initially sought past damages based on past PFAS-related rate increases and future damages based on the City's anticipated PFAS-related rate increases. Where Zieburtz opined that Summerville would raise its future water rates by the full amount of the calculated GAC costs, (Zieburtz Expert Report for Parris, at 3), the Court agrees that such opinions are speculative and no longer relevant. This finding is consistent with the Court's decision not to certify Parris's future damages class. The Court now turns to the remainder of the Defendants' arguments, finding for the Plaintiffs on each one.

### 1. Past Rate Increase Inaccuracies

The Defendants argue that Zieburtz did not "independently validate" Sipe and Senerman's calculations (via Carter & Sloope) of the amount of past rate increases attributable to PFAS and that, as a result, Zieburtz's damages calculations are "inflated." (*Id.* at 9.) The evidence of overinflated damages, according to the Defendants, is the fact that the City received some grants and loans with principal forgiveness to partially offset the cost of its past PFAS expenses. (*Id.* at 9–10; *see also id.* at 6–7 (flagging approximately $1.4 million in grants and $2 million in loans with principal forgiveness).)

Parris responds that, despite these grants and loans, the City charged water ratepayers the full rate increases set out by Carter & Sloope. (Pl.'s Resp. Br. in Opp'n to Defs.' Mot. to Exclude Zieburtz, at 9 [Doc. 936].) In other words, and as Zieburtz testified, what matters is the injury to the putative class of water ratepayers, and Parris alleges that the putative class was injured by the rate increases that Summerville imposed to respond to the Defendants' PFAS—even if the City later received grants to partially recuperate those costs. (*See* Pl.'s Resp. Br. in Opp'n to Defs.' Mot. to Exclude Zieburtz, Ex. 4 ("Zieburtz Dep."), at 85:10–23 [Doc. 936-4].) Zieburtz reasonably relied on Carter & Sloope's calculations as a result.

On this issue of past damages attributable to PFAS, the Court ultimately finds Zieburtz's testimony reliable for Rule 702 purposes. First, the fact that Zieburtz did not deduct all the grants that the City received from Sipe and Senerman's calculations does not render Zieburtz's testimony unreliable; it is entirely consistent with the damages model he describes, which is based on the injury to the ratepayer in the form of actual rate increases.

Second, Zieburtz was well within Rule 702 for his reliance on the rate increase calculations produced by Sipe and Senerman. An expert may rely on the "opinions and findings of other experts, if experts in their respective field would reasonably rely on other expert's opinions and findings." *In re Wright Med. Tech. Inc., Conserve Hip Implant Prods. Liab. Litig.*, 127 F. Supp. 3d

30

1306, 1320 (N.D. Ga. 2015). That is the case here.[8] "As a water rate expert," Zieburtz reasonably relied on the actual rate increase amounts that the City imposed. (*See* Pl.'s Resp. Br. in Opp'n to Defs.' Mot. to Exclude Zieburtz, at 11–13.) That those actual rate increases came from Carter & Sloope's calculations is of no consequence.

Moreover, Zieburtz's testimony does not merely "parrot" Sipe and Senerman's calculations, as the Defendants appear to contend. (*See* Br. in Supp. of Defs.' Mot. to Exclude Zieburtz, at 12–14.) Rather, the primary value of his testimony is his focus—as an economist with experience with rate design, water utilities, and local government financial planning—on the possibility of creating a common formula to calculate past (and future) damages and his method of doing so based on all rate classes' base and volumetric charges. (*See* Zieburtz Am. Expert Report, at 2–3.) Therefore, Zieburtz's testimony would not

---

[8] During a prior hearing, the Court noted that the spreadsheets in Zieburtz's report appeared to be "dozens of numbers filled in" without explanation of how Zieburtz arrived at those numbers, especially his calculation of the percentage of rate increases attributable to PFAS. (Hearing Tr. at 27:15:20, 30:14–15 [Doc. 743]; *see also id.* at 22:7–23 (explaining defense counsel's concerns that they "do not have Mr. Zieburtz's methodology for determining the percent related to PFAS").) In response, Parris filed an amended report with additional exhibits and explanations. For example, the amended report shows the amount (in dollars) of past rate increase attributable to PFAS by year, as reported by Carter & Sloope, and the City's total rate revenue for those years. (*See* Zieburtz Am. Expert Report for Parris, at 13–14.) An updated version of Exhibit 5 shows how Zieburtz divided this data to arrive at the percentage of total rate revenue attributable to PFAS by year for past and future rate increases. (*Id.* at 11.)

crumble even if it were shown that Zieburtz was not justified in relying on Sipe and Senerman's calculations.

