IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

EARL PARRIS, JR.
Individually, and on behalf of a Class of
persons similarly situated,

    Plaintiff,

      v.

                            CIVIL ACTION FILE
                            NO. 4:21-CV-40-TWT

3M COMPANY, et al.,

    Defendants.

**OPINION AND ORDER**

This is an action under the Clean Water Act. It is before the Court on Defendants Daikin America, Inc., 3M Company, E.I. DuPont de Nemours, The Chemours Company's Motion to Exclude the Expert Testimony of Andrew Stahl [Doc. 884]. For the reasons set forth below, the Court DENIES the Defendants' Motion to Exclude the Expert Testimony of Andrew Stahl [Doc. 884].

## I.    Background

This case arises out of the contamination of surface waters and drinking water in Chattooga County, Georgia, with per- and polyfluoroalkyl substances known as "PFAS." (2d Am. Compl. ¶ 1 [Doc. 280].) The facts of this case are well known to the parties by this point, so the Court will not belabor them here. In essence, Plaintiff Earl Parris, Jr., alleges that the Defendants have contaminated his city's water supply and thus his household water with PFAS.

Parris is a resident of Summerville, Georgia, who receives running, potable water to his home from the Summerville Public Works and Utilities Department. (*Id.* ¶ 21.) The City of Summerville, which has intervened in this case, uses Raccoon Creek as the main source of its municipal water supply. (*Id.*) The Court will collectively refer to Plaintiff Parris and Intervenor-Plaintiff Summerville as the Plaintiffs. The Defendants are the following companies, which allegedly manufactured and supplied the PFAS discharged into Raccoon Creek: 3M Company, Daikin America, Inc., E.I. du Pont de Nemours and Company, and The Chemours Company. At present, the Defendants jointly move to exclude the expert witness testimony of Andrew Stahl. His testimony concerns the source of PFAS in Raccoon Creek.

## II.    Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under that rule, "expert testimony is admissible if (1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014) (citation modified). Courts perform a "gatekeeping role" in excluding expert testimony that does not satisfy these qualification, reliability, and helpfulness

2

requirements. *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "This gatekeeping role, however, is not intended to supplant the adversary system or the role of the jury" in determining the persuasiveness of an expert's testimony. *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (citation modified). Rather, the goal is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "The proponent of the expert testimony always bears the burden" of establishing qualification, reliability, and helpfulness. *Id.* (citation modified).

### III.    Discussion

Andrew Stahl is a licensed geologist employed by GEL Engineering, LLC ("GEL"), as a senior hydrogeologist and project manager. (Defs.' Mot. to Exclude Stahl, Ex. 1 (Pt. 1) ("Stahl Report"),[1] at 17 [Doc. 884-1].) He "has more than 37 years of experience in environmental consulting, with areas of expertise" that includes "groundwater, soil, PFAS, and vapor intrusion contaminant investigations and remediations" and "industrial and municipal facility and infrastructure environmental assessments and siting studies." (*Id.* at 17.)

---

[1] The pagination of this exhibit reflects the PDF pagination.

Per the Plaintiffs theory of the case, the Defendants' PFAS was discharged as wastewater to the Town of Trion's Water Pollution Control Plant, and the plant maintained a program by which it applied the treated but still PFAS-laden wastewater to properties in the region, including farm properties in the Raccoon Creek watershed. (2d Am. Compl. ¶¶ 1, 5, 36–37; *see also* Stahl Report, at 8 (describing the Complaint's allegations).) Stahl's expert report opines that PFAS-laden sludge applied to farms in the Raccoon Creek watershed "has entered and is continuing to enter Raccoon Creek" through identified transport pathways from certain PFAS-contaminated farms to Raccoon Creek. (Stahl Report, at 11–12.) His opinion is supported by sampling data collected from two areas ("Area 1" and "Area 2") known to have received sludge from Trion on farm properties owned by Lauren Jarrett. (*Id.* at 9.)

GEL collected samples on three occasions: (1) In January 2023, "[f]ollowing a period of precipitation," GEL collected surface water samples in Areas 1 and 2 and at one upstream location. (*Id.* at 10.) (2) In September 2023, "[d]uring drier conditions," it collected soil and sediment samples in Areas 1 and 2, one groundwater sample at Area 1, two surface water samples at Area 1, and two surface water samples at upstream locations. (*Id.*) (3) In February 2024, it collected groundwater samples in Areas 1 and 2, surface water samples in Areas 1 and 2, and surface water samples at upstream and downstream locations. (*Id.*) The Defendants challenge the reliability of Stahl's testimony,

arguing that his upstream, downstream, and groundwater data do not adequately or reliably support his conclusions. The Court addresses each of these arguments below. The Defendants do not challenge Stahl's qualifications or the helpfulness of his testimony to a trier of fact.

