IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

EARL PARRIS, JR.
Individually, and on behalf of a Class of
persons similarly situated,

    Plaintiff,

       v.

CIVIL ACTION FILE
NO. 4:21-CV-40-TWT

3M COMPANY, et al.,

    Defendants.

## OPINION AND ORDER

This is an action under the Clean Water Act. It is before the Court on Defendants 3M Company, E.I. DuPont de Nemours, The Chemours Company, and Daikin America, Inc.'s ("Daikin") Motion to Exclude the Expert Testimony of Jamie DeWitt [Doc. 880] and Motion for Leave to File Supplementary Authority [Doc. 1068]. For the reasons set forth below, the Court GRANTS in part and DENIES in part the Defendants' Motion to Exclude the Expert Testimony of Jamie DeWitt [Doc. 880] and GRANTS their Motion for Leave to File Supplementary Authority [Doc. 1068].

## I.   Background

This case arises out of the contamination of surface waters and drinking water in Chattooga County, Georgia, with per- and polyfluoroalkyl substances known as "PFAS." (2d Am. Compl. ¶ 1 [Doc. 280].) The facts of this case are

well known to the parties by this point, so the Court will not belabor them here. In essence, Plaintiff Earl Parris, Jr., alleges that the Defendants have contaminated his city's water supply and thus his household water with PFAS. Parris is a resident of Summerville, Georgia, who receives running, potable water to his home from the Summerville Public Works and Utilities Department. (*Id.* ¶ 21.) The City of Summerville, which has intervened in this case, uses Raccoon Creek as the main source of its municipal water supply. (*Id.*) The Court will collectively refer to Plaintiff Parris and Intervenor-Plaintiff Summerville as the Plaintiffs. The Defendants are the following companies, which allegedly manufactured and supplied the PFAS discharged into Raccoon Creek: 3M Company, Daikin America, Inc., E.I. du Pont de Nemours and Company, and The Chemours Company. At present, the Defendants jointly move to exclude the expert witness testimony of Jamie DeWitt and move for leave to file supplementary authority regarding their motion to exclude.

## II.   Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under that rule, "expert testimony is admissible if (1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman v.*

2

*Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014) (citation modified). Courts perform a "gatekeeping role" in excluding expert testimony that does not satisfy these qualification, reliability, and helpfulness requirements. *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "This gatekeeping role, however, is not intended to supplant the adversary system or the role of the jury" in determining the persuasiveness of an expert's testimony. *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (citation modified). Rather, the goal is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "The proponent of the expert testimony always bears the burden" of establishing qualification, reliability, and helpfulness. *Id.* (citation modified).

### III.   Discussion

Jamie DeWitt is a professor at Oregon State University in environmental and molecular toxicology and holds a Ph.D. in environmental science and neural science. (Defs.' Mot. to Exclude DeWitt, Ex. 1 ("DeWitt Report"), [1] at 58 [Doc. 880-1].) She has co-authored twenty-one primary research articles on PFAS toxicity as well as other publications, and she has

---

[1] The pagination of this exhibit reflects the PDF pagination.

held a number of positions with government agencies and groups related to PFAS exposure and toxicology. (*Id.* at 8–11.) Based on her assessment of the available scientific literature, DeWitt opines that "exposure to PFAS poses substantial present or potential hazard to human health" and goes on to opine on the ways in which PFAS exposure is associated with adverse health effects in humans. (*Id.* at 13.)

The Defendants challenge DeWitt's testimony on three grounds: qualification, relevance, and reliability. The Court addresses each of these grounds below. Before doing so, the Court notes that it grants the Defendants' Motion for Leave to File Supplemental Authority, which contains a copy of an opinion in *Nix v. Chemours Co. FC, LLC*, 805 F.Supp.3d 626 (E.D.N.C. 2025), and *Cape Fear Public Utility Authority v. Chemours Co. FC, LLC*, Case Nos. 7:17-CV-195 & 7:17-CV-209 (E.D.N.C. Dec. 17, 2025).

