IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

EARL PARRIS, JR.
Individually, and on behalf of a Class of
persons similarly situated,

    Plaintiff,

      v.

    CIVIL ACTION FILE
NO. 4:21-CV-40-TWT

3M COMPANY, et al.,

    Defendants.

## OPINION AND ORDER

This is an environmental contamination action. It is before the Court on

Defendants 3M Company ("3M"), E.I. du Pont de Nemours and Company ("du

Pont"), the Chemours Company ("Chemours"), and Daikin America, Inc.'s

("Daikin's") Motion to Exclude Opinions of Steven Amter [Doc. 863]. For the

reasons stated below, the Defendants' Motion to Exclude Opinions of Steven

Amter [Doc. 863] is GRANTED in part and DENIED in part.

### I.    Background

This case arises out of the contamination of surface waters and drinking

water in Chattooga County, Georgia, with per- and polyfluoroalkyl substances

known as "PFAS." (2d Am. Compl. ¶ 1 [Doc. 280]). The facts of this case are

well known to the parties by this point, and the Court will not belabor them

here. In essence, Plaintiff sEarl Parris, Jr., alleges that the Defendants have

contaminated his water with PFAS. Parris is a resident of Summerville, Georgia, who receives running, potable water to his home from the Summerville Public Works and Utilities Department. (*Id.* ¶ 21.) The City of Summerville—which has intervened in this case—uses Raccoon Creek, a tributary of the Chattooga River, as the main source of its municipal water supply. (*Id.*) Parris alleges that Raccoon Creek and—consequently, his household water—have been contaminated with PFAS by the Defendants. (*Id.*) At present, the Defendants jointly move to exclude the opinion testimony of the Plaintiffs' expert, Steven Amter.

Amter is the President and Senior Researcher at Disposal Safety Incorporated ("Disposal Safety") in Washington, DC. (Br. in Supp. of Defs.' Mot. to Exclude Testimony of Steven Amter, Ex. A ("Amter Expert Report"), at 1 [Doc. 866-1]). Disposal Safety is a corporation that specializes in evaluating past, current, and the potential for groundwater and soil contamination by hazardous chemical and radioactive wastes. (*Id.* at 2). In Amter's work at Disposal Safety, he has analyzed and reviewed hundreds of sites contaminated by chemical and radioactive wastes. (*Id.*). He has also conducted evaluations of more than a dozen Superfund investigations and remediations. (*Id.*). Additionally, he has designed groundwater flow models and systems to monitor and sample groundwater, soil, and air. (*Id.*). Amter has been hired by the U.S. Department of Justice to analyze, coordinate, and negotiate the technical

aspects of environmental cases involving a large chemical company and an electronics and circuit board manufacturer. (*Id.*).

Amter graduated from the State University of New York as Departmental Scholar of the Geology Program with a Bachelor of Science degree in 1980. (*Id.* at 1). In 1987, Amter was awarded a Master of Science degree in Hydrology and Water Resources, magna cum laude, from the University of Arizona, with a concentration in contaminant hydrogeology and unsaturated flow. (*Id.*). While attending the University of Arizona, he conducted research on a new method of sampling contaminated soil water from the unsaturated zone under a grant provided by the U.S. Nuclear Regulatory Commission, which later became his thesis topic. (*Id.*).

Since 1980, Amter has worked for the government and in private consulting. (*Id.*). His work has encompassed analyzing contaminated sites, companies' operations, management decisions, and waste disposal practices for a variety of commercial, non-profit, legal, and governmental clients. From 1980 through 1983, Amter was an environmental hydrogeologist working for the Environmental Protection Bureau of the New York State Law Department. As part of his job, he participated in, designed, and sometimes conducted environmental, soil, and groundwater monitoring investigations at a variety of sites. (*Id.*). Amter further researched the past operations and waste disposal practices of companies and negotiated on behalf of the New York Environmental Protection Bureau with companies conducting investigations

3

and clean-ups at their sites. (*Id.*). Finally, he inspected sites and interviewed past and present employees about operations and waste disposal practices. (*Id.*).

