IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

EARL PARRIS, JR.
Individually, and on behalf of a Class of
persons similarly situated,

    Plaintiff,

      v.

3M COMPANY, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 4:21-CV-40-TWT

## OPINION AND ORDER

This is an action under the Clean Water Act. It is before the Court on

Defendant 3M Company's ("3M") Motion to Exclude the Expert Testimony of

Erica DiFilippo [Doc. 872], Defendant Daikin America, Inc. ("Daikin"), E.I.

DuPont de Nemours and Company ("DuPont"), and The Chemours Company's

("Chemours") Motion to Exclude the Expert Testimony of Erica DiFilippo[1]

[Doc. 894]. For the following reasons, the Court DENIES Defendant 3M's

Motion to Exclude the Expert Testimony of Erica DiFilippo [Doc. 872] and

GRANTS in part and DENIES in part Defendant Daikin, DuPont, and

Chemours's Motion to Exclude the Expert Testimony of Erica DiFilippo

---

[1] Upon motion, the Court authorized DuPont and Chemours to join Daikin's Motion to Exclude the Expert Testimony of Erica DiFilippo. (*See generally* Order, Mar. 2, 2026, [Doc. 1074].) The Court will nonetheless refer to that Motion as "Defendant Daikin's Motion to Exclude DiFilippo" to easily distinguish it from "Defendant 3M's Motion to Exclude DiFilippo."

[Doc. 894].

## I.   Background

This case arises out of the contamination of surface waters and drinking water in Chattooga County, Georgia, with per- and polyfluoroalkyl substances known as "PFAS." (2d Am. Compl. ¶ 1 [Doc. 280].) The facts of this case are well known to the parties by this point, so the Court will not belabor them here. In essence, Plaintiff Earl Parris, Jr., alleges that the Defendants have contaminated his city's water supply and thus his household water with PFAS. Parris is a resident of Summerville, Georgia, who receives running, potable water to his home from the Summerville Public Works and Utilities Department. (*Id.* ¶ 21.) The City of Summerville, which has intervened in this case, uses Raccoon Creek as the main source of its municipal water supply. (*Id.*) The Defendants are the following companies, which allegedly manufactured and supplied the PFAS discharged into Raccoon Creek: 3M Company ("3M"), Daikin America, Inc., E.I. du Pont de Nemours and Company, and The Chemours Company. At present, the Defendants move to exclude the testimony of expert witness Erica DiFilippo.

## II.   Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under that rule, "expert testimony is admissible if (1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's

2

methodology is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014) (citation modified). Courts perform a "gatekeeping role" in excluding expert testimony that does not satisfy these qualification, reliability, and helpfulness requirements. *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "This gatekeeping role, however, is not intended to supplant the adversary system or the role of the jury" in determining the persuasiveness of an expert's testimony. *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (citation modified). Rather, the goal is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "The proponent of the expert testimony always bears the burden" of establishing qualification, reliability, and helpfulness. *Id.* (citation modified).

## A. Qualifications

Rule 702 provides that a witness may be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. When assessing a witness's qualifications, the district court must focus on "the

3

matter to which the expert seeks to testify—i.e., 'to the task at hand.'" *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021) (quoting *Daubert*, 509 U.S. at 597). While a witness may be "well-trained, highly educated, and experienced" with an "impressive professional track record," Rule 702 contemplates "a more thorough analysis of whether [the witness] is qualified and competent to testify as an expert *as to the subject matter of his proposed testimony.*" *Jack v. Glaxo Wellcome, Inc.*, 239 F. Supp. 2d 1308, 1315–16 (N.D. Ga. 2002) (emphasis added). "It is for that reason that 'expertise in one field does not qualify a witness to testify about others.'" *Moore*, 995 F.3d at 854 (quoting *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1368 (11th Cir. 2014)). The question whether a proposed witness is qualified to testify as an expert rests within the district court's discretion. *Jack*, 239 F. Supp. 2d at 1314 (citing *Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976)).

