IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

EARL PARRIS, JR.,
individually, and on behalf of a Class of
persons similarly situated,

     Plaintiff,

        v.

3M COMPANY, et al.,

     Defendants.

CIVIL ACTION FILE
NO. 4:21-CV-40-TWT

## OPINION AND ORDER

This is an action under the Clean Water Act. It is before the Court on

Defendants E.I. du Pont de Nemours and Company ("DuPont") and the

Chemours Company's ("Chemours") Motion for Summary Judgment [Doc.

873]. For the following reasons, DuPont and Chemours's Motion for Summary

Judgment [Doc. 873] is DENIED.

### I.   Background[1]

___

[1] The operative facts on the Motion for Summary Judgment are taken
from the parties' Statements of Material Facts and the responses thereto. The
Court will deem the parties' factual assertions, where supported by evidentiary
citations, admitted <u>unless the respondent makes a proper objection under
Local Rule 56.1(B)</u>. Where a fact is undisputed or not properly objected to, the
Court will cite only the Statement giving the fact. To that end, the Court notes
that there are several instances of the Plaintiffs attempting to add facts, with
or without citation, to their undisputed responses to DuPont's Statements of
Material Facts. This is not the proper way to assert additional facts under the
Local Rules. *See* LR 56.1(B)(2)(a)(2), N.D.Ga. (noting that the respondent is to
"directly refute[] the movant's fact with <u>concise</u> responses supported by <u>specific
citations to evidence</u> . . . state[] a valid objection to the admissibility of the

This case arises out of the alleged contamination of surface waters and drinking water in Chattooga County, Georgia, with per- and polyfluoroalkyl substances ("PFAS"). (2nd Am. Compl. ("Parris Compl."), [Doc. 280], ¶ 1). The EPA has recognized these substances as "persistent, bioaccumulative, and toxic" ("PBT"). (Pls.' Statement of Add'l Material Facts [Doc. 929-1] ¶ 1). Defendants DuPont and Chemours (collectively, "DuPont") made fluorinated telomer chemistry for use by the textile industry. (DuPont's Statement of Material Facts ¶ 1). DuPont sold its textile chemistry to Ciba Specialty Chemicals ("Ciba") and later to Defendant Huntsman International, LLC ("Huntsman"), after Huntsman purchased this portion of Ciba's business.[2] (*Id.* ¶ 3). DuPont sold its textile chemistry to Ciba/Huntsman via an agreement known as the Alliance Agreement. (*Id.* ¶ 4). At various relevant times, Defendant Mount Vernon Mills ("Mount Vernon Mills") purchased some of the textile chemistry it used at its Trion, Georgia mill from Ciba/Huntsman.[3] (*Id.*

---

movant's fact . . . [or] point out that the movant's citation does not support the movant's fact or that the movant's fact is not material or [does not comply with the Local Rules]." The Court will thus disregard any such "facts" (or legal arguments) added in the Plaintiffs' responses. The Court may also disregard, in its discretion, any citation to the Plaintiffs' Additional Statements of Material Fact within the Plaintiffs' responses, which would require the Court to refer to that document to find citations to the record evidence in support of the objection and therefore does not constitute a "specific citation[] to evidence."

[2] The Plaintiffs settled their claims against Huntsman, which was dismissed from this action on June 11, 2025. [Doc. 916].

[3] The Plaintiffs also settled their claims against Mount Vernon Mills and the Town of Trion ("Trion"), which were dismissed from this action on June 11, 2025. [Doc. 915].

¶ 5). Some percentage of the fluorochemical textile chemistry Mount Vernon Mills used went to its wastewater. (*Id.* ¶ 54). Mount Vernon Mills then discharged its wastewater to Trion's Wastewater Treatment Plant ("WWTP") without pretreating it for chemical constituents, including perfluorooctane sulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA"), which are types of PFAS. (*Id.* ¶¶ 6, 55); (Pls.' Statement of Add'l Material Facts ¶ 1). The wastewater treatment Trion conducted at the WWTP also did not remove PFOS or PFOA. (DuPont's Statement of Material Facts ¶ 7). Until February 4, 2020, Trion disposed of sludge from its wastewater treatment process to nearby farms, and PFOS and PFOA from that sludge ultimately made its way into the Raccoon Creek watershed, leading to detectable amounts of PFAS in the City of Summerville's water supply. (*Id.* ¶ 8). PFOS and PFOA are considered hazardous substances under federal law, and the EPA now requires public water systems to take steps to remove them from public drinking water if they are present in quantities above 4 parts per trillion. (Pls.' Statement of Add'l Material Facts ¶ 13). In 2020, the EPA and the Georgia EPD received sample results showing that the levels of PFAS in the City of Summerville's water supply were well above the EPA's 2016 health advisory limit of 70 parts per trillion. (*Id.* ¶ 129).

The Alliance Agreement between DuPont and Ciba/Huntsman governed the parties' respective duties and designated Ciba/Huntsman as the "sole sales channel" of textile chemistry from Ciba/Huntsman to Mount Vernon Mills.

(DuPont's Statement of Material Facts ¶ 9). Ciba/Huntsman was responsible for the distribution and sale of the textile chemistry, including setting prices and determining which mills it would sell the chemistry to. (*Id.* ¶¶ 10-12).   Under the Alliance Agreement, Ciba/Huntsman was "free to determine . . . formulations, applications, development efforts and levels of technical services [of its products] in its sole discretion." (*Id.* ¶ 13). However, DuPont was aware that its Teflon, Zonyl, and Phobol CP branded products were supplied to Mount Vernon Mills via Ciba/Huntsman, and in letters sent directly from DuPont to Mount Vernon Mills, DuPont acknowledged that these products relied on its chemistry and component products. (Pls.' Statement of Add'l Material Facts ¶ 72); [Doc. 941-10], [Doc. 941-11], [Doc. 941-12 at 4]. DuPont was aware of how these products were being used by textile mills like Mount Vernon Mills. (Pls.' Statement of Add'l Material Facts ¶ 73; DuPont's Resp. to Pls.' Statement of Add'l Material Facts ¶ 73). Further, DuPont was responsible for marketing its brands and administering trademark license agreements. (DuPont's Statement of Material Facts ¶ 18). DuPont sold its products to Ciba/Huntsman, and Ciba/Huntsman in turn determined who to sell its products to. (*Id.* ¶ 21); (Devaney Dep. Vol. II., [Doc. 874-6], at 515:6-10). But DuPont never sold its textile chemistry directly to Mount Vernon Mills. (DuPont's Statement of Material Facts ¶ 22). And DuPont did not know the wastewater treatment practices of specific Ciba/Huntsman textile mill customers. (*Id.* ¶¶ 24-25); (Korzeniowski Dep., Vol. II [Doc. 874-2], at

4

434:12-438:13).

