IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

EARL PARRIS, JR.
Individually, and on behalf of a Class of
persons similarly situated,

     Plaintiff,

       v.

     CIVIL ACTION FILE
     NO. 4:21-CV-40-TWT

3M COMPANY, et al.,

     Defendants.

## OPINION AND ORDER

This is an action under the Clean Water Act. It is before the Court on

Defendant 3M Company's ("3M") Motion for Summary Judgment [Doc. 890].

For the following reasons, 3M's Motion for Summary Judgment [Doc. 890] is

DENIED.

## I.  Background[1]

_____

[1] The operative facts on the Motion for Summary Judgment are taken from the parties' Statements of Material Facts and the responses thereto. The Court will deem the parties' factual assertions, where supported by evidentiary citations, admitted <u>unless the respondent makes a proper objection under Local Rule 56.1(B)</u>. Where a fact is undisputed or not properly objected to, the Court will cite only the Statement giving the fact. To that end, the Court notes that there are several instances of the Plaintiffs attempting to add facts, with or without citation, to their undisputed responses to 3M's Statements of Material Facts. This is not the proper way to assert additional facts under the Local Rules. *See* LR 56.1(B)(2)(a)(2), N.D.Ga. (noting that the respondent is to "directly refute[] the movant's fact with <u>concise</u> responses supported by <u>specific citations to evidence</u> . . . state[] a valid objection to the admissibility of the movant's fact . . . [or] point out that the movant's citation does not support the movant's fact or that the movant's fact is not material or [does not comply with

This case arises out of the alleged contamination of surface waters and drinking water in Chattooga County, Georgia, with per- and polyfluoroalkyl substances ("PFAS"). (2nd Am. Compl. ("Parris Compl."), [Doc. 280], ¶ 1). The EPA has recognized these substances as "persistent, bioaccumulative, and toxic" ("PBT"). (Pls.' Statement of Add'l Material Facts [Doc. 929-1] ¶ 1). Defendant 3M has developed and sold fluorochemical products for the textile industry for decades, including a stain release product known as "FC-248" that it sold under its Scotchgard brand. (3M's Statement of Material Facts [Doc. 899-2] ¶ 1); (Pls.' Resp. to 3M's Statement of Material Facts [Doc. 957] ¶ 1). 3M sold this product to many companies, including the Defendant Mount Vernon Mills, which applied it to textiles to create enhanced soil resistance. (3M's Statement of Material Facts ¶ 3).

Until the early 2000's, 3M's textile products were made using a specific PFAS called perfluorooctanesulfonyl fluoride ("POSF") that reacted with various other compounds to produce a fluorochemical polymer. (*Id.* ¶ 4). POSF contains a chain of eight carbon atoms, also known as "C8-based chemistry," and it can degrade into another C8 fluorochemical known as perfluorooctane

---

the Local Rules]." The Court will thus disregard any such "facts" (or legal arguments) added in the Plaintiffs' responses. The Court may also disregard, in its discretion, any citation to the Plaintiffs' Additional Statements of Material Fact within the Plaintiffs' responses, which would require the Court to refer to that document to find citations to the record evidence in support of the objection and therefore does not constitute a "specific citation[] to evidence."

sulfonic acid ("PFOS"). (*Id.* ¶¶ 5-6). The same chemical properties that provide enhanced soil-resistant attributes also make PFOS resistant to degradation and therefore persistent in the environment. (*Id.* ¶ 7). These products also contained PFOA as an impurity. [Doc. 939-5 at 16-17]. Mount Vernon Mills's predecessor, Riegel Textile Corporation, purchased and used 3M's fluorochemical products from at least 1974 until Mount Vernon Mills acquired it in 1985. (*Id.* ¶¶ 8, 10); (Pls.' Resp. to 3M's Statement of Material Facts ¶¶ 8, 10); (Edward Cochrane Dep., [Doc. 899-16], at 29:20-30:8); (Robert Chad Dep., [Doc. 939-3], at 249:13-251:5, 260:7-261:8). 3M sold its FC-248 product to Mount Vernon Mills itself from 1995 to 2000, and sold it to Riegel as early as 1984. (3M's Statement of Material Facts ¶¶ 9-10); (Robert Chad Dep., [Doc. 939-3], at 72:9-74:7); [Doc. 940-3 at 16].

Mount Vernon Mills is the largest industrial user of the Trion Wastewater Treatment Plant ("WWTP"). (3M's Statement of Material Facts ¶ 21). Mount Vernon Mills does not conduct any pretreatment for PFAS or other chemicals before discharging its wastewater to Trion WWTP. (*Id.* ¶ 25). Ultimately, Trion WWTP separates the wastewater into sludge and water. (*Id.* ¶¶ 28-30, 33-35). The water is disinfected and discharged into the Chattooga River, and the sludge is either used in its land application program or sent to a landfill. (*Id.* ¶¶ 35-37). Trion has had a permit from the Georgia EPD to dispose of the sludge via land application since at least 1992. (*Id.* ¶¶ 38-39). Pursuant to that permit, Trion spread the sludge on various farm properties

3

as fertilizer, some of which are located in the Raccoon Creek watershed. (*Id.* ¶¶ 40-41). The Plaintiff City of Summerville uses Raccoon Creek as its primary water source. (*Id.* ¶ 42); (Pls.' Resp. to 3M's Statement of Material Facts ¶ 42). In January 2020, the City of Summerville received notice from Georgia EPD that sampling results indicated levels of PFOS and PFOA in raw and finished drinking water from Raccoon Creek that exceeded the EPA's 2016 Health Advisory levels of 70 ppt. (Pls.' Statement of Add'l Material Facts ¶ 139); (3M's Resp. to Pls.' Statement of Add'l Material Facts ¶ 139). As a result, Trion stopped applying sludge to properties in the Raccoon Creek watershed in February 2020. (3M's Statements of Material Facts ¶ 102).

Mount Vernon Mills controls the wastewater generated by its textile operations at the mill. (3M's Statements of Material Fact ¶ 13); (Pls.' Resp. to 3M's Statements of Material Fact ¶ 13). In addition to its fluorochemical application processes, Mount Vernon Mills employed several other processes at its plant that generated wastewater, and Mount Vernon Mills combined all of its wastewater together until March 2023. (3M's Statements of Material Fact ¶¶ 14-15). From March 2023 onward, Mount Vernon Mills began separating its wastewater and pumping the wastewater from its fluorochemical application processes into plastic containers. (*Id.* ¶ 19). Segregating wastewater streams is a long-standing industry practice and was considered a "best practice" by the EPA in the 1970's and 1990's. (*Id.* ¶ 20). Nonetheless, until 1990, 3M recommended on its Material Safety Data Sheets ("MSDSs")

4

that users "[d]ischarge spent solutions and small product quantities, <5 gal., to a wastewater treatment system" and to only "[i]ncinerate bulk product." [Doc. 959-12]; (Robert Chad Dep., [Doc. 939-3], at 114:8-17). Beginning in 1990, 3M's MSDSs recommended that users "[i]ncinerate in a permitted hazardous waste incinerator" any "waste product." [Doc. 959-12 at 42]. But despite these recommendations, Mount Vernon Mills understood them to apply only to "bulk product" and "spills" rather than spent solution and general waste products. (Ronald Beegle 30(b)(6) Dep., Vol. I, [Doc. 940-11], at 134:15-135:5). 3M's expert, Doug Rush, explained that "any disposal recommendations that a manufacturer may voluntarily include in an MSDS apply to the material as manufactured; processing, use, or contamination may make the information inappropriate, inaccurate, or incomplete" and that "this information, if provided, does not dictate the proper disposal methods for any waste streaming containing the product." (Expert Report of Doug Rush, [Doc. 962-2], at 21 (quotation marks and citations omitted)). And 3M never discussed with Mount Vernon Mills how it should be handling its PFAS-containing wastewater. (Ronald Beegle 30(b)(6) Dep., Vol. I, [Doc. 940-11], at 194:20-24).

