IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

EARL PARRIS, JR.
Individually, and on behalf of a Class of
persons similarly situated,

      Plaintiff,

        v.

3M COMPANY, et al.,

      Defendants.

CIVIL ACTION FILE
NO. 4:21-CV-40-TWT

## OPINION AND ORDER

This is an action under the Clean Water Act. It is before the Court on

Defendant Daikin America, Inc.'s Motion for Summary Judgment [Doc. 896].

For the following reasons, Daikin's Motion for Summary Judgment [Doc. 896]

is GRANTED in part and DENIED in part.

### I.  Background[1]

---

[1] The operative facts on the Motion for Summary Judgment are taken from the parties' Statements of Material Facts and the responses thereto. The Court will deem the parties' factual assertions, where supported by evidentiary citations, admitted <u>unless the respondent makes a proper objection under Local Rule 56.1(B)</u>. Where a fact is undisputed or not properly objected to, the Court will cite only the Statement giving the fact. To that end, the Court notes that there are several instances of the Plaintiffs attempting to add facts, with or without citation, to their undisputed responses to Daikin's Statement of Material Facts. This is not the proper way to assert additional facts under the Local Rules. *See* LR 56.1(B)(2)(a)(2), N.D.Ga. (noting that the respondent is to "directly refute[] the movant's fact with <u>concise</u> responses supported by <u>specific citations to evidence</u> . . . state[] a valid objection to the admissibility of the movant's fact . . . [or] point out that the movant's citation does not support the movant's fact or that the movant's fact is not material or [does not comply with

This case arises out of the alleged contamination of surface waters and drinking water in Chattooga County, Georgia, with per- and polyfluoroalkyl substances ("PFAS"). (2nd Am. Compl. ("Parris Compl."), [Doc. 280], ¶ 1). The EPA has recognized these substances as "persistent, bioaccumulative, and toxic" ("PBT"). (Pls.' Statement of Add'l Material Facts [Doc. 929-1] ¶ 1). The Defendant Mount Vernon Mills [2] used products containing PFAS in its manufacturing operations and, as a result, some residual PFAS-containing waste went into Mount Vernon Mills's wastewater. (Daikin's Statement of Material Facts ¶ 1.1-1.2).[3] This wastewater was then discharged to Trion's wastewater treatment plant ("Trion WWTP"), where virtually all of the wastewater that Trion treated came from Mount Vernon Mills. (*Id.* ¶ 1.3-1.4); (Pls.' Resp. to Daikin's SMF ¶ 1.4). After treating the wastewater, Trion generated sludge that was later applied to sludge farms. (Daikin's Statement of Material Facts ¶ 1.5). However, Trion WWTP was not capable of removing

---

the Local Rules]." The Court will thus disregard any such "facts" (or legal arguments) added in the Plaintiffs' responses. The Court may also disregard, in its discretion, any citation to the Plaintiffs' Additional Statements of Material Fact within the Plaintiffs' responses, which would require the Court to refer to that document to find citations to the record evidence in support of the objection and therefore does not constitute a "specific citation[] to evidence."

[2] The Plaintiffs settled their claims against Mount Vernon Mills and the Town of Trion ("Trion"), who were dismissed from this action on June 11, 2025. [Doc. 915].

[3] Daikin combined its Statements of Material Fact and Brief in Support into one document, so for clarity, the Court's citations refer to the PDF pagination.

PFAS from the wastewater it treated, so the resulting sludge contained PFAS. (*Id.* ¶ 1.6). Over time, the Plaintiffs assert, the PFAS in the sludge found their way into Raccoon Creek, which is their source of drinking water. (*Id.* ¶ 1.8).

From at least 1995 to 2016, Mount Vernon Mills used a certain type of PFAS-containing product—a long-chain fluorotelomer product—that was manufactured by Daikin, among others. (Pls.' Add'l Statement of Facts ¶ 96); (Charles Andrews' Expert Report, [Doc. 1108-17], at 11). Daikin did not sell these long-chain fluorotelomer products to Mount Vernon Mills directly, but from 1995 to at least 2012, other companies purchased them from Daikin and in turn sold them in various forms to Mount Vernon Mills. (Pls.' Add'l Statement of Facts ¶¶ 97-98); (Daikin's Resp. to Pls.' Statement of Add'l Facts ¶ 97); (Erica DiFilippo Expert Report, [Doc. 1008-4], at 10); (George Hudson Dep., [Doc. 942-10], at 74:5-82:22). Daikin largely sold its fluorochemicals under the umbrella "Unidyne" brand name. (Pls.' Add'l Statement of Facts ¶ 92). Pulcra was the primary intermediate formulator that Daikin supplied its long-chain fluorotelomer products to, and it relied on information that Daikin supplied to assess the risks of Daikin's products in formulating its own products. (Pls.' Add'l Statement of Facts ¶ 276)[4]; (George Hudson Dep., [Doc. 942-10], at 170:18-171:12; 184:3-185:1]. Daikin did not tell Pulcra that the

---

[4] The Court notes that Daikin's response to this statement of fact is largely non-responsive to the actual statement the Plaintiffs make, regarding what it did or did not tell Pulcra.

products it purchased from Daikin degraded to PFOA and instead told Pulcra that the products did not contain "added PFOA" and had safe PFOA levels. (Pls.' Add'l Statement of Facts ¶ 276); (George Hudson Dep., [Doc. 942-10], at 232:10-233:21]. For these products, Daikin provided its customers a Material Safety Data Sheet. (Pls.' Add'l Statement of Facts ¶ 100). Daikin believed that its customers were "sophisticated," they "check[ed] off . . . on the [MSDSs]," and developed proprietary recipes using Daikin's products. (Thomas Poston Dep., Vol. II, [Doc. 907-2], at 583:3-23). One MSDS that Daikin received from its parent company for an ingredient in its Unidyne products warned that the product contained long-chain fluorotelomer compounds which were known to cause serious health effects and accumulate in the human body and should not be disposed of in sewers or waterways. (Ralph Werling Dep., [Doc. 941-17], at 163:11-173:21). Daikin did not include these warnings on the MSDSs it produced for the Unidyne products sold to Mount Vernon Mills and other customers. (*Id.* at 169:17-173:21).

From 2014 to 2022, Daikin sold short-chain fluorotelomer products to Mount Vernon Mills directly. (Daikin's Statement of Material Facts ¶ 1.12); (Daikin's Resp. to Pls.' Statement of Add'l Facts ¶ 97); (Alan Levine Expert Report, [Doc. 897-2], at 21). Daikin did not add PFOA as an intended ingredient to these products, and PFOA is the only regulated PFAS that has a

possible connection to Daikin in this matter.[5] (Daikin's Statement of Material Facts ¶¶ 1.10-1.11); (Daikin's Resp. to Pls.' Statement of Add'l Facts ¶ 97); (Alan Levine Expert Report, [Doc. 897-2], at 21); (Don Harris Dep., [Doc. 907-3], at 58:17-24). But PFOA was nonetheless present in some of Daikin's products, as an impurity. (Daikin's Statement of Material Facts ¶ 1.13); (Pls.' Resp. to Daikin's Statement of Material Facts ¶ 1.13); (Don Harris Dep., [Doc. 907-3], at 58:10-14, 248:3-20). Daikin became aware that PFOA was present in its Unidyne products in approximately 2003. (Don Harris Dep., [Doc. 907-3], at144:5-145:2). Between 2015 and 2019, Daikin offered to sell Mount Vernon Mills non-fluorinated products which could not degrade into PFOA, but Mount Vernon Mills declined. (Daikin's Statement of Material Facts ¶ 5.7).

Some of the short-chain fluorotelomer products that Daikin sold were marketed as "PFOA free," even though they may have contained less than five parts per billion of PFOA.[6] (Pls.' Add'l Statements of Fact ¶ 110); (Daikin's Resp. to Pls.' Add'l Statements of Fact ¶ 110); (Don Harris Dep., [Doc. 907-3], at 199:13-16, 284:12-16). Daikin never told Mount Vernon Mills that it had detected PFOA in its short-chain fluorotelomer products below this reporting limit. (Pls.' Add'l Statement of Facts ¶ 295); (Daikin's Response to Pls.' Add'l

---

[5] Perfluorooctanesulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA") are types of PFAS.