The cases cited by the Defendants are distinguishable. In *Sabal Trail Transmission, LLC v. 0.589 Acres of Land in Hamilton County*, 2018 WL 3655556 (M.D. Fla. Aug. 2, 2018), a Florida district court excluded the testimony of an appraiser who opined on damages from lost timber and pine straw production because he was not a timber or pine straw expert and merely acted "as another expert's mouthpiece." *See id.* at *7–8. In *Jones Creek Investors, LLC v. Columbia County*, 2013 WL 12141348 (S.D. Ga. Dec. 23, 2013), a Georgia district court similarly excluded an expert's testimony because it was "nothing more than parroted statements" from others and simple math "summariz[ing]" their estimates. *Id.* at *19. Lastly, in *Contract Packaging, Inc. v. Central Garden & Pet Co.*, 2011 WL 13162306 (N.D. Ga. Mar. 31, 2011), a court in this district excluded the testimony of an expert where "[t]here [was] no argument before the Court that experts in [that expert's] field typically rely on projections created by others without independent analysis." *Id.* at *6. Zieburtz's testimony is different from those in *Sabal* and *Jones Creek* because Zieburtz applies his own economics and rate design expertise to Sipe's and Senerman's calculations in order to develop a model for past damages. He does not impermissibly regurgitate their opinions. And, unlike in *Contract Packaging*, the Court here is persuaded that rate

32

design experts would rely on actual municipal rate increases when analyzing those rate increases, as Zieburtz did here.

### 2. Speculation of Future GAC Construction

The Defendants contend that Zieburtz's calculations are speculative because a GAC system "may never be built or may be funded by grants or settlements." (Br. in Supp. of Defs.' Mot. to Exclude Zieburtz, at 14.) The Court finds these grounds insufficient to requiring excluding Zieburtz's testimony at this time.

First, the record sufficiently supports the proposition that the City will likely build a permanent GAC system. For example, Summerville previously approved the design and construction of such a system in September 2024. (Sipe & Senerman Expert Report, at 5, 7; Intervenor-Pl.'s Resp. Br. in Opp'n to Defs.' Mot. to Exclude Zieburtz, Ex. A, at 3 [Doc. 921-2].) Summerville's City Council meeting minutes from May 2025 further evince progress toward a GAC system. (Intervenor-Pl.'s Resp. Br. in Opp'n to Defs.' Mot. to Exclude Zieburtz, Ex. B, at 3 [Doc. 921-3].) They note that the City "anticipate[s] that [its] engineers will be ready to submit the project for bids by the end of the year and expect[s] to meet the 2029 EPA compliance deadline." (*Id.*) Carla Rutledge, the City's finance director and a fact witness in this case, has also submitted a declaration stating that the City "will have to increase water and sewer rates substantially to pay for [permanent treatment]," assuming it does not receive

33

outside funding to cover the amount. (Rutledge Decl. ¶ 12 [Doc. 843-3].) Therefore, it was reasonable for Zieburtz's methodology to assume the development of a GAC system.

Second, with respect to considering future grants or settlements, Zieburtz's methodology is not unreliable for excluding these potential sources. It seems that it would be entirely speculative if Zieburtz did in fact rely on future funding sources, given their unknown amount and availability. And Zieburtz has testified that he could update his report if Summerville did receive certain funds. (Zieburtz Dep. at 170:4–17.) That is sufficient for reliability purposes.[9] The only rebuttal that the Defendants provide is that certain expert economists have nonetheless accounted for outside funding sources and that Zieburtz's inclusion of future grants was necessary to ensure that his damages estimates were "reasonable and necessary." (Reply Br. in

---

[9] The Court need not rule on this legal question at this stage, but the Court notes that the collateral source rule likely makes it irrelevant whether the City will receive grants (or their equivalent) anyways. (*See* Intervenor-Pl.'s Resp. Br. in Opp'n to Defs.' Mot. to Exclude Zieburtz, at 14 & n.41 (quoting *Compton v. Bach*, 374 F. Supp. 3d 1296, 1302 (N.D. Ga. 2019).) In Georgia, the collateral source rule provides that "the receipt of benefits or mitigation of loss from sources other than the defendant will not operate to diminish the plaintiff's recovery of damages." *Compton*, 374 F. Supp. 3d at 1302; *see also ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1298 (11th Cir. 2018) ("[E]vidence of collateral benefits is inadmissible 'if the only proposition for which it is offered is in reduction of damages, because it is then offered to help prove a proposition which is not a matter in issue.'" (citation omitted)). In other words, the Defendants cannot offset their own alleged PFAS-related liability by pointing to other actors who help assuage the City's injury.