In determining whether an expert witness's testimony is reliable under Rule 702, the Court must evaluate "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. *Daubert* sets forth a number of factors relevant to this inquiry, including (1) whether an expert's theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of a scientific technique; and (4) whether a known technique has achieved widespread acceptance in the scientific community. *Id.* at 593–94. These factors are not intended to be a "definitive checklist," *id.* at 593; rather, "the law grants the trial judge broad latitude to determine . . . whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case." *Kumho Tire Co., Ltd.*, 526 U.S. at 153. Ultimately, the district court's objective under *Daubert* is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. To this end, a district court may not admit

opinions that "[are] connected to existing data only by the *ipse dixit* of the expert" or leave "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## A. Upstream Data

The Defendants contend that the upstream data samples "undercut[ ]" Stahl's "key assumption" that land-applied sludge is the only source of the PFAS in Raccoon Creek. (Defs.' Mot. to Exclude Stahl, at 3–4.) According to the Defendants, PFAS was found in three samples located upstream of Jarrett farms and all other farms where Trion's sludge was applied, so it is not possible to conclude that the sludge is the only PFAS contributor. (*Id.* at 5–7.)

The Plaintiffs respond that this "key assumption" is not in fact "the key, or even a necessary, assumption or element of Mr. Stahl's report." (Pls.' Resp. Br. in Opp'n to Defs.' Mot. to Exclude Stahl, at 7.) They explain that the purpose of Stahl's report was to "determine if the 'environmental media (surface water, groundwater, soil, and sediment) on the Jarrett's property where sludge had been applied provided transport pathways for PFAS contamination from the property to enter Raccoon Creek." (*Id.* at 7–8.) Moreover, the Plaintiffs point out that Stahl addresses the three samples identified by the Defendants and that he collected "dozens of other surface water, groundwater, soil, and sediment samples" to support his "findings that PFAS contamination from the[ ] sludge fields enters Raccoon Creek." (*Id.* at

6

10–11.)

The Court declines to exclude Stahl's testimony on this upstream data argument. As an initial matter, the Defendants' arguments here are more appropriate for cross-examination than a motion to exclude, as they concern Stahl's interpretation of the data samples and not a problem with Stahl's data collection process. *See Ala. Power Co.*, 730 F.3d at 1282 (noting that Rule 702 "is not intended to supplant . . . vigorous cross-examination," which is a central part of "the adversary system" and "the role of the jury"). Even considering the merits of the Defendants' concerns, the Court finds them unpersuasive for at least two reasons.

First, the Defendants have overstated the relevance of one line in Stahl's report. In his conclusion section, Stahl opines that "PFAS that was contained in the sludge applied to sludge application fields has entered and is continuing to enter Raccoon Creek." (Stahl Report, at 11–12.) He then describes the various "transport pathway[s]" through which PFAS-laden sludge has made its way to Raccoon Creek. (*Id.* at 12.) These pathways form the bulk of his opinion, which is consistent with the stated purpose of Stahl's report.[2] The first page of Stahl's report outlines its purpose and scope: "The objective of the

---

[2] That is, they form the bulk of "Opinion Statement 2," which is the opinion relevant here. There are two opinion statements. "Opinion Statement 1" merely states that the sampling results "can be relied upon with a high degree of confidence" and describes GEL's professional sampling practices. (Stahl Report, at 11.)

environmental media evaluations was to assess PFAS transport pathways from the sludge application fields to assess if PFAS contained in the land-applied sludge has, and is continuing to, enter Raccoon Creek." (*Id.* at 8.) In their briefing, the Defendants seize only on the last line in Stahl's conclusion section, which notes the following: "Based upon a review of state and federal regulatory information and our visual survey of the Raccoon Creek watershed upstream of the City of Summerville's drinking water intake, there are no other known sources of PFAS in the Raccoon Creek watershed other than the Trion sludge application on farm fields in the Raccoon Creek watershed." (*Id.* at 12.) This final line is a note about the lack of awareness of other "*known* sources of PFAS." (*See id.* (emphasis added).) It is entirely consistent with the rest of Stahl's report and conclusions, and it would be consistent with the fact that some samples suggest potential *unknown* sources of PFAS.