## A. Qualification

Rule 702 provides that a witness may be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. When assessing a witness's qualifications, the district court must focus on "the matter to which the expert seeks to testify—i.e., 'to the task at hand.'" *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021) (quoting *Daubert*, 509 U.S. at 597). While a witness may be "well-trained, highly educated, and experienced" with an "impressive professional track record," Rule 702

4

contemplates "a more thorough analysis of whether [the witness] is qualified and competent to testify as an expert *as to the subject matter of his proposed testimony.*" *Jack v. Glaxo Wellcome, Inc.*, 239 F. Supp. 2d 1308, 1316 (N.D. Ga. 2002) (emphasis added). "It is for that reason that 'expertise in one field does not qualify a witness to testify about others.'" *Moore*, 995 F.3d at 854 (quoting *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1368 (11th Cir. 2014)). The question whether a proposed witness is qualified to testify as an expert rests within the district court's discretion. *Jack*, 239 F. Supp. 2d at 1314 (citing *Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976)).

The Defendants' first qualification challenge is that DeWitt is a toxicologist trained to study only animals and not an epidemiologist trained to study humans. (Defs.' Mot. to Exclude DeWitt, at 3–5). The Defendants additionally contend that DeWitt is not qualified to rebut Daikin's expert Anders Abelmann because Abelmann is an industrial hygienist opining on the ways humans can be exposed to PFAS while DeWitt is a toxicologist untrained in the kind of "human exposure assessments" considered by Abelmann. (*Id.* at 6–7.)

The Court disagrees on both fronts. The Defendants' qualification challenge is not well taken. First, DeWitt is qualified to testify about the adverse human health hazards engendered by exposure to PFAS, including the

types of PFAS (PFOA and PFOS[2]) at issue in this case. DeWitt is a recognized PFAS expert and has established her career studying and reviewing literature on the potential human health effects of PFAS exposure. She has "co-authorized 21 review articles/commentaries on PFAS toxicity and use, two book chapters related to PFAS immunotoxicity, and edited one of the first comprehensive texts on the toxicity of PFAS." (DeWitt Report, at 11.) She has also been nominated to or tasked with a variety of PFAS-related roles, including as a member of the EPA's 2021–22 PFAS Science Advisory Board, a member of an International Agency for Research on Cancer working group studying "carcinogenicity of PFOA," a reviewer for the U.S. National Toxicology Program's publication on the "immunotoxicity of PFOA and PFOS," a "Community Liaison" to a committee charged by the Centers for Disease Control and Prevention and the National Institute of Environmental Health Sciences with "examin[ing] health outcomes associated with the most widely studied PFAS," a witness testifying before three subcommittees of the U.S. House of Representatives on PFAS toxicity, an external peer reviewer for the EPA's "health effect documents for PFOA and PFOS in 2014," an external reviewer for the U.S. Agency for Toxic Substances and Disease Registry's "Toxicological Profile for PFAS in 2017" and other PFAS documents, and a

---

[2] PFOS is short for perfluorooctanesulfonic acid, and PFOA is short for perfluorooctanoic acid.

PFAS advisor for governmental agencies in Michigan, North Carolina, and Tennessee. (*Id.* at 9–10.) She is therefore "qualified and competent to testify as an expert as to the subject matter of [her] proposed testimony." *See Jack*, 239 F. Supp. 2d at 1316.

These credentials make DeWitt qualified to evaluate studies and data on PFAS toxicity, including both toxicological and epidemiological data. While DeWitt is trained as a toxicologist and not an epidemiologist, that is of no difference here. DeWitt has testified to the Court's satisfaction that she has previously assessed epidemiological studies and can properly do so here, including for bias, cofounding, and other flaws. (Pls.' Resp. Br. in Opp'n to Defs.' Mot. to Exclude DeWitt, Ex. 2 ("Pls.' DeWitt Dep. Excerpt"), at 138:17–139:10, 141:1–13 [Doc. 955-2].)