From 1986, Amter has worked as a consultant to a variety of clients. (*Id.*). He worked part time as a hydrogeologist for a groundwater consulting company in Arizona. (*Id.*). There, his work involved constructing and monitoring well networks, collecting groundwater samples contaminated with chemicals, and testing the properties of the aquifer. (*Id.*). Since the early 1990s, Amter conducted research on the history of groundwater contamination. (*Id.*). Significant portions of this research involved contamination arising out of heavy metals, perchlorates, and chlorinated, fluorinated, or halogenated hydrocarbons, and the past knowledge, practices, and standards in connection with the use, disposal, and contamination by such chemicals. (*Id.*). Amter has also published peer-reviewed journal articles and a peer-reviewed book on these subjects. (*Id.*).

Amter is no stranger to the courts. Since 1993, he has testified as an expert witness eleven times across nine states in both federal and state court. (*Id.* at 3). Amter has also offered expert deposition testimony in more than 20 other cases. (*Id.*). He has been qualified as an expert by state in federal courts (1) in hydrogeology and the movement of contaminants through various media, (2) on historic operations at industrial sites, and on the history of pollution and (3) the standard of care in preventing or responding to environmental

4

pollution. (*Id.*). These general topics have touched on (1) the movement of contaminants through soil, groundwater, soil gas, and building structures, (2) chlorinated, fluorinated, and halogenated solvents and chemicals, PFAS, dioxin, and heavy metals, (3) waste handling and waste disposal practices, and (4) the standard of care with products and waste management to prevent environmental contamination in the chemical, petroleum, aerospace, electronics, transformer, metal fabrication, and smelting industries. (*Id.*).

## II.    Legal Standard

"Under Federal Rule of Evidence 702, expert testimony is admissible if (1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014) (citation modified). Courts perform a "gatekeeping role" in excluding expert testimony that does not satisfy these qualification, reliability, and helpfulness requirements. *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "This gatekeeping role, however, is not intended to supplant the adversary system or the role of the jury" in determining the persuasiveness of an expert's testimony. *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (citation modified). Rather, the goal is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

"The proponent of the expert testimony always bears the burden" of establishing qualification, reliability, and helpfulness. *Id.* (citation modified). An expert's qualification may be based on "knowledge, skill, experience, training, or education." *Id.* at 1261 (emphasis omitted) (quoting Fed. R. Evid. 702). Regarding reliability, a variety of factors may be relevant, but, "in *all* cases," the Court must find the testimony "properly grounded, well-reasoned, and not speculative before it can be admitted." *Id.* at 1262 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). The focus of the reliability inquiry is on the expert's "principles and methodology," rather than his or her ultimate conclusions. *D.H. Pace Co. v. Aaron Overhead Door Atlanta LLC*, 526 F. Supp. 3d 1360, 1367 (N.D. Ga. 2021) (quoting *Daubert*, 509 U.S. at 595). Lastly, the helpfulness of an expert's opinions to a trier of fact speaks "primarily to relevance," which is a "liberal" standard. *Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11th Cir. 2016) (citations omitted). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (citation omitted).

## III.    Discussion

The Defendants argue for the exclusion of Amter's testimony for several reasons. First, they argue that Amter cannot testify to the intent, motives, or state of mind of a corporation. (*See* Br. in Supp. of Defs.' Mot. to Exclude Testimony of Steven Amter, at 10-13 [Doc. 863]). Second, they argue that Amter is not qualified to testify about corporate history. (*See id.* at 14-20). Third, the Defendants argue that Amter's opinions regarding "responsibilities" and "duties" are inadmissible legal conclusions and should therefore be excluded. (*See id.* at 20-23). Finally, the Defendants argue that Amter is not qualified to offer testimony on subjects like (1) the interpretation and analysis of blood tests, (2) chemistry and analytical chemistry, and (3) sufficiency of the Material Safety Data Sheets (the "MSDS"). The Court addresses each argument in turn.

## A. State of Mind

Testimony proffered by an expert witness that speaks to the state of mind of a person or entity is inadmissible only if such testimony invades the province of a jury. *See Omar v. Babcock*, 177 F. App'x 59, 63 n.5 (11th Cir. 2006) (affirming a district court's determination that an expert witness's testimony regarding the state of mind of another person is inadmissible); *Giusto v. Int'l Paper Co.*, 2021 WL 3603374, at *6-7 (N.D. Ga. Aug. 13, 2021) (holding certain expert testimony inadmissible because it offered speculation as to an individual's state of mind prior to his fall); *AU New Haven, LLC v. YKK Corp.*, 2019 WL 1254763, at *13 (S.D.N.Y. Mar. 19, 2019) ("Because

science has not invented a way to read minds, inferences about the intent or motive of parties or others lie outside the bounds of expert testimony. Instead, juries must answer questions of intent with the lay tools that they always have." (citation modified)).