## B. Reliability

In determining whether an expert witness's testimony is reliable under Rule 702, the Court must evaluate "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. *Daubert* sets forth a number of factors relevant to this inquiry, including (1) whether an expert's theory or technique can be tested;

(2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of a scientific technique; and (4) whether a known technique has achieved widespread acceptance in the scientific community. *Id.* at 593–94. These factors are not intended to be a "definitive checklist," *id.* at 593; rather, "the law grants the trial judge broad latitude to determine . . . whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case." *Kumho Tire Co., Ltd.*, 526 U.S. at 153.

Ultimately, the district court's objective under *Daubert* is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. To this end, a district court may not admit opinions that "[are] connected to existing data only by the *ipse dixit* of the expert" or leave "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## C. Helpfulness

An expert's opinions must be helpful to a trier of fact. Fed. R. Evid. 702(a). The helpfulness of an expert's opinions to a trier of fact speaks "primarily to relevance," which is a "liberal" standard. *Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11th Cir. 2016) (citations omitted). "Expert testimony which does not relate to any issue in the case is not relevant and,

ergo, non-helpful." *Daubert*, 509 U.S. at 591 (citation omitted). Even if the testimony is relevant, however, it must "concern[ ] matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. Expert testimony "generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262–63.

### III.   Discussion

Erica DiFilippo holds a Ph.D. in hydrology and water resources and "ha[s] over fifteen years of experience addressing the fate and transport of organic and inorganic chemicals in the environment." (Def. 3M's Mot. to Exclude DiFilippo, Ex. A ("DiFilippo Report"),[2] at 8 [Doc. 900-2].) She "ha[s] conducted numerous studies of groundwater transport, statistical geochemical analysis, . . . and fate and transport of PFAS." (*Id.*) As a member of the Interstate Technology Regulatory Council's PFAS team and the National Groundwater Association's PFAS working group, she has studied the physical and chemical properties of PFAS and PFAS forensic techniques. (*Id.*) DiFilippo's report offers seven opinions[3] related to the use of PFAS in the textile mill operated by Mount Vernon Mills ("MVM") in Trion, Georgia, the transport and fate of the PFAS from the mill to Raccoon Creek, and the studies

---

[2] The pagination of this exhibit reflects the PDF pagination.

[3] DiFilippo's report technically lists eleven opinions, but Opinions 8–11 appear to be duplicates of Opinions 2–3, 6–7. (*See* DiFilippo Report, at 10–11.)

the Defendants conducted demonstrating their knowledge of these events. (*Id.* at 10.)

## A. Degradation Time and Pathways

According to DiFilippo, MVM used "side-chain fluorinated polymers" in its textile manufacturing, which "degrade with half-lives between 10 to 100 years and produce PFOS and PFOA."[4] (DiFilippo Report, at 24, 31–32.) In other words, it takes 10 to 100 years for half of these polymer products to degrade into PFOS and PFOA, which are types of PFAS. (*See* Def. Daikin's Mot. to Exclude DiFilippo, at 2 [Doc. 895-1].) With respect to 3M's "Scotchgard FC-248" product in particular, DiFilippo further opines that it will degrade over "decades," first into components such as n-MeFOSAA and then finally into PFOS. (*See* Def. 3M's Mot. to Exclude DiFilippo, Ex. E ("3M's 2025 DiFilippo Dep. Excerpts"), at 206:4–25 [Doc. 872-6]; DiFilippo Report, at 22, 50.)

The Defendants challenge the degradation time offered by DiFilippo as unreliable and unsupported. (Def. Daikin's Mot. to Exclude DiFilippo, at 2; Def. 3M's Mot. to Exclude DiFilippo, at 4 [Doc. 900-1].) They point out that DiFilippo herself acknowledged that degradation time depends on a variety of factors (e.g., pH, temperature, soil composition, polymer chemistry) yet she did not consider any of those factors with respect to the Defendants' specific

---

[4] PFOS is short for perfluorooctanesulfonic acid, and PFOA is short for perfluorooctanoic acid.