Additionally, DuPont required Mount Vernon Mills to sign a licensing agreement in order to brand its finished textile products with the Teflon brand and, as part of this program, DuPont required that a "DuPont based fluorochemical . . . be applied to the fabric, and no competitive fluorochemical [could] be used." (Pls.' Statement of Add'l Material Facts ¶¶ 75-76; DuPont's Resp. to Pls.' Statement of Add'l Material Facts ¶¶ 75-76). The licensing agreement also required Mount Vernon Mills to meet certain "performance standards" that DuPont set. (Pls.' Statement of Add'l Material Facts ¶ 77; DuPont's Resp. to Pls.' Statement of Add'l Material Facts ¶ 77). DuPont ensured Mount Vernon Mills met these standards by conducting testing on Mount Vernon Mills's finished products, either itself or via a third-party. (Pls.' Statement of Add'l Material Facts ¶ 78; DuPont's Resp. to Pls.' Statement of Add'l Material Facts ¶ 78). In order to create these standards, DuPont understood the way in which its fluorotelomer-based products were applied to fabrics in textile mills, including the fact that the products were diluted with water in the textile mills. (Korzeniowski Dep., Vol. II [Doc. 874-2], at 432:10-18). DuPont also generally knew the proportions for dilution of these products and would suggest those proportions to textile mills. (*Id.* at 432:19-22). DuPont was aware that, as a result of Mount Vernon Mills's ordinary usage of these products, PFOS and PFOA contaminated wastewater would be discharged to a wastewater treatment plant, that conventional wastewater treatment plants

were not capable of treating for these compounds, and that the result would be polluted downstream drinking water. (Pls.' Statement of Add'l Material Facts ¶¶ 4-6).

Additionally, DuPont discussed with Ciba/Huntsman what information should and should not be included on material safety data sheets ("MSDSs") for the customers of the products Ciba/Huntsman created or rebranded with DuPont's component chemicals. (Devaney Dep. Vol. II., [Doc. 874-6], at 518:12-519:21). DuPont provided Ciba/Huntsman with MSDSs for the products sold to it, and Ciba/Huntsman in turn provided its own MSDS to Mount Vernon Mills for the products it sold to Mount Vernon Mills. (DuPont's Statement of Material Facts ¶¶ 15, 20). Ciba/Huntsman's technical service employees worked with Mount Vernon Mills to resolve any issues or questions regarding Mount Vernon Mills's use of its products and visited Mount Vernon Mills's Trion mill to provide such assistance. (*Id.* ¶ 17).

With regard to the textile chemistry DuPont sold under the Alliance Agreement, DuPont never intentionally added PFOA as an ingredient in its chemistry, but PFOA was created during the telomer manufacturing process and therefore present in the final products that it sold to Ciba/Huntsman. (*Id.* ¶ 26); (Korzeniowski Dep., Vol. II [Doc. 874-2], at 459:16-460:21); (Korzeniowski Dep., Vol. I [Doc. 874-3], at 213:3-19). DuPont's textile chemistry never contained PFOS and was not capable of degrading to PFOS. (DuPont's Statement of Material Facts ¶ 27). In January 1999, 3M disclosed

general information to DuPont concerning its findings of PFOS in composite blood samples of the general public. (*Id.* ¶ 32). However, 3M's chemistry was manufactured thorough electrochemical fluorination, which is different from the telomerization manufacturing process that DuPont used. (*Id.* ¶ 33). In April 1981, DuPont was informed by 3M that a highly fluorinated alcohol, which is a component of DuPont's Zonyl product, metabolized into PFOA. (Pl.'s Statement of Add'l Material Facts ¶ 64); (Hansen Expert Report, [Doc. 925-1], at 11); [Doc. 940-22]. Internal emails from DuPont further indicate awareness of this fact in 1999. [Doc. 920-24].

DuPont conducted internal testing in 1999 that showed PFOA was possibly present in its finished telomer products, so DuPont undertook additional method development and validation work to confirm these results. (DuPont's Statement of Material Facts ¶ 35); (Pls.' Resp. to DuPont's Statement of Material Facts ¶ 35). In 2001, DuPont shared with the EPA internal documents and studies related to the toxicity and persistence of PFOA for the first time. (Pl's Statement of Add'l Material Facts ¶ 27). In 2003, DuPont was able to confirm and quantify the concentrations of PFOA in some of its telomer chemistry, including its textile chemistry, as an unintended manufacturing impurity by utilizing its new validated analytical method. (DuPont's Statement of Material Facts ¶ 37). DuPont then published its analytical method for detecting and quantifying PFOA in complex telomer-based products in scientific literature. (*Id.* ¶ 39). And in 2004, DuPont

made additional disclosures to the EPA, including toxicity studies from the 1990's. (Pl's Statement of Add'l Material Facts ¶ 27). Nonetheless, in 2003, DuPont made a public statement that its use of PFOA for over fifty years had not posed a risk to human health or the environment, and that its products were safe. (*Id.* ¶ 263; *see also id.* ¶ 167). But in 2005, DuPont was fined $10.25 million by the EPA for failing to disclose "substantial risk information" about PFOA to the EPA. (Pls.' Resp. to DuPont's Statement of Material Facts ¶ 38); Press Release, U.S. Envt'l Prot. Agency, *EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History* (Dec. 14, 2005), available at https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/fdcb2f 665cac66bb852570d7005d6665.html (last visited May 8, 2026). DuPont did share *some* findings on an ongoing basis with Ciba/Huntsman and the EPA. (DuPont's Statement of Material Facts ¶¶ 38, 40); (Pls.' Resp. to DuPont's Statement of Material Facts ¶¶ 38, 40); [Doc. 873-18]; (Korzeniowski Dep., Vol. I [Doc. 874-3], at 343:2-25). All the while, DuPont produced and indirectly supplied fluorochemicals containing PFOA to Mount Vernon Mills through its intermediaries and distributors. (Pls.' Statement of Add'l Material Facts ¶ 12).

Ciba/Huntsman also independently obtained some information, including meeting dates, notices, and agendas from the EPA, and had access to other documents and materials related to PFOA, as an "interested party" to EPA's PFOA and Telomers Enforceable Consent Agreement Negotiations

8

docket. (DuPont's Statement of Material Fact ¶ 42). Ciba/Huntsman attended these meetings as an interested party. (*Id.* ¶ 43). In 2005, the EPA sought information directly from Ciba/Huntsman, so Ciba/Huntsman met with the EPA and provided an overview of its products, technology, and testing method development aimed at reducing the presence of low molecular weight residuals in its products. (*Id.* ¶¶ 44-45). Ciba/Huntsman considered DuPont to be "the experts" with regard to the chemistry of its products and testing for potential toxins, but it also considered itself to be an "intelligent customer" and had made itself "aware via other studies" of the potential dangers of PFOAs. (Devaney Dep., Vol. I, [Doc. 874-5], at 58:3-19). DuPont and Ciba/Huntsman, along with other companies, co-developed the Guidance for Best Environmental Practices for the Global Apparel Industry, which explicitly instructed textile mills against discharging wastewater containing fluorochemicals to the sewer system. (Pls.' Statement of Add'l Material Facts ¶¶ 269-70).