Throughout 3M's business relationship with Mount Vernon Mills, the MSDSs 3M provided might include environmental information or disposal recommendations, but provision of that information to a customer is voluntary. (3M's Statements of Material Fact ¶¶ 45, 47). From 1990 to 2000, 3M issued 33 versions of the MSDS for FC-248, and all but one only recommended

incineration for the disposal method. (*Id.* ¶ 50). The one MSDS that did not recommend incineration recommended discharging small quantities to a wastewater treatment system, but that MSDS was revised less than one week after it was issued to recommend incineration only. (*Id.* ¶ 51). Mount Vernon Mills incinerated incidental spills of FC-248, but never wastewater containing FC-248. (*Id.* ¶ 52). 3M did not disclose on the MSDS that FC-248 contained residual fluorochemicals that could persist in the environment and accumulate in the human body until September 1998. (*Id.* ¶ 53). In fact, the MSDSs did not list the fluorochemical ingredients in the product at all, as 3M considered that information to be a trade secret. (Ronald Beegle 30(b)(6) Dep., Vol. I, [Doc. 940-11], at 136:10-137:20).

In February 1999, 3M representatives met with Mount Vernon Mills representatives to discuss PFAS in 3M's products, informing Mount Vernon Mills that PFOS were "persistent" and had been detected in the blood of the general population. (3M's Statements of Material Fact ¶ 55). 3M first disclosed this information to the EPA in May 1998. (Pls.' Statement of Add'l Material Facts ¶ 19); [Doc. 937-9].[2] 3M had been aware since 1964, however, that a

---

[2] The Court pauses here to note the difficulty it has had in locating several of the parties' cited exhibits. For example, in their response to 3M's Statements of Material Fact ¶ 59, the Plaintiffs cite "Pls.' SF, Ex. 17, at 72:3-84:1." (Pls.' Resp. to 3M's Statements of Material Fact ¶ 59 n. 39). The pin cite indicates this exhibit should contain a deposition transcript. The Plaintiffs' Response is Doc. 929 on the docket, but that filing does not contain an exhibit 17. And a keyword search for "Ex. 17" on the docket reveals five Exhibit 17's filed by the Plaintiffs, none of which are depositions. Moreover, all of these

"relatively large amount" of its POSF-based fluorochemicals were being discharged to the sewer system during its own manufacturing processes. [Doc. 949-2]. And it became aware in the 1970's that its Scotchgard product could potentially be the cause of the universal PFOA contamination of human blood. [Doc. 949-6]; [Doc. 949-8]. In a follow-up that same February of 1999, 3M assured Mount Vernon Mills that no health effects had been attributed to these chemicals at the blood levels found to be present. (3M's Statements of Material Fact ¶ 56). Meanwhile, in 1977, animal toxicity studies of 3M perfluorinated products conducted on rats and monkeys showed toxic effects and even death at higher concentrations of certain products, including the FC-95 version of Scotchgard, which was PFOS-based. [Doc. 949-10 at 22-24]. By 1979 at the latest, 3M was aware that PFOS "has a potential for widespread distribution in the environment" based on its wide and varied industrial uses, that "waterways are the environmental sink" for PFOS, and that it was "completely resistant to biodegradation." [Doc. 952-8 at 3, 5, 9]. But as a result of an environmental effects study, 3M concluded that FC-95 would not "present an unreasonable environmental risk" under the conditions tested. [*Id.* at 11]. By 1982, 3M knew that fluorochemicals remained in sludge and that they entered

---

exhibits, once opened, have at least one other exhibit number on them. The Court has spent an untold amount of time searching the docket for the evidence supporting both parties' positions, but any evidence inadvertently overlooked must be blamed on the parties' lack of diligence in properly labeling and organizing their filings on the docket.

the environment through the application of wastewater sludge to land. (Robert Chad Dep., [Doc. 939-3], at 223:13-224:19); [Doc. 958-5 at 3]; [Doc. 952-9 at 29]. By 1996, 3M knew that its textile customers' ordinary usage of its other PFOS-based products would contaminate wastewater sludge. [Doc. 958-6 at 2-3]. And by February 1999, 3M was aware of the potential for environmental contamination owed to "leaching from wastewater treatment sludge." [Doc. 958-8 at 8]. In March 1999, 3M environmental scientist Dr. Richard Purdy resigned due to his "profound disappointment in 3M's handling of the environmental risks associated with the manufacture and use of perfluorinated sulfonates (PFOS) . . . and its precursors."[3]  [Doc. 937-10].

In response to 3M's February 1999 letter, Mount Vernon Mills requested additional information on the health effects of PFOS and the relationship between PFOS and PFOA. [Doc. 962-6]. 3M records indicate that a 1998 article regarding the effect of PFOA on male hormones and a 1980 article on the health of plant workers exposed to fluorochemicals generally were sent in response. [Docs. 962-7, 962-8, 962-9]. In May 2000, 3M announced it was phasing out C-8 based chemistries "based on [its] principles of responsible environmental management." (3M's Statements of Material Fact ¶ 66). 3M

---

[3] Dr. Purdy went on to share his opinion that "3M waited too long to tell customers about the widespread dispersal of PFOS in people and the environment. We knew before May of 1998, yet 3M did not start telling customers until January of 1999. I felt guilt about this and told customers I personally knew earlier." [Doc. 937-10 at 3].

completed this phase out in 2002, and has not manufactured or sold C8 based chemistries since. (*Id.* ¶ 69). After that time, Mount Vernon Mills purchased PFAS-based products from other chemical manufacturers until 2023. (*Id.* ¶ 70). But those products did not contain or degrade to PFOS, so 3M was the sole supplier of PFOS-based products to Mount Vernon Mills. (Pls.' Resp. to 3M's Statements of Material Fact ¶ 70); (Pls.' Statement of Add'l Material Facts ¶ 54); (Ronald Beegle 30(b)(6) Dep., Vol. I, [Doc. 940-11], at 197:19-25). Mount Vernon Mills did not install any PFAS removal technology and continued discharging its untreated wastewater to Trion WWTP. (3M's Statements of Material Fact ¶ 72). Mount Vernon Mills also never disclosed to Trion that its wastewater contained PFAS or PFOS until after the Georgia EPD notified Trion of the PFAS test results in January 2020. (*Id.* ¶ 73).