[6] Short-chain fluorotelomer products are sometimes referred to as "C6" products, while long-chain fluorotelomer products are sometimes referred to as "C8" products. (Pls.' Add'l Statements of Material Fact ¶¶ 10-11).

Statement of Facts ¶ 295); (Ronald Beegle Dep., [Doc. 958-12], at 74:8-75:2).[7] Daikin did not sell any other PFAS-containing products, including any fluorotelomer products, directly to Mount Vernon Mills. (Daikin's Statement of Material Facts ¶ 1.14).[8]

Unlike PFOS, PFOA is present in products manufactured by other companies in addition to Daikin. (*Id.* ¶ 1.15). Structural differences in the PFOA result from differences in manufacturer processes, which may help differentiate between PFOA made by 3M versus PFOA made by Daikin or DuPont. (*Id.* ¶ 1.16); (Pls.' Resp. to Daikin's Statement of Material Facts ¶ 1.16). The Plaintiffs have not analyzed the PFOA in Raccoon Creek to attempt to determine whether it was manufactured by one Manufacturing

---

[7] Daikin's hearsay objection to Beegle's deposition testimony is overruled. Even if the testimony is hearsay, the Court may consider hearsay evidence at the summary judgment stage so long as the evidence could be reduced to an admissible form at trial. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012). Daikin has not argued, nor does the Court have any reason to believe, that Mr. Beegle would not be available to testify and be cross-examined at trial.

[8] The Court notes that the Plaintiffs' objection to this statement of fact, like many of their objections, is largely non-responsive to the actual statement Daikin makes. For example, here, the Plaintiffs object that Daikin sold other PFAS containing products through "intermediaries and distributors," that it knew that its products were being resold in the industry, and that it later started selling the already discussed short-chain products directly to Mount Vernon Mills. (Pls.' Resp. to Daikin's Statement of Material Facts ¶ 1.14). But Daikin did not state that its other PFAS-containing products were not somehow provided to Mount Vernon Mills, just that Daikin itself did not sell those products to Mount Vernon Mills. And the Plaintiffs have not actually disputed that fact.

Defendant versus another, but it has narrowed the source of the PFOA to the collective Manufacturing Defendants' products. [9] (Daikin's Statement of Material Facts ¶ 1.18); (Pls.' Resp. to Daikin's Statement of Material Facts ¶ 1.18). Both sides' experts agree that any PFOA resulting from Daikin's short-chain fluorotelomer products sold to Mount Vernon Mills between 2014 and 2019 was negligible in terms of the overall concentration of PFOA found in Raccoon Creek. (Alan Levine Expert Report, [Doc. 897-2], at 21); (Charles Andrews Rebuttal Report, [Doc. 896-25], at 33 ("[T]he PFOA present as an impurity in Daikin products used between 2014 and 2019 would be a negligible contribution to the PFOA in Raccoon Creek."). Both sides also agree that the bulk of the PFOA that the Plaintiffs contend Daikin is responsible for came from long-chain fluorotelomer products it sold to other companies who in turn sold products, either relabeled or reformulated, to Mount Vernon Mills. (Pls.' Add'l Statement of Facts ¶ 116); (Daikin's Statement of Facts ¶ 1.27).

At least by 2002, Daikin had some knowledge that the fluorochemical products it sold to companies other than Mount Vernon Mills were ultimately

---

[9] The issue of how much of the total PFOA contamination of Raccoon Creek is attributable to Daikin's products is hotly contested. On the one hand, Daikin has presented evidence that from 2014 to 2019, the total PFOA amount from its products could not have exceeded 2.776 pounds. (Alan Levine Expert Report, [Doc. 897-2], at 8). On the other hand, the Plaintiffs have presented evidence that from 1995 to 2022, Daikin's long-chain fluorotelomer products accounted for 63% of Mount Vernon Mills's usage of those products, and Daikin's short-chain fluorotelomer products accounted for 11% of Mount Vernon Mills's usage of those products. (Erica DiFilippo Rebuttal Report, [Doc. 970-12], at 44).

being used in the textile industry. (Pls.' Add'l Statement of Facts ¶ 101); (Thomas Poston Dep., Vol. I, [Doc. 907-1], at 330:24-331:3). And by at least 2006, Daikin knew that Mount Vernon Mills was using its long-chain fluorotelomer chemistries, even if it was not the one selling it to Mount Vernon Mills. (Pls.' Add'l Statement of Fact ¶ 102); (Thomas Poston Dep., Vol. I, [Doc. 907-1], at 65:16-71:12). In 2008, Daikin sought to discuss environmental and safety issues regarding PFOA and short-chain fluorotelomer products with Mount Vernon Mills. [Doc. 942-21]. Daikin did not generally know what its customers did with their products after it sold them, however, because Daikin competed with its customers in the industry. (Thomas Poston Dep., Vol. II, [Doc. 907-2], at 578:14-579:9). But its policies required it to work with its "customers and other direct product receivers" to foster propose use, handling, recycling, disposal, and transmittal of appropriate information to downstream users." (Pls.' Add'l Statement of Facts ¶ 280); (Ralph Werling Dep., Vol. I, [Doc. 941-17], at 127:25-129:24). In fact, Daikin's policies required it to work with its customers to improve wastewater disposal practices and, if improvement was not evident, the policies required it to take "further measures up to and including termination of product sale." (*Id.* at 129:16-130:1).

In reality, Daikin did not actually work with its customers on wastewater improvement practices, and it never provided information to Mount Vernon Mills about wastewater management. (*Id.* at 130:2-131:5). Daikin did not know how Mount Vernon Mills handled its wastewater, nor was

it ever in control of Mount Vernon Mills's wastewater. (Don Harris Dep., [Doc. 907-3], at 392:13-393:22); (Ronald Beegle 30(b)(6) Dep., Vol. II, [Doc. 929-7], at 258:24-259:2). Nonetheless, in 2009, Daikin was aware that PFOA had contaminated another river near Dalton, Georgia after having been applied to a nearby spray field, but it did not provide any information to its textile industry customers about river contamination as a result of wastewater disposal. (Thomas Poston Dep., Vol. II, [Doc. 907-2], at 447:18-448:21). When Daikin sold Mount Vernon Mills products directly, it worked with Mount Vernon Mills to teach it how to apply the products and the two companies "worked together as a team to meet" Mount Vernon Mills's customer's requirements. (Ronald Beegle 30(b)(6) Dep., Vol. II, [Doc. 929-7], at 339:16-340:22). For example, Daikin might point Mount Vernon Mills towards a particular product, provide samples for it to test, or provide a starting recipe for application of the product. (*Id.* at 341:2-14). But no one from Mount Vernon Mills ever discussed Mount Vernon Mills's waste disposal practices with Daikin. (*Id.* at 341:15-18).

The Plaintiff Earl Parris, Jr., a City of Summerville resident, filed this action in February 2021 on behalf of himself and a class of Summerville residents whose drinking water was contaminated with PFAS, purportedly as a result of the Defendants' actions. The Court later permitted the City of Summerville to intervene. On September 29, 2025, the Court granted class certification as to past damages sought through the "Damages Class," which

includes "all rate payers of water and sewer service with the City of Summerville from January 2020 through class certification." (Op. & Order dated Sept. 29, 2025, [Doc. 1059], at 9-10). Daikin moved for summary judgment as to all of the claims against it, and that Motion is presently before the Court.

## II.  Legal Standards

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). The court should view the evidence and draw any inferences in the light most favorable to the non-movant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

## III. Discussion

The Plaintiffs raise several claims against Daikin in their Amended Complaints[10]: negligence (Count One of Summerville Complaint, Count Five

---

[10] The Plaintiff Earl Parris filed his Second Amended Complaint on November 21, 2022, which was a class action complaint. (Parris Compl., [Doc.

of Parris Complaint), public nuisance (Count Two of Summerville Complaint, Count Nine of Parris Complaint), private nuisance (Count Three of Summerville Complaint), abatement of public nuisance (Count Four of Summerville Complaint, Count Ten of Parris Complaint), trespass (Count Five of Summerville Complaint), negligent failure to warn (Count Ten of Summerville Complaint, Count Seven of Parris Complaint), violations of the Georgia Water Quality Control Act (Count Nine of Summerville Complaint), wanton conduct and punitive damages (Count Six of Summerville Complaint, Count Eight of Parris Complaint), injunctive relief (Count Seven of Summerville Complaint), and attorney's fees and costs (Count Eight of Summerville Complaint). (Parris Compl. ¶¶ 173-222; Summerville Compl. ¶¶ 58-138). Daikin assert several challenges to these claims, and the Court will address each challenge in turn.