Supp. of Defs.' Mot. to Exclude Zieburtz, at 7–8 [Doc. 1016].) The Defendants misapply *Government Employees Health Association v. Actelion Pharmaceuticals Ltd.*, 2024 WL 4122123 (D. Md. Sept. 6, 2024), for their first proposition. In that case, a district court declined to exclude an expert's testimony as unreliable merely because it considered past government rebates received by the plaintiff. *Id.* at *7. The Court there agreed that "[w]hether [the expert] has calculated the measure of damages 'correctly in light of the various government reimbursement programs" is not a question of admissibility but "a question of fact for the trier of fact.'" *Id.* Likewise, whether Zieburtz's damages estimates were "reasonable and necessary" is a question for a trier of fact.

### 3. Non-PFAS GAC Benefits

Zieburtz's testimony is not unreliable or unhelpful merely because a GAC system would result in generally better water quality for Summerville's residents, in addition to removing PFAS. The Defendants contend that Zieburtz does not account for this benefit when attributing damages to them, though "the purpose of damages . . . is to put the aggrieved party in the position . . . as he or she would have been without the injury, not a better one." (Br. in Supp. of Defs.' Mot. to Exclude Zieburtz, at 17 (citation modified).) They specifically point to the GAC's ability to remove "disinfectant byproducts," for which the City had previously exceeded the MCL. (*Id.* at 16.)

The Defendants' argument is more appropriately presented before a jury but is unavailing, nonetheless. Zieburtz is an economist who reasonably relied on the opinion of civil engineers (Sipe, Senerman, and Pate) regarding the need to build a GAC system to specifically remove PFAS (and nothing other than PFAS). Moreover, the record is clear that "[t]he only reason [ ] Summerville is constructing a new GAC filtration system is due to the presence of Defendants' PFAS contamination in its drinking water supply." (Intervenor-Pl.'s Resp. Br. in Opp'n to Defs.' Mot. to Exclude Zieburtz, at 15.) Regarding disinfectant byproducts in particular, the City argues to the Court's satisfaction that it was a "one-time issue that was fixed by doing nothing more than flushing the water out of the distribution system." (*Id.* at 16 (citing Intervenor-Pl.'s Resp. Br. in Opp'n to Defs.' Mot. to Exclude Zieburtz, Ex. Q, at 203:12–204:8 [Doc. 921-18]).) Thus, the existence of a potential non-PFAS-related benefit does not render Zieburtz's testimony unreliable.

### 4. Computational Error

Zieburtz's failure to fix a math error does not render his opinion inadmissible. The Defendants note that Pate revised his cost estimates to fix a math error and that Zieburtz subsequently revised his estimates to account for the change. (Br. in Supp. of Defs.' Mot. to Exclude Zieburtz, at 5, 7.) But Zieburtz apparently "corrected only his calculations of the City's damages," (*id.*), and "forgot to revise his calculations as to the putative class's damages,"

(Reply Br. in Supp. of Defs.' Mot. to Exclude Zieburtz, at 5). To the extent Zieburtz's analysis still contains Pate's initial math error, the Court hereby provides Parris twenty-one days from the date of this Order to supplement Zieburtz's report to fully correct this computational mistake, pursuant to Rule 26(e)(1)(B). *See Crawford v. ITW Food Equip. Grp., LLC*, 977 F.3d 1331, 1341 (11th Cir. 2020); *WhereverTV, Inc. v. Comcast Cable Commc'ns LLC*, 2023 WL 2734332, at *2 (M.D. Fla. Mar. 31, 2023) (noting that Rule 26(2)(1)(A) "permits 'true supplementation (e.g., correcting inadvertent errors or omissions),'" as distinguished from "gamesmanship").

### 5. Net Present Value

The fifth reason for which the Defendants seek Zieburtz's exclusion relates to his net present value calculations. Zieburtz calculates a net present value of the GAC's operational costs for a 100-year period with a 3.5% discount rate. (Zieburtz Expert Report for Summerville, at 2–3.) The Defendants argue that these calculations lack foundation and are unreasonable, with the forecast horizon being too long and the discount rate being too low. (Br. in Supp. of Defs.' Mot. to Exclude Zieburtz, at 21–24.) According to them, a more appropriate forecast horizon and discount rate would be a thirty-year period and a 7.375% discount rate, respectively. (*Id.* at 24–25.)