Second, the fact that three of Stahl's samples indicate PFAS concentrations upstream of farms where sludge was applied does not automatically mean that Stahl's conclusions are unfounded. Stahl has collected a number of upstream samples[3] and concluded from those and other

---

[3] The Court does not attempt to count the number of upstream surface water samples but notes that several of them appear to be listed in Tables 5 and 6 of Stahl's report. (*See* Defs.' Mot. to Exclude Stahl, Ex. 1 (Pt. 2), at 7–8 [Doc. 884-2]; *see also* Stahl Report, at 33–34 (describing the upstream surface water data).) As Stahl notes in his rebuttal report, GEL collected and analyzed "29 soil, 8 sediment, 33 surface water, and 7 groundwater samples (excluding quality control samples)." (Pls.' Resp. Br. in Opp'n to Defs.' Mot. to Exclude,

samples that transport pathways from the Jarrett properties to Raccoon Creek have allowed PFAS from the land-applied sludge to enter Raccoon Creek. (*See id.* at 40–41, 12.) Moreover, Stahl specifically addressed the three samples that the Defendants identified, stating that "[s]urface water PFAS contamination upstream of Jarrett properties sludge application fields Areas 1 and 2 may be attributed to these additional land application properties and/or other potential currently unknown land-application parcels within the headwaters of the Raccoon Creek drainage basin. (*Id.* at 41.) For these reasons, the Court finds Stahl's opinions sufficiently supported under *Daubert* and Rule 702 with respect to his analysis of the upstream data.[4]

### B. Downstream Data

The Defendants argue that downstream samples also undercut Stahl's

---

Ex. 2 ("Stahl Rebuttal Report"), at 4 [Doc. 968-4].) The pagination of Exhibit 2 of the Plaintiffs' response brief reflects the PDF pagination.

[4] The Defendants make much of a 2023 amendment to Rule 702 in their reply brief. They explain that courts must find an expert's opinions reliable and based on sufficient facts by a preponderance of the evidence. (Reply Br. in Supp. of Defs.' Mot. to Exclude Stahl, at 2–3 [Doc. 1001].) The Court does so when it holds here and elsewhere that Stahl's opinions are "sufficiently" supported under *Daubert* and Rule 702.

The Court notes that Rule 702 was amended "to clarify and emphasize (1) the applicability of the preponderance of the evidence standard, that is, expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in FRE 702, and (2) that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Demboske v. Autry Greer & Sons, Inc.*, 740 F. Supp. 3d 1172, 1178 n.3 (N.D. Fla. 2024) (citation modified).

conclusion. If Stahl's conclusion about PFAS-laden sludge is correct, samples downstream of the farms should show PFAS concentrations "'decreas[ing] in the downstream direction' due to 'dilution' as the PFAS gets further away from its source." (Defs.' Mot. to Exclude Stahl, at 9 (quoting Stahl Report,[5] at 41).) But the Defendants point out two downstream samples that show the opposition relationship since the sample further downstream had a higher PFAS concentration than the other. (*Id.* at 9–11.)

The Court declines to exclude Stahl's testimony on these grounds. Once again, the Defendants' arguments are better suited for cross-examination and the presentation of contrary evidence than an admissibility challenge. The Defendants take issue with only two of Stahl's myriad samples, whereas Stahl made his determinations from an evaluation of all the samples. The report states: "Total PFAS concentrations measured in samples collected from Raccoon Creek decrease in the downstream direction. Undoubtedly, this is due to dilution from less-contaminated or non-contaminated tributaries." (Stahl Report, at 41; *see also id.* at 41–42 (mentioning other samples on which Stahl relied).) Moreover, Stahl's report addresses the two samples at issue, suggesting that, while further testing is necessary, "the highly contaminated groundwater . . . likely discharges" to an area upstream of where the two

---

[5] The Defendants cite page thirty-four of Stahl's report, which is page forty-one in the PDF document.

samples of high PFAS concentrations were collected. (*See id.* at 42.) The Defendants call this statement mere speculation, (Reply Br. in Supp. of Defs.' Mot. to Exclude Stahl, at 8–9), but the Court is satisfied with Stahl's overall assessment of the data and discussion of potential outlier data for *Daubert* purposes.