Second, DeWitt is adequately qualified to rebut Daikin's expert Abelmann. DeWitt identifies three issues with Abelmann's report: (1) he misinterpreted one study by relying on it as an indicator of "absolute levels of exposure" for various exposure pathways, (2) he misinterpreted another study by relying on it to identify food as the dominant PFAS exposure pathway in Summerville, and (3) he failed to "include any data on PFOA levels in food in Summerville." (Defs.' Mot. to Exclude DeWitt, Ex. 8, at 17–18.) DeWitt is an experienced scientist qualified to review and interpret the kinds of scientific literature on which Abelmann relies. She has not stretched beyond her

7

credentials by identifying how Abelmann may have misinterpreted existing studies or identifying a fundamental flaw in his conclusions.

## B. Relevance

An expert's opinions must be helpful to a trier of fact. Fed. R. Evid. 702(a). The helpfulness of an expert's opinions to a trier of fact speaks "primarily to relevance," which is a "liberal" standard. *Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11th Cir. 2016) (citations omitted). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (citation omitted). The Defendants ask this Court to exclude DeWitt's testimony on PFAS other than PFOS and PFOA. (Defs.' Mot. to Exclude DeWitt, at 21.) They argue that other types of PFAS "are not at issue in this case." (*Id.* at 3.)

Given the liberal relevance standard, the Court declines to exclude DeWitt's testimony referring to PFAS other than PFOS or PFOA. Testimony on the risks of PFAS generally, including but not limited to PFOS and PFOA, is relevant to this litigation. According to the Complaint, the Defendants contaminated the Raccoon Creek watershed with PFAS "including" PFOS and PFOA, and sampling data revealed PFOS, PFOA, and other PFAS substances in Raccoon Creek. (See, e.g., 2d Am. Compl. ¶¶ 88–90.) The Complaint also alleges that the Defendants manufactured PFAS other than PFOS and PFOA and were aware of the danger presented by PFAS chemicals as a whole. (*See,*

8

*e.g., id.* ¶ 81–82.) Moreover, other expert witnesses appear to have identified PFAS other than PFOS and PFOA in Summerville's water supply. (*See, e.g.,* Defs.' Mot. to Exclude Davis, Ex. 8, at 31–34.) The risks posed by PFAS substances other than PFOS and PFOA would therefore be helpful to a trier of fact.

### C. Reliability

In determining whether an expert witness's testimony is reliable under Rule 702, the Court must evaluate "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. *Daubert* sets forth a number of factors relevant to this inquiry, including (1) whether an expert's theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of a scientific technique; and (4) whether a known technique has achieved widespread acceptance in the scientific community. *Id.* at 593–94. These factors are not intended to be a "definitive checklist," *id.* at 593; rather, "the law grants the trial judge broad latitude to determine . . . whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case." *Kumho Tire Co., Ltd.,* 526 U.S. at 153.

The Eleventh Circuit has further recognized the necessity of a "flexible,

context-sensitive application of *Daubert*," especially in cases where the reliability of an expert's opinion may turn more on the expert's competency than his methodology. *Adams v. Lab'y Corp. of Am.*, 760 F.3d 1322, 1340 (11th Cir. 2014) (Garza, J., concurring). Thus, "there are instances in which a district court may determine the reliability prong under *Daubert* based primarily upon an expert's experience and general knowledge in the field." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1336 (11th Cir. 2010). Still, "the qualifications and reliability prongs of *Daubert* are conceptually distinct inquiries that district courts may not collapse into each other." *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 853 (11th Cir. 2021); *see also Adams*, 760 F.3d at 1330 n.13 (quoting *Kilpatrick*, 613 F.3d at 1336).