Courts balance a fine line in allowing tangential state-of-mind testimony where it does not invade the province of the jury. Where a properly qualified expert testifies to what information was available to a corporation, such testimony will not be considered inadmissible. *See Burton v. American Cyanamid*, 2018 WL 3954858, at *6 (E.D. Wis. Aug. 16, 2018) (finding expert testimony by a historian on the knowledge of pigment manufacturers admissible even when the expert's report stated that the manufacturers "should have known" certain information because it was within the scope of a historian's expertise to draw inferences about historical actors' knowledge and beliefs); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 479-80 (S.D.N.Y. 2016) (excluding expert testimony where it directly opines on an employee's state of mind but allowing testimony opining on what the corporation knew based on what information was in their possession or was clearly indicated in public documents). Indeed, in a similar proceeding, a federal court permitted a public health historian to testify about what was knowable at the relevant times about the dangers of polychlorinated biphenyl chemicals. *See City of Seattle v. Monsanto Co.*, 2023 WL 4014294, at *8-9 (W.D. Wash. Jun. 15, 2023).

8

Amter's report contains certain quasi-state-of-mind testimony. His report finds that the Defendants "knew or should have known" (1) that PFAS chemicals were incapable of adequate treatment or disposal by conventional methods or by any method employed by Trion, Georgia, (2) that PFAS chemicals were very likely entering the environment, (3) that PFAS chemicals were capable of polluting the environment and human body, (4) that they were making, supplying, using, or disposing of PFAS chemicals, (5) that the PFAS chemicals contained within their products were incapable of inadequate treatment or disposal by conventional methods or by those employed by Trion, Georgia, (6) that Trion allowed inadequately treated wastewater to be discharged to its wastewater treatment plant and (7) that PFAS chemicals have detrimental effects to human health and the environment and were present in the streams and rivers of North Georgia. (*See* Amter Expert Report at 7-8). Furthermore, Amter's report finds that Defendants 3M, du Pont, Chemours, Huntsman, and Daikin individually had knowledge or should have had knowledge of certain information relevant to the litigation. (*See id.* at 10-23).

The question, then, is whether such testimony is admissible at trial. The case law demonstrates that three elements must be shown for quasi-state-of-mind testimony to be admitted. First, an expert must be qualified to "draw inferences about [the individual's] knowledge and beliefs based on evidence about the availability of information at a given [ ] moment in combination with

9

contextual knowledge of that moment's general practices and mechanisms regarding information dissemination." *City of Seattle*, 2023 WL 4014294, at \*9 (quoting *Burton*, 2018 WL 3054858, at \*6 (quotation marks omitted)); *see also Kelley v. C.R. Bard, Inc.*, 644 F. Supp. 3d 1316, 1343 (N.D. Ga. 2022) (holding that certain statements in an expert report were not state of mind testimony, in part, because the expert had "decades of experience working with mesh slings"). Second, the testimony given by the expert must be in the scope of the expert's knowledge. *See Mirena IUD Prods.*, 169 F. Supp. 3d at 479-80. Third, the testimony must assist the jury in their role as the trier of fact and must not make determinations for the jury. *See Omar*, 177 F. App'x at 63 n.5; *see also Kelley*, 644 F. Supp. 3d at 1341 (holding that certain statements in an expert report were not state of mind testimony because the conclusions speak generally to the mesh devices' developments instead of the defendant's mental state).

To the first element, "experts may be qualified in various ways." *Frazier*, 387 F.3d at 1260. "While scientific training or education may provide possible means to qualify . . . expert status may be based on 'knowledge, skill, *experience*, training, or education.'" *Id.* at 1260-61 (quoting Fed. R. Evid. 702 (emphasis in original)). When looking to whether an expert is qualified to testify to a certain subject area, "courts generally look to evidence of the witness's education and experience and ask whether the subject matter of the witness's proposed testimony is sufficiently within the expert's expertise." *In*

10

*re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 711 F. Supp. 2d 1348, 1367 (M.D. Ga. 2010) (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)).