7

products and Raccoon Creek. (Def. Daikin's Mot. to Exclude DiFilippo, at 3–5; Def. 3M's Mot. to Exclude DiFilippo, at 4–6.) Additionally, 3M takes issue with the degradation pathway DiFilippo theorizes for Scotchgard FC-248, arguing that it is contravened by the absence of N-MeFOSAA in any existing surface water samples. (Def. 3M's Mot. to Exclude DiFilippo, at 6–13.)

The Court disagrees with the Defendants. The degradation time identified in DiFilippo's report is based on a reliable methodology and supported by sufficient facts. DiFilippo analyzed a plethora of peer-reviewed studies on the degradation of side-chain fluorinated polymers, including their degradation in biosolids and under a variety of conditions. (DiFilippo Report, at 24–30.) She also specifically reviewed studies of 8:2 fluorotelomer alcohol (8:2 FTOH) and n-methyl perfluorooctane sulfonamido ethylacrylate (n-MeFOSEA), which she opines are directly relevant to the chemicals produced by Daikin and 3M, respectively. (*Id.* at 22–30.) From these studies, DiFilippo found that "the majority of estimates place the half-life around 100 years," before going on to estimate a half-life of 10 to 100 years for the side-chain fluorinated polymers at issue here. (*Id.* at 31–32.) The Defendants do not challenge the findings of these studies.

The Defendants instead fault DiFilippo for not testing the specific environmental conditions in Raccoon Creek, but they have not shown that her failure to do so is contrary to standard industry practice or otherwise renders

her opinions unreliable. *See Kumho*, 526 U.S. at 152 (emphasizing *Daubert*'s goal of ensuring "that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). DiFilippo explains that her reliance on experiments using modeling and batch studies is "common practice" in the environmental fate-and-transport field and "one of the most effective ways with which to evaluate the degradation of contaminants in environmental media." (*See* Def. Daikin's Mot. to Exclude DiFilippo, Ex. 11 ("DiFilippo Rebuttal Report"), [5] at 10 [Doc. 895-11].) Moreover, DiFilippo did verify these laboratory studies against relevant field data from Raccoon Creek. (DiFilippo Rebuttal Report, at 28; *see also* DiFilippo Report, at 32 (citing four years of Raccoon Creek samples showing PFOS and PFOA concentrations).) She states that the "continued presence of n-MeFOSE [the "initial metabolite" of FC-248] empirically supports the long half-lives for side-chain fluoropolymer degradation found in laboratory studies," since FC-248 "was last used at [Mount Vernon Mills] in 2000." (*Id.* at 28) She says the same about the continued presence of 8:2 FTOH, which is derived from long-chain fluorotelomer polymers last used at MVM in 2016. (*Id.*) DiFilippo further concludes:

> [W]hile laboratory studies have identified several factors that play important roles in the degradation of side-chain fluoropolymers, a detailed evaluation of every factor (e.g., pH, photolysis, microbial community) is not needed. The data

---

[5] The pagination of this PDF reflects the PDF pagination.

9

> collected from both the biosolids and the agricultural fields demonstrate on their own that degradation of the side-chain fluoropolymers used at Mount Vernon Mills is occurring and that degradation occurs on the scale of decades not months or years.

(*Id.* at 29.) The Court therefore finds DiFilippo's methodology for estimating degradation time reliable for *Daubert* purposes.

The Court finds DiFilippo's testimony on the degradation pathway for 3M's Scotchgard FC-248 product reliable as well. Several of 3M's own studies were among the degradation studies that DeFilippo reviewed. (*See* DiFilippo Report, at 20, 24–26, 29–30.) For example, one 3M study concluded that the half-life of a 3M formulation similar to FC-248 was ninety-one years,[6] (*id.* at 25). DiFilippo opines that one step in this long process is FC-248's degradation into n-MeFOSAA. (3M's 2025 DiFilippo Dep. Excerpts, at 206:4–25; DiFilippo Report, at 22, 50.) While 3M harps on the fact that *surface water samples* in Raccoon Creek have not detected any n-MeFOSAA, DiFilippo's report is supported by *biosolids samples* from Trion's wastewater treatment plant showing concentrations of n-MeFOSAA and PFOS. (DiFilippo Report, at 22.) That is sufficient to bridge the analytical gap.