With regard to Mount Vernon Mills's knowledge, Mount Vernon Mills used fluorinated textile treatment formulations in its fabric finishing processes from 1974 to 2023. (DuPont's Statement of Material Facts ¶ 47). Over the years, it used various formulations from various manufacturers, but it knew that the formulations contained fluorochemicals. (*Id.* ¶¶ 48-49). [4] Mount

---

[4] The Court notes that the Plaintiffs' objection to this statement of fact, like many of its objections, is largely non-responsive to the actual statement

Vernon Mills received MSDSs directly from its fluorochemical suppliers, including Ciba/Huntsman, for their textile chemistries. (*Id.* ¶ 51). Mount Vernon Mills's Director of Environmental Affairs reviewed the MSDSs for items either regulated by the EPA or for chemicals that might affect Mount Vernon Mills's permits, so Mount Vernon Mills relied on its direct suppliers for technical information about their specific products. (*Id.* ¶¶ 52-53). Mount Vernon Mills also monitored literature from the EPA regarding PFOA and received product stewardship information from textile trade groups. (*Id.* ¶ 58). Additionally, Mount Vernon Mills owns a chemical company known as Mount Vernon Chemicals. (*Id.* ¶ 59). Mount Vernon Chemicals manufactured, formulated, and branded fluorochemicals through 2020. (*Id.*). As a result, Mount Vernon Chemicals had access to information about EPA's directive to stop distributing products containing C8 chemistry by 2015.[5] (*Id.* ¶ 60).

The Plaintiff Earl Parris, Jr., a City of Summerville resident, filed this action in February 2021 on behalf of himself and a class of Summerville residents whose drinking water was contaminated with PFAS, purportedly as

---

DuPont makes. For example, here, the Plaintiffs object that "Mount Vernon Mills was generally kept in the dark regarding the fluorochemicals that made up the products it was purchasing." (Pls.' Resp. to DuPont's Statement of Material Facts ¶ 49). But DuPont did not state that Mount Vernon Mills knew the exact fluorochemical composition of the products it purchased, just that Mount Vernon Mills knew generally that the products contained fluorochemicals. And the Plaintiffs have not actually disputed that fact.

[5] Products based on PFOS and PFOA chemistries are considered C8 chemicals because they contain eight or more carbon atoms. (Pls.' Statement of Add'l Material Facts ¶ 10).

a result of the Defendants' actions. The Court later permitted the City of Summerville to intervene. On September 29, 2025, the Court granted class certification as to past damages sought through the "Damages Class," which includes "all rate payers of water and sewer service with the City of Summerville from January 2020 through class certification." (Op. & Order dated Sept. 29, 2025, [Doc. 1059], at 9-10). DuPont moved for summary judgment as to all of the claims against it, and that Motion is presently before the Court.

## II.  Legal Standards

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). The court should view the evidence and draw any inferences in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

11

### III. Discussion

The Plaintiffs assert several claims against DuPont in their Amended Complaints[6]: negligence (Count One of Summerville Complaint, Count Five of Parris Complaint), public nuisance (Count Two of Summerville Complaint, Count Nine of Parris Complaint), private nuisance (Count Three of Summerville Complaint), abatement of public nuisance (Count Four of Summerville Complaint, Count Ten of Parris Complaint), trespass (Count Five of Summerville Complaint), negligent failure to warn (Count Ten of Summerville Complaint, Count Seven of Parris Complaint), violations of the Georgia Water Quality Control Act (Count Nine of Summerville Complaint), wanton conduct and punitive damages (Count Six of Summerville Complaint, Count Eight of Parris Complaint), injunctive relief (Count Seven of Summerville Complaint), and attorney's fees and costs (Count Eight of Summerville Complaint). (Parris Compl. ¶¶ 173-222; Summerville Compl. ¶¶ 58-138). DuPont raises several challenges to these Counts, and the Court

---

[6] The Plaintiff Earl Parris filed his Second Amended Complaint on November 21, 2022, a class action complaint which named DuPont as a defendant for the first time. (Parris Compl., [Doc. 280]). Separately, Intervenor-Plaintiff City of Summerville filed its Amended Complaint on February 16, 2023, also naming DuPont and Chemours as a defendant. (Summerville Compl., [Doc. 351]). To date, the Plaintiffs have not filed a consolidated complaint, so the Court considers both the Parris Complaint and the Summerville Complaint to be the operative pleadings with regard to the present Motion for Summary Judgment.

will address each challenge in turn.[7]

## A. Duty

DuPont first argues that it did not owe any duty to the Plaintiffs under Georgia law, so the Plaintiffs' claims for negligence, negligent failure to warn, and wanton conduct fail. (EIPD/C Mot. for Summ. J., at 5-7). They point to this Court's prior order on several motions to dismiss and argue that the Court allowed claims to proceed against the Manufacturing Defendants solely based on allegations in the pleadings that they had continuously supplied PFAS to Mount Vernon Mills and thus the duty was limited in geographic scope. (*Id.* at 7). On that basis, DuPont asserts that a finding that it owed a duty to the Plaintiffs, when it did not sell textile chemistry to Mount Vernon Mills, would run counter to the Court's admonition that "a general duty to prevent harm to all the world" failed as a matter of law. (*Id.* at 7-10).

In response, the Plaintiffs contend that the Court already held that the Manufacturing Defendants owed a duty of care based on their supplying of PFAS-containing products to Mount Vernon Mills "with knowledge that the chemicals were unlikely to be made reasonably safe in their regular use and could foreseeably contaminate surface waters and downstream water supplies." (Pls.' Resp. in Opp'n, [Doc. 943-1], at 28-30 (citing Op. & Order dated

---

[7] The Court notes that DuPont does not challenge Summerville's claim under the Georgia Water Quality Control Act (Count Nine of Summerville's Complaint).

Mar. 30, 2022 ("MTD Order"), at 57)). They assert that DuPont cannot escape liability solely because it did not sell its products to Mount Vernon Mills directly, as Georgia law imposes a duty regardless of whether products are sold directly or through an intermediary. (*Id.* at 30-39). The Court addresses this argument first.

The elements of negligence are (1) "the existence of a duty on the part of the defendant," (2) "a breach of that duty," (3) "causation of the alleged injury," and (4) "damages resulting from the alleged breach of the duty." *Rasnick v. Krishna Hosp., Inc.*, 289 Ga. 565, 566 (2011). "Before negligence can be predicated upon a given act, some duty to the individual complaining must be sought and found, the observance of which duty would have averted or avoided the injury or damage." *CSX Transp. Inc. v. Williams*, 278 Ga. 888, 889 (2005) (citation modified); *see also Department of Lab. v. McConnell*, 305 Ga. 812, 815 (2019) ("Negligence is premised on, among other things, a duty owed by the defendant to the plaintiff."). "The legal duty is the obligation to conform to a standard of conduct under the law for the protection of others against unreasonable risks of harm." *Rasnick*, 289 Ga. at 566. Such a duty can arise from either a legislative enactment or a common law principle recognized in the case law. *Id.* at 566-67. Whether either of these sources imposed a legal duty on DuPont under the circumstances is a question of law reserved to the Court. *Id.* at 567.