The Plaintiff Earl Parris, Jr., a City of Summerville resident, filed this action in February 2021 on behalf of himself and a class of Summerville residents whose drinking water was contaminated with PFAS, purportedly as a result of the Defendants' actions. The Court later permitted the City of Summerville to intervene. On September 29, 2025, the Court granted class certification as to past damages sought through the "Damages Class," which includes "all rate payers of water and sewer service with the City of Summerville from January 2020 through class certification." (Op. & Order dated Sept. 29, 2025, [Doc. 1059], at 9-10). 3M moved for summary judgment

as to all of the claims against it, and that Motion is presently before the Court. [4]

## II. Legal Standards

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). The court should view the evidence and draw any inferences in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

## III. Discussion

### A. Timeliness

3M argues that Georgia law proscribes a four-year statute of limitations to all tort claims except for personal injury claims and that the limitations period here ran before either Plaintiff filed suit. (3M's Mot. for Summ. J., at 8-9). It contends that the statute of limitations begins running on the day the wrong was committed, even if the injury did not manifest until later. (*Id.* at

---

[4] The Court has also read and considered 3M's reply brief. [Doc. 1021].

9-10). 3M also argues that although Georgia recognizes the continuing tort doctrine, it does not apply to non-personal injury cases, and the Plaintiffs have failed to demonstrate a continuing nuisance. (*Id.* at 10-12). Finally, 3M contends that Parris's claims are untimely under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") as well. (*Id.* at 12-13).

The Plaintiffs contend that Georgia courts have applied the continuing tort doctrine to water contamination cases like this one on the grounds that the contamination is continually being committed and continues to injure a plaintiff. (Pls.' Resp. in Opp'n to 3M's Mot. for Summ. J., at 21-24). They also argue that Summerville's claims are timely under CERCLA because it sought to intervene in this action less than a year and a half after the Georgia EPD first notified it of the elevated PFOS levels in its water supply, which could only be attributable to 3M. (*Id.* at 24-27).

The parties here agree that the claims at issue are governed by a four-year statute of limitations, but disagree as to when the statute began running or whether any exceptions might apply. "Whether a statute of limitation bars an action generally is a mixed question of law and fact, but the question is one of law where . . . the pertinent facts appear to be undisputed." *Miller v. Wilcoxson*, 926 S.E.2d 330, 332 (2026). Generally, the statute of limitations on a tort claim begins running "when the damage from the tortious act was actually sustained by the plaintiff." *Walden v. Jones*, 252 Ga. App. 692,

694 (2001) (citation modified); *Therrell v. Georgia Marble Holdings Corp.*, 960 F.2d 1555, 1560 (1992).[5] As to the nuisance claims, the classification of a nuisance claim as permanent or continuing "directly controls the manner in which the statute of limitations will be applied." *City of Atlanta v. Kleber*, 285 Ga. 413, 416 (2009).

> A nuisance, permanent and continuing in its character, the destruction or damage being at once complete upon the completion of the act by which the nuisance is created, gives but one right of action, which accrues immediately upon the creation of the nuisance, and against which the statute of limitations begins, from that time, to run. Where a nuisance is not permanent in its character, but is one which can and should be abated by the person erecting or maintaining it, every continuance of the nuisance is a fresh nuisance for which a fresh action will lie. This action accrues at the time of such continuance, and against it the

[5] Contrary to 3M's broad contention, the rule that tort claims accrue on the date "the wrong is committed" applies to claims for damage to property. *Briggs v. Stratton Corp. v. Concrete Sales & Servs., Inc.*, 990 F. Supp. 1473, 1483 (1998). But Parris does not truly assert claims for property damage here; instead, both Plaintiffs seek recovery of economic losses related to the cost to install a granular activated carbon filtration system at the Trion WWTP that will filter out PFAS from Summerville's finished drinking water and the cost of obtaining alternative water. (*See, e.g.*, Summerville Compl. ¶ 3 ("Summerville also seeks to recover compensatory damages from the manufacturers and distributors of the PFAS chemicals that have contaminated, and will continue to contaminate, the City's water supply and for the costs associated with removing PFAS from the water."); (Parris Compl. ¶ 102 ("Plaintiff and the Proposed Class Members have also suffered losses for the payment of surcharges and rate increases due to both the temporary measures taken by Summerville to attempt to remove PFAS from the water supply and the future measures to be taken by Summerville to permanently filter the PFAS pollution in order to provide a safe, long-term water supply. Plaintiff and the Proposed Class Members have further incurred costs in obtaining alternate supply(s) of potable water."). They also seek injunctive relief to the same end. Summerville's Complaint frames its claims as damage to real property, given that it owns the land through which Raccoon Creek flows and has a propriety interest in that water. (Summerville Compl. ¶ 8).

statute of limitations runs only from the time of such accrual.

*Id.* (citation modified). Continuing nuisance claims are functionally equivalent to continuing trespass claims under Georgia law in surface water invasion cases. *See Brand v. Montega Corp.*, 233 Ga. 32, 33 (1974). Similarly, the continuing tort doctrine provides that "where a time interval elapses between the commission of the act and the infliction of the injury which first puts the recipient on notice the latter date will mark the time from which the statute of limitation runs." *Forgay v. Tucker*, 128 Ga. App. 497, 499 (1973). While Georgia does recognize the doctrine, its application is limited to personal injury cases, so it does not apply in this matter. *Harvey v. Merchan*, 311 Ga. 811, 816 (2021).

Having outlined the applicable law, the Court finds that this is such a case where the pertinent facts appear to be undisputed and the statute of limitations issue can be determined as a matter of law. *See id.* Neither party argues in favor of the governing rule, which is the standard tort rule that the statute of limitations begins running when the damage is actually sustained by the Plaintiff. *Walden*, 252 Ga. App. at 694. The Complaints' framing of the parties' claims is determinative here. As the Court has already touched on, the true basis of the Plaintiffs' injuries is the economic losses they have suffered as a result of the Manufacturing Defendants' alleged contamination of Raccoon Creek. For Parris and the damages class, these losses came in the form of rate increases on their water bills, costs incurred to obtain alternate water, and

alleged diminution in property values as a result of the 2020 EPA test results reflecting high PFAS content both in Raccoon Creek and Summerville's finished drinking water. For Summerville, these losses manifested as costs incurred to provide alternative water to its residents, install a temporary filtration system, and in the future, install a permanent filtration system in order to eliminate PFAS from its water. There is no dispute as to when these damages were incurred; Summerville was notified of the EPA's test results in January 2020, and the resulting costs incurred and passed on as rate increases to its customers necessarily took place shortly thereafter. This action was filed just over a year later, in February 2021, and Summerville was allowed to intervene in March 2022. Using the January 2020 date as the earliest possible date the Plaintiffs could have begun incurring their economic losses, their claims were brought well within the four-year statute of limitations period.