### A. Causation

Daikin first argues that causation is an essential element of all of the Plaintiffs' claims, and that the Plaintiffs cannot show that any PFOA in Raccoon Creek is attributable to products it sold to Mount Vernon Mills.

---

280]). Separately, Intervenor-Plaintiff City of Summerville filed its Amended Complaint on February 16, 2023. (Summerville Compl., [Doc. 351]). To date, the Plaintiffs have not filed a consolidated complaint, so the Court considers both the Parris Complaint and the Summerville Complaint to be the operative pleadings with regard to the present Motion for Summary Judgment.

11

(Daikin Mot. for Summ. J., at 34-37).[11] Second, Daikin contends that there is no legal basis to hold Daikin accountable for its products that other manufacturers sold to Mount Vernon Mills, unbeknownst to Daikin. (*Id.* at 37-42).

In response, the Plaintiffs argue that the proximate cause does not necessarily have to be the last act or the nearest act to the injury under Georgia law. (Pls.' Resp. to Daikin's Mot. for Summ. J., at 39-40). They assert that there is ample evidence linking the PFOS and PFOA found in the Raccoon Creek Watershed to the Manufacturing Defendants' products and showing their awareness of the "chain of contamination." (*Id.* at 40-41). In particular, the Plaintiffs point to "extensive sales records, deposition testimony, and expert analysis linking Daikin's supply of products containing PFOA to Mount Vernon Mills." (*Id.* at 40 n.11). The Court sets forth the applicable law before addressing Daikin's second argument first.

### 1.  Daikin's Sales of Products to Other Distributors

As the Court noted in the Order ruling on the Motions to Dismiss, causation is an essential element of the Plaintiffs' negligence, nuisance, and trespass claims. *Alexander v. Hulsey Env't Servs.*, 306 Ga. App. 459, 462, (2010) (citation modified). "Causation is further broken down into two

---

[11] Daikin combined its Statement of Material Facts and Brief in Support into one document, so for clarity, the Court's citations to this document refer to the PDF pagination.

elements: cause-in-fact and proximate cause." *Yearty v. Scott Holder Enters., Inc.*, 349 Ga. App. 718, 721 (2019). A defendant's conduct is a cause-in-fact if, but for the conduct, the plaintiff would not have been injured. *Id.* "Proximate cause is defined as that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." *Id.* at 722 (citation modified). "Proximate cause is not necessarily the last act or cause, or the nearest act to the injury, but such act that has actively aided in producing the injury as a direct and existing cause. . . . And, there may be more than one proximate cause of an injury." *Sprayberry Crossing P'ship v. Phenix Supply Co.*, 274 Ga. App. 364, 365 (2005) (citations modified). "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to grant summary judgment for the defendant." *Alexander*, 306 Ga. App. at 462 (citation modified). Nonetheless, "[q]uestions regarding causation are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases." *Walker v. Giles*, 276 Ga. App. 632, 639 (2005) (citation modified).

Daikin's argument that the Plaintiffs have "newly concocted" their theory that Daikin is responsible for the PFOA-containing products it sold to other distributors lacks merit. This argument is ingenuine and relies on a stretched reading of the Complaints. Each of the relevant Counts in both Complaints plead that the "Manufacturing Defendants," of which Daikin is

13

one, functioned as "manufacturers, distributors, and/or suppliers of PFAS" that were ultimately used by Mount Vernon Mills and discharged into Raccoon Creek. (*See, e.g.,* Parris Compl. ¶¶ 174, 189, 200; Summerville Compl. ¶¶ 59, 97, 105). The Plaintiffs' position that Daikin distributed or supplied its products to other companies who relabeled or reformulated them and sold them to Mount Vernon Mills is clearly covered by these allegations.

Moreover, the fact that many of Daikin's products were not sold directly to Mount Vernon Mills but were instead sold by distributors who had purchased from Daikin does not absolve Daikin of liability for the alleged PFOA contamination attributed to its products. As discussed in the Court's Order denying summary judgment to Dupont/C, Georgia law is clear that the proximate cause of an injury need only have "actively aided in producing the injury as a direct and existing cause" and that "there may be more than one proximate cause of an injury." *Sprayberry Crossing P'ship*, 274 Ga. App. at 365. Here, there is sufficient evidence from which a jury could find that: (1) Daikin's long-chain fluorotelomer products contained PFOA, which Daikin knew, (2) Daikin sold these products to third-parties, who in turn relabeled or reformulated the products and sold them to Mount Vernon Mills, (3) Daikin knew that its products were being used by Mount Vernon Mills in some form, and (4) the resulting wastewater from Mount Vernon Mills's use of these products contained PFOA, leading to the contamination of Raccoon Creek. (Pls.' Add'l Statement of Facts ¶¶ 96-98, 102, 116); (Daikin's Resp. to Pls.'

14

Statement of Add'l Facts ¶ 97); (Daikin's Statement of Material Facts ¶ 1.1-1.8, 1.27); (Erica DiFilippo Expert Report, [Doc. 1008-4], at 10); (George Hudson Dep., [Doc. 942-10], at 74:5-82:22); (Charles Andrews' Expert Report, [Doc. 1108-17], at 11); (Thomas Poston Dep., Vol. I, [Doc. 907-1], at 65:16-71:12); [Doc. 942-21]. Thus, even accepting that Daikin never sold its long-chain fluorotelomer products directly to Mount Vernon Mills, a jury could still find its sales to third-parties to be a proximate cause of the Plaintiffs' injuries because it "actively aided in producing the injury" by introducing these products into the supply chain that ultimately ended with the contamination of Raccoon Creek. *See Sprayberry Crossing P'ship*, 274 Ga. App. at 365.

Daikin also argues that it cannot have proximately caused the Plaintiffs' injuries because it had no actual knowledge that waste resulting from the use of its products was being improperly processed. (Daikin's Mot. for Summ. J., at 11-13). As the Court explained in the Order denying summary judgment to DuPont/C, this is an inaccurate representation of Georgia law. In nuisance cases, a plaintiff must show that the defendant had actual knowledge of a potentially dangerous situation and the ability to abate it—in other words, control it—but failed to do so within a reasonable time. *Alexander*, 306 Ga. App. at 462 (distinguishing *Citizens & Southern Trust Co v. Phillips Petroleum Co.*, 192 Ga. App. 499 (1989), where the court found a genuine issue of fact as to whether a gasoline supplier deposited gasoline into underground storage tanks with actual knowledge that the tanks were defective, resulting in ground

15

contamination); *see also Johnson v. 3M*, 563 F. Supp. 3d 1253, 1337 (N.D. Ga. 2021); *Horton v. City of Macon*, 144 Ga. App. 380, 382 (1977) ("Knowledge of a dangerous situation created by a defect and a failure to repair the defect within a reasonable time would amount to a nuisance."). The Plaintiffs have made that showing here. There is evidence that Daikin was aware that PFOA was present in its finished long-chain fluorotelomer products and that, even though it did not sell those products directly to Mount Vernon Mills, it knew by at least 2006 that Mount Vernon Mills was using the products. (Pls.' Add'l Statement of Fact ¶¶ 102, 116); (Daikin's Statement of Facts ¶ 1.27); (Thomas Poston Dep., Vol. I, [Doc. 907-1], at 65:16-71:12). There is also evidence that, in 2009, Daikin knew that PFOA had contaminated a nearby river through a similar chain of events, and Daikin had already sought to discuss environmental and safety issues with Mount Vernon Mills with regard to PFOA in 2008. (Thomas Poston Dep., Vol. II, [Doc. 907-2], at 447:18-448:21; 578:14-579:9). And there is evidence that even though Daikin's own policies required it to work with "customers and other direct product receivers" to foster proper recycling and disposal procedures and take measures to improve these practices, Daikin never actually worked with its customers to improve their wastewater practices, nor did it provide information to Mount Vernon Mills about wastewater management. (Ralph Werling Dep., Vol. I, [Doc. 941-17], at 129:16-131:5). Undoubtedly, Daikin retained the ability to stop selling these products at any time. Thus, there is a genuine dispute of material fact as to whether

Daikin knew of the potential for contamination of Mount Vernon Mills's wastewater and, as a result, contamination of Raccoon Creek, so a jury should decide this issue. *Walker*, 276 Ga. App. at 639.