The Court concludes that Zieburtz's methodology for his chosen forecast horizon and discount rate are sufficiently reliable. Regarding the forecast

37

horizon, Zieburtz's report states that he relied on the expert testimonies of Charles Andrews, Erica DiFilippo, and Bryan Pate in selecting a 100-year horizon. (Zieburtz Expert Report for Summerville, at 2.) Andrews—an expert on contaminant fate, transport, and hydrogeology—specifically opined that PFAS will remain in the surface waters of the Raccoon Creek watershed "for more than 100 years." (Intervenor-Pl.'s Resp. Br. in Opp'n to Defs.' Mot. to Exclude Zieburtz, Ex. K ("Andrews Expert Report"), at 3 [Doc. 921-12].) Because Zieburtz is an economist and not a PFAS contamination expert, it is reasonable that he would have relied on the testimony of Andrews and others regarding the long-lasting effects of the so-called "forever chemicals" in the environment. That is sufficient for the Court to conclude that Zieburtz's methodology for selecting the 100-year horizon is not "arbitrary" or "wildly speculative," as the Defendants claim. (Br. in Supp. of Defs.' Mot. to Exclude Zieburtz, at 22–23.) It does not matter that the Defendants may disagree with Zieburtz's decision to select this particular horizon. *See Outback Steakhouse of Fla., LLC v. 137 Acres, LLC*, 2022 WL 4596677, at \*6 (N.D. Ga. June 24, 2022) ("The fact that [an expert] apparently disagrees with [another expert's] measurements and conclusions, and believes that more accurate results could have been achieved by use of different methods does not render [the expert's] work unreliable and inadmissible under Rule 702." (citation omitted)).

38

To contest Zieburtz's reliance on Andrews, the Defendants point to a tension between Zieburtz's expert report and deposition testimony: Zieburtz's report purports to rely on the testimony of Andrews and others, but Zieburtz testified in his deposition that he had not seen Andrews's report or talked to Andrew, (Br. in Supp. of Defs.' Mot. to Exclude Zieburtz, Ex. A, at 197:17–200:24 [Doc. 882-2].) He further testified that the information about the 100-year horizon "was conveyed to [him] by counsel with respect to Mr. Andrews's opinions."(*Id.* at 197:17–23.) At this time, the Court declines to exclude Zieburtz's testimony due to this apparent tension. Resolving this tension is a question of credibility best suited for a trier of fact.

Regarding the discount rate, the Court holds that Zieburtz's testimony satisfies the reliability prong of Rule 702. Relying on his experience as an economist, Zieburtz selected a discount rate of 3.5%. (Zieburtz Expert Report for Summerville, at 3.) He testified that he has used this discount rate "for years" based on his experience as an economist within the environmental space. (Intervenor-Pl.'s Resp. Br. in Opp'n to Defs.' Mot. to Exclude Zieburtz, Ex. P, at 232:20–22, 232:9–11 [Doc. 921-17].) He further testified that, in the environmental space, the discount rate must be "low in comparison to most private entity transactions, business analysis contexts, because of the fundamental nature of the infrastructure and the fact that we're talking about the impacts of future generations and ultimately, because higher discount

39

rates very quickly, devalue those future costs inappropriately." (*Id.* at 232:11–17.) While determining a reasonable discount rate goes to the weight of the evidence, the Court can say at this stage that Zieburtz's explanation of his methodology is enough. For the foregoing reasons, the Court denies the Defendants' motion to exclude Zieburtz's testimony.

## IV.   Conclusion

For the reasons set forth above, the Court GRANTS in part and DENIES in part Defendants 3M Company, E.I. DuPont de Nemour, The Chemours Company, and Daikin America, Inc.'s Motion to Exclude the Expert Testimony of William Zieburtz [Doc. 882], DENIES their Motion to Exclude the Expert Testimony of Chad Sipe & Spencer Senerman [Doc. 883], and GRANTS in part and DENIES in part their Motion to Exclude the Expert Testimony of Bryan Pate [Doc. 885]. William Zieburtz's testimony is excluded to the extent it opines that Summerville will raise its water rates in the future by the full amount of the permanent granulated active carbon system. Bryan Pate's testimony is excluded as to his net present calculations but not as to his other opinions.

SO ORDERED, this ____16th____ day of March, 2026.

THOMAS W. THRASH, JR.
United States District Judge