## C. Groundwater Data

As to Stahl's groundwater data, the Defendants claim that GEL did not use a reliable sampling methodology, as his samples did not comply with the EPA's "Groundwater Sampling Operating Procedure." (Defs.' Mot. to Exclude Stahl, at 14–15.) The EPA manual considers the "purging" aspect of groundwater sampling "adequate" when the samples are collected from water below 10 Nephelometric Turbidity Units ("NTUs"). U.S. EPA, Region 4, *Operating Procedure: Groundwater Sampling* 15 (2013) (hereafter "EPA Region 4 Groundwater Operating Procedure") (available at https://tinyurl.com/3kbs6e6w); *see also id.* at 13 ("Purging is the process of removing stagnant water from a well, immediately prior to sampling, causing its replacement by groundwater from the adjacent formation that is representative of actual aquifer condition."). But, according to the Defendants, "Stahl's groundwater samples had sky-high turbidity readings—ranging from 439 NTUs, to 740 NTUs, and in many cases over 1,000 NTUs." (Defs.' Mot. to Exclude Stahl, at 15.) The Defendants contend that the high turbidity renders

the samples potentially biased because they "cannot accurately isolate a measurement for PFAS *dissolved in the groundwater*" as opposed to "undissolved PFAS in the mud . . . [that] will not migrate to Raccoon Creek." (*Id.* at 16.)

The Court declines to exclude Stahl's testimony for high turbidity. Stahl's report notes that sampling was conducted "in accordance with usual and customary profession practices" and goes on to explain those practices in some depth. (Stahl Report, at 11, 30–31.) His rebuttal report further outlines the sampling methodology conducted and why it aligns with industry practice. (Stahl Rebuttal Report, at 5.)[6] As the Court is no expert on groundwater sampling, the Court excerpts his explanation below:

> The completed groundwater sampling program was conducted using direct-push drilling technology for point-in-time groundwater sampling in part because landowner permission was not granted to install and extensively develop permanent monitoring wells. Direct-push drilling with point-in-time groundwater sampling has been recognized for decades as a usual and customary professional practice for site reconnaissance/site characterization such as that conducted for the Jarrett Properties Sludge Application Fields assessment. This usual-and-customary recognition is acknowledged by the United States Environmental Protection Agency (EPA) in the August 2005 guidance document, *Groundwater Sampling and Monitoring with Direct Push Technologies*, OSWER No. 9200.1-51, EPA 540/R-04/005. In this document, EPA discusses various techniques to collect groundwater samples by advancing direct-push drilling rods . . . . The methodology employed by GEL to conduct the site reconnaissance/site characterization at the Jarrett Properties Sludge Application Fields was a hybrid of and an upgrade to the

---

[6] The pagination of this exhibit reflects the PDF pagination.

> EPA-referenced techniques listed above selected. *The specific methodology was an upgrade to the EPA-endorsed techniques stated above because GEL installed a sand filter-pack around temporary well screens, which allowed for at least some potential filtering of turbidity during sample collection whereas the EPA techniques listed above do not include installation of any sand filter-pack. Moreover, GEL elected to install temporary wells for 2-day point-in-time groundwater sampling to enable groundwater levels to stabilize overnight to static conditions.* . . . These methodologies are, in fact, recognized as usual and customary professional practices.

(*Id.* at 5 (emphasis added).) Stahl goes on to state that his analysis remains sound "[d]espite the presence of turbidity." (*Id.* ("Despite the presence of turbidity . . . , the laboratory analytical results clearly demonstrate that shallow groundwater is contaminated from PFAS that leached to the water table through contaminated soils across Jarrett properties sludge application fields.").) Considering Stahl's explanation, qualifications, and experience, the Court is satisfied that Stahl has "employ[ed] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. Thus, his groundwater sampling methodology is reliable under *Daubert* and Rule 702.

The Defendants' mere citation to an EPA manual about turbidity does not by itself show that Stahl's methodology is unreliable. For example, the EPA manual on which the Defendants rely states that turbidity lower than 10 NTUs "has been shown to be easily achievable in most situations and reasonable attempts should be made to achieve these lower levels." EPA Region 4 Groundwater Operating Procedure, at 15. The Defendants rely on this

13

statement to demonstrate that Stahl's data sampling was improper. But Stahl's rebuttal report suggests that low turbidity ratings were not possible at the time and that GEL made reasonable attempts to ensure high quality samples. The Defendants have not shown that taking low turbidity samples is possible at these sites. Moreover, they have not established that EPA guidance *requires* low turbidity to qualify data as reliable nor that the "operating procedure" for EPA Region 4 is the only reliable method of collecting data samples. If the Defendants wish to point out the high turbidity ratings, they may do so on cross examination and present evidence as to why that may bias the samples and to what degree. The Court denies the Defendants' Motion to Exclude as to Stahl's groundwater methodology.

## IV.    Conclusion

For the reasons set forth above, the Court DENIES Defendants Daikin America, Inc., 3M Company, E.I. DuPont de Nemours, The Chemours Company's Motion to Exclude the Expert Testimony of Andrew Stahl [Doc. 884].

SO ORDERED, this ___20th___ day of March, 2026.

THOMAS W. THRASH, JR.
United States District Judge

14