Ultimately, the district court's objective under *Daubert* is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. To this end, a district court may not admit opinions that "[are] connected to existing data only by the *ipse dixit* of the expert" or leave "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The Defendants challenge the reliability of DeWitt's testimony from five angles. They contend that her testimony fails to (1) establish general causation; (2) establish that there is no safe level of PFAS exposure; (3) justify

the applicability of animal studies to humans; (4) make transparent her methodology such that it is reproduceable; and (5) justify opinions on PFAS other than PFOS and PFOA.

### 1. General Causation and Risk Assessment

The Defendants contend that DeWitt's testimony is unreliable because it fails to adequately consider the "three sources of evidence relevant to general causation." (Defs.' Mot. to Exclude DeWitt, at 11.) Those three sources are "epidemiological evidence, the dose-response relationship, and the background risk of disease." (Defs.' Mot. to Exclude DeWitt, at 11 (citing *In re Deepwater Horizon BELO Cases*, 119 F.4th 937, 941 (11th Cir. 2024).)

The Plaintiffs respond that DeWitt's testimony does not seek to prove general (or specific) causation as would be required in a toxic tort case connecting a given pollutant to particular personal injuries. Instead, they argue that the testimony reflects a public health "risk assessment" that assesses the weight of the scientific evidence to identify the risks associated with PFAS exposure. (Pls.' Resp. Br. in Opp'n to Defs.' Mot. to Exclude, at 14–15 [Doc. 955].) The Plaintiffs contend that the goal of the testimony is to explain to a jury why a city like Summerville might choose to abate the threat of PFAS in its water supply.

The Court holds that DeWitt's assessment of risk is reliable for the purpose of contextualizing the damages claimed by the Plaintiffs, though not

11

reliable for establishing specific or general causation. The Eleventh Court in *McClain v. Metabolife International, Inc.*, 401 F.3d 1233 (11th Cir. 2005), distinguished between causation evidence and risk assessment evidence. *Id.* at 1249. According to *McClain*, a risk assessment evaluates whether the potential risks of a substance outweigh the potential benefits, whereas a causation analysis evaluates whether a substance more likely than not causes or caused an alleged harm. *See McClain*, 401 F.3d at 1249. Because *McClain* was a toxic tort action involving alleged personal injuries, the Eleventh Circuit found that it "[o]bviously . . . must focus on assessing causation, not a cost-benefit analysis." *Id.* It further noted that a risk assessment would not be reliable evidence of legal causation under *Daubert*. *Id.* at 1250. Relying on *McClain*, *In re Deepwater Horizon BELO Cases*, 119 F.4th 937, 941 (11th Cir. 2024), affirmed the exclusion of testimony by the plaintiffs' general causation expert in a similar toxic tort action for personal injury damages. *Id.* at 945–46. *Deepwater Horizon* held that the district court did not abuse its discretion when it excluded an expert's testimony for failing to "identify a 'toxin' and prove it '[was] harmful above a particular threshold.'" *Id.* (referring to the dose-response relationship).

Here, the Plaintiffs do not seek to prove—and need not prove—legal causation between PFAS and any particular health injuries. The Plaintiffs instead seek to rely on DeWitt's expert testimony to support Summerville's

decision to build a treatment system to remove PFAS from its water supply and take other abatement measures—the alleged damages in this case. DeWitt testified that, while her report discusses the association between PFAS and various adverse health outcomes, it does not assert a "cause and effect" relationship. (Pls.' DeWitt Dep. Excerpt, at 126:5–9.) She further testified that she "do[es] not intend to offer any causality opinions," (*id.* at 159:23–24), as she was merely asked to "evaluate the existing toxicological data on PFAS and determine the toxicological hazards," (*id.* at 127:11–13; *see also id.* at 158:5–10 (testifying to the same)).