The Plaintiffs offer Amter as an expert on the history of corporate knowledge related to environmental contamination and prevailing chemical industry standards. (Pls.' Br. in Opp'n to Defs.' Mot. to Exclude Testimony of Steven Amter, at 7 [Doc. 974]). The Plaintiffs argue that Amter's testimony on what the Defendants knew or should have known amounts to "evidence-based historical analysis" and is not "speculation." (*Id.* at 20).

The Defendants disagree. They argue that Amter has (1) never worked for a company that manufactures PFAS compounds or other chemicals, (2) never worked for the Environmental Protection Agency, the Agency for Toxic Substances and Disease Registry, the National Institute for Occupational Safety and Health, the Occupational Safety and Health Administration, or any Georgia governmental agency, (3) never worked in any capacity where he had responsibility for Toxic Substances Control Act compliance or reporting, (4) never worked as an industrial hygienist and has never advised a company on industrial hygiene, and (5) no non-litigation PFAS experience. (Br. in Supp. of Defs.' Mot. to Exclude Testimony of Steven Amter, at 6-7). Furthermore, the Defendants also point to the fact that Amter was never "trained in the interpretation and synthesis of historical documents." (Reply Br. in Supp. of Defs.' Mot. to Exclude Testimony of Steven Amter, at 9 [Doc. 1010]).

11

The Court finds that Amter is sufficiently qualified as an expert on the history of corporate knowledge related to environmental contamination and prevailing chemical industry standards. As another court put it, "Mr. Amter has spent more than three decades working in both the private and public sectors as a scientist and investigator of environmental contamination, including some of the largest projects in American history." *In re E.I. du Pont de Nemours and Co. C-8 Pers. Inj. Litig.*, 345 F. Supp. 3d 897, 920 (S.D. Ohio 2015); *see Bd. Of Cnty. Comm'rs of Cnty. of Kay, Okla. v. Freeport-McMoran Copper & Gold, Inc.*, 2013 WL 7802172, at *1 (W.D. Okla. Sep. 9, 2013) (finding Amter qualified in the field of environmental history).

But the Defendants are correct to argue that the question of whether Amter is qualified to testify in the instant action is a question for this Court. (*See* Reply Br. in Supp. of Defs.' Mot. to Exclude Testimony of Steven Amter, at 2-3). They are also correct to argue that solely experience developed as a professional expert witness is insufficient to qualify as an expert and that only experience obtained in a practical context is relevant. (*See id.* at 3 (citing *Frushtick v. FeroExpress Inc.*, 2022 WL 824239, at *4 (N.D. Ga. Mar. 18, 2022))). Nonetheless, the Court concludes that Amter is qualified.

Ignoring all litigation experience, Amter has significant work and research experience related to groundwater and soil chemical contamination. (*See* Amter Expert Report, at 1-3). For nearly four decades, Amter has worked at Disposal Safety, where he performs both scientific and historical research

at numerous sites. (*Id.* at 2). He has completed in-depth evaluations for more than a dozen Superfund investigations and remediations conducting similar research. (*Id.*). Amter is also a published author on the topic of environmental history. (*Id.*). The Court acknowledges that Amter lacks any educational training in conducting a historical analysis. But surely decades of practical experience outweigh the need for formal training. While Amter has not directly worked within the chemical industry specifically, Amter has worked closely with the industry throughout his career. *See Kelley*, 644 F. Supp. 3d at 1343 ("Knowledge of an industry's business practices can be 'gleaned from years of working within the industry and with its professionals.'" (quoting *United States v. Jennings*, 599 F.3d 1241, 1249 (11th Cir. 2010))).

The remaining points the Defendants raise against Amter's qualification are best suited for cross-examination at trial. *See Humleker v. Boston Sci. Corp.*, 2020 WL 6870852, at *4 (M.D. Fla. Oct. 2, 2020) ("Any gaps in Dr. Rosenzweig's knowledge go to his credibility, not his admissibility as an expert." (citation modified)); *Bd. Of Cnty. Comm'rs of Cnty. of Kay, Okla.*, 2013 WL 7802172, at *2 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." (citation modified)). Accordingly, Amter is qualified as a general expert on the history of corporate knowledge related to environmental contamination and prevailing chemical industry standards.