To point out that n-MeFOSAA should have been detected in the water samples, the Defendants point to testimony from one of the Plaintiffs' experts

---

[6] The 3M study evaluated FC-845 rather than FC-248, but DiFilippo noted that FC-845 and FC-248 are "both n-MeFOSEA copolymers with similar weight percents of active fluorochemicals and PFOS-equivalents," making the degradation of both "likely similar." (DiFilippo Report, at 25.)

and the presence of n-MeFOSAA in wastewater at the Trion plant. (Def. 3M's Mot. to Exclude DiFilippo, at 7–8; Reply Br. in Supp. of Def. 3M's Mot. to Exclude DiFilippo, at 6–7 [Doc. 1019-1].) But there are at least two problems here. First, the testimony that 3M cites from the Plaintiffs' expert, Charlie Andrews, does not state that n-MeFOSAA can be detected in surface water samples, let alone that it should be or that it is likely to be. He simply testified that it "could" be the case that "some of the undegraded side-chain fluoropolymers erode with soil particles into the creeks in heavy rain." (Def. 3M's Mot. to Exclude DiFilippo, Ex. F, at 107:2–5 [Doc. 900-4]; *see also id.* 103:9–107:19 (providing additional context).) Moreover, in response to the next question, Andrews testified that those same polymers do not easily dissolve in surface water. (*Id.* at 107:6–13.) The Court is no expert on this subject, but the Plaintiffs suggest this means it is more difficult to detect in surface water samples, which lessens the weight of the Defendants' contention. (Pls.' Resp. Br. in Opp'n to Def. 3M's Mot. to Exclude DiFilippo, at 16 [Doc. 928].) Second, regarding wastewater samples that did detect n-MeFOSAA, the Defendants are free to argue on cross-examination the significance of that data in relation to DiFilippo's testimony.[7] The Court is not persuaded that the existence of such data creates untenable gaps in DiFilippo's reasoning or methodology. For

---

[7] The same can be said about 3M's other arguments that certain soil samples did not detect n-MeFOSAA. (Def. 3M's Mot. to Exclude, at 11–12.)

all these reasons, the Court denies the Defendants' Motion to Exclude DiFilippo's opinions on degradation time and pathways.

## B. PFOS and PFOA Equivalents

DiFilippo opines that "[t]he amount of PFOS or PFOA present in a textile product . . . can be expressed in terms of PFOS or PFOA-equivalents." (DiFilippo Report, at 15.) She testified that the equivalents are "a way to determine in a worst-case scenario . . . how much PFOA or PFOS" would be produced by the Defendants' products. (Def. Daikin's Mot. to Exclude, Ex. 2 ("Daikin's DiFilippo Dep. Excerpts"), at 48:21–25 [Doc. 895-3].) For example, DiFilippo calculates that one pound of Scotchgard FC-248 contains 0.12 pounds of PFOS, which is equivalent to approximately 12% of Scotchgard FC-248's total mass. (*Id.*) She performs a similar calculation to find that approximately 11% of Daikin's TG-470 product is PFOA. (*Id.*) To calculate these equivalents, DiFilippo identified the molecular weight of the "PFAS precursors" present in the Defendants' products and the total mass of the products, then assumed that the full weight of the PFAS precursors would degrade into "terminal PFAS" such as PFOS or PFOA. (*Id.*) "PFAS precursors" are polyfluoroalkyl substances that further degrade into perfluoroalkyl substances such as PFOS and PFOA, which generally do not degrade further and are thus "often referred to as terminal PFAS." (DiFilippo Report, at 12.)