14

Section 389 of the Second Restatement of Torts provides:

> One who supplies directly or through a third person a chattel for another's use, knowing or having reason to know that the chattel is unlikely to be made reasonably safe before being put to a use which the supplier should expect it to be put, is subject to liability for physical harm caused by such use to those whom the supplier should expect to use the chattel or to be endangered by its probable use, and who are ignorant of the dangerous character of the chattel or whose knowledge thereof does not make them contributorily negligent, although the supplier has informed the other for whose use the chattel is supplied of its dangerous character.

Restatement (Second) of Torts § 389 (Am. L. Inst. 1965). The term "physical harm" in this context refers to impairment of the human body as well as land and chattels. *Johnson v. Ford Motor Co.*, 281 Ga. App. 166, 173 (2006) ("[T]he Restatement (Second) of Torts clearly provides that physical harm can be damage to property."), *overruled on other grounds by Campbell v. Altec Indus., Inc.*, 288 Ga. 535 (2011). The Georgia Court of Appeals originally adopted section 389, then part of the First Restatement of Torts, in *Moody v. Martin Motor Co.*, 76 Ga. App. 456, 461 (1948).

As the Court previously found, the Manufacturing Defendants—as product suppliers—had a duty to protect third parties, like the Plaintiffs, from reasonably foreseeable harm arising from the normal, intended use of their products in textile mills like Mount Vernon Mills. In the Motion to Dismiss order, the Court concluded that Parris had identified a specific, legal duty applicable to the Manufacturing Defendants with regard to the negligence claim, holding that "a duty arose where the Manufacturing Defendants

15

continuously supplied PFAS to Mount Vernon with knowledge that the chemicals were unlikely to be made reasonably safe in their regular use and could foreseeably contaminate surface waters and downstream water supplies." (MTD Order, at 57). The Court made this determination based on allegations in the Complaint that the Manufacturing Defendants had known of the toxicity and bioaccumulative nature of PFAS, had been aware that conventional wastewater treatment processes were ineffective at removing PFAS and, despite such knowledge, continued to supply PFAS to Mount Vernon Mills without taking precautions to prevent PFAS from contaminating local municipal water supplies. (*Id.* at 57-58). Notably, DuPont had not yet been added as a party to this action at the time the Court ruled on the Motions to Dismiss.

The key difference here between DuPont and the other Manufacturing Defendants is that there are no allegations or any evidence that DuPont ever sold its textile chemistry directly to Mount Vernon Mills; instead, the parties agree that Mount Vernon Mills purchased DuPont's textile chemistry from Ciba/Huntsman. DuPont essentially contends that the existence of this sophisticated, third-party intermediary absolved them of any duty to the Plaintiffs.[8] DuPont has not cited any authority on all fours with the present

---

[8] In contrast to the Plaintiffs' negligent failure to warn claims, in their traditional negligence claims, the Plaintiffs assert that DuPont owed a duty directly to them (and to the Class). (Parris Compl. ¶ 174); (Summerville Compl. ¶¶ 59-60).

16

case that supports this contention. The Court finds this to be a difference without a distinction, especially given the evidence here that (1) at least some of Ciba/Huntsman's knowledge of the toxicity of PFOS and PFOA was based on the information given to it by DuPont itself, (2) DuPont provided letters directly to Mount Vernon Mills indicating that the DuPont products it purchased through Ciba/Huntsman were safe for Mount Vernon Mills's intended purposes, and (3) DuPont was generally aware of how textile mills like Mount Vernon Mills used its products. (Pls.' Statement of Add'l Material Facts ¶¶ 4-6, 72-73); [Doc. 941-10], [Doc. 941-11], [Doc. 941-12 at 4]; (DuPont's Statement of Material Facts ¶¶ 38, 40); (Pls.' Resp. to DuPont's Statement of Material Facts ¶¶ 38, 40); [Doc. 873-18]; *see also* (Korzeniowski Dep., Vol. II [Doc. 874-2], at 432:10-18), (Devaney Dep., Vol. I, [Doc. 874-5], at 58:3-19). As the Plaintiffs point out, section 389 specifically contemplates liability on the part of a manufacturer supplying a potentially dangerous product through a third party. *See* Restatement (Second) of Torts § 389 (Am. L. Inst. 1965). Thus, DuPont is not entitled to summary judgment as to the Plaintiffs' traditional negligence claims on duty grounds.

DuPont additionally argues that it owed no duty to warn the Plaintiffs because it supplied its component chemistries to sophisticated users and provided them with accurate MSDSs as its knowledge of PFAS changed over time. (DuPont's Mot. for Summ. J. at 10-14). DuPont contends that it only owed a duty to warn, if any, to Ciba/Huntsman, and only if it was "ignorant of the

17

dangerous character" of PFAS. (*Id.* at 10-13). The Plaintiffs respond that DuPont's position is not supported by Georgia law. (Pls.' Resp. in Opp'n, at 48-52). They also contend that DuPont cannot shirk its duty where it directly mislead Mount Vernon Mills about the safety of its chemicals. (*Id.* at 51-53). Finally, the Plaintiffs argue that how much knowledge Ciba/Huntsman and Mount Vernon Mills actually had and whether DuPont sufficiently discharged its duty to warn are highly disputed questions of fact not suited for summary judgment. (*Id.* at 52-55, 58-59).

For negligent failure to warn, a plaintiff must establish that "(1) the manufacturer knew or reasonably should have known of a danger arising from use of the product and therefore had a duty to warn; (2) the manufacturer breached the duty; and (3) the breach was the proximate cause of the plaintiff's injury." *Johnson v. Shaner SPA Assocs.*, 2011 WL 13323678, at *2 (N.D. Ga. May 19, 2011); *see also Davis v. John Crane, Inc.*, 353 Ga. App. 243, 251 (2019). "The duty to warn may be owed to consumers, reasonably foreseeable users, and[] purchasers of the product. This duty has been extended, in some cases, to reasonably foreseeable third parties." *Certainteed Corp. v. Fletcher*, 300 Ga. 327, 330 (2016) (citations modified). "In determining whether such a duty exists, the court should consider the foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger. Such matters generally

are not susceptible of summary adjudication and should be resolved by a trial in the ordinary manner." *Williams v. Taser Int'l, Inc.*, 2006 WL 8433374, at *6 (N.D. Ga. Oct. 10, 2006) (citations modified). Under Georgia law, "the warning need not necessarily be given to the person actually injured in order for the manufacturer to escape liability"; rather, it may be given to "a person in a position such that he may reasonably be expected to act so as to prevent the danger from manifesting itself." *Stovall & Co. v. Tate*, 124 Ga. App. 605, 613 (1971) (citation modified).