Even if the Court were forced to rely on an exception in order to find the Plaintiffs' claims timely, most of the Plaintiffs' claims could proceed. First, the Plaintiffs have demonstrated a continuing nuisance here. Contrary to 3M's argument otherwise, the fact that it stopped selling its FC-248 product to Mount Vernon Mills in 2000 does not absolve it of nuisance liability. The Georgia Court of Appeals addressed a version of this argument in *Hoffman v. Atlanta Gas Light Co.*, 206 Ga. App. 727 (1992). There, a pipeline company argued that it was not responsible for continuing ground contamination that occurred due to leaks in its pipeline because it had since transferred ownership

14

of the pipeline to another company. *Hoffman*, 206 Ga. App. at 729. The Georgia Court of Appeals disagreed, explaining that the original owner could be liable because the contamination constituted a continuing nuisance, so the appellants' damages were not limited to the initial leaks that caused the contamination to begin. *Id.* at 730 ("The damages growing out of the nuisance are the continuing hurt, inconvenience, or damage caused by the hydrocarbon contamination, for which OCGA § 41-1-1 gives a cause of action, and which were not assuaged by [the defendant's] sale of the pipeline to another." (citations modified)). So too, here. The fact that 3M no longer sells its PFOS-based products has no bearing on whether it controlled the creation or continuance of the contamination of the Raccoon Creek watershed, because this type of contamination is considered a continuing nuisance under Georgia law. *See id.* ("Every continuance of a nuisance which is not permanent, and which could and should be abated, is a fresh nuisance for which a new action will lie. Consequently, a suit may be maintained for damages growing out of a nuisance of [this character]." (citation modified)). Regardless, "[l]iability may flow where the defendant is the cause/concurrent cause of the creation *or* maintenance of a nuisance, even if there are subsequent actions involved." *Johnson v. 3M*, 563 F. Supp. 3d 1253, 1338 (N.D. Ga. 2021).

In *Smith*, the Georgia Court of Appeals clarified its ruling in *Hoffman*, explaining that it did not hold that the mere "*existence* of the contamination" constitutes a continuing nuisance and trespass, but that where "hazardous

15

chemicals . . . continu[e] to spread, causing fresh acts of contamination," the plaintiffs "had a cause of action against the original owner of the subject property for causing a continuing nuisance" notwithstanding the fact that the original owner no longer owned the property. *Smith,* 226 Ga. App. at 628. The same is true here. A public nuisance is "one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals." O.C.G.A. § 41-1-2. Even though 3M did in fact stop selling its PFOS-based products in 2000, the EPA's testing in 2020 still revealed levels of PFOS in Summerville's raw and finished drinking water well above the then-set health advisory levels, 20 years later. (Pls.' Statement of Add'l Material Facts ¶ 139); (3M's Resp. to Pls.' Statement of Add'l Material Facts ¶ 139). There is no dispute that 3M's products are the only PFOS-based products that Mount Vernon Mills used. (Pls.' Resp. to 3M's Statements of Material Fact ¶ 70); (Pls.' Statement of Add'l Material Facts ¶ 54); (Ronald Beegle 30(b)(6) Dep., Vol. I, [Doc. 940-11], at 197:19-25). And there is no dispute that these chemicals are persistent in the environment and do not biodegrade. (Pls.' Statement of Add'l Material Facts [Doc. 929-1] ¶ 1); (3M's Statement of Material Facts ¶ 7). Because the Plaintiffs claims are based on a continuing nuisance and continuing trespass, they are not time barred. *City of Atlanta*, 285 Ga. at 416 ("[E]very continuance of the nuisance is a fresh nuisance for which a fresh action will lie. This action accrues at the time of such continuance, and against it the statute of limitations runs only from the

16

time of such accrual.").

As to CERCLA, 3M contends that the CERCLA discovery rule exception applies only to claims for personal injury or property damage, and that Parris asserts neither. (3M's Mot. for Summ. J., at 12-13). And as to Summerville, 3M argues that even though it asserts a claim for property damage, it first became aware of PFAS contamination in its water no later than 2015, which would have triggered the four-year limitations period. (*Id.* at 13).

Georgia law does not have a "discovery rule," which tolls the statute of limitations until a tortious injury is discovered, but federal law does. *See Smith v. Branch*, 226 Ga. App. 626, 627 (1997). Under CERCLA, the statute of limitations for a claim for personal injury or property damages caused by exposure to a contaminant released into the environment from a facility begins to run on the date "the plaintiff knew (or reasonably should have known) that the personal injury or property damages . . . were caused or contributed to by . . . the contaminant concerned." 42 U.S.C. § 9658(b)(4)(A). This "federally required commencement date" supersedes any start date specified by state statute. *Id.* § 9658(a)(1).

Construing the evidence in the Plaintiffs' favor, the Court disagrees with 3M. While it is true that the crux of Parris's claims seek to recoup economic losses based on increased rates and alternative water costs, he does assert property damage in the form of diminution to his and other class members' property values. And as to Summerville, the Court agrees with the Plaintiffs

that even if Summerville knew of PFAS in its water in 2015, at that time, it did not have any reason to believe there was cause for concern because the levels were below the EPA's standards—a fact which 3M admits in its Motion. (3M's Statements of Material Fact ¶¶ 81, 85-87). Thus, the earliest time when Summerville and Parris could have reasonably known that their properties were damaged by "the contaminant concerned" was in January 2020 when the EPA relayed its test results, making their claims timely under CERCLA as well. For all of these reasons, the Plaintiffs claims are timely, so 3M's Motion will be denied as to this issue.

### B. Duty

Next, 3M argues that it discharged any potential duty it had by warning Mount Vernon Mills to incinerate its PFOS waste via the MSDSs on its products. (3M's Mot. for Summ. J., at 14-16). Although Mount Vernon Mills clearly failed to heed those warnings, 3M contends, Georgia law does not require it to police the conduct of a sophisticated customer like Mount Vernon Mills. (*Id.* at 18-19). The Plaintiffs respond that how much knowledge Mount Vernon Mills actually had is a highly disputed question of fact not suited for summary judgment, as are the issues of whether 3M's warnings were adequate and timely. (Pls.' Resp. in Opp'n to 3M's Mot. for Summ. J., at 54-58).

As an initial matter, the Court notes that 3M's arguments with regard to duty only address the Plaintiffs' negligent failure to warn claims and not

their standard negligence claims.[6] (*See* 3M's Mot. for Summ. J., at 14-16 (referencing standards and past rulings on the duty to warn). The Plaintiffs framed these claims as a failure to warn Mount Vernon Mills. (*See* Parris Compl. ¶ 189); (Summerville Compl. ¶ 129). So, the Court addresses 3M's arguments from this angle.