Similarly, a jury could find Daikin's supply of its long-chain fluorotelomer products to third-parties to be a cause-in-fact cause of the Plaintiffs' injuries under Georgia law. Contrary to Daikin's position, the Plaintiffs are not required to definitely prove on a molecular level that PFOA from Daikin's products is responsible for the contamination of Raccoon Creek. "Rather, the plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." *Yearty*, 349 Ga. App. at 821 (citation modified). Here, the same evidence cited above creates a genuine dispute of material fact as to whether Daikin's sale of long-chain fluorotelomer products with awareness that those products were ultimately being used in some form at Mount Vernon Mills was more likely than not a cause-in-fact of the PFOA contamination of Raccoon Creek. Because this evidence does not demonstrate a "clear, plain, palpable and undisputed case" in Daikin's favor, a jury must decide the cause-in-fact issue as to Daikin's long-chain fluorotelomer products. *Walker*, 276 Ga. App. at 639. For these reasons, Daikin's Motion for Summary Judgment [Doc. 896] will be denied as to causation with regard to its long-chain fluorotelomer products.

17

### 2. Daikin's Sales of Product Directly to Mount Vernon Mills

With regard to the short-chain fluorotelomer products that Daikin sold directly to Mount Vernon Mills, Daikin again argues that it is entitled to summary judgment because the Plaintiffs have not conclusively traced the molecular structure of the PFOA found in Raccoon Creek to one of Daikin's products. (*See* Daikin's Mot. for Summ. J., at 6-7). In support of this argument, Daikin relies on products liability cases like *Thurmon v. Georgia Pacific, LLC*, 650 Fed. App'x 752, 757 (2016). But this is not a products liability case. The Plaintiffs do not contend that the Manufacturing Defendants are liable for some defect in their products, but instead that they are liable for their alleged negligence in failing to reasonably prevent the discharge of known contaminants—PFAS—into downstream water supplies, and for failing to warn of that danger. (*See, e.g.*, Parris Compl. ¶¶ 174-76, 189-92). And the Plaintiffs contend that the Defendants' failures resulted in a nuisance. (*See, e.g., id.* ¶¶ 208-12). Regardless, Daikin's reliance on these cases misconstrues the Plaintiffs' evidentiary burden. While it is true that a plaintiff "must link a particular defendant's product to his injury in order to survive a motion for summary judgment" in a product liability case, *Thurmon*, 650 Fed. App'x at 757, this is simply another way of stating the same proximate cause requirement applicable to all tort claims. *See Hoffman v. AC&S, Inc.*, 248 Ga. App. 608, 610-11 (2001) ("Unless the manufacturer's defective product can be shown to be the proximate cause of the injuries there can be no recovery."

(citation modified)).

It is well-established by now that Georgia law allows the consideration of more than one proximate cause for a tort-related injury, so long as the cause "actively aided in producing the injury." *Sprayberry Crossing P'ship*, 274 Ga. App. at 365. And the Plaintiffs only have to produce evidence showing it is "more likely than not" that Daikin's short-chain fluorotelomer products contributed to the contamination of Raccoon Creek to survive summary judgment. *Yearty*, 349 Ga. App. at 821. The causation evidence with respect to Daikin's short-chain fluorotelomer products is more favorable for Daikin. True, there is evidence that Daikin became aware that PFOA was present in its Unidyne products in 2003, long before it began selling them to Mount Vernon Mills. (Don Harris Dep., [Doc. 907-3], at144:5-145:2). There is also evidence that even though Daikin had detected PFOA in these products below its self-set reporting limit, it did not inform Mount Vernon Mills of this fact. (Pls.' Add'l Statement of Facts ¶ 295); (Daikin's Response to Pls.' Add'l Statement of Facts ¶ 295); (Ronald Beegle Dep., [Doc. 958-12], at 74:8-75:2). And even though Daikin sought to address environmental and safety issues with Mount Vernon Mills with regard to these products in 2008, Daikin never discussed proper waste disposal procedures with Mount Vernon Mills. [Doc. 942-21]; (Ronald Beegle 30(b)(6) Dep., Vol. II, [Doc. 929-7], at 341:15-18). Daikin is correct, however, that the Plaintiffs have not established cause-in-fact with regard to its short-chain fluorotelomer products. But Daikin's arguments with regard to

19

the "negligible" contribution it alleges its short-chain fluorotelomer products had on the overall PFOA contamination of Raccoon Creek leave out important context from Alan Levine's expert report. Levine did not simply opine that the total amount of PFOA in Raccoon Creek attributable to Daikin was "negligible" or "de minimis" but qualified that the quantity was negligible compared to "the total amount of PFAS alleged to be in the watershed." (Alan Levine Expert Report, [Doc. 897-2], at 22); (Charles Andrews Rebuttal Report, [Doc. 896-25], at 33). While the Plaintiffs argue that the quantity of PFOA necessary to exceed the EPA's strict drinking water limits is "quite small," to establish cause-in-fact, that quantity must still be large enough that a jury could conclude that it is more likely than not that, but for the PFOA attributable to Daikin's short-chain fluorotelomer products, the Plaintiffs' water supply would not have been contaminated. See Yearty, 349 Ga. App. at 821. Here, the Plaintiffs have not rebutted Dr. Charles Andrews' analysis that Daikin's short-chain fluorotelomer products could represent at most .0002% of the PFOA in the sludge that Trion applied to the farmland and that Daikin's actual contribution would be lower. (Charles Andrews Rebuttal Report, [Doc. 896-25], at 22). The Court is left with the Plaintiffs' reliance on expert Maureen Reitman's vague assertions that "it really only takes a very small amount to enter a large amount of water" to achieve detectable PFOA contamination. (Pls.' Resp. to Daikin's Mot. for Summ. J., at 22). But in the face of Dr. Andrews' data-supported opinion that there is no evidence that Daikin's short-chain

20

fluorotelomer products could have contributed PFOA to the Raccoon Creek watershed, the Court cannot take the Plaintiffs' word that the possibility of causation exists. *See Alexander*, 306 Ga. App. at 462 ("A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to grant summary judgment for the defendant." (citation modified)). The Court will thus grant summary judgment in Daikin's favor as to causation with regard to Daikin's short-chain fluorotelomer products that it sold directly to Mount Vernon Mills.

## B. Nuisance, Abatement, and GWQCA Claims

Daikin next argues that the Plaintiffs cannot establish the elements of their nuisance, abatement, and Georgia Water Quality Control Act claims. The Court will address these arguments in turn. Causation is an essential element of these claims, *see Alexander*, 306 Ga. App. at 462, so these claims fail with regard to Daikin's short-chain fluorotelomer products. The Court thus addresses these arguments only with regard to Daikin's long-chain fluorotelomer products.

### 1. Nuisance

Daikin argues that it cannot be held liable for nuisance under Georgia law because it never controlled any land from which PFAS emanated or any operations related to discharges of the PFAS-laden waste at issue. (Daikin's Mot. for Summ. J., at 44-45). In response, the Plaintiffs contend that Georgia

law only requires a defendant to have knowledge of and a right to abate the cause of the nuisance, and that Daikin did so here. (Pls.' Resp. to Daikin's Mot. for Summ. J., at 60-66).