Therefore, the Defendants' arguments that DeWitt's testimony does not amount to reliable general causation evidence are largely immaterial. Although association and causation are related, the concepts are not equivalent. Thus, it is possible for an expert to assess whether the weight of the scientific evidence supports an association between PFAS and a particular adverse health without opining on causation. Such may be relevant when a government agency must assess the available evidence and choose whether to take precautionary regulatory action in response to exposure to a chemical.[3] That is the case here with Summerville. Where an expert does seek to establish general causation, the Defendants are correct that the Eleventh Circuit has

---

[3] For the same reason, DeWitt's testimony about the precautionary principle is relevant and not made unreliable by the requirements of proving causation.

13

looked favorably on testimony that applies the "Bradford Hill" factors to individual studies, assesses the dose-response relationship, and assesses background risk. *See Deepwater Horizon*, 119 F.4th at 941. But, as explained, DeWitt's testimony need not satisfy the *Daubert* standard for proving general causation. It need only satisfy *Daubert* for what it sets out to do—identifying potential health risks associated with PFAS exposure in the scientific literature. For the reasons explained elsewhere below, it does so.

### 2.  No Safe Exposure Level

To the extent DeWitt's testimony contains an opinion that the only safe level of PFAS exposure is zero, the Court excludes that opinion. The Defendants point out that DeWitt offered an opinion about no level of PFAS exposure being safe, citing the following sentence in her report: "The U.S. EPA's established [maximum contaminant level goals of zero] for PFOA and PFOS and the evidence upon which the actions were based[ ] support my opinion that the weight of the evidence is that PFAS exposure through contaminated drinking water is a risk for cancer and that *no* level of PFOA or PFOS in drinking water can be considered 'safe' with respect to cancer risks."[4]

---

[4] The Defendants also point to DeWitt's rebuttal deposition in which she apparently testified "no level of exposure to PFOA or PFOS is without risk and specifically carcinogenic risk." (Reply Br. in Supp. of Defs.' Mot. to File Suppl. Auth., at 2.) The Court cannot identify this testimony in the record at this time, however. The Defendants' other citations to DeWitt's testimony refer to regulatory goals, which are distinct from testimony of safe PFAS exposure levels. Additionally, the Court is aware of deposition testimony in which

14

(DeWitt Report, at 20; *see also id.* at 19 (regarding MCLGs of 0 ppt).) As the Defendants explain, determining particular "safe" and "unsafe" levels of PFAS is not supported by DeWitt's existing testimony. Determining such exposure levels requires establishing a causal link between PFAS and known adverse health effects, including by evaluating such factors as the dose-response relationship. *See In re Deepwater Horizon BELO Cases*, 119 F.4th 937, 945–46 (11th Cir. 2024) (affirming a district court order excluding an expert's causation testimony for failing to "prove" an alleged toxin "[was] harmful above a particular threshold").

The Court agrees with courts in other districts that have excluded DeWitt's testimony for failure to bridge the gap between her risk assessment and her opinion on unsafe PFAS levels. In *Nix*, a North Carolina district court excluded DeWitt's testimony as unhelpful to a jury in determining whether PFAS interfered with the plaintiffs' use and enjoyment of their property. 805 F. Supp. 3d at 656. It reasoned that DeWitt leaped without support to the conclusion that "any non-zero level of PFAS in drinking water is unsafe" and could therefore only opine on adverse health risks associated with PFAS exposure, which the court did not find helpful to a jury on the questions of

DeWitt is asked what an "acceptable level" of PFAS exposure would be and responds by deferring to the acceptable levels prescribed by the EPA, which for PFOS and PFOA are 0 ppt for the maximum contaminant level goal and 4 ppt for the maximum containment level. (Defs.' Mot. to Exclude DeWitt, Ex. 3, at 143:1–14 [Doc. 880-3].)

specific or general causation. *Id.* In *Cape Fear*, the same judge relied on *Nix* to exclude DeWitt's testimony for the same reason. *Cape Fear*, Case Nos. 7:17-CV-195 & 7:17-CV-209, at 40–41. Like her risk assessment in *Nix* and *Cape Fear*, DeWitt's risk assessment here has not done enough to establish specific safe and unsafe PFAS exposure levels. That being said, the Court notes that *Nix* and *Cape Fear* differ from this case in that the Court finds DeWitt's assessment of risk helpful to a jury on the question of the Plaintiffs' requested damages—the necessity and cost of Summerville's PFAS abatement measures.