Turning to the second element, the Court asks whether any testimony provided by the expert falls outside the scope of the expert's qualifications. After all, "[a]n expert in one field cannot express an opinion relying on data that requires expertise in another field." *City of Seattle*, 2023 WL 4014294, at *8. Courts generally will not admit any testimony that speaks to the state of mind of a defendant that lacks any basis in the expert's qualifications. *See id.* at *8-10 (admitting testimony from a historian about what was knowable during the relevant times, but disallowing testimony about what the defendant could have done); *Mirena IUD Prods.*, 169 F. Supp. 3d at 466 (admitting testimony where the expert opined on what the reviewed documents mean but rejecting testimony where the expert opined on what the defendant would have done).

Reviewing Amter's report, all of his testimony falls within the scope of his qualifications. Amter reviewed documents provided by the Defendants, along with scientific, historical, and industrial literature to make specific conclusions about what the Defendants knew or should have known based on his personal expertise. (*See* Amter Expert Report, at 7). The conclusions provide commentary on information available to the Defendants at the relevant times of the injury as to the PFAS chemicals. *See Kelley*, 644 F. Supp. 3d at 1341; *Burton*, 2018 WL 3954858, at *6 ; *City of Seattle*, 2023 WL 4014294, at *9 ("Dr. Markowitz is not directly testifying as to Monsanto's intent, motive, or state of mind . . . [his] testimony instead addresses what was knowable at

relevant times in this case"). Thus, Amter's testimony falls within its proper scope.

Turning to the third element, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262-63. "[R]elevant testimony from a qualified expert is admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988) (citations omitted). "Speculative state of mind statements are not admissible as expert testimony because they are legal conclusions as to another person's state of mind and thus are not of the type of evidence that a jury needs the assistance of an expert to understand." *Kelley*, 644 F. Supp. 3d at 1343 (quoting *Omar*, 177 F. App'x at 63 n.6 (citation modified)). But testimony arising out of an expert's knowledge of an industry's business practices is admissible. *See id.* Applying these standards, the court in *Kelley* excluded expert testimony purporting that an individual "absolutely" knew certain information as state-of-mind testimony. *Id.* at 1342-43.

Here, all of Amter's opinions are purported to be based on his knowledge of the chemical industry and information available to the Defendants. (*See* Amter Expert Report at 7). Indeed, courts have found that testimony from a

15

historian finding that a defendant knew or should have known certain information based on the information available to them was not inadmissible state-of-mind testimony. *See, e.g., Burton*, 2018 WL 3954858, at *3, 6 ("[R]ather, I take the phrase as indicating an opinion that [ ] is reasonable to infer from the historical record that the defendants had actual knowledge of the information.").

But the Court takes issue with the statements by Amter stating that individual Defendants unequivocally "knew" (without the qualifier of "or should have known") certain information. Such statements cannot be admissible because "science has not invented a way to read minds." *AU New Haven*, 2019 WL 1254763, at *13. Amter effectively offers "legal conclusions" that supplant the role of the trier of fact and are not the "type of evidence that a jury needs the assistance of an expert to understand." *Kelley*, 644 F. Supp. 3d at 1343 (quoting *Omar*, 177 F. App'x at 63 n.6 (citation modified)). Thus, the Court excludes all state-of-mind testimony from Amter's expert report that claim, without any qualifiers, that the Defendants "knew" certain information or any other testimony that provides conclusive commentary on what the Defendants could have done or could not have done.

## B. Corporate History

The Defendants next argue for the exclusion of Amter's testimony on corporate history. (*See* Br. in Supp. of Defs.' Mot. to Exclude Testimony of Steven Amter, at 14-20). First, the Defendants argue that Amter's testimony

16

amounts to a narration of the Defendants' corporate documents. (*See id.* at 14-17). It is true that "[a]s a general matter, it is inappropriate for experts to become a vehicle for factual narrative." *Pledger v. Reliance Tr. Co.*, 2019 WL 4439606, at \*12 (N.D. Ga. Feb. 25, 2019) (citation modified). But "as opposed to providing a mere factual narrative, an expert is allowed to articulate the factual underpinning upon which he bases his opinion." *Id.* (citation modified). "[T]he synthesizing of voluminous historical texts is the type of expertise courts regularly acknowledge historians possess." *City of Seattle*, 2023 WL 4014294, at \*8. The Defendants' argument fails on its face because, as discussed earlier, Amter's role as a historian permits him to make inferences on what the Defendants should have known. Some of those inferences remain after the Court's exclusion. Any discussion of the facts underlying his expert opinion is accordingly admissible.