12

The Defendants contend that the methodology behind these PFOS and PFOA equivalents is unreliable for two primary reasons. [8] First, the Defendants argue that her calculations are inaccurate. (Def. Daikin's Mot. to Exclude DiFilippo, at 6–8, 10–11; Def. 3M's Mot. to Exclude DiFilippo, at 14–15.) They cite DiFilippo's deposition testimony in which she admits that, while her report assumes 100% of the PFAS precursors would degrade into terminal PFAS, the percentage that would degrade into terminal PFAS under realistic environmental conditions would be less than 100%. (Daikin's DiFilippo Dep. Excerpts, at 244:13–21.)

Second, the Defendants cite DiFilippo's testimony to show that her equivalency methodology is not an accepted or peer-reviewed methodology within the scientific community. (Def. Daikin's Mot. to Exclude DiFilippo, at 8–10; Def. 3M's Mot. to Exclude DiFilippo, at 14.) When DiFilippo was asked whether her equivalency methodology was accepted in the scientific community, the Defendants pointed out that she could not identify any EPA or state regulatory documents that used the methodology. (Daikin's DiFilippo Dep. Excerpts, at 50:20–51:6.) Rather, she responded that she had seen the same methodology "used in documents by [an organization known as] Battelle"

---

[8] Both Daikin's and 3M's briefs advance the same general arguments, but Daikin focuses on PFOA equivalents while 3M focuses on PFOS equivalents. (*Compare* Def. Daikin's Mot. to Exclude DiFilippo, at 6–11, *with* Def. 3M's Mot. to Exclude DiFilippo, at 14–15.)

and "in reference to [Aqueous Film Forming Foam] formulations." (*Id.* at 49:10–21.)

The Court declines to exclude DiFilippo's opinions on PFOS and PFOA equivalents. Regarding the potential inaccuracy of these equivalents, DiFilippo acknowledges that the equivalents are a "worst case" calculation that assumes 100% of the PFAS precursors degrade into terminal PFAS. (Daikin's DiFilippo Dep. Excerpts, at 48:21–25.) She acknowledges this limitation and does not opine that these "worst case" calculations are certain to transpire. Thus, this limitation is not an appropriate justification for exclusion. And that is especially so given that DiFilippo has testified about the high percentage of PFAS precursors that become PFOS and PFOA, respectively. For example, she cites one set of studies in which the "vast majority" of PFAS precursors degraded into PFOS and another where the "overwhelming majority" of PFAS precursors degraded into PFOA. (DiFilippo Rebuttal Report, at 22–23; *see also* Daikin's DiFilippo Dep. Excerpts, at 244:13–21 (testifying that the percentage under realistic environmental conditions still remains as high as "90 percent or so" for PFOA); *id.* at 95:11–96:7 (testifying that "95 percent or more . . . of the degradation of 8:2 FTOH will result in the formation of PFOA")).) The Court is not persuaded that the error rate is so high that DiFilippo's methodology is unreliable. *See Riley v. Tesla, Inc.*, 603 F. Supp. 3d 1259, 1281 (S.D. Fla. 2022) ("[A]n expert's method need not be perfect, nor must he apply it perfectly."

14

(citation omitted)); *Davis v. City of Loganville*, 2006 WL 826713, at \*7 (M.D. Ga. Mar. 28, 2006) ("*Daubert* [ ] requires neither perfection from an expert nor that he demonstrate a flawless methodology.").