In *Carter v. E.I. DuPont de Nemours & Co., Inc.*, 217 Ga. App. 139, (1995), DuPont made a similar argument as it does here that it sold its "Tyvek" product in bulk only to intermediaries and thus any duty to warn about Tyvek's flammability risks was owed by the manufacturer of the Tyvek coveralls the plaintiffs had worn when they sustained severe burns. *Carter*, 217 Ga. App. at 140. The Georgia Court of Appeals applied § 389 of the Second Restatement and concluded that DuPont could not avoid liability on learned intermediary grounds because the flammability of the product "remain[ed] unchanged after being converted" into coveralls, and DuPont had actively promoted Tyvek as a "protective material" for workplaces. *Id.* at 141. Thus, the court held that EIPD/C could still be liable to the plaintiffs, as the ultimate user of the products, for failure to warn. *Id.* at 141-42 ("In no case have we held that the manufacturer may *always* rely on an intermediary to pass along to the ultimate user warnings of dangers inherent in the use of a product.").

19

In so ruling, the Georgia Court of Appeals relied on a framework articulated by the Eleventh Circuit in *Stuckey v. Northern Propane Gas Co.*, 874 F.2d 1563 (11th Cir. 1989) to apply the learned intermediary doctrine—the theory that a manufacturer or supplier discharges its duty to warn by supplying its product to an intermediary familiar with the potential hazards. In *Stuckey*, the Eleventh Circuit relied on Comment n to § 388 of the Second Restatement, which "addresses when a supplier's duty to warn an ultimate consumer can be discharged by a warning given to an intermediary party." *Stuckey*, 874 F.2d at 1568. The court determined that Comment n's analysis of a supplier's duty to warn a consumer did not turn on whether a warning was actually given to the intermediary, but instead whether the intermediary's knowledge was sufficient to ultimately protect the consumer. *Id.* In so holding, the court noted that

> Comment n provides a test that balances several factors: the burden of requiring a warning; the likelihood that the intermediary will provide a warning; the likely efficacy of such a warning; the degree of danger posed by the absence of such a warning; and the nature of the potential harm.

*Id.* (citation modified). As such, the court held, the intermediary's actual knowledge of a dangerous condition with the product was a "condition precedent" to the application of these factors. *Id.* at 1569.

DuPont's reliance on *Certainteed Corp.* is misplaced. In *Certainteed*, the Georgia Supreme Court held that a manufacturer of asbestos-laden water pipes owed no duty to the daughter of a utility worker who worked with the

20

pipes, after the daughter developed mesothelioma from laundering her father's asbestos-dust-covered clothing. *Certainteed Corp.*, 300 Ga. at 327-28. The court's holding hinged on its prior precedents holding that the duty to warn can be extended to reasonably foreseeable third parties of users of dangerous products, but that logic, science, and public policy also play an important role in this determination. *Id.* at 330. In particular, the court noted, "[t]o impose a duty that either cannot feasibly be implemented or, even if implemented, would have no practical effect would be poor public policy indeed." *Id.* (citation modified).

Contrary to DuPont's position that a finding of duty here would subject it to liability to "unknown downstream users" equivalent to "imposing a general duty to prevent harm to all the world," the duty here is clearly defined and limited to warning Mount Vernon Mills of the risks of discharging PFAS-laden water into Raccoon Creek. *See Certainteed Corp.*, 300 Ga. at 330. Again, DuPont's argument muddies the claim presented by the Plaintiffs—the Plaintiffs do not claim that DuPont had a duty to warn them directly, but that it had a duty to warn Mount Vernon Mills. (*See* Parris Compl. ¶ 189); (Summerville Compl. ¶ 129). Even accepting DuPont's argument, though, the evidence shows that the ratepayers of the City of Summerville were obviously foreseeable third-parties implicated by the users of DuPont's dangerous products, like Mount Vernon Mills. *See Certainteed Corp.*, 300 Ga. at 330. The evidence reflects DuPont's knowledge that for years, it knew that its products

21

were toxic to humans and bioaccumulative, that conventional wastewater treatment processes are ineffective at removing PFAS, and that, as a result, discharges of affected wastewater and sewage sludge would contaminate local water supplies with PFAS. (Pls.' Statement of Add'l Material Facts ¶¶ 4-6, 27). DuPont also knew that Mount Vernon Mills was a user of its products, even if it did not sell its products to Mount Vernon Mills directly. (DuPont's Statement of Material Facts ¶ 9). Thus, the evidence supports the conclusion that the risk of pollution of the Raccoon Creek watershed as a result of Mount Vernon Mills's intended use and discharge of DuPont's textile chemistry was foreseeable to DuPont such that it owed a duty to warn Mount Vernon Mills under Georgia law. *Certainteed Corp.*, 300 Ga. at 330 (nothing that the determination of the existence of a duty to warn is a legal question). DuPont is not entitled to summary judgment as to whether it had a duty on the negligent failure to warn claims, either.

DuPont's contention that, even if it had a duty to warn, it discharged that duty by providing Ciba/Huntsman with accurate MSDSs is unconvincing. The duty determination is a specific one, requiring warnings of "nonobvious foreseeable dangers from the normal use of [the manufacturer's] products." *Certainteed Corp.*, 300 Ga. at 330 (citation modified). The parties do not point to any evidence before the Court indicating that DuPont informed Ciba/Huntsman (or Mount Vernon Mills) of the risks of improper disposal of PFAS contaminated waste or that Ciba/Huntsman was otherwise aware of the

22

specific potential for water contamination. In fact, there is some evidence that may indicate Ciba/Huntsman was not aware of the PFAS content in the resulting wastewater. (Devaney Dep. Vol. I., [Doc. 874-5], at 204:16-24 ("Huntsman is not aware of all local regulations and is not aware of the content of the effluent and how it should be treated to meet local regulations."). The most DuPont states is that it provided MSDSs, with no indication of what specific information those documents contained. (DuPont Statement of Material Facts ¶ 20; Pls.' Resp. to DuPont's Statement of Material Facts [Doc. 969] (disputing that DuPont "provided Mount Vernon Mills—or even Ciba/Huntsman—with sufficient information to determine the full risks associated with the use of [DuPont's] fluorotelomer products."). Therefore, there is a genuine dispute of material fact as to whether providing Ciba/Huntsman with MSDSs about the general toxicity of DuPont's products, with no indication of whether it warned Ciba/Huntsman of the nonobvious risk of contamination of the local water supply should the resulting waste be improperly disposed, satisfied DuPont's duty to warn under Georgia law. *See Stuckey*, 874 F.2d at 1568 (holding that whether a supplier discharges its duty to warn turns on whether the intermediary's knowledge was sufficient to ultimately protect the consumer). For these reasons, the Court will deny DuPont's Motion as to the duty issue.