For negligent failure to warn, a plaintiff must establish that "(1) the manufacturer knew or reasonably should have known of a danger arising from use of the product and therefore had a duty to warn; (2) the manufacturer breached the duty; and (3) the breach was the proximate cause of the plaintiff's injury." *Johnson v. Shaner SPA Assocs.*, 2011 WL 13323678, at *2 (N.D. Ga. May 19, 2011); *see also Davis v. John Crane, Inc.*, 353 Ga. App. 243, 251 (2019). "The duty to warn may be owed to consumers, reasonably foreseeable users, and[] purchasers of the product. This duty has been extended, in some cases, to reasonably foreseeable third parties." *Certainteed*

---

[6] In fact, 3M did not challenge the Plaintiffs' ordinary negligence or trespass claims. Although 3M states that all of the Plaintiffs' claims rest on a failure to warn theory, (3M's Mot. for Summ. J., at 1), that is not true. The Plaintiffs assert discrete claims for ordinary negligence, failure to warn, and trespass in their Complaints. (*See, e.g.*, Parris Compl. ¶¶ 174-181 (asserting a negligence claim for the Manufacturing Defendants' supply of PFAS-based products and failure to "prevent the disposal and discharge of toxic PFAS into surface waters and downstream water supplies"); (Summerville Compl. ¶¶ 93-103 ("Defendants' intentional or wanton acts in manufacturing, supplying, disposing and discharging PFAS knowing that they would contaminate the water supply and flow downstream, caused an invasion of Summerville's property by Defendants' chemicals.")).

*Corp. v. Fletcher*, 300 Ga. 327, 330 (2016) (citations modified). "In determining whether such a duty exists, the court should consider the foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger. Such matters generally are not susceptible of summary adjudication and should be resolved by a trial in the ordinary manner." *Williams v. Taser Int'l, Inc.*, 2006 WL 8433374, at *6 (N.D. Ga. Oct. 10, 2006) (citations modified). Under Georgia law, "the warning need not necessarily be given to the person actually injured in order for the manufacturer to escape liability"; rather, it may be given to "a person in a position such that he may reasonably be expected to act so as to prevent the danger from manifesting itself." *Stovall & Co. v. Tate*, 124 Ga. App. 605, 613 (1971) (citation modified). The determination of the existence of a duty to warn is a legal question. *Certainteed Corp.*, 300 Ga. at 330.

The Court ultimately finds that 3M had a duty to warn Mount Vernon Mills of the dangers of PFAS and, specifically, of the dangers of disposing PFAS-laden waste improperly. The Court also finds that there is a genuine dispute of material fact as to whether 3M discharged its duty to warn Mount Vernon Mills. As an initial matter, however, 3M's reliance on *Stiltjes v. Ridco Exterminating Co.*, 178 Ga. App. 438, 442 (1986) is misplaced. 3M relies on *Stiltjes* for the propositions that "Georgia law does not require a manufacturer to police the conduct of a sophisticated consumer" and that a manufacturer, like the defendant in *Stiltjes*, fulfills its duty to warn by including

"precautionary statements" on it labels. (3M's Mot. for Summ. J., at 16-17). *Stiltjes* dealt with a failure to warn claim brought by a widow whose husband died after inhaling pesticides applied at their home by a licensed pest control operator. *Stiltjes*, 178 Ga. App. at 438. The plaintiff argued that the pesticide manufacturer was liable in negligence because it failed to provide adequate warnings and instructions on dangers of pesticides containing a certain ingredient. *Id.* at 438-39. In holding that the pesticide manufacturer had no duty to warn the pesticide operator, the Georgia Court of Appeals explained that state and federal law charged such operators with "the knowledge of the principles and practices of pest control and safe use of pesticides," and that such operators are required to demonstrate that practical knowledge to become licensed. *Id.* at 441-42. The court thus found that the pesticide operator knew or should have known of the dangers associated with the particular pesticide. *Id.* at 442. Further, the court found that even if the pesticide manufacturer had a duty, it had discharged that duty by providing labels with precautionary statements that complied with federal labeling requirements under a federal pesticide control act, where the court had previously held that compliance with that act satisfies the duty to warn as a matter of law. *Id.*

Suffice it to say, *Stiltjes* involved a context-specific set of holdings that relied on several state statutes not at issue in the present case. There is no evidence or any allegations that Mount Vernon Mills was required to have a license of any sort, or comply with any particular state statutes that

21

demonstrate knowledge of the dangers associated with certain textile chemistries, in order to purchase FC-248 from 3M. Nor is there any evidence or allegations that 3M's MSDSs complied with a federally-mandated content requirement for such labels, at least with regard to the waste disposal information. In fact, there is evidence that any information provided about waste disposal was voluntary. (3M's Statements of Material Fact ¶¶ 45, 47). But critically, even if there were such a law, 3M has not argued or provided any authority holding that compliance with a similar warning label content requirement discharges their duty to warn here as a matter of law, as in *Stiltjes*. For all of these reasons, *Stiltjes* is inapplicable to the case at hand.

Turning back to the dispositive issues, 3M had a duty to warn Mount Vernon Mills of the risks of improper disposal for several reasons. The evidence here reflects 3M's knowledge for decades that its FC-248 product contained PFOS, which was toxic to humans and bioaccumulative, and that PFOS-containing waste should not be disposed of via wastewater or sewage. [Docs. 949-2, 949-6, 949-8]; [Doc. 949-10 at 22-24]; [Doc. 952-8 at 3, 5, 9]; [Doc. 952-9 at 29]; [Doc. 958-5 at 3]; [Doc. 958-6 at 2-3]; (Robert Chad Dep., [Doc. 939-3], at 223:13-224:19). 3M also knew at least by 1996 that its textile customers' ordinary usage of its PFOS-based products would result in contaminated wastewater sludge. [Doc. 958-6 at 2-3]. But 3M knew as early as 1964 that a significant amount of PFOS were being discharged to the sewer system in its own manufacturing processes, and by the 1970's that its products could

potentially be the cause of the universal PFOA contamination of human blood. [Doc. 949-2 at 2 ("The water washes from the [PFOSF] are drained to the sewer. The water contains . . . a relatively large amount of the PFOSF. The PFOSF is a major contaminant."); [Doc. 949-6]; [Doc. 949-8]. But despite this knowledge, 3M did not discuss proper disposal practices with Mount Vernon Mills, and although it added incineration recommendations to its MSDSs in the 1990's, there is no evidence that it informed Mount Vernon Mills or its predecessor of the risks of disposing its waste through discharged wastewater in the decades prior that it sold PFOS-based products to the mill. (Ronald Beegle 30(b)(6) Dep., Vol. I, [Doc. 940-11], at 194:20-24). More poignantly, it did not even disclose to Mount Vernon Mills that its products contained residual fluorochemicals that were persistent and bioaccumulative until September 1998, over 30 years after it first became aware of the potential for a wastewater contamination problem. (3M's Statements of Material Fact ¶ 53). Taken together, this evidence supports the conclusion that the risk of pollution of the Raccoon Creek watershed as a result of Mount Vernon Mill's intended use and discharge of 3M's PFOS-based products was foreseeable to 3M such that it owed a duty to warn Mount Vernon Mills under Georgia law. *Certainteed Corp.*, 300 Ga. at 330 (noting that the determination of the existence of a duty to warn is a legal question).