Under Georgia law, a nuisance is anything that "causes hurt, inconvenience, or damage to . . . . an ordinary, reasonable man." O.C.G.A. § 41-1-1. A public nuisance is "one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals." *Id.* § 41-1-2. Under Georgia law, "[t]he essential element of nuisance is control over the cause of the harm. The tortfeasor must be either the cause or a concurrent cause of the creation, continuance, or maintenance of the nuisance." *Grinold v. Farist*, 284 Ga. App. 120, 122 (2007) (citation modified). Thus, where a defendant has knowledge of and a right to abate a dangerous situation, but fails to do so within a reasonable time, its actions or omissions may constitute a nuisance. *Johnson*, 563 F. Supp. 3d at 1337; *Horton*, 144 Ga. App. at 382. Moreover, "[l]iability may flow where the defendant is the cause/concurrent cause of the creation *or* maintenance of a nuisance, even if there are subsequent actions involved." *Johnson*, 563 F. Supp. 3d at 1338. "Under Georgia law, the discharge or release of harmful pollutants or substances may constitute a nuisance." *Id.* at 1337 (collecting cases).

Daikin misconstrues the holdings of the two cases it relies on to support its position. In *Terry v. Catherall*, 337 Ga. App. 902 (2016), the Georgia Court of Appeals restated the well-worn principle that "ownership of land by the

22

tortfeasor is not an element [of a nuisance claim], but control is; the essential element of nuisance is *control over the cause of the harm*." *Terry*, 337 Ga. App. at 905 (emphasis added). Daikin's assertion that *Terry* held that a tortfeasor must control the land itself in order for a plaintiff to prevail on a nuisance claim is thus disingenuous at best. Likewise, the Georgia Supreme Court did not broadly hold that control of property was a requirement for a nuisance claim in *Gatto v. City of Statesboro*, 312 Ga. 164 (2021). Instead, the court held that case law supported certain parameters around a municipality's liability for nuisance which are "grounded in [the municipality's] exercise of some degree of dominion or control over the property giving rise to the alleged nuisance." *Gatto*, 312 Ga. at 171. The court explained that these parameters exist in part because claims for nuisance against municipalities are considered takings claims. *See id.* at 168. It is apparent that there is no municipality-defendant in the present action and therefore no takings clause concerns. So, Daikin's reliance on *Gatto* is misplaced.

Instead, as noted previously, Georgia law requires only that the "tortfeasor . . . be either the cause or a concurrent cause of the creation, continuance, or maintenance of the nuisance." *Grinold*, 284 Ga. App. at 122. There is ample evidence here that Daikin contributed to the cause and continuance of the PFOA contamination of Raccoon Creek through its sales of long-chain fluorotelomer products to third-parties, with knowledge that those products contained PFOA and were being relabeled or reformulated and sold

to Mount Vernon Mills. (Pls.' Add'l Statement of Fact ¶¶ 102, 116); (Daikin's Statement of Facts ¶ 1.27); (Thomas Poston Dep., Vol. I, [Doc. 907-1], at 65:16-71:12). Daikin also knew of the potential for surface water contamination as a result of improper discharge, and even though its own policies encouraged termination of sales if a customer was not properly disposing of its waste, Daikin did not stop selling its long-chain fluorotelomer products to its third-party customers or discuss disposal practices with Mount Vernon Mills. (Thomas Poston Dep., Vol. II, [Doc. 907-2], at 447:18-448:21; 578:14-579:9); (Ralph Werling Dep., Vol. I, [Doc. 941-17], at 129:16-131:5). This evidence creates a genuine dispute of material fact as to whether Daikin had such control and knowledge of the potential for contamination of Raccoon Creek that it can be liable for nuisance. *Johnson*, 563 F. Supp. 3d at 1337 ("Where the element of control is met, knowledge of a dangerous situation and a failure to remedy that situation within a reasonable time can result in a legal nuisance."); *Horton*, 144 Ga. App. at 382.

Finally, the fact that Daikin eventually stopped selling the long-chain fluorotelomer products at issue does not absolve it of nuisance liability. The Georgia Court of Appeals addressed a version of this argument in *Hoffman v. Atlanta Gas Light Co.*, 206 Ga. App. 727 (1992). There, a pipeline company argued that it was not responsible for continuing ground contamination that occurred due to leaks in its pipeline because it had since transferred ownership of the pipeline to another company. *Hoffman*, 206 Ga. App. at 729. The Georgia

24

Court of Appeals disagreed, explaining that the original owner could be liable because the contamination constituted a continuing nuisance, so the appellants' damages were not limited to the initial leaks that caused the contamination to begin. *Id.* at 730 ("The damages growing out of the nuisance are the continuing hurt, inconvenience, or damage caused by the hydrocarbon contamination, for which OCGA § 41-1-1 gives a cause of action, and which were not assuaged by [the defendant's] sale of the pipeline to another." (citations modified)). So too, here. The fact that Daikin no longer sells these long-chain fluorotelomer products has no bearing on whether it controlled the creation or continuance of the contamination of the Raccoon Creek watershed, because this type of contamination is considered a continuing nuisance under Georgia law. *See id.* ("Every continuance of a nuisance which is not permanent, and which could and should be abated, is a fresh nuisance for which a new action will lie. Consequently, a suit may be maintained for damages growing out of a nuisance of [this character]." (citation modified)). Regardless, "[l]iability may flow where the defendant is the cause/concurrent cause of the creation *or* maintenance of a nuisance, even if there are subsequent actions involved." *Johnson*, 563 F. Supp. 3d at 1338. For all of these reasons, Daikin is not entitled to summary judgment on the Plaintiffs' nuisance claims with regard to its long-chain fluorotelomer products.

25

### 2. Abatement

Daikin argues that it has already abated any nuisance it may be liable for by stopping all sales to Mount Vernon Mills, contending that there is nothing else it can do. (Daikin's Mot. for Summ. J., at 46). The Plaintiffs contend that the relevant question under Georgia law is not whether Daikin currently has a right to abate the contamination, but whether it had that right during the timeframe that the Plaintiffs allege Daikin was creating or maintaining the nuisance. (Pls.' Resp. to Daikin's Mot. for Summ. J., at 64-65). Again, the Court agrees with the Plaintiffs—the fact that Daikin no longer sells the products at issue does not absolve it of liability. *See* Section III. B. 1., *supra*.

Further, Daikin's argument misconstrues the actual nuisance at issue in this case. The nuisance is not Dakin's sales per se of long-chain fluorotelomer products, but the resulting contamination. (*See, e.g.*, Parris Compl. ¶ 209); *see also Hoffman*, 206 Ga. App. at 729-30 ("The old holes in this pipeline are not the nuisance; the nuisance is the continuing exudation and leaching of chemicals into the ground from the contaminants deposited long ago through the leaks."). Though Daikin has arguably abated one cause of the nuisance by discontinuing its sales, it has done nothing to abate the nuisance itself—i.e., to remedy the contamination. Contrary to Daikin's reliance on this Court's Order ruling on the Motions to Dismiss, the Court did not hold that the only way Daikin could abate the nuisance was to stop selling the products at issue. Instead, in response to the Manufacturing Defendants' arguments that

they lacked control over the *cause* of the nuisance, the Court explained that one way the Manufacturing Defendants could take "appropriate remedial steps" would be "refus[ing] to sell PFAS except to customers that have established and complied with proper disposal methods." (MTD Order, [Doc. 136], at 86-87). But the Plaintiffs also seek abatement in the form of remedying the actual contamination, either by funding the necessary remedial measures or otherwise, and Daikin has not made any argument against this remedy. Accordingly, the Court will deny Daikin's Motion for Summary Judgment as to the abatement claims.

### 3. Georgia Water Quality Control Act

Daikin next argues that Summerville's claim under the GWQCA (Count Nine) is precluded because it lacked control over the actual discharge of PFAS into Raccoon Creek. (Daikin's Mot. for Summ. J., at 18-19). It asserts that the language of the statute has not been extended to supplier defendants but, even if it were, Daikin is still not liable because Mount Vernon Mills's discharges were to Trion WWTP rather than directly into "waters of the state". (*Id.*). Summerville argues that Daikin's reading of the statute is belied by the case law and the language of the statute itself and that the evidence supports sufficient causation as to Daikin. (Pls.' Resp. to Daikin's Mot. for Summ. J., at 66-69).