### 3. Extrapolation of Animal Studies to Humans

The Defendants contend that DeWitt "improperly extrapolated from results of animal studies to assert that PFAS causes human health effects." (Defs.' Mot. to Exclude DeWitt, at 19.) They cite *Siharath v. Sandoz Pharmaceuticals Corp.*, 131 F. Supp. 2d 1347 (N.D. Ga. 2001), for the proposition that "[e]xtrapolations from animal studies to human beings generally are not considered reliable in the absence of a credible scientific explanation of why such extrapolation is warranted." (*Id.* (quoting *Siharath*, 131 F. Supp. 2d at 1366).)

The Court finds DeWitt's testimony reliable to the extent its conclusions on human health consequences are supported by studies on animals. DeWitt sufficiently bridges the analytical gap between PFAS studies involving animals and the application of those studies to humans. First, her report notes

16

that "experimental animal models . . . are accepted models for human health in the toxicological sciences as well as other biomedical sciences." (DeWitt Report, at 28.) It continues: "While humans and animals are not exactly alike, evaluation of toxicity of chemicals in experimental animal models is a cornerstone of human safety evaluation, and findings in animal toxicology studies are applicable to humans." (*Id.* at 25; *see also id.* ("Data from both [toxicological and epidemiological] studies are [ ] used to reach conclusions about the likelihood of adverse effects following exposure to an exogenous agent."). The necessity of animal studies is evident to the Court, as it would be "unethical to test potentially toxic substances on humans." (Pls.' Resp. Br. in Opp'n to Defs.' Mot. to Exclude DeWitt, at 18.)

Second, in the context of PFAS animal studies in particular, DeWitt explains why she found studies of animals applicable to humans. She states that the results of prior animal studies are "highly relevant to human health" because "adverse health outcomes [were] observed in experimental animal studies *in multiple systems/organs/tissues/cells/pathways, in multiple species, across different exposure pathways, occur for a range of PFAS,* and *show agreement with epidemiological findings.*" (*See* DeWitt Report, at 28.) She further explains in her report that toxicologists "frequently rely on experimental animal models . . . to understand adverse health outcomes from chemical exposures . . . in humans." (*Id.* at 25.) Contrary to the Defendants'

17

position, DeWitt has presented "a credible scientific explanation of why such extrapolation is warranted." *See Siharath*, 131 F. Supp. 2d at 1366. At bottom, nothing about DeWitt's testimony suggests that she is "employing in the courtroom" anything other than the "same level of rigor that characterizes the practice of an expert" in her field. *See Kumho*, 526 U.S. at 152.

### 4. Reproducibility

The Defendants take issue with the reproducibility of DeWitt's methodology. (Reply Br. in Supp. of Defs.' Mot. to Exclude DeWitt, at 11 [Doc. 1011].) They argue that her weight-of-the-evidence methodology is not "transparent, testable, [or] reproducible," as she does not expressly assign weight to any evidence or explain similar balancing decisions.

The Court finds DeWitt's weight-of-the-evidence methodology adequately reproduceable for *Daubert* purposes. DeWitt explains her weight-of-the-evidence approach in the following manner: She first "identif[ied] existing narrative reviews, systematic reviews, meta-analyses, health risk assessments, and scientific opinions related to PFAS health effects conducted by national and international government agencies and/or entities." (DeWitt Report, at 15.) She identified other literature as well using "targeted online searches of online databases, including PubMed, Google Scholar, and PubChem" and using specified search terms, then narrowed her review to results that matched certain specified criteria. (*Id.*) She then categorized that

18

literature by quality (e.g., high, medium, or low) and type of review (e.g., systematic reviews and meta-analyses published by national and international government agencies and/or entities, the same published in peer-reviewed scientific literature, primary research articles published in peer-reviewed scientific literature, and other sources). (*Id.* at 16–17.) Lastly, she "appraise[d]" the literature in those groups to come to her ultimate conclusions. (*Id.* at 17.)