Second, the Defendants argue that the underlying methodology used by Amter in his report is unreliable. (*See* Br. in Supp. of Defs.' Mot. to Exclude Testimony of Steven Amter, at 17-20). In coming to this conclusion, the Defendants mechanically apply the *Daubert* factors. (*See id.*). This application is erroneous. "The trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Chapman*, 766 F.3d at 1305 (quoting *Kumho Tire Co.*, 526 U.S. at 152 (citation modified)). "As gatekeeper for the expert evidence presented to the jury, the judge must do a preliminary assessment of whether

17

the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 1306 (citation modified). "It is proper and necessary for the trial judge to focus on the reliability of a proffered expert's sources and methods." *Id.* (citation modified).

But "in non-scientific cases such as this one, 'the relevant reliability concerns may focus on an expert's personal knowledge or experience.'" *Ma v. Equifax Info. Servs., LLC*, 288 F. Supp. 3d 1360, 1366 (N.D. Ga. 2017) (quoting *Kumho Tire Co.*, 526 U.S. at 150). "Courts have found that gathering and analyzing multiple sources to reach conclusions about historical facts is an accepted historical methodology for expert witnesses." *Fair Fight Action, Inc. v. Raffensperger*, 2020 WL 13561776, at *6 (N.D. Ga. Dec. 4, 2020). Indeed, courts generally depart from the mechanical application of every *Daubert* factor in assessing the reliability of non-scientific expert witnesses. *See, e.g., id.* at *5-7; *Ma*, 288 F. Supp. 3d at 1366-67; *Germon v. Sun Path Prods. Inc.*, 2025 WL 3567284, at *3 (N.D. Ga. Aug. 6, 2025); *In re Terrorist Attacks on September 11, 2001*, 2023 WL 3116763, at *2 (S.D.N.Y. Apr. 27, 2023) ("But these [*Daubert*] factors are poorly suited to terrorism experts, who are often security experts, social scientists, accountants, or *historians*." (emphasis added)).

Reviewing Amter's report, he delineates five general steps he took when arriving at his conclusions. First, he "examine[s] a company's corporate

history, technical sophistication, and environmental knowledge." (Amter Expert Report at 5). Second, he "construct[s] an environmental historical narrative that is relevant to the case at hand." (*Id.*). Third, he "perform[s] an analysis of a company's potential responsibilities with respect to relevant prevailing standards that may apply." (*Id.*). Fourth, he "construct[s] a historical narrative and analysis of specific company knowledge and actions based on case-specific documents," giving greater weight to evidence and documents that are primary sources, speak directly to the topic of interest, are the kind of historical documents that would routinely be created in the field under scrutiny, are logically consistent with other evidence and documents, and lead to historical narratives that are supported by multiple lines of evidence and lead to conclusions and opinions that are coherent and reasonable. (*Id.* at 6). Fifth, he "perform[s] an analysis of a company's potential responsibilities with respect to relevant prevailing standards that may apply." (*Id.* at 6). Amter states that the procedure he used was "the standard method of constructing a two-pronged narrative of the [Defendants'] knowledge and decisions." (*Id.* at 4).

These steps appear consistent to the process approved by the court in *Fair Fight Action* as reliable. 2020 WL 13561776, at *6. The court there concluded that "historians may reasonably rely on a combination of primary and secondary sources while maintaining sound methodology." *Id.* Further, the

19

court gave weight to the expert's statement that the methodology used was standard for historians and political scientists in his field of expertise." *Id.*

Just like the court in *Fair Fight Action* ultimately concluded that the expert's methods were reliable, the Court does so here as well. Throughout the expert report, Amter identifies key documents used in coming to his conclusion. While Amter may not provide a full list of sources, the sufficiency of the factual underpinnings of an expert witness's report is best addressed in cross-examination, not here for exclusion. *See id.* at *7; *Bd. Of Cnty. Comm'rs of Cnty. of Kay, Okla.*, 2013 WL 7802172, at *2. Thus, the Court will not exclude Amter's testimony on this basis.