Regarding the acceptance of the equivalency methodology in the scientific community, the Court is satisfied that DiFilippo's methodology falls within accepted scientific practice. In her rebuttal report, DiFilippo noted that "[t]he concept of PFAS-equivalence, or equivalent concentration, is not novel and is regularly used to evaluate the transformation of environmental contaminants." (DiFilippo Rebuttal Report, at 21.) Citing 3M's own documents and at least six other studies, DiFilippo explained that this equivalency concept was frequently used by 3M and is "key" in assessing the likelihood that PFAS precursors will degrade to terminal PFAS. (*Id.*) She further explained that analyses of PFAS in Aqueous Film Forming Foam (fire-suppressing foam commonly used by firefighters) have relied on PFOS and PFOA equivalents. (Daikin's DiFilippo Dep. Excerpts, at 49:10–21.) And she identified at least a dozen examples of additional scientific studies involving the equivalency concept, including studies focused on degradation of other environmental contaminants and by organizations such as the U.S. Geological Survey and EPA. (*Id.*) While DiFilippo's methodology may not be widely used in her field, it is sufficient that she has shown it has been used and tested across a number of relevant publications and reputable entities. *See Daubert*, 509 U.S. at 593

15

(noting that the *Daubert* factors are not a "definitive checklist"); *Kumho Tire Co., Ltd.*, 526 U.S. at 153 (acknowledging the district court's "broad latitude" in making reliability findings). And it is of little importance that DiFilippo could not immediately identify studies by the EPA or state environmental agencies during her deposition. With these findings in mind, the Court denies the Defendants' Motion to Exclude DiFilippo's opinions on PFOS and PFOA equivalents.

### C. 3M Products as the Source of Raccoon Creek's PFOA

3M argues that "Dr. DiFilippo should not be permitted to testify that FC-248 has contributed to PFOA in biosolids fields upstream of Summerville's drinking water intake." (Def. 3M's Mot. to Exclude DiFilippo, at 16.) The Plaintiffs respond that DiFilippo has not presented such an opinion and does not plan to do so at trial. (Pls.' Resp. Br. in Opp'n to Def. 3M's Mot. to Exclude DiFilippo, at 20.) Upon review of DiFilippo's testimony, the Court agrees with the Plaintiffs that DiFilippo has not offered an opinion on this topic. In fact, this section of 3M's brief merely cites DiFilippo's deposition in which she disclaimed opining on this topic and acknowledged doing so would amount to speculation on her part. (*See* Def. 3M's Mot. to Exclude DiFilippo, Ex. D ("3M's 2024 DiFilippo Dep. Excerpts"), at 218:17–219:20 [Doc. 872-5].) The Court therefore denies 3M's Motion to Exclude as to this argument.

16

### D. "Rebranded" Daikin Products

Daikin asks this Court to exclude DiFilippo's opinions that (1) other companies bought and rebranded Daikin's products and then sold them to Mount Vernon Mills, and (2) "Daikin chemicals made up 67% of Mount Vernon Mills' total use of PFAS precursors from 1995 to 2012." (Def. Daikin's Mot. to Exclude DiFilippo, at 12–21.) Daikin challenges these opinions on three grounds: helpfulness, qualification, and reliability. As to helpfulness, it contends that a jury could just as easily evaluate the same "non-scientific documents" that DiFilippo reviewed in forming these opinions. (*Id.* at 12–13.) As to qualification, Daikin points out that DiFilippo is a water and soil expert, not an expert on "the buying or manufacturing practices of chemical companies." (*Id.* at 14.) As to reliability, the company argues that DiFilippo makes an unsupported "inferential leap" by concluding from limited evidence that five of the products Mount Vernon Mills bought over the years contained Daikin chemicals. (*Id.* at 15–21.)

First, although a jury can evaluate non-scientific documents on its own in most cases, the Court finds that an expert's assessment of the documents here would be helpful given their technical nature. They involve various chemical compositions, chemical properties, and other unfamiliar terms, [9]

---

[9] In an effort to show that the documents are not highly technical, Daikin's reply brief includes portions of one sales report and one product formulation key. While the Court agrees that those two portions may not

which are "beyond the understanding of the average lay person." *See Frazier*, 387 F.3d at 1262. The Court itself has difficulty understanding the terminology in these documents.