## B. Proximate Cause

Next, DuPont argues that it did not proximately cause the Plaintiffs' alleged harms because it is "at least four steps removed" from those harms, so it is entitled to summary judgment on the Plaintiffs' claims for negligence, negligent failure to warn, wantonness, nuisance, and trespass. (DuPont's Mot. for Summ. J., at 14-15). Specifically, DuPont contends that there are four superseding and intervening causes that occurred after it sold textile chemistries to Ciba/Huntsman. First, Ciba/Huntsman manufactured, reformulated, or rebranded DuPont's chemistries into their own products, for which it developed its own MSDSs. (*Id.* at 16). Second, Mount Vernon Mills, a sophisticated user, improperly disposed of its waste into the Trion WWTP. (*Id.*). Third, Trion treated the wastewater before dumping the resulting sludge onto farmland. (*Id.*). And fourth, Summerville installed water treatment technologies and imposed rate increases on Parris and the other class members to recoup the cost of the treatment. (*Id.*). Lastly, DuPont argues that the Plaintiffs have not put forth any evidence that it had knowledge of the uses to which its textile chemistries were being put, in terms of Mount Vernon Mills's or the Town of Trion's operations. (*Id.* at 23-24).

The Plaintiffs argue that the proximate cause does not necessarily have to be the last act or the nearest act to the injury under Georgia law. (Pls.' Resp. in Opp'n, at 39-40). They assert that there is ample evidence linking the PFOS and PFOA found in the Raccoon Creek Watershed to the Manufacturing

24

Defendants' products and showing their awareness of the "chain of contamination." (*Id.* at 40-41). The Plaintiffs contend that DuPont's alleged intervening causes are not truly intervening because they were foreseeable, they were triggered by DuPont's actions, and DuPont's actions were sufficient in and of themselves to cause the Plaintiffs' injuries. (*Id.* at 41-49).

As the Court noted in the Order ruling on the Motions to Dismiss, causation is an essential element of the Plaintiffs' negligence, nuisance, and trespass claims. *Alexander v. Hulsey Env't Servs.*, 306 Ga. App. 459, 462, (2010) (citation modified). "Causation is further broken down into two elements: cause-in-fact and proximate cause." *Yearty v. Scott Holder Enters., Inc.*, 349 Ga. App. 718, 721 (2019). "Proximate cause is defined as that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." *Id.* at 722 (citation modified). "Proximate cause is not necessarily the last act or cause, or the nearest act to the injury, but such act that has actively aided in producing the injury as a direct and existing cause. . . . And, there may be more than one proximate cause of an injury." *Sprayberry Crossing P'ship v. Phenix Supply Co.*, 274 Ga. App. 364, 365 (2005) (citations modified).

"A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to grant summary judgment for the defendant." *Alexander*, 306 Ga. App. at 462 (citation modified).

25

Nonetheless, "[t]he existence of proximate cause is a question of fact for the jury, except in palpable, clear, and indisputable cases." *Sprayberry Crossing P'ship*, 274 Ga. App. at 365.

DuPont's challenge to proximate cause lacks merit for several reasons. First and foremost is DuPont's assertion that its supplying Ciba/Huntsman with textile chemistry that metabolized into PFOA cannot be a proximate cause of the ultimate contamination of the Raccoon Creek watershed because the Plaintiffs have not presented any evidence that it actually knew of Mount Vernon Mills's waste disposal processes. (*See* DuPont's Mot. for Summ. J., at 16-17). This is an inaccurate application of Georgia law to the facts at issue, hinged on a misplaced reliance on the Georgia Court of Appeals's decision in *Alexander*. As the Court explained in the MTD Order, the nuisance at issue in *Alexander* was the specific way in which one of the defendants, a waste disposal facility, disposed of human and commercial waste by spraying it into the air. *Alexander*, 306 Ga. App. at 460-62. In upholding summary judgment in favor of another defendant—a customer of the waste disposal facility—the court noted that, "as a customer, [the defendant] does not direct or control any conduct of the waste disposal operation," and there was no evidence that it had actual knowledge that its waste, once brought to the facility for processing, was being discarded in an offensive manner. *Id.* at 461-62. Here, contrary to the analogy DuPont attempts to draw, the nuisance at issue is not Mount Vernon Mills's waste disposal process or Trion's water treatment process; the nuisance

26

is the contamination of the City of Summerville's drinking water supply. (*See, e.g.*, Parris Compl. ¶ 209).

*Alexander* does not stand for the proposition that, in any case where improper waste disposal is involved in creating a nuisance, a defendant must have actual knowledge of the disposal processes in order to be held liable. Instead, the case reaffirms the broader principle that, in nuisance cases, a plaintiff must show that the defendant had actual knowledge of a potentially dangerous situation and the ability to abate it—in other words, control it—but failed to do so within a reasonable time. *Id.* at 462 (distinguishing *Citizens & Southern Trust Co v. Phillips Petroleum Co.*, 192 Ga. App. 499 (1989), where the court found a genuine issue of fact as to whether a gasoline supplier deposited gasoline into underground storage tanks with actual knowledge that the tanks were defective, resulting in ground contamination); *see also Johnson v. 3M*, 563 F. Supp. 3d 1253, 1337 (N.D. Ga. 2021); *Horton v. City of Macon*, 144 Ga. App. 380, 382 (1977) ("Knowledge of a dangerous situation created by a defect and a failure to repair the defect within a reasonable time would amount to a nuisance."). As explained previously, the Plaintiffs have made that showing here. DuPont did not object to the veracity of the Plaintiffs' statement that it was aware that, as a result of Mount Vernon Mills's ordinary use of its products, PFOA contaminated wastewater would be discharged to a wastewater treatment plant that was not capable of treating for those compounds. (Pls.' Statement of Add'l Material Facts ¶¶ 4-6). There is also

27

evidence that DuPont became aware that PFOA was present in the products it sold to Ciba/Huntsman—albeit unintentionally—as early as 1981, and that it knew that PFOA is toxic and bioaccumulative in humans. (Korzeniowski Dep., Vol. II [Doc. 874-2], at 459:16-460:21); (Korzeniowski Dep., Vol. I [Doc. 874-3], at 213:3-19); (Pl.'s Statement of Add'l Material Facts ¶¶ 27, 64); (Hansen Expert Report, [Doc. 925-1], at 11); [Doc. 940-22], [Doc. 940-24]. And there is no dispute that DuPont continued supplying its textile chemistries to Ciba/Huntsman, knowing Mount Vernon Mills was one of Ciba/Huntsman's customers, nor is there evidence that DuPont did anything, for years, to stop or prevent the resulting water contamination. (Pls.' Statement of Add'l Material Facts ¶ 12).