3M argues that it discharged any such duty, however, because Mount Vernon Mills was a "sophisticated user" with regard to its products; in other

words, a learned intermediary between 3M and the third-party Plaintiffs. It also asserts that its MSDSs adequately instructed Mount Vernon Mills on how to properly dispose of its PFOS-containing waste. In *Carter v. E.I. DuPont de Nemours & Co., Inc.*, 217 Ga. App. 139, (1995), DuPont argued that it sold its "Tyvek" product in bulk only to intermediaries and, thus, any duty to warn about Tyvek's flammability risks was owed by the manufacturer of the Tyvek coveralls the plaintiffs had worn when they sustained severe burns. *Carter*, 217 Ga. App. at 140. The Georgia Court of Appeals applied § 389 of the Second Restatement and concluded that DuPont could not avoid liability on learned intermediary grounds because the flammability of the product "remain[ed] unchanged after being converted" into coveralls, and DuPont had actively promoted Tyvek as a "protective material" for workplaces. *Id.* at 141. Thus, the court held that DuPont could still be liable to the plaintiffs, as the ultimate user of the products, for failure to warn. *Id.* at 141-42 ("In no case have we held that the manufacturer may *always* rely on an intermediary to pass along to the ultimate user warnings of dangers inherent in the use of a product.").

In so ruling, the Georgia Court of Appeals relied on a framework articulated by the Eleventh Circuit in *Stuckey v. Northern Propane Gas Co.*, 874 F.2d 1563 (11th Cir. 1989) to apply the learned intermediary doctrine—the theory that a manufacturer or supplier discharges its duty to warn by supplying its product to an intermediary familiar with the potential hazards. In *Stuckey*, the Eleventh Circuit relied on Comment n to § 388 of the Second

Restatement, which "addresses when a supplier's duty to warn an ultimate consumer can be discharged by a warning given to an intermediary party." *Stuckey*, 874 F.2d at 1568. The court determined that Comment n's analysis of a supplier's duty to warn a consumer did not turn on whether a warning was actually given to the intermediary, but instead whether the intermediary's knowledge was sufficient to ultimately protect the consumer. *Id.* In so holding, the court noted that

> Comment n provides a test that balances several factors: the burden of requiring a warning; the likelihood that the intermediary will provide a warning; the likely efficacy of such a warning; the degree of danger posed by the absence of such a warning; and the nature of the potential harm.

*Id.* (citation modified). As such, the court held, the intermediary's actual knowledge of a dangerous condition with the product was a "condition precedent" to the application of these factors. *Id.* at 1569.

While it is true that 3M could be discharged of its duty to warn Mount Vernon Mills if Mount Vernon Mills's knowledge of the harms of improperly disposing of PFOS-laden wastewater was sufficient to ultimately protect the Plaintiffs from harm, viewing the evidence in the Plaintiffs' favor, there is a genuine dispute of material fact that precludes summary judgment as to this issue, too. First, applying *Stuckey*, the evidence shows that Mount Vernon Mills did not know that 3M's products contained PFOS or the bioaccumulative nature of PFOS until May 1998, at the earliest, when 3M disclosed this information to the EPA. (3M's Statements of Material Fact ¶ 55); Pls.'

Statement of Add'l Material Facts ¶ 19); [Doc. 937-9]. The MSDSs that 3M provided over the years did not include the specific fluorochemicals in the product, as 3M considered that information to be a trade secret. (Ronald Beegle 30(b)(6) Dep., Vol. I, [Doc. 940-11], at 136:10-137:20). And still, when 3M did disclose to Mount Vernon Mills directly in 1999 that its products contained PFOS, 3M told Mount Vernon Mills that no health effects had been attributed to the chemicals "at [the] levels [found in the blood of the general population], despite the concerning toxicity studies it had conducted. [Doc. 962-4 at 2-3]. This undercuts 3M's argument that Mount Vernon Mills knew about the risks of PFAS as a sophisticated user. Mount Vernon Mills's general knowledge is irrelevant if they were not informed that the products they purchased contained PFOS or believed they contained insignificant levels, as the evidence suggests. 3M did provide its customers MSDSs, but those MSDSs did not contain warnings about the risks of improper disposal resulting in water contamination. [*See, e.g.*, Doc. 959-12 at 42]. And that is to say nothing of the MSDSs it produced for decades before 1990 that approved of discharging used waste solution to the sewer. [*See generally* Doc. 959-12]; (Robert Chad Dep., [Doc. 939-3], at 114:8-17).

All of this evidence is sufficient to create a genuine dispute of material fact as to whether Mount Vernon Mills had actual knowledge that using 3M's products would result in PFOS-contaminated waste—particularly prior to 1998—and the risks of improperly disposing of the waste, which is a condition

26

precedent of application of the *Stuckey* factors. *Stuckey*, 874 F.2d at 1569. In turn, assuming Mount Vernon Mills had such knowledge with regard to 3M's products, there is a genuine dispute of material fact as to whether this knowledge would have been sufficient to protect the Plaintiffs. *Id.* As a result, a jury should resolve this issue, and the Court will deny 3M's Motion for Summary Judgment as to the negligent failure to warn claims. *Williams*, 2006 WL 8433374, at *6.

### C. Causation

3M also argues that duty issues notwithstanding, the Plaintiffs cannot establish that 3M's alleged failure to warn proximately caused their damages. (3M's Mot. for Summ. J., at 17-19). Specifically, 3M contends that the proximate cause of the Plaintiffs' injuries was Mount Vernon Mills's disregard of 3M's warnings, especially in light of Mount Vernon Mills's decision to continue purchasing PFAS-based products after 3M stopped selling to Mount Vernon Mills. (*Id.*). 3M asserts that it did not exercise any control over or have any knowledge of Mount Vernon Mills's disposal practices, and Georgia law does not require manufacturers to anticipate that its customers will discard its product warnings. (*Id.* at 19).

In response, the Plaintiffs argue that the proximate cause does not necessarily have to be the last act or the nearest act to the injury under Georgia law. (Pls.' Resp. to Daikin's Mot. for Summ. J., at 39-40). They assert that there is ample evidence linking the PFOS and PFOA found in the Raccoon Creek

27

Watershed to the Manufacturing Defendants' products and showing their awareness of the "chain of contamination." (*Id.* at 40-41). In particular, the Plaintiffs contend, it was foreseeable to 3M that Mount Vernon Mills's ordinary usage of its products would cause PFOS contamination in Raccoon Creek, its actions initially triggered that contamination, and 3M's actions were sufficient by themselves to cause the PFOS contamination. (*Id.* at 41-46).

As the Court noted in the Order ruling on the Motions to Dismiss, causation is an essential element of the Plaintiffs' negligence, nuisance, and trespass claims. *Alexander v. Hulsey Env't Servs.*, 306 Ga. App. 459, 462, (2010) (citation modified). "Causation is further broken down into two elements: cause-in-fact and proximate cause." *Yearty v. Scott Holder Enters., Inc.*, 349 Ga. App. 718, 721 (2019). A defendant's conduct is a cause-in-fact if, but for the conduct, the plaintiff would not have been injured. *Id.* "Proximate cause is defined as that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." *Id.* at 722 (citation modified). "Proximate cause is not necessarily the last act or cause, or the nearest act to the injury, but such act that has actively aided in producing the injury as a direct and existing cause. . . . And, there may be more than one proximate cause of an injury." *Sprayberry Crossing P'ship v. Phenix Supply Co.*, 274 Ga. App. 364, 365 (2005) (citations modified). "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the

probabilities are at best evenly balanced, it becomes the duty of the court to grant summary judgment for the defendant." *Alexander*, 306 Ga. App. at 462 (citation modified). Nonetheless, "[q]uestions regarding causation are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases." *Walker v. Giles*, 276 Ga. App. 632, 639 (2005) (citation modified).