Georgia law provides that "[i]t shall be unlawful to use any waters of the state for the disposal of sewage, industrial wastes, or other wastes, or to

withdraw, divert, or impound any surface waters of the state, except in such a manner as to conform to and comply with this article and all rules, regulations, orders, and permits established under this article and applicable to the waters involved." O.C.G.A. § 12-5-29. To effectuate this policy, "[a]ny person who intentionally or negligently causes or permits any sewage, industrial wastes, or other wastes, oil, scum, floating debris, or other substance or substances to be spilled, discharged, or deposited in the waters of the state, resulting in a condition of pollution as defined by this article, shall be liable in damages to the state." O.C.G.A. § 12-5-51(a).

Mount Vernon Mills made a similar argument in its Motion to Dismiss, which the Court rejected. There, the Court held that it did not read O.C.G.A. § 12-5-29(a) and, specifically the inclusion of the term "use", so narrowly that it would only cover direct discharges into state waters. (MTD Order, [Doc. 136], at 67). Nor was the Court convinced that Mount Vernon Mills had not controlled or caused the disposal of PFAS-contaminated sludge into state waters solely because it released its wastewater into Trion WWTP and wiped its hands clean of it from there, because Mount Vernon Mills had "knowledge of and the right to abate the causes of PFAS pollution in Raccoon Creek." (*Id.* at 67). The same holds true here with regard to Daikin. The fact that, as explained previously, Daikin arguably had knowledge of and a right to abate its contributions to the PFOA contamination of Raccoon Creek creates a genuine dispute of material fact as to whether it "caused" such discharge

28

within the meaning of the statute. *See* O.C.G.A. § 12-5-51(a).

Nor is the fact that Daikin itself did not discharge PFOA directly into Raccoon Creek dispositive at this stage as a matter of law. Nothing in the text of the statute limits liability only to direct discharges of industrial waste into state waters. *See Deal v. Coleman*, 294 Ga. 170, 172-73 (2013) (noting that in interpreting statutes, the court must presume that that "the General Assembly meant what it said and said what it meant" and that, if the statutory text is clear and unambiguous, the statute is given its "plain meaning, and [the] search for statutory meaning is at an end."). Here, there is no dispute that the waste at issue ultimately led to the contamination of Raccoon Creek. Accordingly, because Daikin has not carried its burden on this issue of showing it is entitled to summary judgment as a matter of law, the Court will deny Daikin's Motion for Summary Judgment as to Summerville's GWQCA claim (Count Nine of Summerville's Complaint). *See* Fed. R. Civ. P. 56(a), (c); *Celotex Corp.*, 477 U.S. at 323-24.

### C. Negligence Claims[12]

With regard to the Plaintiffs' negligence claims, Daikin argues that it owed no duty to the Plaintiffs under Section 389 of the Second Restatement of Torts because the only expected use of its products by Mount Vernon Mills was

---

[12] Because the Court has already held that the Plaintiffs have not established causation as to Daikin's short-chain fluorotelomer products, the Court need not address Daikin's negligence arguments as to those products.

their application to textiles and not their disposal via wastewater. (Daikin's Mot. for Summ. J., at 50-51). Daikin contends that there is no evidence that its products were unsafe for that particular use and that the Plaintiffs' harms were caused by Mount Vernon Mills's and Trion's improper disposal after Mount Vernon Mills's expected use. (*Id.* ¶¶ 51-52).

The Plaintiffs respond that the Court already addressed this argument at the Motion to Dismiss stage and noted that "Raccoon Creek was not contaminated due to Mount Vernon's or any other Defendant's intentional misuse of PFAS but as a predictable consequence of the chemicals' normal use." (Pls.' Resp. to Daikin's Mot. for Summ. J., at 36-37 (citing MTD Order at 58-59). They assert that none of the cases on which Daikin relies require the injury to result from the plaintiff's immediate use of a product as a condition of imposing a duty and rely on *Henry v. St. Croix Alumina, LLC*, 2007 WL 6030275 (D.V.I. Aug. 10, 2007) in support. (*Id.* at 37 & n. 10).

The elements of negligence are (1) "the existence of a duty on the part of the defendant," (2) "a breach of that duty," (3) "causation of the alleged injury," and (4) "damages resulting from the alleged breach of the duty." *Rasnick v. Krishna Hosp., Inc.*, 289 Ga. 565, 566 (2011). "Before negligence can be predicated upon a given act, some duty to the individual complaining must be sought and found, the observance of which duty would have averted or avoided the injury or damage." *CSX Transp. Inc. v. Williams*, 278 Ga. 888, 889 (2005) (citation modified); *see also Department of Lab. v. McConnell*, 305 Ga.

30

812, 815 (2019) ("Negligence is premised on, among other things, a duty owed by the defendant to the plaintiff."). "The legal duty is the obligation to conform to a standard of conduct under the law for the protection of others against unreasonable risks of harm." *Rasnick*, 289 Ga. at 566. Such a duty can arise from either a legislative enactment or a common law principle recognized in the case law. *Id.* at 566-67. Whether either of these sources imposed a legal duty on Daikin under the circumstances is a question of law reserved to the Court. *Id.* at 567.

> Section 389 of the Second Restatement of Torts provides:
>
> One who supplies directly or through a third person a chattel for another's use, knowing or having reason to know that the chattel is unlikely to be made reasonably safe before being put to a use which the supplier should expect it to be put, is subject to liability for physical harm caused by such use to those whom the supplier should expect to use the chattel or to be endangered by its probable use, and who are ignorant of the dangerous character of the chattel or whose knowledge thereof does not make them contributorily negligent, although the supplier has informed the other for whose use the chattel is supplied of its dangerous character.

Restatement (Second) of Torts § 389 (Am. L. Inst. 1965). The term "physical harm" in this context refers to impairment of the human body as well as land and chattels. *Johnson v. Ford Motor Co.*, 281 Ga. App. 166, 173 (2006) ("[T]he Restatement (Second) of Torts clearly provides that physical harm can be damage to property."), *overruled on other grounds by Campbell v. Altec Indus., Inc.*, 288 Ga. 535 (2011). The Georgia Court of Appeals originally adopted section 389, then part of the First Restatement of Torts, in *Moody v. Martin*

31

*Motor Co.*, 76 Ga. App. 456, 461 (1948).

The Court finds that Daikin's narrow reading of Section 389 falls flat. As the Court previously found, the Manufacturing Defendants—as product suppliers—had a duty to protect third parties, like the Plaintiffs, from reasonably foreseeable harm arising from the normal, intended use of their products in textile mills like Mount Vernon Mills. In the Motion to Dismiss order, the Court concluded that Parris had identified a specific, legal duty applicable to the Manufacturing Defendants with regard to the negligence claim, holding that "a duty arose where the Manufacturing Defendants continuously supplied PFAS to Mount Vernon with knowledge that the chemicals were unlikely to be made reasonably safe in their regular use and could foreseeably contaminate surface waters and downstream water supplies." (MTD Order, at 57). The Court made this determination based on allegations in the Complaint that the Manufacturing Defendants had known of the toxicity and bioaccumulative nature of PFAS, had been aware that conventional wastewater treatment processes were ineffective at removing PFAS and, despite such knowledge, continued to supply PFAS to Mount Vernon Mills without taking precautions to prevent PFAS from contaminating local municipal water supplies. (*Id.* at 57-58). Daikin has not given the Court any reason to depart from this holding now, especially in light of evidence indicating that (1) Daikin's intermediate customers relied on information Daikin supplied to assess the risk of its products; (2) Daikin did not tell its

primary intermediary—Pulcra—that its products degraded to PFOA and instead told them that they had safe PFOA levels; (3) despite receiving warnings from its parent company that a primary ingredient in its Unidyne products should not be disposed of in sewers or waterways, it did not provide those warnings on the MSDSs it produced for the products sold to Mount Vernon Mills and other customers; (4) by at least 2006, Daikin knew that Mount Vernon Mills was using its long-chain fluorotelomer chemistries; and (5) even though Daikin's policies required it to work with its customers to ensure proper disposal, it never discussed proper disposal practices with Mount Vernon Mills. (Pls.' Add'l Statement of Facts ¶¶ 100, 102, 276); (George Hudson Dep., [Doc. 942-10], at 170:18-171:12; 184:3-185:1, 232:10-233:21); (Ralph Werling Dep., [Doc. 941-17], at 127:25-131:5, 163:11-173:21); (Thomas Poston Dep., Vol. I, [Doc. 907-1], at 330:24-331:3). This evidence creates a genuine dispute of material fact under Section 389 as to whether Daikin knew or had reason to know that its products were unlikely to be made reasonably safe before being applied to fabrics in textile mills like Mount Vernon Mills, in terms of their PFOA content, whether it knew or had reason to know that such anticipated use would result in PFOA-containing waste of some sort, and whether Mount Vernon Mills was ignorant of the dangers associated with discharging the waste to Trion WWTP as a result of Daikin's alleged failures. *See* Restatement (Second) of Torts § 389 (Am. L. Inst. 1965).