While DeWitt's explanation for how she "appraised" each study or group of studies may be light on details, her explanation of her process is sufficient. Moreover, Dewitt testified that other toxicologists and scientists conduct literature reviews as a "routine part" of their job, and she noted that she has been asked to conduct similar reviews as an expert in her field while working for reputable governmental agencies and entities. (Pls.' DeWitt Dep. Excerpt, at 161:16–25; *see* DeWitt Report, at 9–10.) If the goal is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," such can be said in this case. *See Kumho*, 526 U.S. at 152. The Court sees no reason why another expert could not conduct a similar weight-of-the-evidence assessment and come to the same or a different conclusion. Lastly, the Court notes that other courts have found weight-of-the-evidence analyses reliable and admissible. *See, e.g., In re Seroquel Prods. Liab. Litig.*, 2009 WL 3806435, at *5–6 (M.D. Fla. June 23, 2009) (holding that an expert's weight-of-the-evidence

19

methodology was "a reliable process for gathering and assessing the scientific evidence"); *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 795 (3d Cir. 2017) (noting that "weight of the evidence" methodologies are "generally reliable," though "each application is distinct and should be analyzed for reliability"); *Milward v. Acuity Specialty Prods. Grp., Inc.,* 639 F.3d 11, 18 (1st Cir. 2011)("The fact that the role of judgment in the weight of the evidence approach is more readily apparent than it is in other methodologies does not mean that the approach is any less scientific.").

### 5.  PFAS Other Than PFOS and PFOA

The Defendants seek to exclude DeWitt's opinions on PFAS other than PFOS and PFOA as unreliable. They argue that DeWitt presumes without sufficient evidentiary support that "all PFAS are alike in human causality." (Defs.' Mot. to Exclude DeWitt, at 23.) And they further argue that "nearly all of the studies" cited by DeWitt concern only PFOS or PFOA, making it difficult to draw conclusions about the other thousands of chemicals that fall under the category of PFAS. (Id. at 21–22.)

The Court disagrees with the Defendants and finds DeWitt's testimony sufficiently reliable to the extent it opines on PFOS and PFOA, the four other "well-studied" PFAS compounds identified (PFHxS, PFBS, PFNA, and HFPO-DA), and other PFAS more generally. Here, the Defendants merely point out that DeWitt opines on both well-studied and less-studied PFAS, but DeWitt's

20

testimony explaining why she has opined on both is sufficient. First, her most of her opinions are expressly confined to PFOS, PFOA, or the four other "well-studied" PFAS. (*See* DeWitt Report, at 13.) To the extent she opines on PFAS generally, including both well-studied and less-studied PFAS, DeWitt testified that the relatively "understudied" PFAS "are part of the same class of chemicals," "share similar physical-chemical characteristics," and likely have the same health risks due to key consistencies across all available PFAS data. (*Id.* at 14, 28.)

## IV.    Conclusion

For the reasons set forth above, the Court GRANTS in part and DENIES in part Defendants 3M Company, E.I. DuPont de Nemours, The Chemours Company, and Daikin America, Inc.'s Motion to Exclude the Expert Testimony of Jamie DeWitt [Doc. 880]. The Motion is granted as to Jamie DeWitt's testimony that the only safe level of PFAS exposure is zero and denied as to all other relief requested therein. Additionally, the Court GRANTS their Motion for Leave to File Supplementary Authority [Doc. 1068].

SO ORDERED, this ___20th___ day of March, 2026.

THOMAS W. THRASH, JR.
United States District Judge

21