## C. Responsibilities and Duties

As discussed earlier, Amter's report discusses the standards of care applicable to the companies he analyzes. (*See* Amter Expert Report at 5-6). The parties dispute whether such discussion on the standards of care amount to legal or factual conclusions. (*See* Br. in Supp. of Defs.' Mot. to Exclude Testimony of Steven Amter, at 20-23; Pls.' Br. in Opp'n to Defs.' Mot. to Exclude Testimony of Steven Amter, at 21-23). "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). But the question of whether such testimony should be excluded is a difficult one. *See Haney v. Mizell Mem'l Hosp.*, 744 F.2d 1467, 1473 (11th Cir. 1984). Ultimately, the key difference between an impermissible legal conclusion and a permissible factual conclusion on the issue of standard of care is one of breadth. *See Stiefel v.*

20

*Malone*, 2021 WL 426217, at \*8-10 (N.D. Ala. Feb. 8, 2021) (quoting *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983)). While conclusory statements in a report without explanation will likely be legal conclusions, in-depth reasoning will be determined to be a factual conclusion. *See id.*

Here, Amter's report makes several statements pertaining to the "responsibilities" and "duties" of the Defendants. While such statements alone would amount to legal conclusions, Amter's statements are based off ample reasoning and reputable sources. Not only does Amter explain in his report that his methods involve the application of the prevailing standards of a certain industry, but he also goes into sufficient detail as to where those standards are derived from. (*See* Amter Expert Report at 5-6, 27-41, 112-14); *cf. In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 557-58 (S.D.N.Y. 2004) (holding standard of care testimony by a doctor inadmissible, in part, because the doctor's testimony lacked foundation and were instead "thinly-disguised legal or quasi-legal principles"). Such sources arise out of guidance issued by national organizations or by the company itself. Amter is qualified to offer these factual opinions in his role as a historian.

But Amter cannot conclusively state that such organizations establish the applicable standard of care for the chemical industry. None of the organizations cited by Amter within his report carry any apparent force of law or regulation, nor does it conclusively establish the applicable standard of care. *See Stiefel*, 2021 WL 426217, at \*11 (holding, in a trucking accident case, that

21

an expert may not be able to testify that the Model Commercial Driver License Manual or the Federal Motor Carrier Safety Regulations establish the standard of care for truckers because the sources do not carry the force of law or regulation and that neither establishes the standard of care for truckers). Any assertion that such organizations conclusively establish the standard of care would encroach upon the jury's role as trier of fact. Accordingly, Amter may testify to whether practices complied with the standard of care as referenced within his report, but he cannot testify that guidance issued from such organizations conclusively establish the standard of care within the chemical industry.

### D. Additional Qualification Challenges

Finally, the Defendants make three brief arguments related to Amter's qualifications to testify to certain areas of expertise. First, they argue that Amter cannot opine on certain blood studies in the late twentieth century and apply them to the Defendants because Amter has no "medical, toxicological, or epidemiological background or experience." (Br. in Supp. of Defs.' Mot. to Exclude Testimony of Steven Amter, at 24). Second, they argue that Amter cannot testify to (1) "the chemistry on which [the] Defendants' products are based;" (2) "characterizations and descriptions of the chemical processes and reactions by which [the] Defendants' products are produced;" (3) "predictions regarding the properties of chemicals under certain conditions," and (4) "the makeup and nature of chemicals" because Amter lacks a degree in chemistry,

22

chemical engineering, or analytical chemistry." (*Id.* at 24-25). Third, they argue that Amter cannot testify to the sufficiency of the MSDS used by the Defendants because "Amter has never authored an MSDS[,] has never been employed by a chemical manufacturer[,] and lacks expertise and training in industrial hygiene and toxicology." (*Id.* at 25).

The Court disagrees. Amter's extensive interdisciplinary work experience, research, and education more than qualify him to testify to such matters before the Court. To the extent Amter has any deficiencies in his knowledge on these subjects, the Defendants may freely cross-examine his testimony or provide testimony of their own contradicting the findings of Amter. Accordingly, the Court will not exclude Amter's testimony on this basis.

## IV.    Conclusion

For the foregoing reasons, the Defendants' Motion to Exclude Opinions of Steven Amter [Doc. 863] is GRANTED in part and DENIED in part.

SO ORDERED, this  20th  day of March, 2026.

THOMAS W. THRASH, JR.
United States District Judge

23