Second, the Court holds that DiFilippo is qualified to identify the products used by Mount Vernon Mills that contained Daikin formulations and to opine on the percentage of long-chain fluorotelomer polymers attributable to Daikin. DiFilippo identified product trade names and chemical formulations from company records and testimony, then matched both to records of total pounds bought by MVM over time. The technical part is understanding Daikin's formulations and identifying whether they were present in other companies' products, which she applies her expertise to do. For example, she opines that Pulcra Chemicals's ("Pulcra") "Repellant KTW" was a blend between Daikin's TG-581 and certain other agents. (DiFilippo Report, at 17.) She also categorized various formulations by polymer type to determine the number of pounds of long-chain fluorotelomer polymers attributable to each company, which led to DiFilippo's conclusion that 67% of long-chain fluorotelomer polymers were attributable to Daikin. (*See* DiFilippo Report, at 57–58 tbls. 3–4.) DiFilippo need not hold particular expertise in "commercial

appear overly technical, the Court's review of several of the other documents reveals a number of sufficiently technical documents. (*See, e.g.*, Def. Daikin's Mot. to Exclude DiFilippo, Exs. 6–7, 9–10 [Docs. 895-7, 895-8, 895-9, 895-10].)

chemical sales" nor have "worked in-house for a chemical company" to form these opinions. (*But see* Def. Daikin's Mot. to Exclude DiFilippo, at 14.)

Third, the Court agrees that some of DiFilippo's opinions about the "rebranded" Daikin products may be inadmissible. According to DiFilippo, five Daikin formulations were present in the "long-chain fluorotelomer polymer" products sold to Mount Vernon Mills between 1995 and 2012:

1. TG-470 sold by Apexical Specialty Chemicals ("Apexical") as Gardapex 115 ("Gardapex") and Glo-Guard 15X ("Glo-Guard");

2. TG-472 sold by Apexical as Waterproofon 242-M ("Waterproofon");

3. TG-571 sold by Ciba as Zonyl 7714 and sold by Piedmont Chemical Industries ("Piedmont") as Pomoguard FC500 ("Pomoguard");

4. TG-581 blended with another agent and sold by Pulcra as Repellant KTW; and

5. TG-5130 sold by Sequa/Omnova as Sequapel CQR-46 ("Sequapel").

(DiFilippo Report, at 43 fig. 5, 57 tbl. 3.) Daikin challenges DiFilippo's basis for concluding that four of these Daikin formulations were "rebranded" into products by other companies: TG-470 as Gardapex and Glo-Guard; TG-472 as Waterproofon; TG-571 as Pomoguard; and TG-5130 as Sequapel. Nonetheless, the Court concludes that Defendant's objections to this testimony will be more appropriately handled by objections at trial rather than on a motion to exclude.

19

### E. 3M's and Daikin's Knowledge of PFAS

The Defendants seek to exclude DiFilippo's opinion that Daikin and 3M knew for decades that their products would be discharged into the environment as PFAS-laden wastewater. (Def. Daikin's Mot. to Exclude DiFilippo, at 22–25; Def. 3M's Mot. to Exclude DiFilippo, at 17.) Daikin seeks to further exclude DiFilippo's opinion in her rebuttal report that "Daikin knew products [it] sold to distributors, formulators and competitors were being used in formulations sold to various industries, including textile mills." (DiFilippo Rebuttal Report, at 25.) According to the Defendants, DiFilippo's state-of-mind opinions are (1) unhelpful to a jury, which can assess knowledge from its own review of the relevant documents, (Def. Daikin's Mot. to Exclude DiFilippo, at 22–23), (2) not within the scope of DiFilippo's expertise as a hydrologist, (*id.* at 24), and (3) unreliable guesswork "about important dates based on unspecific documents," (*id.* at 24–25).