DuPont's second challenge to proximate cause relies on Section 389 of the Second Restatement, and it involves similarly flawed reasoning. Ignoring that Section 389 imposes liability on suppliers who supply their chattels through third parties, DuPont argues that the language "is subject to liability for physical harm caused by such use to those whom the supplier should expect to use the chattel or to be endangered by its probable use" means that it cannot be liable for the water contamination absent actual knowledge of Mount Vernon Mills's waste disposal practices or Trion's water treatment practices. (*See* DuPont's Mot. for Summ. J., at 19-20). This is an inaccurate

28

interpretation of Restatement 389.[9] Georgia law is clear that there can be more than one proximate cause of an injury, and a proximate cause does not necessarily have to be the nearest act to an injury. *Sprayberry Crossing P'ship*, 274 Ga. App. at 365. This means a jury could find that DuPont's knowing supply of textile chemistry that contained ingredients that metabolized into PFOA for resale to Mount Vernon Mills, who used it for the purposes DuPont intended it to be used, is one of several proximate causes that lead to the injury the Plaintiffs complain of—contaminated drinking water. A jury could also find that Mount Vernon Mills's alleged improper disposal practices was also a proximate cause, and or that Trion's application of the resulting sludge-waste to farmland was as well. But as a matter of law, those findings would not necessarily negate a conclusion that DuPont's action of knowingly supplying PFOA-laden textile chemistry to ultimately be used as intended in a textile

---

[9] The Comment to Section 389 cuts against DuPont's position: "[T]he circumstances may be such that although the chattel is capable of being made safe for use, the person supplying it should realize the unlikelihood that this will be done before it is used. Among circumstances which render this unlikely are the facts . . . that the person to whom it is supplied is financially incapable of bearing the expense of making it safe." Restatement (Second) of Torts § 389, cmt. c. (Am. L. Inst. 1965). Here, the Plaintiffs have alleged (and DuPont has not disputed) that they were unaware of the PFAS content of their drinking water prior to the 2020 discovery and that typical wastewater treatment facilities, like Trion WWTP, are not capable of treating for PFOS or PFOA contamination absent an expensive granulated carbon filtration system. Further, "the phrase 'subject to liability' means that the supplier will be liable if, but only if, his conduct is, in law, the cause of bodily harm sustained by another." *Id.* cmt. d. As explained above, a jury could find that DuPont's acts constituted one of several proximate causes of the water contamination.

mill like Mount Vernon Mills was a proximate cause of the harm. *See id.* For purposes of the present motion, what matters is that there is no dispute that DuPont's textile chemistry contained at least some of the PFOA that ultimately contaminated the Raccoon Creek watershed, and DuPont's knowing continued supply of that chemistry to Ciba/Huntsman with knowledge that it was being resold to Mount Vernon Mills "actively aided in producing the injury as a direct and existing cause." *Id.* In other words, without DuPont's act, the PFOA from its products would not have contaminated the water.

Third, and relatedly, the alleged intervening causes that DuPont identifies are not true intervening causes in that they are not sufficient on their own to have caused the Plaintiffs' alleged harm. An intervening cause must not have been "foreseeable by defendant . . . not triggered by defendant's act, and . . . sufficient of itself to cause the injury." *Yearty*, 349 Ga. App. at 722. Such a cause must be "of itself sufficient to stand as the cause of the misfortune," and "if the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer," then the intervening act does not break the causal chain "and the original wrong-doer is responsible for all of the consequences resulting from the intervening act." *Ontario Sewing Mach. Co., Ltd. v. Smith*, 275 Ga. 683, 686-87 (2002) (citations modified).

30

Here, there is sufficient evidence from which a jury could find that DuPont knew that if its products were used as intended by Mount Vernon Mills, PFOA contamination of the water supply was a foreseeable result. (*See, e.g.*, Pls.' Statement of Add'l Material Facts ¶¶ 4-6). There is also evidence from which a jury could find that DuPont's act of continuing to supply its textile chemistry to Ciba/Huntsman triggered a chain of events, without which (1) Ciba/Huntsman could not have repackaged or sold DuPont-based products to Mount Vernon Mills, (2) Mount Vernon Mills could not have improperly disposed of PFAS-containing waste to Trion WWTP, (3) Trion could not have improperly treated the resulting waste, and (4) the City of Summerville would not have needed an advanced water treatment system paid for via rate hikes to its customers. And given that, again, there is no dispute that DuPont's products are at least one of the sources of the PFAS contamination of the Raccoon Creek watershed, a jury could also find that none of these alleged intervening acts were "sufficient by [themselves] to cause the injury" absent DuPont's acts. *Ontario Sewing Machine Co., Ltd.*, 275 Ga. at 686 (citation modified).

For all of these reasons, there is a genuine dispute of material fact as to whether DuPont's actions, as alleged by the Plaintiffs, were a proximate cause of the resulting water contamination in the Raccoon Creek watershed. Accordingly, the Court will deny DuPont's Motion for Summary Judgment on this issue.

31

## C. Nuisance

Next, DuPont asserts that the Plaintiffs' nuisance claims fail because there is no evidence that it controlled the alleged cause of the nuisance. (DuPont's Mot. for Summ. J., at 20-23). It argues that it no longer sells textile chemistries, it never sold textile chemistry to Mount Vernon Mills, and it did not exert any control over the chemistries once sold to Ciba/Huntsman. (*Id.* at 21-22). DuPont also contends the claim for abatement of public nuisance necessarily fails because the underlying public nuisance claim fails. (*Id.* at 5 n.10).

The Plaintiffs argue in response that there is evidence that DuPont was aware that PFAS would ultimately pollute downstream surface waters once discharged to a conventional water treatment facility. (Pls.' Resp. in Opp'n, at 60-61). They also contend that DuPont controlled the cause of the nuisance because it "had the power and authority to discontinue sales of a product if [it] became aware of improper disposal of that product by a customer or downstream user." (*Id.* at 61). The Plaintiffs assert that DuPont also contracted with Mount Vernon Mills directly for licensing and, in doing so, made suggestions on how to apply its chemicals, which further indicates control. (*Id.* at 62-63). Nonetheless, the Plaintiffs contend, DuPont made no effort to prevent these chemicals from discharging into the Raccoon Creek watershed. (*Id.* at 62).

Under Georgia law, a nuisance is anything that "causes hurt, inconvenience, or damage to . . . . an ordinary, reasonable man." O.C.G.A. § 41-1-1. A public nuisance is "one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals." *Id.* § 41-1-2. Under Georgia law, "[t]he essential element of nuisance is control over the cause of the harm. The tortfeasor must be either the cause or a concurrent cause of the creation, continuance, or maintenance of the nuisance." *Grinold v. Farist*, 284 Ga. App. 120, 122 (2007) (citation modified). Thus, where a defendant has knowledge of and a right to abate a dangerous situation, but fails to do so within a reasonable time, its actions or omissions may constitute a nuisance. *Johnson*, 563 F. Supp. 3d at 1337; *Horton*, 144 Ga. App. at 382. "Under Georgia law, the discharge or release of harmful pollutants or substances may constitute a nuisance." *Johnson*, 563 F. Supp. 3d at 1337 (collecting cases).