At the outset, the Court notes that 3M does not challenge the cause-in-fact element of causation, so the Court addresses only proximate cause. 3M's argument that the proximate cause of the Plaintiffs' alleged injuries was Mount Vernon Mills's disregard of its warnings lacks merit. First, as previously discussed, the evidence shows that the warnings 3M gave did not start recommending incineration disposal until 1990 and never disclosed the specific fluorochemicals the products contained. [Doc. 959-12 at 42]; (Ronald Beegle 30(b)(6) Dep., Vol. I, [Doc. 940-11], at 136:10-137:20). And there is no dispute that 3M directed disposal of "spent solutions" into wastewater for decades prior to 1990. [*See generally* Doc. 959-12]; (Robert Chad Dep., [Doc. 939-3], at 114:8-17). Nor could Mount Vernon Mills have truly been aware of the risks of PFOS contamination if it did not know that 3M's products contained PFOS until 1998, at the earliest, which the evidence suggests. (3M's Statements of Material Fact ¶ 55); Pls.' Statement of Add'l Material Facts ¶ 19); [Doc. 937-9]; [Doc. 962-4 at 2-3]. Second, even accepting 3M's contention that it began warning Mount Vernon Mills not to discharge its waste to wastewater in 1990, a jury could still find 3M's failure to properly instruct on

29

disposal methods prior to 1990 and its failure to even inform Mount Vernon Mills that the product contained PFOS to be proximate causes of the Plaintiffs' injuries because it "actively aided in producing the injury"—the PFOS contamination of Raccoon Creek—at least prior to 1990. *See Sprayberry Crossing P'ship*, 274 Ga. App. at 365. This evidence is more than sufficient to create a genuine dispute of material fact as to whether the PFOS contamination of Raccoon Creek would have occurred absent 3M's actions. See *Yearty*, 349 Ga. App. at 721.

3M also argues that its actions cannot suffice to establish proximate cause because Mount Vernon Milles continued purchasing and using other PFAS-based products from other manufacturers after it phased out PFOS. (3M's Mot. for Summ. J., at 17). But again, Georgia law is clear that the proximate cause of an injury need only have "actively aided in producing the injury as a direct and existing cause" and that "there may be more than one proximate cause of an injury." *Sprayberry Crossing P'ship*, 274 Ga. App. at 365. Putting aside that there is undisputed evidence that 3M was the only manufacturer of PFOS products used by Mount Vernon Mills, and its products are therefore arguably the only possible source of *PFOS* contamination in Raccoon Creek, the fact that Mount Vernon Mills's use of other PFAS-containing products also contributed to the water contamination does not prevent a finding of proximate cause as to 3M because a jury could find the

actions of all three Manufacturing Defendants, or any one of them alone, to be proximate causes of the PFAS contamination of Raccoon Creek. *See id.*

Finally, 3M's argument that it had no knowledge or control over Mount Vernon Mills's waste disposal practices relies on an inaccurate understanding of Georgia law. In nuisance cases, a plaintiff must show that the defendant had actual knowledge of a potentially dangerous situation and the ability to abate it—in other words, control it—but failed to do so within a reasonable time. *Alexander*, 306 Ga. App. at 462 (distinguishing *Citizens & Southern Trust Co v. Phillips Petroleum Co.*, 192 Ga. App. 499 (1989), where the court found a genuine issue of fact as to whether a gasoline supplier deposited gasoline into underground storage tanks with actual knowledge that the tanks were defective, resulting in ground contamination); *see also Johnson v. 3M*, 563 F. Supp. 3d 1253, 1337 (N.D. Ga. 2021); *Horton v. City of Macon*, 144 Ga. App. 380, 382 (1977) ("Knowledge of a dangerous situation created by a defect and a failure to repair the defect within a reasonable time would amount to a nuisance."). The Plaintiffs have made that showing here. There is evidence that 3M was aware as early as 1964 that there was PFOS in the wastewater of its own manufacturing facilities, which it deemed a "major contaminant," and that it was aware by the 1970's of the potential that its Scotchgard product could be the cause of universal PFOA contamination of human blood. [Docs. 949-2, 949-6, 949-8]. There is also evidence that it knew in 1977 that animal toxicity studies showed potential for harmful effects as a result of PFOS concentrations

and that, by 1979, PFOS had the potential for widespread distribution in the environment via waterways because it was "completely resistant to biodegradation." [Doc. 949-10 at 22-24]; [Doc. 952-8 at 3, 5, 9]. Based on just this evidence, a jury could find that 3M knew of the potential for PFOS-contamination of Mount Vernon Mills's wastewater years before it began warning its customers to incinerate their waste and, as a result, 3M knew of the potential for contamination of Raccoon Creek. *See Alexander*, 306 Ga. App. at 462 *Walker*, 276 Ga. App. at 639. And 3M undoubtedly could have stopped sales of its PFOS-based products at any time. Accordingly, because the proximate cause issue is far from a "clear, plain, palpable and undisputed" one, a jury should decide it. *Walker*, 276 Ga. App. at 639. The Court will deny 3M's Motion for Summary Judgment as to causation.

## D. Nuisance and Abatement

As to the Plaintiffs' nuisance claims, 3M argues that it has no control over the continuing contamination of Raccoon Creek and "has no legal right to remove Trion's sludge from privately owned farmland in the Raccoon Creek watershed." (3M's Mot. for Summ. J., at 19-20). It asserts that any liability for continuing nuisance cut off when it ceased production of its PFOS-based products in 2002. (*Id.* at 20-21). In response, the Plaintiffs contend that Georgia law only requires a defendant to have knowledge of and a right to abate the cause of the nuisance, and that 3M did so here. (Pls.' Resp. to 3M's Mot. for Summ. J., at 60-66). They also argue that the relevant question under Georgia

32

law is not whether 3M currently has a right to abate the contamination, but whether it had that right during the timeframe that the Plaintiffs allege 3M was creating or maintaining the nuisance. (Pls.' Resp. to Daikin's Mot. for Summ. J., at 64-65).

Under Georgia law, "[t]he essential element of nuisance is control over the cause of the harm. The tortfeasor must be either the cause or a concurrent cause of the creation, continuance, or maintenance of the nuisance." *Grinold v. Farist*, 284 Ga. App. 120, 122 (2007) (citation modified). Thus, where a defendant has knowledge of and a right to abate a dangerous situation, but fails to do so within a reasonable time, its actions or omissions may constitute a nuisance. *Johnson*, 563 F. Supp. 3d at 1337; *Horton*, 144 Ga. App. at 382. Moreover, "[l]iability may flow where the defendant is the cause/concurrent cause of the creation *or* maintenance of a nuisance, even if there are subsequent actions involved." *Johnson*, 563 F. Supp. 3d at 1338. "Under Georgia law, the discharge or release of harmful pollutants or substances may constitute a nuisance." *Id.* at 1337 (collecting cases).