33

None of the cases Daikin relies on change the Court's conclusion on this issue. As the Plaintiffs point out, none of these cases forbid a finding of duty where the harm results from a foreseeable consequence of the expected use versus from the expected use itself; they are instead just factually distinguishable from the case at hand. This case is more like *Henry*, which was an environmental pollution case.[13] There, individuals who lived and worked downwind of an aluminum refinery sued the company, Glencore, that supplied bauxite to the refinery. Red bauxite mud is produced as a by-product of the refining process, and the plaintiffs complained that this mud blew into their neighborhoods during a hurricane due to improper storage. *Id.* at *1. The court declined to grant summary judgment to Glencore on whether it owed a legal duty under Section 389 as a bauxite supplier. *Id.* at *14-15. The court found "sufficient evidence for a jury to conclude that Glencore knew or had reason to know that the bauxite was unlikely to be made unreasonably [sic] safe before being put to its expected use." *Id.* at *15. Glencore's designated representative had visited the refinery multiple times each year and seen the open-air storage of red mud firsthand. Further, Glencore knew that the refinery was in a

---

[13] As the Court noted in its 2022 Motion to Dismiss Order, and is still true today, no Georgia court has ever applied Section 389 to an environmental pollution case. Thus, the Court must do its best to predict how a Georgia court would decide this issue. *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2005) ("Where the highest court . . . has spoken on the topic, [the district court] follow[s] its rule. Where that court has not spoken, however, [the district court] must predict how the highest court would decide this case.").

hurricane zone, and that there was a possibility for mud to be blown into nearby neighborhoods. On these facts, the court determined that Glencore could be held liable under Section 389 for continuing to sell bauxite to the refinery. *Id.*

So too, here. Based on the aforementioned evidence, a jury could find that Daikin knew or had reason to know that its long-chain fluorotelomer products and the PFOA they contained were unlikely to be made reasonably safe before being applied to textiles, that this normal use would result in discharge of some waste containing PFOA, and that such discharge was a foreseeable consequence of the normal, expected use of the products. *See id.* at *15. On the other hand, *Ogletree v. Navistar Intern. Transp. Corp.*, 194 Ga. App. 41 (1989), one of the cases on which Daikin relies, was a standard products liability case involving the absence of a backup alarm on a truck. The standards for duty applicable to products liability cases differ markedly from those applicable in the present case. *See Ogletree*, 194 Ga. App. at 47-48. Thus, *Ogletree* is not persuasive to the Court. *Molinos Valle Del Cibao, C. por A.*, 633 F.3d at 1348. In any event, it cuts against Daikin's position because the Georgia Court of Appeals noted there that the fact it was "open and obvious" that the truck at issue did not have a backup alarm did not foreclose the manufacturer's liability, "since the alarm was not made for the safety of the purchaser or user but for third parties [bystanders standing behind the truck] who may only learn of the absence only after not being warned." In a similar

35

vein, Daikin's duty to prevent the discharge of PFOA-containing waste as a result of foreseeable disposal practices was not for the safety of its actual customers but for third-parties harmed by their failure, like the Plaintiffs. For all of these reasons, Daikin is not entitled to summary judgment on the Plaintiffs' negligence claims because the evidence creates a genuine dispute of material fact as to whether it had a duty under Section 389 based on the facts presented.

Additionally, like Dupont/C, Daikin argues that it owed no duty to warn its customers, the third-party companies who sold its reformulated or relabeled products to Mount Vernon Mills, about any risks associated with its long-chain fluorotelomer products because these companies were "highly sophisticated entities with their own chemists" who have known about the risks of PFAS for a long time. (Daikin's Mot. for Summ. J., at 48 n. 26). It also argues that it had no duty to warn Mount Vernon Mills of the risks of PFAS because it "knew plenty" about these risks, arguing that Mount Vernon Mills "knew perfectly well that PFOA might pose such alleged risks." (*Id.* at 48-49). Poignantly, Daikin contends, Mount Vernon Mills knew that PFOA was present in its wastewater and that conventional wastewater treatment processes were not capable of removing them, and Mount Vernon Mills would not have changed its disposal practices even if it had been warned. (*Id.* at 49-50). The Plaintiffs respond that Daikin's position is not supported by Georgia law. (Pls.' Resp. in Opp'n, at 48-52). They also contend that Daikin cannot shirk its duty where it

36

mislead its customers about the safety of its chemicals. (*Id.* at 51-53). Finally, the Plaintiffs argue that how much knowledge Mount Vernon Mills actually had is a highly disputed question of fact not suited for summary judgment. (*Id.* at 53).

For negligent failure to warn, a plaintiff must establish that "(1) the manufacturer knew or reasonably should have known of a danger arising from use of the product and therefore had a duty to warn; (2) the manufacturer breached the duty; and (3) the breach was the proximate cause of the plaintiff's injury." *Johnson v. Shaner SPA Assocs.*, 2011 WL 13323678, at *2 (N.D. Ga. May 19, 2011); *see also Davis v. John Crane, Inc.*, 353 Ga. App. 243, 251 (2019). "The duty to warn may be owed to consumers, reasonably foreseeable users, and[] purchasers of the product. This duty has been extended, in some cases, to reasonably foreseeable third parties." *Certainteed Corp. v. Fletcher*, 300 Ga. 327, 330 (2016) (citations modified). "In determining whether such a duty exists, the court should consider the foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger. Such matters generally are not susceptible of summary adjudication and should be resolved by a trial in the ordinary manner." *Williams v. Taser Int'l, Inc.*, 2006 WL 8433374, at *6 (N.D. Ga. Oct. 10, 2006) (citations modified). Under Georgia law, "the warning need not necessarily be given to the person actually injured in order for the

manufacturer to escape liability"; rather, it may be given to "a person in a position such that he may reasonably be expected to act so as to prevent the danger from manifesting itself." *Stovall & Co. v. Tate*, 124 Ga. App. 605, 613 (1971) (citation modified).

In *Carter v. E.I. DuPont de Nemours & Co., Inc.*, 217 Ga. App. 139, (1995), Dupont made a similar argument as Daikin does here. Dupont argued that it sold its "Tyvek" product in bulk only to intermediaries and, thus, any duty to warn about Tyvek's flammability risks was owed by the manufacturer of the Tyvek coveralls the plaintiffs had worn when they sustained severe burns. *Carter*, 217 Ga. App. at 140. The Georgia Court of Appeals applied § 389 of the Second Restatement and concluded that DuPont could not avoid liability on learned intermediary grounds because the flammability of the product "remain[ed] unchanged after being converted" into coveralls, and Dupont had actively promoted Tyvek as a "protective material" for workplaces. *Id.* at 141. Thus, the court held that Dupont could still be liable to the plaintiffs, as the ultimate user of the products, for failure to warn. *Id.* at 141-42 ("In no case have we held that the manufacturer may *always* rely on an intermediary to pass along to the ultimate user warnings of dangers inherent in the use of a product.").

In so ruling, the Georgia Court of Appeals relied on a framework articulated by the Eleventh Circuit in *Stuckey v. Northern Propane Gas Co.*, 874 F.2d 1563 (11th Cir. 1989) to apply the learned intermediary doctrine—

the theory that a manufacturer or supplier discharges its duty to warn by supplying its product to an intermediary familiar with the potential hazards. In *Stuckey*, the Eleventh Circuit relied on Comment n to § 388 of the Second Restatement, which "addresses when a supplier's duty to warn an ultimate consumer can be discharged by a warning given to an intermediary party." *Stuckey*, 874 F.2d at 1568. The court determined that Comment n's analysis of a supplier's duty to warn a consumer did not turn on whether a warning was actually given to the intermediary, but instead whether the intermediary's knowledge was sufficient to ultimately protect the consumer. *Id.* In so holding, the court noted that

> Comment n provides a test that balances several factors: the burden of requiring a warning; the likelihood that the intermediary will provide a warning; the likely efficacy of such a warning; the degree of danger posed by the absence of such a warning; and the nature of the potential harm.