The Court begins and ends with the helpfulness inquiry. "An expert cannot speculate as to an individual's state of mind. Speculative state of mind statements are not admissible as expert testimony because they are legal conclusions as to another person's state of mind and thus are not of the type of evidence that a jury needs the assistance of an expert to understand." *Kelley v. C.R. Bard, Inc.*, 644 F. Supp. 3d 1316, 1343 (N.D. Ga. 2022) (citation modified). Instead, "the jury should hear and/or see firsthand any relevant

20

evidence pertaining to the Defendant's intent. Then the jury . . . should consider the facts and make its own determination regarding [the] [d]efendant's intent." *Ocasio v. C.R. Bard., Inc.*, 2015 WL 2062611, at *4 (M.D. Fla. May 4, 2015) (citation omitted).

The Court agrees with the Defendants that DiFilippo offers some inadmissible conclusions about the Defendants' knowledge and state of mind. These include (1) Opinions 4–5 in Section 2 of DiFilippo's report[10] and other explicit statements about the Defendants' knowledge offered in the "Industry Knowledge of PFAS in Wastewater and Biosolids" section of her report, (DiFilippo Report, at 10, 20–21); (2) her rebuttal report opinion that "Daikin knew products they sold to distributors, formulators and competitors were being used in formulations sold to various industries, including textile mills," (DiFilippo Rebuttal Report, at 25); and (3) similar statements expressed in DiFilippo's testimony, (*see, e.g.*, 3M's 2024 DiFilippo Dep. Excerpts, at 192:17–23, 193:12–194:5). DiFilippo's initial and rebuttal reports make clear that she came to these conclusions about the Defendants' knowledge based on her

---

[10] Opinion 4 states: "Manufacturers of PFAS-containing products have long known that products used in the textile industry contained precursors that would transform to terminal compounds, such as [PFOS] and [PFOA], that would not degrade further." (DiFilippo Report, at 10.) Opinion 5 states: "Manufacturers of PFAS-containing products have long known their products, when discharged to conventional wastewater treatment plants, sorb to sludge and contaminate soils, surface water, and groundwater with PFAS when the sludge is applied to land as biosolids." (*Id.*)

21

review of company documents and deposition testimony—rather than through first-hand experience or other specialized expertise about the companies—and she has testified to as much. (*See* DiFilippo Report, at 20–21; DiFilippo Rebuttal Report, at 25–26; 3M's 2024 DiFilippo Dep. Excerpts, at 192:20–193:4, 194:6–19.) As a result, a jury is just as well positioned as DiFilippo to make determinations about the Defendants' level of knowledge over time.

Notwithstanding the above, the Court notes that DiFilippo's efforts to summarize studies performed or possessed by the Defendants (or others) remain admissible. For example, while DiFilippo's "Industry Knowledge of PFAS in Wastewater and Biosolids" section contains inadmissible conclusions as to the Defendants' knowledge, it also contains admissible descriptions of PFAS studies performed or possessed by the Defendants. (*See* DiFilippo Report, at 20–21.) DiFilippo's discussion of these studies and their results is helpful to a jury, which would otherwise have difficulty interpreting their meaning. From there, a jury could then assess for itself whether the Defendants' possession of relevant research is indicative of some level of overall knowledge. *See, e.g.*, *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1333 (M.D. Fla. 2015) (declining to admit an expert's testimony on the defendant's "intent or motivations," but admitting testimony "that merely discusses what information was available and possessed by" the defendant]"); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 396, 479 (S.D.N.Y. 2016) (admitting

22

expert testimony to the extent it opined on the documents that were in the defendant's "possession"); *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2023 WL 3517923, at *3 (D.S.C. May 2, 2023).

### IV.    Conclusion

For the foregoing reasons, the Court DENIES Defendant 3M Company's Motion to Exclude the Expert Testimony of Erica DiFilippo [Doc. 872] and GRANTS in part and DENIES in part Defendant Daikin America, Inc., E.I. DuPont de Nemours and Company, and The Chemours Company's Motion to Exclude the Expert Testimony of Erica DiFilippo [Doc. 894].

SO ORDERED, this ___26th___ day of March, 2026.


THOMAS W. THRASH, JR.
United States District Judge

23