In the Motion to Dismiss Order, the Court held that the Manufacturing Defendants' argument that a claim for nuisance could not lie where the products allegedly caused harm after they left the manufacturers' control was not supported by Georgia law. (MTD Order, at 85-86). Although DuPont was not yet a party to the case at that time, its nearly identical argument here likewise has no merit. First, it is irrelevant under Georgia law whether DuPont retained control of its textile chemistry after it was sold to Ciba/Huntsman because there is no dispute that its textile chemistry was a "concurrent cause

of the creation" and arguably the "continuance or maintenance of" the contamination of the Raccoon Creek watershed. *See Grinold*, 284 Ga. App. at 122. Second, DuPont has admitted that it was aware that Mount Vernon Mills's ordinary use of its products in Mount Vernon Mills's mill was likely to result in contamination of local water supplies. (Pls.' Statement of Add'l Material Facts ¶¶ 4-6). Despite that knowledge, there is no dispute that DuPont chose not to cease its sales of textile chemistry to Ciba/Huntsman for years. *Johnson*, 563 F. Supp. 3d at 1337 ("Where the element of control is met, knowledge of a dangerous situation and a failure to remedy that situation within a reasonable time can result in a legal nuisance."); *Horton*, 144 Ga. App. at 382.

Finally, the fact that DuPont no longer sells the textile chemistries at issue does not absolve it of nuisance liability. The Georgia Court of Appeals addressed a version of this argument in *Hoffman v. Atlanta Gas Light Co.*, 206 Ga. App. 727 (1992). There, a pipeline company argued that it was not responsible for continuing ground contamination that occurred due to leaks in its pipeline because it had since transferred ownership of the pipeline to another company. *Hoffman*, 206 Ga. App. at 729. The Georgia Court of Appeals disagreed, explaining that the original owner could be liable because the contamination constituted a continuing nuisance, so the appellants' damages were not limited to the initial leaks that caused the contamination to begin. *Id.* at 730 ("The damages growing out of the nuisance are the continuing hurt,

34

inconvenience, or damage caused by the hydrocarbon contamination, for which OCGA § 41-1-1 gives a cause of action, and which were not assuaged by [the defendant's] sale of the pipeline to another." (citations modified)). So too, here. The fact that DuPont no longer sells its textile chemistries to Ciba/Huntsman has no bearing on whether it controlled the creation or continuance of the contamination of the Raccoon Creek watershed, because this type of contamination is considered a continuing nuisance under Georgia law. *See id.* ("Every continuance of a nuisance which is not permanent, and which could and should be abated, is a fresh nuisance for which a new action will lie. Consequently, a suit may be maintained for damages growing out of a nuisance of [this character]." (citation modified)). Regardless, "[l]iability may flow where the defendant is the cause/concurrent cause of the creation *or* maintenance of a nuisance, even if there are subsequent actions involved." *Johnson*, 563 F. Supp. 3d at 1338. Thus, DuPont is not entitled to summary judgment on the control element of the Plaintiffs' nuisance claims on these grounds.

## D. Injunctive Relief, Attorney's Fees, and Punitive Damages

Finally, DuPont argues that the Plaintiffs are not entitled to injunctive relief because they have an adequate remedy at law. (DuPont's Mot. for Summ. J., at 24-25). They also assert that, because the underlying claims fail, so do the Plaintiffs' claims for punitive damages and attorneys' fees. (*Id.* at 5 n.10). DuPont is correct that the Plaintiffs cannot recover punitive damages or attorney's fees unless they recover damages or other relief on an underlying,

35

substantive claim. *ABH Corp. v. Montgomery*, 356 Ga. App. 703, 706 (2020) ("The derivative claims of attorney fees and punitive damages will not lie in the absence of a finding of compensatory damages on an underlying claim." (citation modified)). However, the Court has not dismissed the Plaintiffs' substantive claims against DuPont, so their claims for punitive damages and attorney's fees survive. Nor can the Court say at this stage that DuPont's conduct falls outside the scope of O.C.G.A. § 13-6-11, which awards litigation expenses "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." In general, the jury should be allowed to decide whether a party has displayed such conduct in the course of the litigation. *Steel Magnolias Realty, LLC v. Bleakley*, 276 Ga. App. 155, 156 (2005). Accordingly, the Court denies DuPont's Motion as to the Plaintiffs' punitive damages and attorney's fees claims.

As the Court reads the Parris Complaint, the Plaintiffs mainly sought injunctive relief against Defendants Mount Vernon Mills and Town of Trion, but those claims are no longer live since the Plaintiffs settled with those Defendants and dismissed them from this action. (Parris Compl. at 77-79); [Docs. 915, 916]. The Plaintiffs did seek injunctive relief against all Defendants, including DuPont, by seeking abatement of public nuisance under O.C.G.A. § 41-2-1 and 41-2-2. (Parris Compl. ¶¶ 217-22). DuPont is correct that, under Georgia law, the Court may not grant injunctive relief if the Plaintiffs have an adequate remedy at law. *See, e.g., Lue v. Eady*, 297 Ga. 321,

36

329 (2015). And here, the Plaintiffs may have a remedy at law in the form of money damages on their substantive tort claims. As the Court noted in its Order on class certification, the Plaintiffs' requests for injunctive relief are "just a dressed-up version of [their] request for monetary damages," seeking to offset the cost of a granular activated carbon filtration system that will remove PFAS from the affected water supply. (Op. & Order dated Sept. 29, 2025, at 29). However, the Plaintiffs are permitted to pursue alternative theories of relief, regardless of their consistency. Fed. R. Civ. P. 8(d)(2), (3); *Allstate Ins. Co. v. James*, 779 F.2d 1536, 1540-41 (11th Cir. 1986). Because the Court has not granted summary judgment in DuPont's favor on any of the Plaintiffs' claims seeking money damages, they may continue to pursue their alternative theories for injunctive relief with regard to abating the nuisance. So, although the Court has already ruled that a class may not be certified for injunctive relief, Parris and Summerville, as named Plaintiffs, may continue to pursue both injunctive relief and monetary damages until such time as a jury awards one or the other form of relief at trial. Therefore, the Court denies DuPont's Motion as to the Plaintiffs' claims for injunctive relief.

## IV. Conclusion

For the foregoing reasons, the Defendants E.I. du Pont de Nemours and Company and the Chemours Company's Motion for Summary Judgment [Doc.

873] is DENIED.[10]

SO ORDERED, this ___10th___ day of July, 2026.

THOMAS W. THRASH, JR.
United States District Judge

---

[10] Because the Court is denying the Motion for Summary Judgment, it declines to address the Plaintiffs' arguments regarding apportionment of liability at this time.