The Court has already addressed most of the second part of 3M's argument—that its potential for liability ended when it ceased sales of its PFOS-based products. *See Supra* Section A.; *Johnson*, 563 F. Supp. 3d at 1337-38. Georgia law requires only that the "tortfeasor . . . be either the cause or a concurrent cause of the creation, continuance, or maintenance of the nuisance." *Grinold*, 284 Ga. App. at 122. There is ample evidence here that 3M

contributed to the cause and continuance of the PFOS contamination of Raccoon Creek through its sales of FC-248 to Mount Vernon Mills, with knowledge that product contained PFOS. 3M also knew of the potential for surface water contamination as a result of improper discharge, and even though it knew of this risk for years, it did not inform Mount Vernon Mills until 1998 at the earliest and did not cease sales until 2000. [Doc. 937-9]; [Docs. 949-2, 949-6, 949-8]; [Doc. 949-10 at 22-24]; [Doc. 952-8 at 3, 5, 9]; [Doc. 962-4 at 2-3]; (3M's Statements of Material Fact ¶ 55); (Pls.' Statement of Add'l Material Facts ¶ 19). This evidence creates a genuine dispute of material fact as to whether 3M had such control and knowledge of the potential for contamination of Raccoon Creek that it can be liable for a continuing nuisance. *Johnson*, 563 F. Supp. 3d at 1337 ("Where the element of control is met, knowledge of a dangerous situation and a failure to remedy that situation within a reasonable time can result in a legal nuisance."); *Horton*, 144 Ga. App. at 382.

3M's position that it lacks control or a legal right to abate the continuing contamination of Raccoon Creek also lacks merit. Though 3M has arguably abated one cause of the nuisance by discontinuing the sales of its PFOS-based products, it has done nothing to abate the nuisance itself—i.e., to remedy the contamination. Contrary to 3M's reliance on this Court's Order ruling on the Motions to Dismiss, the Court did not hold that the only way the Manufacturing Defendants could abate the nuisance was to stop selling the

34

products at issue. Instead, in response to the Manufacturing Defendants'
arguments that they lacked control over the *cause* of the nuisance, the Court
explained that one way the Manufacturing Defendants could take "appropriate
remedial steps" would be "refus[ing] to sell PFAS except to customers that have
established and complied with proper disposal methods." (MTD Order, [Doc.
136], at 86-87). But the Plaintiffs also seek abatement in the form of remedying
the actual contamination, either by funding the necessary remedial measures
or otherwise, and 3M has not made any argument against this remedy.
Accordingly, the Court will deny 3M's Motion for Summary Judgment as to the
nuisance and abatement claims.

### E. Damages, Attorney's Fees, and Injunctive Relief

3M argues that it is entitled to summary judgment with respect to the
Plaintiffs' claims for future damages because they have not presented any
evidence that would allow such damages to be calculated with any degree of
reasonable certainty. (3M's Mot. for Summ. J., at 21-22). It also argues that
the Plaintiffs' derivative claims for punitive damages and attorneys' fees fail
because its substantive claims fail. (*Id.* at 22-23). And finally, 3M asserts that
it is entitled to summary judgment on the Plaintiffs' request for injunctive
relief because it is duplicative of their remedies at law, so equitable relief is
unavailable. (*Id.* at 23-24).

3M is correct that the Plaintiffs cannot recover punitive damages or
attorney's fees unless they recover damages or other relief on an underlying,

substantive claim. *ABH Corp. v. Montgomery*, 356 Ga. App. 703, 706 (2020) ("The derivative claims of attorney fees and punitive damages will not lie in the absence of a finding of compensatory damages on an underlying claim." (citation modified)). However, the Court has not dismissed the Plaintiffs' substantive claims against 3M, so their claims for punitive damages and attorney's fees survive. Nor can the Court say at this stage that 3M's conduct falls outside the scope of O.C.G.A. § 13-6-11, which awards litigation expenses "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." In general, the jury should be allowed to decide whether a party has displayed such conduct in the course of the litigation. *Steel Magnolias Realty, LLC v. Bleakley*, 276 Ga. App. 155, 156 (2005). Accordingly, the Court denies 3M's Motion as to the Plaintiffs' punitive damages and attorney's fees claims.

As the Court reads the Parris Complaint, the Plaintiffs mainly sought injunctive relief against Defendants Mount Vernon Mills and Town of Trion, but those claims are no longer live since the Plaintiffs settled with those Defendants and dismissed them from this action. (Parris Compl. at 77-79); [Docs. 915, 916]. The Plaintiffs did seek injunctive relief against all Defendants, including 3M, by seeking abatement of public nuisance under O.C.G.A. § 41-2-1 and 41-2-2. (Parris Compl. ¶¶ 217-22). 3M is correct that, under Georgia law, the Court may not grant injunctive relief if the Plaintiffs have an adequate remedy at law. *See, e.g., Lue v. Eady*, 297 Ga. 321, 329

36

(2015). And here, the Plaintiffs may have a remedy at law in the form of money damages on their substantive tort claims. As the Court noted in its Order on class certification, the Plaintiffs' requests for injunctive relief are "just a dressed-up version of [their] request for monetary damages" seeking to offset the cost of a granular activated carbon filtration system that will remove PFAS from the affected water supply. (Op. & Order dated Sept. 29, 2025, [Doc. 1059], at 29). However, the Plaintiffs are permitted to pursue alternative theories of relief, regardless of their consistency. Fed. R. Civ. P. 8(d)(2), (3); *Allstate Ins. Co. v. James*, 779 F.2d 1536, 1540-41 (11th Cir. 1986). Because the Court has not granted summary judgment in 3M's favor on any of the Plaintiffs' claims seeking money damages, they may continue to pursue their alternative theories for injunctive relief with regard to abating the nuisance. So, although the Court has already ruled that a class may not be certified for injunctive relief, Parris and Summerville, as named Plaintiffs, may continue to pursue both injunctive relief and monetary damages until such time as a jury awards one or the other form of relief at trial. Therefore, the Court denies 3M's Motion as to the Plaintiffs' claims for injunctive relief.

Finally, 3M's arguments against future damages rely heavily on its motions to exclude several of the Plaintiffs' experts, and those motions have now been granted in part and denied in part. Thus, they do not resolve the Plaintiffs' claims as 3M had hoped. However, in the Court's order on class certification, the Court declined to certify a class as to future damages. (Op. &

Order dated Sept. 29, 2025, [Doc. 1059], at 22-27, 30). As such, only the named Plaintiffs claims for future damages may proceed against 3M (and the remaining Defendants). To the extent some of the expert evidence 3M challenged will be permitted at trial, the Court agrees with the Plaintiffs that the jury should weigh this evidence and determine whether future damages are warranted. *See* O.C.G.A. 51-12-12(a) ("The question of damages is ordinarily one for the jury."). Thus, the Court also denies 3M's Motion as to the Plaintiffs' claims for future damages.

## IV. Conclusion

For the foregoing reasons, the Defendant 3M Company's Motion for Summary Judgment is DENIED.

SO ORDERED, this ____10th____ day of July, 2026.

THOMAS W. THRASH, JR.
United States District Judge