*Id.* (citation modified). As such, the court held, the intermediary's actual knowledge of a dangerous condition with the product was a "condition precedent" to the application of these factors. *Id.* at 1569.

Here too, the Court finds that Daikin is not entitled to summary judgment. The evidence reflects Daikin's knowledge that that its long-chain fluorotelomer products contained PFOA, which was toxic to humans and bioaccumulative, and that PFOA-containing products should thus not be disposed of in sewage or wastewater. (Ralph Werling Dep., [Doc. 941-17], at 163:11-173:21). This knowledge is further demonstrated by Daikin's own

39

policies requiring it to work with its customers to ensure proper disposal practices and terminate sales if proper practices were not in place. (Pls.' Add'l Statement of Facts ¶ 280); (Ralph Werling Dep., Vol. I, [Doc. 941-17], at 127:25-130:1). Daikin also knew that Mount Vernon Mills was a user of its products, even if it did not sell its products to Mount Vernon Mills directly. (Pls.' Add'l Statement of Facts ¶¶ 97-98, 102); (Daikin's Resp. to Pls.' Statement of Add'l Facts ¶ 97); (Erica DiFilippo Expert Report, [Doc. 1008-4], at 10); (George Hudson Dep., [Doc. 942-10], at 74:5-82:22); ); (Thomas Poston Dep., Vol. I, [Doc. 907-1], at 65:16-71:12). But despite this knowledge, Daikin did not discuss proper disposal practices with Mount Vernon Mills and never warned Mount Vernon Mills of the risks of disposing of its waste through discharged wastewater. (Ralph Werling Dep., Vol. I, [Doc. 941-17], at 130:2-131:5); (Ronald Beegle 30(b)(6) Dep., Vol. II, [Doc. 929-7], at 341:15-18). This evidence supports the conclusion that the risk of pollution of the Raccoon Creek watershed as a result of Mount Vernon Mills's intended use and discharge of Daikin's long-chain fluorotelomer products was foreseeable to Daikin such that it owed a duty to warn Mount Vernon Mills under Georgia law. *Certainteed Corp.*, 300 Ga. at 330 (noting that the determination of the existence of a duty to warn is a legal question).

But Daikin argues that it discharged any duty it had because Mount Vernon Mills and its intermediate customers were "sophisticated users;" in other words, learned intermediaries, with regard to its long-chain

fluorotelomer products. While it is true that Daikin could be discharged of its duty to warn Mount Vernon Mills if Mount Vernon Mills or the intermediate customers' knowledge of the harms of improperly disposing of PFOA-laden wastewater was sufficient to ultimately protect the Plaintiffs, viewing the evidence in the Plaintiffs' favor, there is a genuine dispute of material fact that precludes summary judgment as to this issue, too. First, applying *Stuckey*, it is unclear whether Mount Vernon Mills knew that Daikin's long-chain fluorotelomer products contained levels of PFOA that could cause significant contamination of downstream water supplies. The evidence Daikin points to relates to its short-chain fluorotelomer products, not its long-chain ones. (*See* Daikin Mot. for Summ. J., at 49-50). And although it points to evidence showing that Mount Vernon Mills was aware of the toxicity of PFOA generally, it does not point to any evidence showing that Mount Vernon Mills knew specifically that Daikin's long-chain fluorotelomer products contained potentially hazardous levels of PFOA or that it knew of the risks of disposing of its waste through discharge to the Trion WWTP. In fact, some of Daikin's cites to Ronald Beegle's 30(b)(6) deposition testimony do not state what Daikin says they do. (*See id.* at 49 & n. 30-31).[14] On the other hand, there is evidence

---

[14] For example, Beegle does not state that Mount Vernon Mills knew PFOA was in the wastewater or that conventional treatment processes would not remove PFOA. All he states is that the long-chain fluorotelomer products Mount Vernon Mills used were PFOA-based and that any wastewater Mount Vernon Mills had went to the Trion WWTP. (Ronald Beegle 30(b)(6) Dep., Vol. I, [Doc. 940-11], at 81:6-23). And Zavaglia only stated that it "assumed" some

that Daikin did not tell Pulcra, its primary intermediate formulator, that its long-chain fluorotelomer products contained ingredients that would degrade into PFOA and instead told Pulcra that the products did not contain "added PFOA" and had safe PFOA levels. (Pls.' Add'l Statement of Facts ¶ 276); (George Hudson Dep., [Doc. 942-10], at 232:10-233:21]. This undercuts Daikin's argument that its intermediate customers knew about the risks of PFAS—their general knowledge is irrelevant if they were misled into believing the products they purchased either did not contain PFOA or contained insignificant levels, as the evidence suggests. Daikin also provided its customers MSDSs, but those MSDSs did not contain warnings about the risks of improper disposal resulting in water contamination. (Ralph Werling Dep., [Doc. 941-17], at 163:11-173:21). And Pulcra relied on the information that Daikin supplied to assess the risks of Daikin's products in formulating its own. (Pls.' Add'l Statement of Facts ¶ 276)[15]; (George Hudson Dep., [Doc. 942-10], at 170:18-171:12; 184:3-185:1]. All of this evidence is sufficient to create a genuine dispute of material fact as to whether Mount Vernon Mills or the intermediate customers had actual knowledge that using these products would

---

fluorochemicals might be in the sludge, but that it "didn't ever seem to come up at least in our discussions [with Daikin] that this could be a problem until they decided to get out [of selling it]." (Excerpts of Mike Zavaglia 30(b)(6) Dep., [Doc. 896-37], at 224:3-23). This evidence is more harmful than helpful to Daikin's position.

[15] The Court notes that Daikin's response to this statement of fact is largely non-responsive to the actual statement the Plaintiffs make about what it did or did not tell Pulcra.

result in PFOA-contaminated waste and the risks of improperly disposing of the waste, which is a condition precedent to the application of the *Stuckey* factors. *Stuckey*, 874 F.2d at 1569. In turn, assuming these third-parties had such knowledge with regard to Daikin's fluorotelomer products, there is a genuine dispute of material fact as to whether this knowledge would have been sufficient to protect the Plaintiffs. *Id.* As a result, a jury should resolve this issue, and the Court will deny Daikin's Motion for Summary Judgment as to the negligent failure to warn claims. *Williams*, 2006 WL 8433374, at *6.

### D. Joint and Several Liability

Lastly, Daikin argues that even if Daikin could be liable for any of the Plaintiffs' claims, the Court should find that any potential liability should be apportioned by the jury because Georgia has largely abolished joint and several liability in suits against multiple tortfeasors. (Daikin's Mot. for Summ. J., at 24-25). The Plaintiffs note that joint and several liability is still appropriate where codefendants engaged in concerted action or a civil conspiracy and that, under Georgia law, this is an issue for a jury to decide. (Pls.' Resp. to Mot. for Summ. J., at 74-75). The Court finds this apportionment of liability issue to be premature and, regardless, agrees with the Plaintiffs that it is not an issue amenable to summary judgment. If at trial, a jury finds Daikin not liable on all counts, there will be no need to address the apportionment issue. But for now, the Court denies Daikin summary judgment on the Plaintiffs' request for joint and several liability because "whether alleged concerted action is actually

43

present in a particular case . . . present[s] a fact-intensive question for a properly instructed jury." *Alston & Bird, LLP v. Hatcher Mgmt. Holdings,* LLC, 312 Ga. 350, 361 (2021).

### IV. Conclusion[16]

For the foregoing reasons, the Defendant Daikin America, Inc.'s Motion for Summary Judgment [Doc. 896] is GRANTED in part and DENIED in part.

SO ORDERED, this ___10th___ day of July, 2026.

THOMAS W. THRASH, JR.
United States District Judge

---

[16] Because Daikin's only challenge to the Plaintiffs claims for punitive damages and attorney's fees was based on it being granted summary judgment on the substantive claims, these claims also survive summary judgment. (*See* Daikin's Mot. for Summ J., at 53 n.38).